Robert T. DeMarco
Michael S. Mitchell
12770 Coit Road, Suite 850
Dallas, TX 75251
**T** 972-991-5591
**F** 972-346-6791

## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| IN RE: | Case No.: **23-11007-cgb** |
| **ArtiusID, Inc.,** | Chapter: **7** |
| Alleged Debtor. | |

### DECLARATION OF MICHAEL MARCOTTE

**I, Michael Marcotte,** hereby state that I am over eighteen (18) years of age, of sound mind, qualified and competent in all respects to make this Declaration, and do so of my own personal knowledge, and further state the following:

1.      I am President and Chief Executive Officer of ArtiusID, Inc., formerly known as Q5id, Inc., the Alleged Debtor in the above-styled and numbered case ("**ArtiusID**").   In this capacity, I am generally familiar with the day to day business and financial operations, and books and records of the ArtiusID.

2.      I submit this declaration ("**Declaration**") in response to the request of this Court as set forth in *Scheduling Order* entered on April 2, 2024 [Docket Entry No. 45].   Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) information supplied to me by other shareholders of ArtiusID, its management or professionals; (b) my review of relevant documents; and (c) my opinion based upon my experience and knowledge of the ArtiusID's operations and financial conditions. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

3.      On or about **May 22, 2023**, ArtiusID was sued by Xmogrify, LLC ("**Xmogrify**"), in the Supreme Court of New York, County of Westchester, case number 57870/2023 ("**Xmogrify Complaint**").  A true and correct copy of the Xmogrify Complaint is attached hereto as Exhibit "A".

4.      On or about September 8, 2023, ArtiusID filed an *Answer to Complaint and Counterclaims* in response to the Xmogrify Complaint ("**Xmogrify Counterclaim**").  A true and correct copy of the Xmogrify Counterclaim is attached hereto as Exhibit "B" and incorporated herein by this reference.

5.      I am personally familiar with the content of both the Xmogrify Complaint and the Xmogrify Counterclaim.

6.      The Xmogrify Counterclaim presents the following affirmative defenses, which affirmative defenses, I adopt and incorporate into this Declaration:

- Xmogrify failed to perform its obligations under the agreements between the parties and is therefore barred from any recovery.
- To the extent that Xmogrify claims are based on any oral agreement or oral amendment to a written agreement, such claims are barred by the Statute of Frauds.
- To the extent Xmogrify has suffered any damages for which the law would provide a remedy, which ArtiusID denies, Xmogrify is not entitled to an award of attorneys' fees.
- Xmogrify claims are barred by the principle of equitable estoppel.
- Xmogrify claims for unjust enrichment is barred as duplicative of Xmofrify's contract claim.

7.      The Xmogrify Counterclaim asserts the following counterclaims against Xmogrify, which claims I adopt and incorporate into this Declaration:

- Breach of Contract:
  - ArtiusID and Xmogrify formed an agreement through which Xmogrify would provide certain services to ArtiusID.

---

- o Xmogrify did not perform the services it had contracted to perform under the agreement.
- o ArtiusID performed by making some payments to Xmogrify under the agreement but is relieved of further obligations due to nonperformance and deficient performance.
- o As a result of this breach, ArtiusID has incurred losses by paying for services that were not performed or were not performed satisfactorily.

- Breach of Confidentiality:
  - o ArtiusID and Xmogrify formed an agreement, which provided that Xmogrify would maintain certain business and proprietary information of ArtiusID in confidence and would not disclose such information publicly.
  - o Xmogrify disclosed confidential information of ArtiusID by publicly filing the Xmogrify Complaint which contained proprietary and confidential business information relating to the business of ArtiusID, including payment records, investor information and business processes and practices.
  - o Further, on or about May 26, 2023, Xmogrify sent an email publicly disclosing confidential information and has threatened to disclose further confidential information.
  - o ArtiusID has been damaged by the public disclosure of its confidential information by Xmogrify.

8.     On or about **May 22, 2023**, ArtiusID was sued by Goldstein Consulting Services, LLC, ("**Goldstein**"), in the Supreme Court of New York, County of Bronx, case number 803962/2023 ("**Goldstein Complaint**").  A true and correct copy of the Goldstein Complaint is attached hereto as Exhibit "C".

9.     On or about September 8, 2023, ArtiusID filed an *Answer to Complaint and Counterclaims* in response to the Goldstein Complaint ("**Goldstein Counterclaim**").  A true and correct copy of the Goldstein Counterclaim is attached hereto as Exhibit "D" and incorporated herein by this reference.

10.     I am personally familiar with the content of both the Goldstein Complaint and the Goldstein Counterclaim.

---

Declaration of Michael Marcotte

11.     The Goldstein Counterclaim presents the following affirmative defenses, which

affirmative defenses, I adopt and incorporate into this Declaration:

- Goldstein failed to perform its obligations under the agreements between the parties and is therefore barred from any recovery.
- To the extent that Goldstein claims are based on any oral agreement or oral amendment to a written agreement, such claims are barred by the Statute of Frauds.
- To the extent Goldstein has suffered any damages for which the law would provide a remedy, which ArtiusID denies, Goldstein is not entitled to an award of attorneys' fees.
- Goldstein claims are barred by the principle of equitable estoppel.
- Goldstein claims for unjust enrichment is barred as duplicative of Goldstein's contract claim.

12.     The Goldstein Counterclaim asserts the following counterclaims against Goldstein,

which claims I adopt and incorporate into this Declaration:

- Breach of Contract:
  - ArtiusID and Goldstein formed an agreement through which Goldstein would provide certain services to ArtiusID.
  - Goldstein did not perform the services it had contracted to perform under the agreement.
  - ArtiusID performed by making some payments to Goldstein under the agreement but is relieved of further obligations due to nonperformance and deficient performance.
  - As a result of this breach, ArtiusID has incurred losses by paying for services that were not performed or were not performed satisfactorily.

- Breach of Confidentiality:
  - ArtiusID and Goldstein formed an agreement, which provided that Goldstein would maintain certain business and proprietary information of ArtiusID in confidence and would not disclose such information publicly.
  - Goldstein disclosed confidential information of ArtiusID by publicly filing the Goldstein Complaint which contained proprietary and confidential business information relating to the business of ArtiusID, including payment records, investor information and business processes and practices.
  - Further, on or about May 26, 2023, Goldstein sent an email publicly disclosing confidential information and has threatened to disclose

      further confidential information.

- ○ ArtiusID has been damaged by the public disclosure of its confidential information by Goldstein.

13.     On or about **May 22, 2023**, ArtiusID was sued by Rearc, LLC ("**Rearc**"), in the Supreme Court of New York, County of Westchester, case number 651278/23 ("**Rearc Complaint**").  A true and correct copy of the Rearc Complaint is attached hereto as Exhibit "E".

14.     On or about September 8, 2023, ArtiusID filed an *Answer to Complaint and Counterclaims* in response to the Rearc Complaint ("**Rearc Counterclaim**").  A true and correct copy of the Rearc Counterclaim is attached hereto as Exhibit "F" and incorporated herein by this reference.

15.     I am personally familiar with the content of both the Rearc Complaint and the Rearc Counterclaim.

16.     The Rearc Counterclaim presents the following affirmative defenses, which affirmative defenses, I adopt and incorporate into this Declaration:

- Rearc failed to perform its obligations under the agreements between the parties and is therefore barred from any recovery.
- To the extent that Rearc claims are based on any oral agreement or oral amendment to a written agreement, such claims are barred by the Statute of Frauds.
- To the extent Rearc has suffered any damages for which the law would provide a remedy, which ArtiusID denies, Rearc is not entitled to an award of attorneys' fees.
- Rearc claims are barred by the principle of equitable estoppel.
- Rearc claims for unjust enrichment is barred as duplicative of Rearc's contract claim.

17.     The Rearc Counterclaim asserts the following counterclaims against Rearc, which claims I adopt and incorporate into this Declaration:

- Breach of Contract:

---

- ArtiusID and Rearc formed an agreement through which Rearc would provide certain services to ArtiusID.
- Rearc did not perform the services it had contracted to perform under the agreement.
- ArtiusID performed by making some payments to Rearc under the agreement but is relieved of further obligations due to nonperformance and deficient performance.
- As a result of this breach, ArtiusID has incurred losses by paying for services that were not performed or were not performed satisfactorily.

- Breach of Confidentiality:
  - ArtiusID and Rearc formed an agreement, which provided that Rearc would maintain certain business and proprietary information of ArtiusID in confidence and would not disclose such information publicly.
  - Rearc disclosed confidential information of ArtiusID by publicly filing the Rearc Complaint which contained proprietary and confidential business information relating to the business of ArtiusID, including payment records, investor information and business processes and practices.
  - Further, on or about May 26, 2023, Rearc sent an email publicly disclosing confidential information and has threatened to disclose further confidential information.
  - ArtiusID has been damaged by the public disclosure of its confidential information by Rearc.

## B.  <u>Verification</u>

18.     In accordance with the provisions of 28 U.S.C § 1746, I declare under penalty of

perjury that the foregoing is true and correct.

Dated:  April 9, 2024                      */s/ Michael Marcotte*
                                          **Michael Marcotte**

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------------------------- X

Xmogrify, LLC,                               Index No. 57870/2023

               Plaintiff,

           - against -                        **COMPLAINT**

Q5id Inc.,                                   Plaintiff designates Westchester County
                                             as the place of trial.
               Defendant.

---------------------------------------------------------- X

Plaintiff Xmogrify, LLC ("Plaintiff" or "Xmogrify"), by and through its undersigned counsel, and for its Complaint against defendant Q5id Inc. ("Q5id," the "Company," or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.     Defendant Q5id is a start-up company founded in 2018 and touts itself as "THE premiere enterprise cybersecurity software company." In fact, and though Q5id has raised millions of dollars from investors, it has failed to pay Plaintiff Xmogrify (and numerous other contractors) for the developmental work to build its business. So determined were its officers to enrich themselves from investor cash that, despite promising Xmogrify (and other contractors) that they would be paid from additional financing and inducing them to work for "free," when the capital came in, the officers instead paid themselves unapproved commissions and prioritized paying themselves, and paid nothing but lip service to Xmogrify (and other contractors).

2.     Xmogrify now brings this action to address Defendant's breach of contract and other wrongful conduct, in connection with certain services Xmogrify provided to Q5id. Pursuant

1



to written agreements, Q5id promised to pay Xmogrify $255 per hour, in exchange for Xmogrify's

services, as well as any expenses, which would be invoiced bi-weekly and paid within 15 days of

receipt of the invoice. Beginning in March 2022, Xmogrify performed services in accordance with

the agreements and as directed by the Company, which services the Company accepted. The

Company initially made payments as the parties agreed; however, as time – and Xmogrify's work

– progressed, Q5id's payments toward the invoices became late, irregular, and intermittent.

3.      To excuse its breaches, the Company claimed that it had insufficient capital to pay

Xmogrify. However, in order to induce Xmogrify to continue to provide services, Q5id's

management advised that the Company was working diligently to raise capital and repeatedly and

falsely promised that it would pay all outstanding amounts due once it received a capital infusion.

In reliance upon the Company's promises, Xmogrify continued to provide services to Q5id through

early March 2023.

4.      On information and belief, the Company has received millions of dollars in funding

on multiple occasions since July 2022. However, despite due demand and though the Company

has never objected to a single invoice or the amounts due to Xmogrify, and despite repeated

promises by management that Xmogrify would be paid in full, Q5id has failed and refused to pay

Xmogrify for any of the services rendered from August 2022 through March 2023. To date, the

Company owes $287,812.89, plus interest in an amount to be determined, to Xmogrify.

5.      Xmogrify now asserts claims against Defendant for breach of contract, unjust

enrichment, and account stated.

## THE PARTIES

6.      Plaintiff Xmogrify is a New York limited liability company with its principal place

of business at 23 Arden Drive, Hartsdale, New York. It provides technology design, management,

2

and consulting services.  David Levy ("Levy") is one of two principals and is the sole individual providing services on behalf of Xmogrify.

7.      On information and belief, defendant Q5id is a corporation organized under the laws of Oregon, with its headquarters at 801 Barton Springs, Austin, Texas, and 800 Bellevue Way NE, Bellevue, Washington.  It claims it is a cybersecurity software company that sells software and services to protect against fraud, data breaches, and identity theft.

## JURISDICTION AND VENUE

8.      Jurisdiction is properly laid in this Court in that the Company is subject to personal and specific jurisdiction in New York.

9.      The Company has systematic and continuous contacts in New York as it transacts business in New York.  Specifically, it recruits and solicits numerous independent contractors (such as Xmogrify) located in New York, enters into agreements with such contractors to perform services on behalf of the Company from New York, and accepts services from such contractors which are performed fully, or in large part, in New York.

10.     The Company has engaged in and solicited business from at least three independent contractors who conduct business in and perform services from New York: (a) Xmogrify, which is located in Westchester County, New York; (b) Rearc, LLC ("Rearc"), which has an office in New York, New York; and (c) Goldstein Consulting Services, LLC ("GCS"), which is located in Bronx County, New York.

11.     The Company's communications by, among other things, telephone, text messages, and email, with the independent contractors in New York that it solicits and hires takes place in New York.

3

12.     As alleged below, the Company instructed Xmogrify to communicate on its behalf to at least one other contractor it hired, Rearc, which communications took place, in part, in New York.  In addition, Xmogrify, Rearc, and another New York-based contractor, GCS, worked closely together and communicated on an almost daily basis in connection with the services they provided to the Company, which communications took place, in part, in New York.

13.     Moreover, on information and belief, the Company's management traveled to New York in November 2022, to raise capital and solicit investments from investors in New York.

14.     Venue is properly laid in Westchester County as the acts and events giving rise to the claims set forth herein took place in substantial part in Westchester County.  As alleged below, the Company transacted business with Xmogrify in Westchester County, New York, beginning in March 2022, when it solicited Xmogrify, which is located in Westchester County, to perform services for the Company.

15.     The parties entered into a written agreement, which was negotiated and executed in Westchester County.  Xmogrify performed the services under that written agreement, in substantial part, from its office located in Westchester County.  Xmogrify sent invoices pursuant to that written agreement from Westchester County, and the Company made payments to Xmogrify in New York.

16.     The Company and its management team also had numerous communications with and made repeated promises to pay Xmogrify, in accordance with the parties' written agreement, while Xmogrify was in Westchester County.

17.     Moreover, the written agreement between the Company and Xmogrify contains a forum selection clause wherein the parties agreed to "the exclusive jurisdiction of any state or federal court located within Westchester, New York and agree that all actions or proceedings

4

relating to this Agreement shall be litigated in such courts, and waive any objection based on improper venue."

18. Xmogrify designates Westchester County as the place of trial.

19. Jurisdiction and venue are proper herein pursuant to New York Civil Rules and Practice §§ 301, 302, and 503.

**FACTUAL BACKGROUND**

*The Business of Q5id*

20. On its website, Q5id touts itself as "THE premiere enterprise cybersecurity software company." In fact, Q5id is a start-up that was founded only a few short years ago in 2018.

21. On information and belief, the Company only has a few dozen employees, and thus is deeply reliant on the services of outside, independent contractors to assist in its software, business, and technology development.

22. As of early 2022, the Company's "software" was highly ineffectual, replete with performance errors and inefficiencies, and could not be launched. Indeed, the Company had *no* marketable product, and as such, it was desperate to hire software and technology experts – like Xmogrify – to "fix" the "bugs" and build usable products.

23. At all relevant times, Q5id had nearly 60 independent contractors, including Xmogrify.

24. On information and belief, to date, Q5id has no corporate clients, and only has "potential clients" that have never provided revenue or user flow. Thus, it relies upon funding from investors to keep its business afloat.

*Q5id Enters into a Statement of Work and Master Services Agreement with Xmogrify*

5

25.     On March 11, 2022, Q5id and Xmogrify executed a Statement of Work, and the

following day, on March 12, 2022, executed a corresponding Master Services Agreement

(together, the "Agreement").

26.     Xmogrify originally agreed to provide certain services, including, *inter alia*,

assessing the Company's cloud security and providing a gap analysis and offer recommendations

for cloud security.  However, almost immediately after Xmogrify began providing services, in

March 2022, the Company's then-Chief Information Officer and Chief Technology Officer,

Rebecca Wanta ("Wanta") and Xmogrify orally agreed to modify the Agreement to change the

scope of Xmogrify's services to staffing and leading the Company's cloud infrastructure team,

working with prospective customers on integration approaches, and collaborating with the

Company on its product road mapping and architecture (the "Services").

27.     In connection with the Services, Xmogrify also assisted the Company in

onboarding Rearc, a New York-based boutique consulting firm specializing in, *inter alia*, cloud

infrastructure development, to perform other services for the Company.  Specifically, Xmogrify

was tasked with managing the Company's relationship with Rearc, including relaying Company-

related communications to Rearc's principal, Mahesh Varma ("Varma"), and all of Rearc's

contractors on the project, who reported to Xmogrify's principal, David Levy ("Levy").

28.     In addition, Xmogrify was tasked with working closely with another New York-

based contractor retained by the Company, GCS and its principal, Kevin Goldstein ("Goldstein").

29.     The Company and Xmogrify agreed that Xmogrify would be paid $255 per hour

for performing the Services, and for any expenses that Xmogrify incurred in connection with the

Services, which would be invoiced bi-weekly, with payment due within fifteen (15) days of receipt

of the invoice.

6

*Q5id Breaches the Agreement*

30.     Beginning in or about March 2022, Xmogrify began performing the Services and subsequently submitted bi-weekly invoices to the Company.

31.     Importantly, the Company never objected to a single invoice submitted by Xmogrify or any of the amounts sought therein.  In fact, for the first few months, it fully paid all invoices for the Services and expenses.

32.     However, beginning in May 2022, the Company's payment toward the invoices became intermittent, with some invoices outstanding for several weeks before they were paid.

33.     Levy, on behalf Xmogrify, demanded payment for the overdue invoices.

34.     In multiple written and oral communications beginning in mid-July 2022, the Company's then-Chief Executive Officer, Steve Larson ("Larson"), and Wanta (i) acknowledged that the invoices and the amounts sought therein were correct, (ii) the Company was in breach of the Agreement, and (iii) Xmogrify was owed payment.  However, they claimed that the Company did not have sufficient capital to continue to pay for the Services.

35.     The Company knew that Xmogrify would not continue to provide Services unless it was paid.  As such, in order to induce Xmogrify to continue to provide the Services, Larson and Wanta advised Levy that the Company was expecting financing from its ongoing capital raises and that he simply "needed more time."  Larson and Wanta then promised Levy that if Xmogrify "stuck it out," the Company would pay Xmogrify in full as soon as it received the expected capital infusion.

36.     Indeed, Larson even apologized to Levy for the Company's missed payments.  Then, in an effort to portray the Company's alleged viability and further induce Xmogrify to continue providing the Services, he offered and later provided Xmogrify with stock options.

7

37.     Xmogrify continued to provide Services to Q5id, in good faith and in accordance with the Agreement, and in reliance upon the Company's express promises.

38.     On information and belief, the Company received more than $2.5 million in funding in July 2022; however, rather than paying Xmogrify, the Company's officers, including Larson, paid themselves unapproved commissions, and prioritized paying themselves.

39.     Indeed, by August 2022, the Company only made partial payments on some invoices and failed to pay any portion of other invoices.

*Q5id Makes Repeated and Continuous Promises to Pay Xmogrify in Full*

40.     From August 2022 through March 2023, the Company continued to make numerous oral and written assurances to Levy to induce him to continue providing the Services.

41.     The Company fully recognized Xmogrify's value to its brand, as it was only through the efforts of Xmogrify (and other contractors that Xmogrify collaborated with) that the Q5id's software and other products were launched at all.

42.     As such, the Company dangled a "new carrot" in August 2022. Specifically, it made Xmogrify's principal, Levy, an offer to join as Vice President, Infrastructure Management and Production for a base salary of $350,000 and numerous other benefits (and promised that he would receive "a much larger grant," if he joined as an employee). The Company, however, reneged on the offer but – as with payment – promised to bring him on board full-time once it received funding.

43.     On September 30, 2022, during a meeting with Larson, Wanta, and Levy, Larson again acknowledged on behalf of the Company – and did not dispute – that substantial payments were owed to Xmogrify for the Services, as invoiced. He promised that payment would be made

8

in full by the end of October 2022, once the Company received its expected infusion of needed capital.

44. In early November 2022, Larson made similar promises to Levy and stated that payment in full would be made by the end of November.

45. On November 14, 2022, the Company's Executive Vice President of Business Development and Co-Founder, Dominic O'Dierno traveled to raise capital and solicit investments from investors. O'Dierno had dinner with Levy, during which he acknowledged the amounts owed to Xmogrify and promised to pay it in full upon receiving additional funding.

46. The Company did not pay Xmogrify, as promised, at the end of November 2022. As such, in December 2022, O'Dierno, Larson, and Wanta again promised to pay Xmogrify as soon as funding came in.

47. In January 4, 2023, O'Dierno again acknowledged that substantial amounts remain owing to Xmogrify, and promised that payment would be made in full.

48. On January 23, 2023, the Company appointed Brian Grant ("Grant") as Chief Financial Officer.

49. Thereafter, Grant reached out to Levy to schedule a meeting to discuss the outstanding payments to Xmogrify.

50. In the scheduled meeting on February 7, 2023, Grant expressly acknowledged that the Company owed hundreds of thousands to Xmogrify. However, they reiterated that the Company needed additional capital and asked that Levy "work with" them by agreeing to a payment plan. They also reiterated that the Company would still like to hire Levy as a full-time employee and inquired whether he was still interested in joining.

9

FILED: WESTCHESTER COUNTY CLERK 05/22/2023 04:54 PM
INDEX NO. 57870/2023
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 05/22/2023

51.    The Company's Chief Information Security Officer, Tony Clem ("Clem") also made promises and assurances to Levy.  In a phone call on February 16, 2023, with Levy, Clem also acknowledged the substantial amounts due to Xmogrify.  Clem told Levy that, "we've got to get you paid and everyone paid, and this isn't right," assured him that he was an "important part of the team," and Xmogrify would be paid as soon as the Company received more funding.

52.    In a phone call on February 17, 2023, Grant again made another promise that the Company would pay Xmogrify for all the outstanding amounts and that he would circulate a payment schedule.  Grant also promised that payment for Xmogrify's most recent invoice would be paid by wire "as soon" as the expected funding was "deposited" into the Company's accounts, i.e., "we get the money in, and you'll get paid the day after."

53.    On March 2, 2023, in a meeting with all staff titled "All Teams Meeting" Michael Marcotte ("Marcotte") announced that the Company had appointed him as Chief Executive Officer and that Larson would "continue as an advisor and be spending more time with family."

54.    On March 2, 2023, Levy had a call with Marcotte.  Marcotte acknowledged the past due balance owed to Xmogrify and promised that the balance due would be paid but that they "need[ed] to figure out a plan" And "making the plan was the highest priority."

55.    On information and belief, on or about March 2, 2023, the Company received $6 million in funding.  As such, in reliance upon Marcotte's and Grant's repeated promises that Q5id would pay Xmogrify the "day after" it received funding, Levy expected payment the following day.

56.    On March 3, 2023, Levy contacted Grant by text to inquire if payment for Xmogrify's most recent invoice would be made by close of business as promised.  Grant stated that he was working on a plan with Marcotte "today," and that he had received instructions from

10

Marcotte, "not to spend any money until he agrees with a plan. But I think your current bill is a reasonable ask."

57.     After Grant relayed that Marcotte had not approved any payments, Levy called Marcotte to demand payment.  Again, Marcotte promised that a payment plan would be put together as fast as possible, but would not commit to any timeline for doing so or for making payments.

58.     Neither Marcotte, Grant, nor anyone else at the Company sent a payment plan to Xmogrify.

*Q5id Instructs Xmogrify to Provide Assurances to Other Contractors*

59.     Contemporaneously with the Company's assurances and promises to Xmogrify, the Company requested that Xmogrify communicate with other contractors that the Company had retained regarding overdue payments to those contractors.

60.     Beginning in June 2022, the Company had stopped paying the invoices of Rearc – the entity that Xmogrify was tasked with onboarding – even though Rearc was continuing to perform services in accordance with its agreement with the Company.

61.     Larson and Wanta requested that Levy communicate with Rearc's principal, Varma, and provide assurances on behalf of the Company that it would – as it had promised Xmogrify – pay Rearc in full once it received funding.

62.     Accordingly, in numerous communications from June 2022 through the end of February 2023, Levy, on behalf of the Company, parroted the promises that Q5id had made and assured Rearc that it would be paid, so long as it continued to provide services.

63.     The communications between Xmogrify and Rearc took place, in part, in New York.

11

*The Company Never Pays Xmogrify*

64.     Q5id did not fully pay Xmogrify for the Services rendered and expenses incurred.

65.     As a result of the Company's material breaches, Xmogrify terminated the Services as of March 3, 2023.

66.     To date, Xmogrify is owed $287,812.89, plus interest, for the Services rendered and expenses incurred between August 1, 2022 through March 3, 2023.

*Xmogrify Discovers the Company's Fraudulent Scheme*

67.     Xmogrify and Levy have since discovered that the Company has engaged in a scheme wherein it retains outside contractors to perform services for the Company, breaches their agreements with such contractors, and fraudulently induces them to continue providing services on the false promise that they would be paid when Q5id receives additional capital.

68.     On information and belief, presently, the Company is in breach of at least eleven other agreements with outside contractors and other creditors and owe more than $5.5 million collectively.[1]

69.     Xmogrify has also discovered that the stock options granted to it by the Company have no present value, and in fact, would require Xmogrify to remit money to the Company if it later wishes to exercise any of those options.

70.     As such, the stock options do not reduce the total amount owed by the Company to Xmogrify for the Services that were provided, accepted, invoiced, and remain unpaid.

---

[1]     Two other contractors retained by the Company have commenced lawsuits in the Supreme Court of New York. *Goldstein Consulting Services, LLC v. Q5id, Inc., et al*, Index No. 803962/2023 is pending in Bronx County, and *Rearc v. Q5id, Inc., et al*, Index No. 651278/2023 is pending in New York County.

12

## FIRST CAUSE OF ACTION
### ACCOUNT STATED

71.     Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

72.     Pursuant to the Agreement, Q5id promised to pay Plaintiff $255 per hour in exchange for the Services.

73.     Plaintiff performed all its obligations under the MSA and performed the Services from March 28, 2022 through March 3, 2023, which Services the Company accepted.

74.     Plaintiff submitted invoices for the Services, from March 28, 2022 through March 3, 2023, to the Company.

75.     Payment on the invoices was due within fifteen (15) days of receipt of the invoices.

76.     Each invoice included (i) the date(s) the Services were performed; (ii) the amounts due; (iii) and that payment on the invoices was due within fifteen (15) days of receipt of the invoice.

77.     Q5id received the invoices from Plaintiff, never objected to any of the issued invoices, or the amounts stated therein.

78.     On multiple occasions from July 2022 through March 2023, Q5id acknowledged that the invoices were true and correct and that the amounts set forth therein were due and owing to Plaintiff.

79.     On multiple occasions from July 2022 through March 2023, Q5id promised to pay the amounts due under the invoices to Plaintiff.

80.     Despite demand, the Company has refused to pay the amounts due and owing to Plaintiff.

13

FILED: WESTCHESTER COUNTY CLERK 05/22/2023 04:54 PM    INDEX NO. 57870/2023
NYSCEF DOC. NO. 5                                      RECEIVED NYSCEF: 05/22/2023

81.     As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $287,812.89, plus interest.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

82.     Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

83.     Plaintiff and Q5id executed the Agreement.

84.     Pursuant to the Agreement, Q5id promised to pay Plaintiff $255 per hour in exchange for the Services.

85.     From March 28, 2022 through March 3, 2023, Plaintiff performed all its obligations under the Agreement and provided the Services to the Company.

86.     Plaintiff submitted invoices for the Services to the Company, in accordance with the Agreement and as directed by the Company.

87.     Q5id received the invoices from Plaintiff, never objected to any of the issued invoices, or the amounts stated therein, and continued to accept all Services provided by Plaintiff.

88.     Q5id materially breached the Agreement by unlawfully failing to pay the full amounts due to Plaintiff under the invoices beginning in August 2022.

89.     Despite demand, the Company has refused to pay the amounts due and owing to Plaintiff.

90.     As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $287,812.89, plus interest.

## THIRD CAUSE OF ACTION
## IN THE ALTERNATIVE, UNJUST ENRICHMENT

91.     Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

92.     From March 28, 2022 through March 3, 2023, Plaintiff performed the Services.

93.     Q5id accepted the Services rendered by Plaintiff and was enriched by such Services at Plaintiff's expense, as the value of such Services amounted to $255 per hour.

94.     Q5id was aware the Plaintiff was not providing the Services gratuitously and that the value of such Services amounted to $255 per hour.

95.     On multiple occasions since June 2022, Plaintiff has demanded that Q5id pay Plaintiff for the Services and since March 2022, has submitted invoices to Q5id for payment.

96.     Q5id received the invoices from Plaintiff, acknowledged them, and never objected to any of the invoices, or the amounts sought therein.

97.     On multiple occasions, Q5id's management promised that Plaintiff and its principal, Levy, that it would pay Plaintiff in full once the Q5id received funding from investors.

98.     Plaintiff and Q5id had a sufficiently close relationship or connection as to cause reliance or inducement by Plaintiff.  Plaintiff was an independent contractor for the Company, from March 28, 2022 through March 3, 2023.

99.     As a result of Q5id's accepting the Services without paying Plaintiff, Plaintiff has suffered actual and significant damages.  To date, Plaintiff is owed $287,812.89, plus interest for the Services rendered from August 2022 through March 3, 2023.

100.    It is against equity and good conscience to permit Q5id to retain the amounts due to Plaintiff.

101.    Equity and good conscience require restitution to Plaintiff.

15

FILED: WESTCHESTER COUNTY CLERK 05/22/2023 04:54 PM
NYSCEF DOC. NO. 5
INDEX NO. 57870/2023
RECEIVED NYSCEF: 05/22/2023

102.    As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $287,812.89, plus interest.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests Judgment against Defendants:

(i)      in the amount of $287,812.89, plus pre- and post-judgment interest;

(ii)     attorney's fees and the costs of this action;

(iii)    and such other and further relief as the Court deems proper.

Dated: May 22, 2023
       New York, New York

LAZARE POTTER GIACOVAS
& MOYLE LLP

By:   Robert A. Giacovas
       Robert A. Giacovas
       Anna Pia D. Felix
       Jacob E. Englander
747 Third Avenue, 16th Floor
New York, NY 10017
(212) 758-9300
(212) 888-3295 (fax)
rgiacovas@lpgmlaw.com
afelix@lpgmlaw.com
jenglander@lpgmlaw.com

*Attorneys for Plaintiff Xmogrify, LLC*

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

------------------------------------------------------------- x

XMOGRIFY, LLC,

Plaintiff,

Index No. 57870/2023

-against-

Q5ID, INC.,

Defendant.

**ANSWER TO COMPLAINT AND
COUNTERCLAIMS**

------------------------------------------------------------- x

Q5ID, Inc.,

Counterclaim-Plaintiff,

-against-

XMOGRIFY, LLC,

Counterclaim-
Defendant.

------------------------------------------------------------- x

Defendant Q5iD, Inc. ("Defendant" or "Q5iD"), by its attorneys Cowan, Liebowitz &

Latman, P.C., as and for its Answer to the Complaint (the "Complaint") filed by Plaintiff

Xmogrify, LLC ("Plaintiff" or "Xmogrify") responds to the allegations in the Complaint as

follows:

## NATURE OF THE ACTIONS

1.      Defendant admits that it was founded in 2018 and that it has used the phrase

"THE premier enterprise cybersecurity software company delivering world-class identity

management solutions" in certain contexts but denies the remaining allegations contained in

Paragraph 1 of the Complaint.

2.      Defendant admits that it entered into a contract with Plaintiff wherein Defendant

agreed to pay Plaintiff in exchange for certain software services to be rendered to Defendant but

states that Plaintiff failed to perform its obligations under the contract and that no further sums are

owed to Plaintiff, and, further, the Defendant is entitled to a return of money already paid due to



EXHIBIT B

FILED: WESTCHESTER COUNTY CLERK 08/08/2023 01:43 PM          INDEX NO. 57870/2023
NYSCEF DOC. NO. 10                                              RECEIVED NYSCEF: 09/08/2023

the poor quality of Plaintiff's work and Plaintiff's failure to fulfill its obligations and denies the remaining allegations contained in Paragraph 2 of the Complaint.

3.    Defendant denies the allegations contained in Paragraph 3 of the Complaint.

4.    Defendant admits that it has received investor funding in connection with its business but denies the remaining allegations contained in Paragraph 4 of the Complaint.

5.    Defendants admits that Plaintiff purports to bring claims against Defendant for breach of contract, unjust enrichment and account stated but denies that Plaintiff has established such claims and denies liability therefor.

## THE PARTIES

6.    Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 6 of the Complaint.

7.    Defendant admits the allegations contained in Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 8 of the Complaint.

9.    Defendant denies the allegations contained in Paragraph 9 of the Complaint.

10.    Defendant admits that it is has engaged in business with Plaintiff, Rearc, LLC ("Rearc") and Goldstein Consulting Services, LLC ("GCS"), is without knowledge or information sufficient to form a belief as to the offices or locations of Plaintiff, Rearc or GCS and denies the remaining allegations in Paragraph 10 of the Complaint.

11.    Defendants admits that it has had certain communications with Plaintiff and other independent contractors in New York and otherwise denies the allegations contained in Paragraph 11 of the Complaint.

12.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 12 of the Complaint.

-2-

13.    Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 13 of the Complaint.

14.    Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 14 of the Complaint.

15.    Defendant admits that it entered into a written agreement with Plaintiff, is without knowledge or information sufficient to form as belief as to the location where Xmogrify performed any services or sent invoices and denies the remaining allegations contained in Paragraph 15 of the Complaint.

16.    Defendant denies the allegations contained in Paragraph 16 of the Complaint.

17.    Defendant admits it entered into a written consulting agreement with Plaintiff and refers to that agreement for its terms and otherwise denies the remaining allegations contained in Paragraph 17.

18.    Defendant admits the allegations contained in Paragraph 18 of the Complaint but is without knowledge or information sufficient to form a belief as whether such county is an appropriate venue for trial.

19.    Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 19 of the Complaint.

## FACTUAL BACKGROUND

20.    Defendant admits that it was founded in 2018 and that it has used the phrase "THE premier enterprise cybersecurity software company delivering world-class identity management solutions" in certain contexts but denies the remaining allegations contained in Paragraph 20 of the Complaint.

21.    Defendant denies the allegations contained in Paragraph 21 of the Complaint.

22.    Defendant denies the allegations contained in Paragraph 22 of the Complaint.

23.    Defendant denies the allegations contained in Paragraph 23 of the Complaint.

FILED: WESTCHESTER COUNTY CLERK 09/08/2023 01:43 PM
NYSCEF DOC. NO. 10

24.     Defendant denies the allegations contained in Paragraph 24 of the Complaint and states that Defendant is a startup engaged in product building, marketing and growth.

25.     Defendant admits it entered into a written agreement with Plaintiff (the "Agreement") and refers to that agreement for its terms and otherwise denies the remaining allegations contained in Paragraph 25.

26.     Defendant admits it entered into a written agreement with Plaintiff and refers to that agreement for its terms and otherwise denies the remaining allegations contained in Paragraph 26.

27.     Defendant admits that it also retained Rearc and otherwise is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 27 of the Complaint.

28.     Defendant admits that it also retained GCS and otherwise is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 28 of the Complaint.

29.     Defendant admits that the Agreement provided that Plaintiff would charge Defendant for services rendered at an agreed upon rate and otherwise refers to the Agreement for its terms and denies the remaining allegations contained in Paragraph 29 of the Complaint.

30.     Defendant admits that it received certain invoices from Plaintiff but denies that Plaintiff is entitled to payment in connection with such invoices and further denies the remaining allegations contained in Paragraph 30 of the Complaint.

31.     Defendant denies the allegations contained in Paragraph 31 of the Complaint and further denies that Plaintiff performed the services for which it was invoicing Defendant.

32.     Defendant admits that it did not pay the full amount invoiced by Plaintiff and states that Defendant did not perform the agreed upon services and otherwise denies the remaining allegations contained in Paragraph 32 of the Complaint.

33.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 33 of the Complaint.

34.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 34 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

35.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 35 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

36.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 36 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

37.     Defendant denies the allegations contained in Paragraph 37 of the Complaint.

38.     Defendant denies the allegations contained in Paragraph 38 of the Complaint.

39.     Defendant denies the allegations contained in Paragraph 39 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

40.     Defendant denies the allegations contained in Paragraph 40 of the Complaint.

41.     Defendant denies the allegations contained in Paragraph 41 of the Complaint.

42.     Defendant is without knowledge or information sufficient to form a belief as to whether Levy was offered a position as alleged therein and denies the remaining allegations contained in Paragraph 42 of the Complaint.

43.     Defendant denies the allegations contained in Paragraph 43 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

44.     Defendant denies the allegations contained in Paragraph 44 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

45.     Defendant is without knowledge or information sufficient to form a belief as to the whether Dominic O'Dierno travelled to New York at the time alleged and denies the remaining allegations contained in Paragraph 42 of the Complaint.

46.     Defendant denies the allegations contained in Paragraph 46 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

47.     Defendant denies the allegations contained in Paragraph 47 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

48.     Defendant admits that in or around January 2023 Brian Grant ("Grant") was appointed as CFO of the Company and denies the remaining allegations contained in Paragraph 48 of the Complaint.

49.     Defendant is without knowledge or information sufficient to form a belief as to allegations contained in Paragraph 49 of the Complaint.

50.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding discussions between Grant and Levy described in Paragraph 50 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

51.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the meeting between Clem and Levy contained in Paragraph 51 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

FILED: WESTCHESTER COUNTY CLERK 09/08/2023 02:43 PM        INDEX NO. 57870/2023
NYSCEF DOC. NO. 10                                          RECEIVED NYSCEF: 09/08/2023

52.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the call described in Paragraph 52 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

53.     Defendant admits that on or about March 2, 2023, a company meeting was held wherein Michael Marcotte introduced himself as CEO of the company and advised that Larson would be transitioning to a new role and denies the remaining allegations contained Paragraph 53 of the Complaint.

54.     Defendant denies the allegations contained in Paragraph 54 of the Complaint.

55.     Defendant admits that the company received certain funding in March 2023 and denies the remaining allegations contained in Paragraph 55 of the Complaint.

56.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 56 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

57.     Defendant denies the allegations contained in Paragraph 57 of the Complaint.

58.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 58 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

59.     Defendant denies the allegations contained in Paragraph 59 of the Complaint.

60.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 60 of the Complaint and denies that it owes any outstanding payments to Rearc.

61.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 61 of the Complaint and denies that it owes any outstanding payments to Rearc.

62.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 62 of the Complaint and denies that it owes any outstanding payments to Rearc.

63.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 63 of the Complaint.

64.     Defendant denies the allegations contained in Paragraph 64 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

65.     Defendant admits that Plaintiff did not perform any services for Defendant and otherwise denies the remaining allegations contained in Paragraph 65 of the Complaint.

66.     Defendant denies the allegations contained in Paragraph 66 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

67.     Defendant denies the allegations contained in Paragraph 67 of the Complaint. With respect to the accompanying footnote, Defendant admits that there are pending lawsuits involving Defendant and GCS and Rearc and that Defendant denies the allegations contained in those complaints and any liability therein.

68.     Defendant denies the allegations contained in Paragraph 68 of the Complaint.

69.     Defendant denies the allegations contained in Paragraph 69 of the Complaint.

70.     Defendant denies the allegations contained in Paragraph 70 of the Complaint.

**FIRST CAUSE OF ACTION**
**ACCOUNT STATED**

71.     Defendant repeats and realleges its responses to Paragraphs 1 - 70 as if fully set forth herein.

72.     Defendant denies the allegations contained in Paragraph 72 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

73.     Defendant denies the allegations contained in Paragraph 73 of the Complaint.

74.     Defendant denies the allegations contained in Paragraph 74 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

75.     Defendant denies the allegations contained in Paragraph 75 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

76.     Defendant denies the allegations contained in Paragraph 76 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

77.     Defendant denies the allegations contained in Paragraph 77 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

78.     Defendant denies the allegations contained in Paragraph 78 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

79.     Defendant denies the allegations contained in Paragraph 79 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

00001/579/4363649.1

FILED: WESTCHESTER COUNTY CLERK 08/08/2023 01:43 PM
NYSCEF DOC. NO. 10

INDEX NO. 57870/2023
RECEIVED NYSCEF: 09/08/2023

80.     Defendant denies the allegations contained in Paragraph 80 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

81.     Defendant denies the allegations contained in Paragraph 81 of the Complaint.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

82.     Defendant repeats and realleges its responses to Paragraphs 1 - 81 as if fully set forth herein.

83.     Defendant admits the allegations contained in Paragraph 83 of the Complaint.

84.     Defendant denies the allegations contained in Paragraph 84 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

85.     Defendant denies the allegations contained in Paragraph 85 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

86.     Defendant denies the allegations contained in Paragraph 86 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

87.     Defendant denies the allegations contained in Paragraph 87 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

88.     Defendant denies the allegations contained in Paragraph 88 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

FILED: WESTCHESTER COUNTY CLERK 09/08/2023 01:43 PM INDEX NO. 57870/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 09/08/2023

89. Defendant denies the allegations contained in Paragraph 89 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

90. Defendant denies the allegations contained in Paragraph 90 of the Complaint.

**THIRD CAUSE OF ACTION
IN THE ALTERNATIVE, UNJUST ENRICHMENT**

91. Defendant repeats and realleges its responses to Paragraphs 1 - 90 as if fully set forth herein.

92. Defendant denies the allegations contained in Paragraph 92 of the Complaint.

93. Defendant denies the allegations contained in Paragraph 93 of the Complaint.

94. Defendant denies the allegations contained in Paragraph 94 the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

95. Defendant denies the allegations contained in Paragraph 95 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

96. Defendant denies the allegations contained in Paragraph 96 the Complaint.

97. Defendant denies the allegations contained in Paragraph 97 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

98. Defendant denies the allegations contained in Paragraph 98 of the Complaint.

99. Defendant denies the allegations contained in Paragraph 99 of the Complaint.

100. Defendant denies the allegations contained in Paragraph 100 of the Complaint.

101. Defendant denies the allegations contained in Paragraph 101 of the Complaint.

102. Defendant denies the allegations contained in Paragraph 102 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

Plaintiff failed to perform its obligations under the agreements between the parties and is therefore barred from any recovery.

### Second Defense

To the extent that Plaintiff's claims are based on any oral agreement or oral amendment to a written agreement, such claims are barred by the Statute of Frauds.

### Third Defense

To the extent Plaintiff has suffered any damages for which the law would provide a remedy, which Defendants deny, Plaintiff is not entitled to an award of attorneys' fees.

### Fourth Defense

Plaintiff's claims are barred by the principle of equitable estoppel.

### Fifth Defense

Plaintiff's claim for unjust enrichment is barred as duplicative of Plaintiff's contract claim.

* * *

WHEREFORE, Defendant Q5iD respectfully requests judgment in its favor, that Plaintiff's claims be dismissed in their entirety, an award of attorneys' fees and costs, an award of prejudgment and post-judgment interest at the highest rate allowed by law, and such other further relief as the Court deems just and proper.

## COUNTERCLAIMS

Q5iD, Inc. ("Counterclaim Plaintiff" or "Q5iD"), by its attorneys Cowan, Liebowitz & Latman, P.C., brings these counterclaims against Xmogrify, LLC ("Counterclaim Defendant" or "Xmogrify") for breach of contract and other agreements between the parties due to Xmogrify's

failure to perform the services required and for breach of the confidentiality provision therein. As a result of Xmogrify's breaches, Q5iD seeks a refund of the amounts paid by Q5iD to Xmogrify and damages due to breach of confidentiality.

## PARTIES

1.  Counterclaim-Plaintiff Q5id is a corporation organized under the laws of Oregon, with its headquarters at 801 Barton Springs, Austin, Texas and 800 Bellevue Way NE, Bellevue, Washington.

2.  Upon information and belief, Counterclaim-Defendant Xmogrify is a New York limited liability company with its principal place of business 23 Arden Drive, Hartsdale, New York.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this counterclaim pursuant to CPLR § 3019.

4.  Venue is proper because Xmogrify is located in Westchester County, New York.

## FACTS

5.  Q5iD is an enterprise cybersecurity software identity management company providing enterprise technology products.

6.  Upon information and belief, Xmogrify is a provider of software services.

7.  On March 4, 2022, Q5id and Xmogrify entered into a Mutual Non-Disclosure Agreement (the "MNDA"), governing confidential information learned by either party in the course of the business transaction that they were at that time planning to enter into (the "Transaction").

8.  On March 11, 2022, Q5iD entered executed a Statement of Work (the "SOW") with Xmogrify, and on March 12, 2022, executed a Master Services Agreement (the "MSA," and together with the SOW, the "Agreement"). The Agreement established the terms of the

FILED: WESTCHESTER COUNTY CLERK 09/08/2023 02:43 PM
INDEX NO. 57870/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 09/08/2023

Transaction that was governed by the MNDA. The MSA explicitly incorporates the MNDA by reference.

9. The MNDA included a confidentiality provision that provided that Xmogrify was not to disclose any data or information relating to the business of Q5iD that Q5iD would reasonably be considered to be proprietary, including business plans related to any financial or strategic partnerships, investor information, client records, and information not generally known in the industry regarding Q5iD. Further, such information was deemed confidential regardless of whether it was provided before or after the date of the MSA or how it was provided to Xmogrify, and such obligations survived the termination of the MSA.

10. During the course of the relationship between Q5iD and Xmogrify, Xmogrify submitted invoices to Q5iD notwithstanding that it did not perform the agreed upon services, or, alternatively, for services that were deficient, inadequate and not in accordance with standard protocols and procedures in the industry.

11. In or around March 2023, Q5iD conducted an internal audit to review the services allegedly provided by Xmogrify and for which Xmogrify had been submitting invoices to Q5iD. The audit revealed that Xmogrify and its business associates GCS and Xmogrify had not been performing the services they had been engaged to perform, and, in the alternative, any services that were provided were deficient and substandard. In fact, no work product, artifacts or accompanying data, worksheets, manuals or other materials have been provided to Q5iD despite Plaintiff's demands for payment.

12. Any payments due to Xmogrify were conditioned upon Xmogrify's performance of its obligations under the Agreement or any other contracts upon which Xmogrify relies. Thus, Q5iD does not have any payment obligations to Xmogrify and is entitled to a return of sums already paid.

13.     On May 22, 2023, Xmogrify publicly filed the Complaint in this action against Q5iD for account stated, breach of contract, and unjust enrichment.

14.     In the Complaint, Xmogrify disclosed proprietary and confidential business information relating to Q5iD in violation of the confidentiality provision in the MNDA, including payment records, investor information and business processes and practices.

15.     Further, on or about May 26, 2023, Xmogrify sent an email to certain persons disclosing details regarding the parties' business relationship and the disputes between the parties, in breach of the confidentiality provision of the MNDA. Xmogrify has further threatened to reveal additional confidential information in an effort to obtain leverage in this dispute.

16.     Q5iD's investigation into Xmogrify's conduct is still ongoing and it is likely to find additional unauthorized disclosure of confidential and proprietary information in breach of the MNDA.

17.     As a result of Xmogrify's actions, Q5iD has been damaged and its reputation has been harmed, causing damage in an amount to be determined at trial.

18.     Xmogrify's unlawful activities have also resulted in irreparable harm and injury to Q5iD for which Q5iD has no adequate remedy at law, and Xmogrify must be further restrained to prevent further disclosure and harm to Q5iD.

19.     As a result of Xmogrify's breach of the MNDA, Q5iD is entitled to an injunction prohibiting further disclosure of confidential information and to damages, in an amount to be determined at trial.

## COUNT I
### (Breach of Contract)

20.     Q5iD realleges paragraphs 1 through 19 above, as fully set forth herein.

21.     Q5iD and Xmogrify formed an agreement, the MSA, through which Xmogrify would provide certain services to Q5iD.

22.     Xmogrify did not perform the services it had contracted to perform under the MSA.

23.     Q5iD performed by making some payments to Xmogrify under the MSA but is relieved of further obligations under the MSA due to GCS' nonperformance and deficient performance.

24.     As a result of this breach, Q5iD has incurred losses by paying for services that were not performed or were not performed satisfactorily.

25.     Accordingly, Q5iD is entitled to a return of the amounts paid by Q5iD to Xmogrify.

## COUNT II
### (Breach of Confidentiality)

26.     Q5iD realleges paragraphs 1 through 25 above, as fully set forth herein.

27.     Q5iD and Xmogrify formed an agreement, the MNDA, which provided that Xmogrify would maintain certain business and proprietary information of Q5iD in confidence and would not disclose such information publicly.

28.     Xmogrify disclosed confidential information of Q5iD by publicly filing the Complaint which contained proprietary and confidential business information relating to the business of Q5iD, including payment records, investor information and business processes and practices.

29.     Further, on or about May 26, 2023, Xmogrify sent an email publicly disclosing confidential information and has threatened to disclose further confidential information..

30.     Q5iD has been damaged by the public disclosure of its confidential information by Xmogrify in an amount to be determined at trial.

31.     As a result of Xmogrify's wrongful conduct, Q5iD has sustained, and will continue to sustain, immediate irreparable harm and incalculable monetary loss.

## PRAYER FOR RELIEF

WHEREFORE, Q5iD respectfully demands judgment against Xmogrify and respectfully requests that:

1.      The Court grant judgment in favor of Q5iD and against Xmogrify on all of Q5iD's claims;

2.      The Court issue a permanent injunction against Xmogrify and its officers, agents, subsidiaries, servants, partners, employees, attorneys, and all others in active concert or participation with it:

   a.   requiring Xmogrify to return or destroy all of Q5iD's Confidential Information;

   b.   enjoining Xmogrify from using or disclosing Q5iD's Confidential Information to any party, at any time, and for any reason;

   c.   requiring Xmogrify to provide an accounting of the whereabouts of, and the names of all persons given access to or who otherwise viewed, Q5iD's Confidential Information, including all files, data, information removed, downloaded, transferred or forwarded to any third-parties or unauthorized employees or contractors,

   d.   requiring Xmogrify to delete all content obtained from Q5iD anywhere it may reside, including the computer system and servers of Xmogrify or on any other computer, electronic device, or cloud accounts, hard copy documents, or any other materials in Xmogrify's possession, custody, or control; and

   e.   requiring Xmogrify to provide written certification to Q5iD's counsel of its compliance with paragraph (d) above;

3.  The Court award Q5iD a judgment against Xmogrify on the above claims in an amount of damages as may be proven at trial, including the disgorgement of any profits, benefits, or compensation received as a result of Xmogrify's misconduct;

4.  The Court award of attorneys' fees and costs, an award of prejudgment and post-judgment interest at the highest rate allowed by law, and such other further relief as the Court deems just and proper.

5.  The Court grant Q5iD such other and further relief as the Court deems just, equitable, and proper.

Dated: New York, New York
       September 8, 2023

                                        COWAN LIEBOWITZ & LATMAN, P.C.


                                        By: _____/s/ Meichelle R. MacGregor_____
                                        Meichelle R. MacGregor
                                        Jeremy A. Berman
                                        Paige A. Geier
                                        114 West 47th Street
                                        New York, New York  10036-1525
                                        (212) 790-9200

                                        Attorneys for Q5id, Inc.


To:

Lazare Potter Giacovas & Moyle LLP
747 Third Avenue, 16th Floor
New York, NY  10017
Attorneys for XMOGRIFY, LLC

# EXHIBIT C

INDEX NO. 803962/2023E

RECEIVED NYSCEF: 05/22/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

------------------------------------------------------------ X

Goldstein Consulting Services, LLC,

                     Plaintiff,

         - against -

Q5id Inc.,

                    Defendant.

------------------------------------------------------------ X

Index No. 803962/2023

**COMPLAINT**

Plaintiff designates Bronx County as
the place of trial.

      Plaintiff Goldstein Consulting Services, LLC ("Plaintiff" or "GCS"), by and through its

undersigned counsel, and for its Complaint against defendant Q5id Inc. ("Q5id," the "Company,"

or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

      1.    Defendant Q5id is a start-up company founded in 2018 and touts itself as "THE

premiere enterprise cybersecurity software company." In fact, and though Q5id has raised millions

of dollars from investors, it has failed to pay Plaintiff GCS (and numerous other contractors) for

the developmental work to build its business. So determined were its officers to enrich themselves

from investor cash that, despite promising GCS (and other contractors) that they would be paid

from additional financing and inducing them to work for "free," when the capital came in, the

officers instead paid themselves unapproved commissions and prioritized paying themselves and

paid nothing but lip service to GCS (and other contractors).

      2.    GCS now brings this action to address Defendants' breach of contract and other

wrongful conduct in connection with certain services GCS provided to Q5id. Pursuant to a written



EXHIBIT
C

FILED: BRONX COUNTY CLERK 05/22/2023 05:01 PM INDEX NO. 803962/2023E
NYSCEF DOC. NO. 5                                                    RECEIVED NYSCEF: 05/22/2023

agreement, Q5id promised to pay GCS on a monthly basis in exchange for certain services, beginning in March 2022. GCS fully complied with its obligations and provided services in accordance with the agreement, which services the Company accepted. Though the Company initially made payments as the parties agreed, beginning in August 2022, it only made partial payments to GCS.

3.   To excuse its breaches, the Company claimed that it had insufficient capital to pay GCS. However, in order to induce GCS to continue to provide services, Q5id's management advised that the Company was working diligently to raise capital and repeatedly and falsely promised that it would pay all outstanding amounts due once it received a capital infusion. In reliance upon the Company's promises, GCS continued to provide services to Q5id through November 2022.

4.   On information and belief, the Company has received millions of dollars in funding on multiple occasions since August 2022. However, despite due demand and though the Company has never objected to a single invoice or the amounts due to GCS, and despite repeated promises by management that GCS would be paid in full, Q5id has failed and refused to pay GCS for any of the services rendered from August through November 2022. To date, the Company owes $131,390, plus interest in an amount to be determined, to GCS.

5.   GCS now asserts claims against Defendant for breach of contract, unjust enrichment, and account stated.

**THE PARTIES**

6.   Plaintiff GCS is a New York limited liability company, with its principal place of business at 4445 Post Road, Apt. 4J, Bronx, New York. GSC provides software consultancy

2

FILED: BRONX COUNTY CLERK 05/22/2023 05:01 PM
NYSCEF DOC. NO. 5

INDEX NO. 803962/2023E
RECEIVED NYSCEF: 05/22/2023

services.  Its sole owner and principal is Kevin Goldstein ("Goldstein"), who provides all services on behalf of GCS.

7.      On information and belief, defendant Q5id is a corporation organized under the laws of Oregon, with its headquarters at 801 Barton Springs, Austin, Texas, and 800 Bellevue Way NE, Bellevue, Washington.  It claims it is a cybersecurity software company that sells software and services to protect against fraud, data breaches, and identity theft.

## JURISDICTION AND VENUE

8.      Jurisdiction is properly laid in this Court in that the Company is subject to personal and specific jurisdiction in New York.

9.      The Company has systematic and continuous contacts in New York as it transacts business in New York.  Specifically, it recruits and solicits numerous independent contractors (such as GCS) located in New York, enters into agreements with such contractors to perform services on behalf of the Company from New York, and accepts services from such contractors which are performed fully, or in large part, in New York.

10.      In addition, the Company's communications by, among other things, telephone, text messages, and email, with the independent contractors located in New York that it solicits and hires takes place in New York.

11.      The Company has engaged in and solicited business from at least three independent contractors who conduct business in and perform services from New York: (a) GCS, which is located in Bronx County; (b) Rearc, LLC ("Rearc"), which has an office in New York, New York; and (c) Xmogrify, LLC ("Xmogrify"), which is located in Westchester County, New York.

FILED: BRONX COUNTY CLERK 05/22/2023 05:01 PM
NYSCEF DOC. NO. 5

INDEX NO. 803962/2023E
RECEIVED NYSCEF: 05/22/2023

12.     Xmogrify, Rearc, and GCS worked closely together and communicated on an almost daily basis in connection with the services they provided to the Company, which communications took place, in part, in New York.

13.     Moreover, on information and belief, the Company's management traveled to New York in November 2022 to raise capital, and solicit investments from investors in New York.

14.     Venue is properly laid in Bronx County as the acts and events giving rise to the claims set forth herein took place in substantial part in Bronx County.  As alleged below, the Company transacted business with GCS in Bronx County, New York, beginning in February 2022, when it solicited GCS, which is located in Bronx County, to perform services for the Company.

15.     The parties entered into a written agreement, which was negotiated and executed in Bronx County, and GCS performed the services under that written agreement from its office located in Bronx County.  GCS sent invoices pursuant to that written agreement from Bronx County, and the Company made payments to GCS in New York.

16.     The Company again solicited GCS, while it was in New York to perform services for the Company.  The parties subsequently entered into a written agreement in or about March 2022.  That written agreement was also negotiated and executed in Bronx County.

17.     As alleged below, the Company hired Plaintiff's principal as an employee.  From January 2023 through March 2023, the work performed by Plaintiff's principal was performed in Bronx County, and the Company made payments to him in Bronx County.

18.     Moreover, the Company and its management team had numerous communications with and made repeated promises to pay GCS in accordance with the parties' written agreement, while GCS was in Bronx County.

19.     In addition, GCS designates Bronx County as the place of trial.

4

FILED: BRONX COUNTY CLERK 05/22/2016 05:01 PM
NYSCEF DOC. NO. 5

INDEX NO. 803962/2023E

RECEIVED NYSCEF: 05/22/2023

20.     Accordingly, jurisdiction and venue are proper herein pursuant to New York Civil Rules and Practice §§ 302 and 503.

## FACTUAL BACKGROUND

*The Business of Q5id*

21.     On its website, Q5id touts itself as "THE premiere enterprise cybersecurity software company." In fact, Q5id is a start-up that was founded only a few short years ago in 2018.

22.     On information and belief, the Company only has a few dozen employees and thus is deeply reliant on the services of outside, independent contractors to assist in its software, business, and technology development.

23.     As of early 2022, the Company's "software" was highly ineffectual, replete with performance errors and inefficiencies, and could not be launched. Indeed, the Company had *no* marketable product, and as such, it was desperate to hire software and technology experts – like GCS – to "fix" the "bugs" and build usable products.

24.     At all relevant times, Q5id had nearly 60 independent contractors, including GCS.

25.     On information and belief, to date, Q5id has no corporate clients, and only has "potential clients" that have never provided revenue or user flow. Thus, it relies upon funding from investors to keep its business afloat.

*Q5id Enters into a Master Services Agreement with GCS*

26.     On or about February 2022, Q5id and GCS entered into a written consulting agreement, wherein GCS agreed to, *inter alia*, perform certain consulting services part-time on behalf of the Company.

5

27.     On or about March 16, 2022, Q5id and GCS entered into a second written agreement, the Master Services Agreement (the "MSA").

28.     Pursuant to the MSA, GCS agreed to, among other things, run development staff and operations at the direction of the then-Chief Information Officer and Chief Technology Officer, Rebecca Wanta ("Wanta"), and to provide personnel for development purposes on an "as needed" basis (the "Services").

29.     In connection with the Services, GCS worked closely with Rearc and Xmogrify – which are both New York-based entities – and their principals and communicated on an almost daily basis with them.

30.     Under the MSA, Q5id was obligated to pay $45,000 per month to GCS for performing the Services, which GCS would invoice bi-weekly, with payment due within seven (7) days of receipt of the invoice.

31.     The Company wanted GCS's principal, Goldstein, to temporarily relocate to Oregon (where the Company's offices were then-located) away from his home in the Bronx to perform GCS's obligations under the MSA, as it was beneficial to Q5id to have him on-site.

32.     To induce Goldstein to relocate to Oregon, in April 2022, the Company's then-Chief Executive Officer, Steve Larson ("Larson") and Wanta orally agreed that the Company would increase the monthly payment amount to GCS to $50,000, and also pay for Goldstein's living and other expenses.

33.     Larson and Wanta then orally instructed Goldstein to invoice the Company for $50,000 for the Services, as well as the additional amounts owed to Goldstein for his living and other expenses.

6

*Q5id Breaches the MSA but Promises to Pay GCS in Full*

34.     On or about March 20, 2022, GCS began performing Services and submitted bi-weekly invoices to the Company for the Services and expenses incurred.

35.     Importantly, the Company never objected to a single invoice submitted by GCS or any of the amounts sought therein.  In fact, the Company fully paid GCS for all invoices submitted from March through end of July 2022.

36.     However, it subsequently stopped paying the full amount of GCS' invoices beginning in August 2022.

37.     As such, Goldstein, on behalf of GCS, demanded payment for the overdue invoices.

38.     In multiple written and oral communications in mid-August 2022, Larson and Wanta acknowledged that the invoices and the amounts sought therein were correct, the Company was in breach of the MSA, and that GCS was owed payment.  However, they claimed that the Company did not have sufficient capital to continue to pay for the Services.

39.     The Company knew that GCS would not continue to provide Services unless it was paid.  As such, in order to induce GCS to continue to provide the Services, Larson and Wanta advised that the Company was expecting financing from its ongoing capital raises and that they simply "needed more time."  Larson and Wanta then promised Goldstein that if GCS "stuck it out," the Company would pay GCS in full as soon as it received the expected capital infusion.

40.     As further inducement and to convince Goldstein that "funding" was coming, Larson and Wanta provided Goldstein with regular "funding updates" from the Company's Executive Vice President of Business Development and Co-Founder, Dominic O'Dierno.

7

41.     Moreover, Larson apologized to Goldstein for the Company's missed payments. Then, in an effort to portray the Company's alleged viability and further induce GCS to continue providing the Services, he offered and later provided GCS with stock options.

42.     GCS continued to provide Services to Q5id, in good faith and in accordance with the MSA, in reliance upon the Company's express promises.

*Q5id Executes a Change Order to the MSA*

43.     On September 25, 2022, the Company and GCS executed a change order (the "Change Order") that modified the amounts to be paid to GCS for the Services under the MSA.

44.     Pursuant to the Change Order, the Company agreed to pay GCS $18,750 bi-weekly, for the Services GCS provided under the MSA. The Company further agreed to pay GCS $18,750 on the 5th and 20th of each month, concurrently with the Company's payroll cycles.

45.     The parties further agreed that GCS would invoice the Company $18,750 bi-weekly.

46.     Goldstein continued to provide the Services through November, and subsequently submitted bi-weekly invoices to the Company, in accordance with the Change Order.

47.     Again, the Company never objected to the invoices submitted by GCS or any of the amounts sought therein; however, despite demand, it failed to pay GCS.

*The Company Continued to Promise Payment to GCS*

48.     Through November 2022, Larson and Wanta made repeated oral and written assurances to Goldstein that "payments would be coming" and that he would be "made whole."

49.     In October 2022, O'Dierno called Goldstein to tell him that the Company "had raised an additional $300,000 cash" and that GCS would be paid in full.

8

FILED: BRONX COUNTY CLERK 05/22/2016305:01 PM
NYSCEF DOC. NO. 5

INDEX NO. 803962/2023E
RECEIVED NYSCEF: 05/22/2023

50.     On information and belief, the Company received more $2.5 million in funding between July 2022 and October 2022; however, rather than paying GCS, the Company's officers, including Larson and O'Dierno, paid themselves unapproved commissions, and prioritized paying themselves.

51.     Despite its promises and though it received millions of dollars in expected capital infusion, Q5id did not pay GCS for the Services rendered from August 2022 through November 2022.

*The Company Hires Goldstein as an Employee in Order to Continue Obtaining the Services*

52.     On information and belief, Q5id had *no* intention of paying the outstanding amounts due to GCS.

53.     However, the Company fully recognized GCS' value to its brand, as it was only through the efforts of GCS (and other contractors that GCS collaborated with) that the Q5id's software and other products were launched at all.

54.     Knowing full well that GCS would never continue to simply work for free, the Company had to formulate a plan to sidestep its obligations under the MSA.

55.     As such, the Company offered Goldstein a full-time position as Vice President of Software Development – which duties were identical to the Services provided by GCS under the MSA.

56.     As inducement for Goldstein to accept the position, Larson and Wanta told him that employee payroll took "priority over the contractors," and that, unlike the overdue bills to GCS, the Company would pay Goldstein "on time." They also assured him that his continued work on the products as a full-time employee would only facilitate the capital raise, and that Q5id would pay the back-invoices as soon as it received capital.

9

57.     As such on or about November 1, 2022, the Company onboarded Goldstein as a full-time, salaried employee.

58.     However, and as a "back up" plan, the Company kept GCS on its roster of contractors and did not terminate the MSA.

*Q5id Appoints New Management and Terminates Goldstein*

59.     In January 2023 – after the Company continually failed to pay GCS for the outstanding amounts due – Goldstein moved back to New York and continued to be employed by Q5id as a remote employee from GCS's office in Bronx County.

60.     On January 23, 2023, the Company appointed Brian Grant ("Grant") as Chief Financial Officer.

61.     Thereafter, Goldstein reached out to Grant to discuss the outstanding payments to GCS.

62.     In a phone call on February 7, 2023, Grant expressly acknowledged that the Company owed over $130,000 to GCS.  However, he reiterated that the Company needed additional capital and asked that Goldstein "work with" the Company by agreeing to a payment plan.

63.     Grant promised that he would circulate a proposed payment plan "within the next week or so."

64.     Following this call, the Company missed payroll and failed to pay Goldstein (and other key employees) their salaries.  In a phone call on February 16, 2023, Grant advised Goldstein that the Company would "take care of it as soon as we can."

10

FILED: BRONX COUNTY CLERK 05/22/2013 05:01 PM
INDEX NO. 803962/2023E
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 05/22/2023

65. On March 2, 2023, in a meeting with all staff titled "All Teams Meeting" Michael Marcotte ("Marcotte") announced that the Company had been appointed him as Chief Executive Officer and that Larson would "continue as an advisor and be spending more time with family."

66. Thereafter, on March 3, 3023, Marcotte spoke to Goldstein and parroted Grant's prior assurances and promises – that the Company owed GCS the outstanding balances under the invoices, but that the Company needed to make a plan to pay them.

67. On information and belief, the Company received $6 million in funding on or about March 2, 2023. However, it did not pay GCS, and neither Grant, Marcotte, nor anyone else at the Company sent a payment plan to GCS.

68. Instead, on March 8, 2023, Q5id terminated Goldstein's employment without cause.

*GCS Discovers the Company's Fraudulent Scheme*

69. GCS and Goldstein have since discovered that the Company has engaged in a scheme wherein it retains outside contractors to perform services for the Company, breaches their agreements with such contractors, and fraudulently induces them to continue providing services on the false promise that they would be paid when Q5id receives additional capital.[1]

70. On information and belief, presently, the Company is in breach of at least eleven other agreements with outside contractors and other creditors and owes more than $5.5 million collectively.

---

[1] Two other contractors retained by the Company have commenced lawsuits in the Supreme Court of New York. *XMografy LLC v. Q5id, Inc., et al*, Index No. 57870/2023 is pending in Westchester County, and *Rearc v. Q5id, Inc., et al*, Index No. 651278/2023 is pending in New York County.

11

71. GCS has also discovered that the stock options granted to it by the Company have no present value, and in fact, would require GCS to remit money to the Company if it later wishes to exercise any of those options.

72. As such, the stock options do not reduce the total amount owed by the Company to GCS for the Services that were provided, accepted, invoiced, and remain unpaid.

### FIRST CAUSE OF ACTION
### ACCOUNT STATED

73. Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

74. Pursuant to the MSA, Q5id promised to pay Plaintiff $45,000 monthly in exchange for the Services.

75. Plaintiff and Q5id subsequently amended the MSA, wherein Q5id orally agreed to pay Plaintiff an additional $5,000 to GSA, plus additional amounts to cover the living and other expenses of Plaintiff's principal, Goldstein.

76. Q5id instructed Plaintiff to invoice the Company for $50,000, plus the additional amounts to cover the living and other expenses of Plaintiff's principal.

77. Pursuant to the MSA, payment was due within seven (7) days of receipt of the invoice.

78. From March 2022 through September 2022, Plaintiff submitted invoices for the Services in the amount of $50,000, plus additional expenses, as directed by the Company and pursuant to the MSA.

79. On September 25, 2022, Plaintiff and Q5id executed the Change Order that amended the amounts to be paid to GCS under the MSA. The parties agreed that GCS would be

12

FILED: BRONX COUNTY CLERK 05/22/2023 05:01 PM
INDEX NO. 803962/2023E
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 05/22/2023

paid $18,750 bi-weekly for the Services, which GCS would invoice bi-weekly. The parties further agreed that it would pay GCS on the 5th and 20th of every month.

80. From September 2022 through November 2022, Plaintiff submitted invoices, in the amount of $18,750, for the Services on a bi-weekly basis.

81. From March 2022 through November 2022, Plaintiff performed all its obligations under the MSA, provided the Services to the Company, and submitted invoices to the Company.

82. Each invoice included (i) the date(s) the Services were performed; (ii) the amounts due; (iii) and the due date on such invoices.

83. Q5id received the invoices, never objected to any of the issued invoices, or the amounts stated therein, and continued to accept all Services provided by Plaintiff.

84. On multiple occasions from August 2022 through February 2023, Q5id acknowledged that the invoices were true and correct and that the amounts set forth therein were due and owing to Plaintiff.

85. On multiple occasions from August 2022 through February 2023, Q5id promised to pay the amounts due under the invoices to Plaintiff.

86. Despite demand, the Company has refused to pay the amounts due and owing to Plaintiff.

87. As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $131,390, plus interest.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

88. Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

89. Plaintiff and Q5id executed the MSA.

13

90.     Pursuant to the MSA, Q5id promised to pay Plaintiff $45,000 monthly in exchange for the Services.

91.     Plaintiff and Q5id subsequently amended the MSA, wherein Q5id orally agreed to pay Plaintiff an additional $5,000 to GSA, plus additional amounts to cover the living and other expenses of Plaintiff's principal, Goldstein.

92.     Q5id instructed Plaintiff to invoice the Company for $50,000, plus the additional amounts to cover the living and other expenses of Plaintiff's principal.

93.     Pursuant to the MSA, payment was due within seven (7) days of receipt of the invoice.

94.     On September 25, 2022, Plaintiff and Q5id executed the Change Order that amended the amounts to be paid to GCS under the MSA.  The parties agreed that GCS would be paid $18,750 bi-weekly for the Services, which GCS would invoice bi-weekly.  The parties further agreed that it would pay GCS on the 5th and 20th of every month.

95.     From March 2022 through November 2022, Plaintiff performed all its obligations under the MSA and provided the Services to the Company.

96.     From March 2022 through November 2022, Plaintiff submitted invoices to the Company, in accordance with the MSA and the Change Order and as directed by the Company.

97.     Q5id received the invoices, never objected to any of the issued invoices, or the amounts stated therein, and continued to accept all Services provided by Plaintiff.

98.     Q5id materially breached the MSA, the oral agreement to pay for additional expenses, and the Change Order to the MSA by unlawfully failing to pay the amounts due under the invoices to Plaintiff beginning in August 2022.

14

FILED: BRONX COUNTY CLERK 05/22/2018 05:01 PM

NYSCEF DOC. NO. 5

INDEX NO. 803962/2023E

RECEIVED NYSCEF: 05/22/2023

99.     Despite demand, the Company has refused to pay the amounts due and owing to Plaintiff.

100.    As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $131,390, plus interest.

### THIRD CAUSE OF ACTION
### IN THE ALTERNATIVE, UNJUST ENRICHMENT

101.    Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

102.    From August 2022 through November 2022, Plaintiff performed the Services.

103.    Q5id accepted the Services rendered by Plaintiff and was enriched by such Services at Plaintiff's expense.

104.    Q5id was aware the Plaintiff was not providing the Services gratuitously and that the value of such Services amounted to approximately $50,000 per month.

105.    On multiple occasions since August 2022, Plaintiff has demanded that Q5id pay Plaintiff for the Services and since August 2022, has submitted invoices to Q5id for payment.

106.    Q5id received the invoices, acknowledged the invoices, and never objected to any of the invoices, or the amounts sought therein.

107.    On multiple occasions, Q5id's management promised that Plaintiff and its principal, Goldstein, that it would pay Plaintiff in full once the Company received funding from investors.

108.    Plaintiff and Q5id had a sufficiently close relationship or connection as to cause reliance or inducement by Plaintiff.  Plaintiff was retained by Q5id as an independent contractor beginning in February 2022, and Plaintiff's principal, Goldstein, was a full-time employee of Q5id from November 1, 2022 through March 8, 2023.

15

FILED: BRONX COUNTY CLERK 05/22/2018 05:01 PM
NYSCEF DOC. NO. 5

INDEX NO. 803962/2023E

RECEIVED NYSCEF: 05/22/2023

109.    As a result of Q5id's accepting the Services without paying Plaintiff, Plaintiff has suffered actual and significant damages.  To date, Plaintiff is owed $144,811.05, plus interest for the Services rendered from August 2022 through November 2022.

110.    It is against equity and good conscience to permit Q5id to retain the amounts due to Plaintiff.

111.    Equity and good conscience require restitution to Plaintiff.

112.    As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $144,811.05, plus interest.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests Judgment against Defendant:

(i)      in the amount of $131,390, plus pre- and post-judgment interest;

(ii)     attorney's fees and the costs of this action;

(iii)    and such other and further relief as the Court deems proper.

Dated: May 22, 2023
         New York, New York

LAZARE POTTER GIACOVAS
& MOYLE LLP

By:    Robert A. Giacovas
         Robert A. Giacovas
         Anna Pia D. Felix
         Jacob E. Englander
747 Third Avenue, 16th Floor
New York, NY 10017
(212) 758-9300
(212) 888-3295 (fax)
rgiacovas@lpgmlaw.com
afelix@lpgmlaw.com
jenglander@lpgmlaw.com

16

FILED: BRONX COUNTY CLERK 05/22/2023 05:01 PM INDEX NO. 803962/2023E
NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 05/22/2023

*Attorneys for Plaintiff Goldstein Consulting Services, LLC*

17

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

------------------------------------------------------------ x

GOLDSTEIN CONSULTING SERVICES, LLC,

                Plaintiff,

    -against-

Q5ID, INC.,

                Defendant.

Index No. 651278/23

**DEFENDANT Q5ID, INC.'S**
**ANSWER TO COMPLAINT AND**
**COUNTERCLAIMS**

------------------------------------------------------------ x

Q5ID, INC.,

                Counterclaim-Plaintiff,

    -against-

GOLDSTEIN CONSULTING SERVICES, LLC,

                Counterclaim-
                Defendant.

------------------------------------------------------------ x

      Defendant Q5iD, Inc. ("Defendant" or "Q5iD"), by its attorneys Cowan, Liebowitz &

Latman, P.C., as and for its Answer to the Complaint (the "Complaint") filed by Plaintiff

Goldstein Consulting Services, LLC ("Plaintiff" or "GCS") responds to the allegations in the

Complaint as follows:

## NATURE OF THE ACTIONS

      1.    Defendant admits that it was founded in 2018 and that it has used the phrase

"THE premier enterprise cybersecurity software company delivering world-class identity

management solutions" in certain contexts but denies the remaining allegations contained in

Paragraph 1 of the Complaint.

      2.    Defendant admits that it entered into a contract with Plaintiff wherein Defendant

agreed to pay Plaintiff in exchange for certain software services to be rendered to Defendant but

states that Plaintiff failed to perform its obligations under the contract and that no further sums are

owed to Plaintiff, and, further, the Defendant is entitled to a return of money already paid due to

the poor quality of Plaintiff's work and Plaintiff's failure to fulfill its obligations and denies the

remaining allegations contained in Paragraph 2 of the Complaint.

      3.      Defendant denies the allegations contained in Paragraph 3 of the Complaint.

      4.      Defendant admits that it has received investor funding in connection with its

business but denies the remaining allegations contained in Paragraph 4 of the Complaint.

      5.      Defendants admits that Plaintiff purports to bring claims against Defendant for

breach of contract, unjust enrichment and account stated but denies that Plaintiff has established

such claims and denies liability therefor.

## THE PARTIES

      6.      Defendants is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 6 of the Complaint.

      7.      Defendant admits the allegations contained in Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

      8.      Defendant is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 8 of the Complaint.

      9.      Defendant denies the allegations contained in Paragraph 9 of the Complaint.

      10.      Defendants admits that it has had certain communications with Plaintiff and other

independent contractors in New York and otherwise denies the allegations contained in

Paragraph 10 of the Complaint.

      11.      Defendant admits that it is has engaged in business with Plaintiff, Rearc, LLC

("Rearc") and Xmogrify, LLC ("Xmogrify") but is without knowledge or information sufficient

to form a belief as to the offices or locations of Plaintiff, Rearc or Xmogrify and denies the

remaining allegations in Paragraph 11 of the Complaint.

12.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 12 of the Complaint.

13.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 13 of the Complaint.

14.    Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 14 of the Complaint.

15.    Defendant admits that it entered into a written agreement with Plaintiff referred to as the MSA but is without knowledge or information sufficient to form as belief as to the location where GCS performed any alleged services or sent invoices and denies the remaining allegations contained in Paragraph 15 of the Complaint.

16.    Defendant admits that it entered into a written agreement referred to as the MSA with Plaintiff, which agreement is not dated, but denies the remaining allegations contained in Paragraph 16 of the Complaint.

17.    Defendant admits that it hired Kevin Goldstein ("Goldstein") as an employee but is without knowledge or information as to the date in which such employment commenced and states that Goldstein was terminated in or around March 2023 for cause and denies the remaining allegations contained in Paragraph 17 of the Complaint.

18.    Defendant denies the allegations contained in Paragraph 18 of the Complaint.

19.    Defendant admits the allegations contained in Paragraph 19 of the Complaint but is without knowledge or information sufficient to form a belief as whether such county is an appropriate venue for trial.

20.    Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 20 of the Complaint.

## FACTUAL BACKGROUND

21.     Defendant admits that it was founded in 2018 and that it has used the phrase "THE premier enterprise cybersecurity software company delivering world-class identity management solutions" in certain contexts but denies the remaining allegations contained in Paragraph 21 of the Complaint.

22.     Defendant denies the allegations contained in Paragraph 22 of the Complaint.

23.     Defendant denies the allegations contained in Paragraph 23 of the Complaint.

24.     Defendant denies the allegations contained in Paragraph 24 of the Complaint.

25.     Defendant denies the allegations contained in Paragraph 25 of the Complaint and states that Defendant is a startup engaged in product building, marketing and growth.

26.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 26 of the Complaint.

27.     Defendant admits that it entered into a Consulting Agreement (the "MSA") with Plaintiff, which was undated, and refers to the MSA for its terms, and otherwise denies the remaining allegations contained in Paragraph 27 of the Complaint.

28.     Defendant refers to the MSA for its terms and otherwise denies the remaining allegations contained in Paragraph 28 of the Complaint.

29.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 29 of the Complaint.

30.     Defendant admits that the MSA provided that Plaintiff would charge Defendant for services rendered at a rate of $45,000 per month and refers the Court to the MSA for the terms thereof but denies that Plaintiff performed such services or that it is entitled to such compensation and further denies the remaining allegations contained in Paragraph 30 of the Complaint.

31.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 31 of the Complaint.

32.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 32 of the Complaint.

33.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 33 of the Complaint.

34.     Defendant admits that it received certain invoices from Plaintiff but denies that Plaintiff is entitled to payment in connection with such invoices and further denies the remaining allegations contained in Paragraph 34 of the Complaint.

35.     Defendant denies the allegations contained in Paragraph 35 of the Complaint and further denies that Plaintiff performed the services for which it was invoicing Defendant.

36.     Defendant admits that it did not pay the full amount invoiced by Plaintiff and denies the remaining allegations contained in Paragraph 36 of the Complaint.

37.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 37 of the Complaint.

38.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 38 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the services for which is was invoicing Defendant.

39.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 39 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

40.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 40 of the Complaint.

41.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 41 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

42.     Defendant denies the allegations contained in Paragraph 42 of the Complaint.

43.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 43 of the Complaint.

44.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 44 of the Complaint.

45.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 45 of the Complaint.

46.     Defendant denies the allegations contained in Paragraph 46 of the Complaint.

47.     Defendant denies the allegations contained in Paragraph 47 of the Complaint.

48.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 48 of the Complaint.

49.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 49 of the Complaint.

50.     Defendant denies the allegations contained in Paragraph 50 of the Complaint.

51.     Defendant denies the allegations contained in Paragraph 51 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

52.     Defendant denies the allegations contained in Paragraph 52 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

53.     Defendant denies the allegations contained in Paragraph 53 of the Complaint.

54.     Defendant denies the allegations contained in Paragraph 54 of the Complaint.

55.     Defendant admits that it offered Kevin Goldstein a position as an employee but denies the remaining allegations contained in Paragraph 55 of the Complaint.

56.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 56 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

57.     Defendant admits that it employed Goldstein but is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 57 of the Complaint.

58.     Defendant denies the allegations contained in Paragraph 58 of the Complaint.

59.     Defendant is without knowledge or information sufficient to form a belief as to Goldstein's move to New York and denies the remaining allegations contained in Paragraph 59 of the Complaint.

60.     Defendant admits that in or around January 2023 Brian Grant ("Grant") was appointed as CFO of the Company and denies the remaining allegations contained in Paragraph 60 of the Complaint.

61.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding discussions between Grant and Goldstein contained in contained in Paragraph 61 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

62.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding phone calls between Grant and Goldstein contained in Paragraph 62 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

63.     Defendant is without knowledge or information sufficient to form a belief as to discussions between Grant and Goldstein contained in Paragraph 63 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

-7-

64.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding a phone call between Grant and Goldstein and denies the remaining allegations contained in Paragraph 64 of the Complaint.

65.     Defendant admits that on or about March 2, 2023, a company meeting was held wherein Michael Marcotte introduced himself as CEO of the company and advised that Larson would be transitioning to a new role and denies the remaining allegations contained Paragraph 65 of the Complaint.

66.     Defendant denies the allegations contained in Paragraph 66 of the Complaint.

67.     Defendant admits that the company received certain funding in March 2023 and denies the remaining allegations contained in Paragraph 67 of the Complaint.

68.     Defendant denies the allegations contained in Paragraph 68 of the Complaint but states that Goldstein was terminated in March 2023 for cause.

69.     Defendant denies the allegations contained in Paragraph 69 of the Complaint. With respect to the accompanying footnote, Defendant admits that there are pending lawsuits involving Defendant and Xmogrify and Rearc and that Defendant denies the allegations contained in those complaints and any liability therein.

70.     Defendant denies the allegations contained in Paragraph 70 of the Complaint.

71.     Defendant denies the allegations contained in Paragraph 71 of the Complaint.

72.     Defendant denies the allegations contained in Paragraph 72 of the Complaint.

**FIRST CAUSE OF ACTION**
**ACCOUNT STATED**

73.     Defendant repeats and realleges its responses to Paragraphs 1 - 72 as if fully set forth herein.

33006/001/4363639.3

23-1100720-1007-48 Filed 04/08/24 Entered 08/24 12:39:23 Main Document Exhibit Pg 70 of
INDEX NO. 803962/2023E
FILED: BRONX COUNTY CLERK 09/08/2023 12:45 PM
answer/counterclaim Pg 17 of 28
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 09/08/2023

74.     Defendant denies the allegations contained in Paragraph 74 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

75.     Defendant denies the allegations contained in Paragraph 75 of the Complaint and states that the MSA requires any amendments to be in writing and that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

76.     Defendant denies the allegations contained in Paragraph 76 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

77.     Defendant denies the allegations contained in Paragraph 77 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

78.     Defendant denies the allegations contained in Paragraph 78 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

79.     Defendant denies the allegations contained in Paragraph 79 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

80.     Defendant denies the allegations contained in Paragraph 80 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

81.     Defendant denies the allegations contained in Paragraph 81 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant,

which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

82.    Defendant denies the allegations contained in Paragraph 82 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

83.    Defendant denies the allegations contained in Paragraph 83 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

84.    Defendant denies the allegations contained in Paragraph 84 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

85.    Defendant denies the allegations contained in Paragraph 85 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

86.    Defendant denies the allegations contained in Paragraph 86 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

87.    Defendant denies the allegations contained in Paragraph 87 of the Complaint.

33006/001/4363639.3

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

88.     Defendant repeats and realleges its responses to Paragraphs 1 - 87 as if fully set forth herein.

89.     Defendant admits the allegations contained in Paragraph 89 of the Complaint.

90.     Defendant denies the allegations contained in Paragraph 90 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

91.     Defendant denies the allegations contained in Paragraph 91 of the Complaint and states that the MSA requires any amendments to be in writing and that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

92.     Defendant denies the allegations contained in Paragraph 92 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

93.     Defendant denies the allegations contained in Paragraph 93 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

94.     Defendant denies the allegations contained in Paragraph 94 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

95.     Defendant denies the allegations contained in Paragraph 95 of the Complaint.

96.     Defendant denies the allegations contained in Paragraph 96 of the Complaint and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

97.     Defendant denies the allegations contained in Paragraph 97 of the Complaint and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

98.     Defendant denies the allegations contained in Paragraph 98 of the Complaint.

99.     Defendant denies the allegations contained in Paragraph 99 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

100.    Defendant denies the allegations contained in Paragraph 100 of the Complaint.

## THIRD CAUSE OF ACTION
### IN THE ALTERNATIVE, UNJUST ENRICHMENT

101.    Defendant repeats and realleges its responses to Paragraphs 1 - 100 as if fully set forth herein.

102.    Defendant denies the allegations contained in Paragraph 102 of the Complaint.

103.    Defendant denies the allegations contained in Paragraph 103 of the Complaint.

104.    Defendant denies the allegations contained in Paragraph 104 the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

105.    Defendant denies the allegations contained in Paragraph 105 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

106.    Defendant denies the allegations contained in Paragraph 106 the Complaint and further states that the invoices submitted by Plaintiff failed to set forth the details of the services allegedly performed.

33006/001/4363639.3

107.    Defendant denies the allegations contained in Paragraph 107 of the Complaint and

states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant,

which Plaintiff failed to do.

108.    Defendant denies the allegations contained in Paragraph 108 of the Complaint.

109.    Defendant denies the allegations contained in Paragraph 109 of the Complaint.

110.    Defendant denies the allegations contained in Paragraph 110 of the Complaint

111.    Defendant denies the allegations contained in Paragraph 111 of the Complaint.

112.    Defendant denies the allegations contained in Paragraph 112 of the Complaint.

## **AFFIRMATIVE AND OTHER DEFENSES**

### **First Defense**

Plaintiff failed to perform its obligations under the agreements between the parties and is

therefore barred from any recovery.

### **Second Defense**

To the extent that Plaintiff's claims are based on any oral agreement or oral amendment

to a written agreement, such claims are barred by the Statute of Frauds.

### **Third Defense**

To the extent Plaintiff has suffered any damages for which the law would provide a

remedy, which Defendants deny, Plaintiff is not entitled to an award of attorneys' fees.

### **Fourth Defense**

Plaintiff's claims are barred by the principle of equitable estoppel.

### **Fifth Defense**

Plaintiff's claim for unjust enrichment is barred as duplicative of Plaintiff's contract

claim.

\* \* \*

WHEREFORE, Defendant Q5iD respectfully requests judgment in its favor, that Plaintiff's claims be dismissed in their entirety, an award of attorneys' fees and costs, an award of prejudgment and post-judgment interest at the highest rate allowed by law, and such other further relief as the Court deems just and proper.

## COUNTERCLAIMS

Q5iD, Inc. ("Counterclaim Plaintiff" or "Q5iD"), by its attorneys Cowan, Liebowitz & Latman, P.C., brings these counterclaims against Goldstein Consulting Services, LLC ("Counterclaim Defendant" or "GCS") for breach of the MSA and other agreements between the parties due to GCS' failure to perform the services required and for breach of the confidentiality provision therein. As a result of GCS' breaches, Q5iD seeks a refund of the amounts paid by Q5iD to GCS and damages due to breach of confidentiality.

## PARTIES

1.     Counterclaim-Plaintiff Q5id is a corporation organized under the laws of Oregon, with business locations at 801 Barton Springs, Austin, Texas and 800 Bellevue Way NE, Bellevue, Washington.

2.     Upon information and belief, Counterclaim-Defendant GCS is a New York limited liability company with its principal place of business at 4445 Post Road, Apt. 4J, Bronx, New York.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this counterclaim pursuant to CPLR § 3019.

4.     Venue is proper because GCS is located in the Bronx, New York.

## FACTS

5.     Q5iD is an enterprise cybersecurity software identity management company providing enterprise technology products.

-14-

6.    Upon information and belief, GCS is a provider of software consultancy services.

7.    Upon information and belief, the sole owner and principal of GCS is Kevin Goldstein ("Goldstein").

8.    On or around March 16, 2022, Q5iD entered into a Consulting Agreement with GCS, alternatively referred to as the Master Services Agreement ("MSA").

9.    Per the MSA, GCS agreed to provide Q5iD with the following services: "Running development staff and operations, at the direction of the CIO/CTO," "Providing personnel for development purposes on an 'as-needed' basis," and "any other consulting tasks which the Parties may agree on."

10.    In return for GCS's performance of those services, Q5iD agreed to compensate GCS at a monthly rate.

11.    The MSA included a confidentiality provision that provided that GCS was not to disclose any data or information relating to the business of Q5iD that Q5iD would reasonably be considered to be proprietary, including accounting records, business processes, and client records, and information not generally known in the industry regarding Q5iD. Further, such information was deemed confidential regardless of whether it was provided before or after the date of the MSA or how it was provided to the GCS, and such obligations survived the termination of the MSA.

12.    Upon information and belief, GCS had a relationship with Rearc, LLC ("Rearc") and Xmogrify, LLC ("Xmogrify") and engaged those entities as subcontractors and/or business vendors to perform certain services for GCS or on behalf of Q5iD.

13.    Subsequently, Q5iD engaged Goldstein as an employee to perform certain software and consulting services for the company.

14.    During the course of the relationship between Q5iD and GCS, GCS submitted invoices to Q5iD notwithstanding that it did not perform the agreed upon services, or, alternatively,

-15-

for services that were deficient, inadequate and not in accordance with standard protocols and procedures in the industry.

15.     In or around March 2023, Q5iD conducted an internal audit to review the services allegedly provided by GCS and for which GCS had been submitting invoices to Q5iD.  The audit revealed that GCS and its business associates Rearc and Xmogrify had not been performing the services they had been engaged to perform, and, in the alternative, any services that were provided were deficient and substandard. In fact, no work product, artifacts or accompanying data, worksheets, manuals or other materials have been provided to Q5iD despite Plaintiff's demands for payment.

16.     As a result of an internal investigation and audit, in or around March 2023, Q5iD terminated Goldstein as an employee at Q5iD. The termination was for cause due to Goldstein's failure to perform the services of his employment in a satisfactory manner.

17.     Any payments due to GCS were conditioned upon GCS's performance of its obligations under the MSA or any other contracts upon which GCS relies.  Thus, Q5iD does not have any payment obligations to GCS and is entitled to a return of sums already paid.

18.     On May 22, 2023, GCS publicly filed the Complaint in this action against Q5iD for account stated, breach of contract, and unjust enrichment.

19.     In the GCS Complaint, GCS disclosed proprietary and confidential business information relating to Q5iD in violation of the confidentiality provision in the MSA, including payment records, investor information and business processes and practices.

20.     Further, on or about May 26, 2023, GCS sent an email to certain persons disclosing details regarding the parties' business relationship and the disputes between the parties, in breach of the confidentiality provision of the MSA. GCS has further threatened to reveal additional confidential information in an effort to obtain leverage in this dispute.

21. Q5iD's investigation into GCS's conduct is still ongoing and it is likely to find additional unauthorized disclosure of confidential and proprietary information in breach of the MSA.

22. As a result of GCS's actions, Q5iD has been damaged and its reputation has been harmed, causing damage in an amount to be determined at trial.

23. GCS's unlawful activities have also resulted in irreparable harm and injury to Q5iD for which Q5iD has no adequate remedy at law, and GCS must be further restrained to prevent further disclosure and harm to Q5iD.

24. As a result of GCS' breaches of the MSA, Q5iD is entitled to an injunction prohibiting further disclosure of confidential information and to damages, in an amount to be determined at trial.

## COUNT I
### (Breach of Contract)

25. Q5iD realleges paragraphs 1 through 24 above, as fully set forth herein.

26. Q5iD and GCS formed an agreement, the MSA, through which GCS would provide consulting services to Q5iD.

27. GCS did not perform the consulting services it had contracted to perform under the MSA.

28. Q5iD performed by making some payments to GCS under the MSA but is relieved of further obligations under the MSA due to GCS' nonperformance and deficient performance.

29. As a result of this breach, Q5iD has incurred losses by paying for services that were not performed or were not performed satisfactorily.

30. Accordingly, Q5iD is entitled to a return of the amounts paid by Q5iD to GCS under the MSA.

## COUNT II
### (Breach of Confidentiality)

31.     Q5iD realleges paragraphs 1 through 30 above, as fully set forth herein.

32.     Q5iD and GCS formed an agreement, the MSA, which provide that GCS would maintain certain business and proprietary information of Q5iD in confidence and would not disclose such information publicly.

33.     GCS disclosed confidential information of Q5iD by publicly filing the Complaint which contained proprietary and confidential business information relating to the business of Q5iD, including payment records, investor information and business processes and practices.

34.     Further, on or about May 26, 2023, GCS sent an email publicly disclosing confidential information.

35.     Q5iD has been damaged by the public disclosure of its confidential information by GCS in an amount to be determined at trial.

36.     As a result of GCS's wrongful conduct, Q5iD has sustained, and will continue to sustain, immediate irreparable harm and incalculable monetary loss.

### PRAYER FOR RELIEF

WHEREFORE, Q5iD respectfully demands judgment against GCS and respectfully requests that:

1.     The Court grant judgment in favor of Q5iD and against GCS Defendants on all of Q5iD's claims;

2.     The Court issue a permanent injunction against GCS and its officers, agents, subsidiaries, servants, partners, employees, attorneys, and all others in active concert or participation with it:

a.   requiring GCS to return or destroy all of Q5iD's Confidential Information;

33006/001/4363639.3

   b. enjoining GCS from using or disclosing Q5iD's Confidential Information to any party, at any time, and for any reason;

   c. requiring GCS to provide an accounting of the whereabouts of, and the names of all persons given access to or who otherwise viewed, Q5iD's Confidential Information, including all files, data, information removed, downloaded, transferred or forwarded to any third-parties or unauthorized employees or contractors,

   d. requiring GCS to delete all content obtained from Q5iD anywhere it may reside, including the computer system and servers of GCS or on any other computer, electronic device, or cloud accounts, hard copy documents, or any other materials in GCS's possession, custody, or control; and

   e. requiring GCS to provide written certification to Q5iD's counsel of its compliance with paragraph (d) above;

3. The Court award Q5iD a judgment against GCS on the above claims in an amount of damages as may be proven at trial, including the disgorgement of any profits, benefits, or compensation received as a result of GCS's misconduct;

4. The Court award of attorneys' fees and costs, an award of prejudgment and post-judgment interest at the highest rate allowed by law, and such other further relief as the Court deems just and proper.

5. The Court grant Q5iD such other and further relief as the Court deems just, equitable, and proper.

Dated: New York, New York        COWAN LIEBOWITZ & LATMAN, P.C.
       September 8, 2023

                            By:_____ /s/ Meichelle R. MacGregor_____
                            Meichelle R. MacGregor
                            Jeremy A. Berman

-19-

Paige A. Geier
114 West 47th Street
New York, New York 10036-1525
(212) 790-9200

Attorneys for Q5iD, Inc.

To:

Lazare Potter Giacovas & Moyle LLP
747 Third Avenue, 16th Floor
New York, NY 10017
Attorneys for Goldstein Consulting Services,
LLC

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-------------------------------------------------------------- X

Rearc LLC,                                      Index No. 651278/23

                  Plaintiff,

             - against -

Q5id Inc.,                                      Plaintiff designates New York County as
                                                the place of trial.

                  Defendant.

-------------------------------------------------------------- X

**COMPLAINT**

Plaintiff Rearc, LLC ("Plaintiff" or "Rearc"), by and through its undersigned counsel, and for its Complaint against defendant Q5id Inc. ("Q5id," the "Company," or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.      Defendant Q5id is a start-up company founded in 2018 and touts itself as "THE premiere enterprise cybersecurity software company." In fact, and though Q5id has raised millions of dollars from investors, it has failed to pay Plaintiff Rearc (and numerous other contractors) for the developmental work to build its business. So determined were its officers to enrich themselves from investor cash that, despite promising Rearc (and other contractors) that they would be paid from additional financing and inducing them to work for "free," when the capital came in, the officers paid themselves unapproved commissions and prioritized paying themselves, and paid nothing but lip service to Rearc (and other contractors).

2.      Rearc now brings this action to address Defendant's breach of contract and other wrongful conduct, in connection with certain services Rearc provided to Q5id. Pursuant to a

1



written agreement, Q5id promised to pay Rearc, in exchange for Rearc's services, which would be invoiced monthly and paid within 30 days of receipt of the invoice. Beginning in April 2022, Rearc performed services in accordance with the agreement, which services the Company accepted. The Company paid the first invoice as the parties agreed; however, though time – and Rearc's work – progressed, Q5id stopped paying the invoices entirely.

3.      To excuse its breaches, the Company claimed that it had insufficient capital to pay Rearc. However, in order to induce Rearc to continue to provide services, Q5id's management advised that the Company was working diligently to raise capital and repeatedly and falsely promised that it would pay all outstanding amounts due once it received a capital infusion. In reliance upon the Company's promises, Rearc continued to provide services to Q5id through December 2022, and to show its good faith, even agreed that the work it performed in December 2022 would be *free*.

4.      On information and belief, the Company has received funding on multiple occasions. However, despite due demand and though it has repeatedly acknowledged and never objected to the invoices and/or the amounts due to Rearc, and repeatedly promised to pay them in full, Q5id has not fully paid Rearc for services rendered from June 2022 through November 2022. To date, the Company owes $556,070, plus interest in an amount to be determined, to Rearc.

5.      Rearc now asserts claims against Defendant for breach of contract, unjust enrichment, and account stated.

<u>**THE PARTIES**</u>

6.      Plaintiff Rearc is a Delaware limited liability company with a principal place of business at 1216 Broadway, Suite 218, New York, New York. Rearc is a boutique consulting firm specializing in transforming organization, driving digital transformation efforts, enabling the use

2

of cloud and modern software development practices, and leveraging data to make better decisions. and one of its principals is Mahesh Varma ("Varma"). Rearc has employees in New York City and throughout the United States.

7.      On information and belief, defendant Q5id is a corporation organized under the laws of Oregon, with its headquarters at 801 Barton Springs, Austin, Texas, and 800 Bellevue Way NE, Bellevue, Washington. It claims it is a cybersecurity software company that sells software and services to protect against fraud, data breaches, and identity theft.

## JURISDICTION AND VENUE

8.      Jurisdiction is properly laid in this Court in that the Company is subject to personal and specific jurisdiction in New York.

9.      The Company has systematic and continuous contacts in New York as it transacts business in New York. Specifically, it recruits and solicits numerous independent contractors (such as Rearc) located in New York, enters into agreements with such contractors to perform services on behalf of the Company from New York, and accepts services from such contractors which are performed fully, or in large part, in New York.

10.     The Company has engaged in and solicited business from at least three independent contractors who conduct business in and perform services from New York: (a) Rearc, which has an office in New York County, New York; (b) Xmogrify, LLC ("Xmogrify"), which is located in Westchester County, New York; and (c) Goldstein Consulting Services, LLC ("GCS"), which is located in Bronx County, New York.

11.     The Company's communications by, among other things, telephone, text messages, and email, with the independent contractors that it solicits and hires in New York takes place, in part, in New York.

3

12.    As alleged below, on information and belief, the Company instructed another independent contractor that it hired, Xmogrify – which is based in New York – to introduce Rearc to the Company.    In addition, the Company instructed Xmogrify to communicate on its behalf with Rearc, which communications took place, in part, in New York.  The Company's repeated promises to pay Rearc, in accordance with the parties' written agreement, were relayed by Xmogrify in New York.

13.    Rearc, Xmogrify, and another New York-based contractor, GCS, worked closely together and communicated on an almost daily basis in connection with the services they provided to the Company, which communications took place, in part, in New York.

14.    Moreover, on information and belief, one of the Company's officers traveled to New York in November 2022, to raise capital and to solicit investments from investors in New York.

15.    Venue is properly laid in New York County as the acts and events giving rise to the claims set forth herein took place in substantial part in New York County.  Rearc has a principal office in and conducts business from New York County.

16.    The services provided by Rearc to the Company were performed in substantial part in New York County by an employee of Rearc who works from and resides in New York County.

17.     In addition, Rearc designates New York County as the place of trial.

18.    Jurisdiction and venue are proper herein pursuant to New York Civil Rules and Practice §§ 302 and 503.

4

# FACTUAL BACKGROUND

*The Business of Q5id*

19.     On its website, Q5id touts itself as "THE premiere enterprise cybersecurity software company." In fact, Q5id is a start-up that was founded only a few short years ago in 2018.

20.     On information and belief, the Company only has a few dozen employees, and thus is deeply reliant on the services of outside, independent contractors to assist in its software, business, and technology development.

21.     As of early 2022, the Company's "software" was highly ineffectual, replete with performance errors and inefficiencies, and could not be launched. Indeed, the Company had *no* marketable product, and as such, it was desperate to hire software and technology experts – like Rearc – to "fix" the "bugs" and build usable products.

22.     At all relevant times, Q5id had nearly 60 independent contractors, including Rearc.

23.     On information and belief, to date, Q5id has no corporate clients, and only has "potential clients" that have never provided revenue or user flow. Thus, it relies upon funding from investors to keep its business afloat.

*One of the Company's New York-Based Contractors Introduces,*
*Rearc to the Company and Q5id Enters into a Statement of Work with Rearc*

24.     On information and belief, beginning in March 2022, the Company contracted with Xmogrify, a New York-based company specializing in technology design, management, and consulting services. Xmogrify, in turn, introduced Rearc to the Q5id.

25.     On April 25, 2022, Q5id and Rearc entered into a Statement of Work (the "SOW").

5

26.     Pursuant to the SOW, Rearc agreed to provide certain services (the "Services"),

including, *inter alia*, designing and building a cloud architecture and providing other software

support to the Company and its existing technology, which would be broken down into two tracks,

commencing on April 25, 2022.

27.     In connection with the Services, Rearc worked closely with Xmogrify.  All of

Rearc's contractors on the project reported to Xmogrify's principal, David Levy ("Levy"), who

was located in and performed services from his office in Westchester County, New York.

28.     In addition, Company-related communications were primarily relayed by Levy to

Rearc's principal, Mahesh Varma ("Varma"), while Levy was in New York.

29.     In connection with the Services, Rearc (and all of its individual contractors) also

worked closely with GCS and its principal, Kevin Goldstein.

30.     The Company agreed to pay Rearc for the Services "on a time and materials basis

at cost" as follows:

| Position | Hourly Rate | Discounted Hourly Rate |
| --- | --- | --- |
| Architect | $250 | $237.50 |
| Senior Engineer | $200 | $190 |
| Engineer | $175 | $166.25 |
| Engineer | $175 | $166.25 |
| Engineer | $175 | $166.25 |

31.     The parties further agreed that Rearc would invoice on a monthly basis, with

payment due within thirty (30) days of receipt of the invoice.

*Q5id Breaches the Agreement and Rearc Demands Payment*

32.     Beginning on or about April 25, 2022, Rearc began performing the Services and

subsequently submitted invoices on a monthly basis to the Company.

6

33.     Importantly, the Company never objected to a single invoice submitted by Rearc or any of the amounts sought therein.  In fact, it fully paid Rearc for the invoice submitted in June 2022 for the Services rendered from April 2022 through May 2022.

34.     However, though it acknowledged that the invoices and the amounts therein were accurate, it abruptly stopped paying *any* subsequent invoices beginning in June 2022.

35.     Thereafter, Varma, on behalf of Rearc, demanded payment for the overdue invoices.

*Q5id Makes Repeated and Continuous Promises to Pay Rearc in Full*

36.     On multiple occasions beginning in or around mid-June 2022, Varma spoke to Levy – who was Rearc's main point of contact at the Company – regarding the status of the outstanding invoices of Rearc and demanded payment.

37.     Levy advised Varma that the Company was also delinquent in paying Xmogrify's invoices.  However, Levy – who on information and belief was instructed by the Company to speak to Varma and to convey Q5id's promises to Rearc on its behalf – advised Varma that he was in constant communication with the Company's then-Chief Executive Officer, Steve Larson ("Larson"), and then-Chief Information Officer and Chief Technology Officer, Rebecca Wanta ("Wanta"), who acknowledged that (i) the invoices and the amounts sought by Rearc were correct; (ii) the Company was in breach of the SOW; and (iii) and Rearc was owed payment.  However, they claimed that the Company did not have sufficient capital to continue to pay for the Services.

38.     The Company knew that Rearc would not continue to provide Services unless it was paid.  As such, to induce Rearc to continue to provide the Services, Larson and Wanta – through Levy – advised Varma that the Company was expecting financing from its ongoing capital

7

raises and that he simply "needed more time." They then promised Varma that if Rearc "stuck it out," the Company would pay Rearc in full as soon as it received the expected capital infusion.

39.     As such, Rearc continued to provide Services to Q5id, in good faith and in accordance with the SOW, and in reliance upon the Company's express promises.

40.     However, the Company continued to be delinquent in its payments, and as such, the amounts owed to Rearc for services from June through August were nearly half a million dollars.

41.     Beginning in August 2022, Rearc's accounting department began sending emails almost daily to the Company's accounting department, demanding payment.

42.     Because Rearc had made clear that it could not continue the Services without some payment, the Company made a one-time $75,000 payment on September 1, 2022 and another payment of $25,000 on November 25, 2022 toward the June 2022 invoices – which was a mere fraction of what was owed.

43.     Varma thereafter reached out directly to Larson and Wanta and requested a meeting to discuss the significant amounts owed to Rearc.

44.     During a phone call on September 30, 2022, with Larson, Wanta, Varma, (and Xmogrify's principal, Levy), Larson again acknowledged – as the Company had done through Levy months earlier – that (i) Rearc's invoices and the amounts sought therein were correct, (ii) the Company was in breach of the Agreement, and (iii) Rearc was owed hundreds of thousands of dollars. However, they reiterated that the Company did not have sufficient capital to pay for the Services.

8

45.     Again, in order to induce Rearc to continue to provide the Services, Larson and Wanta advised Varma that the Company was "so close" to obtaining funding from its ongoing capital raises.

46.     Larson and Wanta then promised that if Rearc continued to provide the Services, all outstanding amounts (which at that time was $476,000) would be paid in full by the end of October 2022.

47.     As such, Rearc continued to perform its obligations under the SOW.

48.     However, the Company *again* failed to pay the outstanding amounts at the end of October.

49.     On or about November 2, 2022, Varma again reached out to Larson and Wanta demanding payment and requesting an update regarding the Company's capital raise.

50.     In a phone call held on or about November 10, 2022, Larson again promised that Rearc would be paid what was owed and even apologized to Varma for the Company's missed payments. Then, to portray the Company's alleged viability and further induce Rearc to continue providing the Services, he offered and later provided Rearc with stock options.

51.     Contemporaneously with the above discussions, Varma continued to discuss the outstanding payments due to Rearc with Levy. Again, Levy advised that Xmogrify – like Rearc – was also owed hundreds of thousands of dollars for the services it was performing for the Company, but that Larson and Wanta promised him that Xmogrify – like Rearc – would be paid once the Company received additional funding.

52.     As such, Rearc provided Services under the SOW until November 30, 2022, when it terminated the SOW. As a show of good faith and in reliance upon promises that payment would be forthcoming, it even agreed to provide its Services to the Company *for free* in December.

9

RECEIVED NYSCEF: 05/22/2023

53. But no good deed goes unpunished, and months passed with no payments from the Company.

54. On January 23, 2023, the Company appointed Brian Grant ("Grant") as Chief Financial Officer.

55. Thereafter, Varma reached out to Wanta and requested that he be introduced to Grant to discuss the outstanding payments to Rearc.

56. In a phone call on February 7, 2023, Grant expressly acknowledged that the Company owed over $500,000 to Rearc. However, he reiterated that the Company needed additional capital and asked that Varma "work with" them by agreeing to a payment plan.

57. Grant then promised to send a proposed payment plan to Rearc.

58. However, neither Grant, nor anyone else at the Company sent a payment plan to Rearc.

*The Company Never Pays Rearc*

59. On information and belief, the Company received more than $2.5 million in funding since July 2022, and most recently, received $6 million in funding in March 2023. However, rather than paying Rearc, the Company's officers, including Larson, paid themselves unapproved commissions, and prioritized paying themselves.

60. Q5id did not pay Rearc for the services rendered from June 1, 2022 through November 30, 2022.

61. To date, Rearc is owed $556,070, plus interest in an amount to be determined.

*Rearc Discovers the Company's Fraudulent Scheme*

62. Rearc has since discovered that the Company has engaged in a scheme wherein it retains outside contractors to perform services for the Company, breaches their agreements with

10

such contractors, and fraudulently induces them to continue providing services on the false promise that they would be paid when Q5id receives additional capital.[1]

63.     On information and belief, presently, the Company is in breach of at least eleven other agreements with outside contractors and other creditors owes more than $5.5 million collectively.

64.     Rearc has also discovered that the stock options granted to it by the Company have no present value, and in fact, would require Rearc to remit money to the Company if it later wishes to exercise any of those options.

65.     As such, the stock options do not reduce the total amount owed by the Company to Rearc for the Services that were provided, accepted, invoiced, and remain unpaid.

## FIRST CAUSE OF ACTION
### ACCOUNT STATED

66.     Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

67.     Pursuant to the Agreement, Q5id promised to pay Plaintiff in exchange for the Services.

68.     Plaintiff performed all its obligations under the SOW and performed the Services from April 25, 2022 through November 30, 2022, which Services the Company accepted.

69.     Plaintiff submitted invoices for the Services, from May 2022 through November 2022, to the Company.

70.     Payment on the invoices was due within thirty (30) days of receipt of the invoices.

---

[1]     Two other contractors retained by the Company have commenced lawsuits in the Supreme Court of New York. *XMogrify LLC v. Q5id, Inc., et al*, Index No. 57870/2023 is pending in Westchester County, and *Goldstein Consulting Services, LLC v. Q5id, Inc., et al*, Index No. 803962/2023 is pending in Bronx County.

11

71. Each invoice included (i) the date(s) the Services were performed; (ii) the amounts due; (iii) and that payment on the invoices was due within thirty (30) days of receipt of the invoice.

72. Q5id received the invoices from Plaintiff, never objected to any of the issued invoices, or the amounts stated therein.

73. On multiple occasions from June 2022 through February 2023, Q5id acknowledged that the invoices were true and correct and that the amounts set forth therein were due and owing to Plaintiff.

74. On multiple occasions from June 2022 through February 2023, Q5id promised to pay the amounts due under the invoices to Plaintiff.

75. Despite demand, the Company has refused to pay the amounts due and owing to Plaintiff.

76. As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $556,070, plus interest.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

77. Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

78. Plaintiff and Q5id executed the SOW.

79. Pursuant to the SOW, Q5id promised to pay Plaintiff in exchange for the Services.

80. From April 25, 2022 through November 30, 2022, Plaintiff performed all its obligations under the SOW.

81. Plaintiff submitted invoices for the Services to the Company, in accordance with the SOW and as directed by the Company.

12

82.    Q5id received the invoices from Plaintiff, never objected to any of the issued invoices, or the amounts stated therein, and continued to accept all Services provided by Plaintiff.

83.    Q5id materially breached the Agreement by unlawfully failing to pay the amounts due to Plaintiff beginning in June 2022.

84.    Despite demand, the Company has refused to pay the amounts due and owing to Plaintiff.

85.    As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $556,070, plus interest.

<u>**THIRD CAUSE OF ACTION**</u>
**IN THE ALTERNATIVE, UNJUST ENRICHMENT**

86.    Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

87.    From April 25, 2022 through November 30, 2022, Plaintiff performed the Services.

88.    Q5id accepted the Services rendered by Plaintiff and was enriched by such Services at Plaintiff's expense, as the value of such Services amounted to $556,070, plus interest.

89.    Q5id was aware the Plaintiff was not providing the Services gratuitously and that the value of such Services amounted to $556,070, plus interest.

90.    On multiple occasions since June 2022, Plaintiff demanded that Q5id pay Plaintiff for the Services and submitted invoices to Q5id for payment.

91.    Q5id received the invoices from Plaintiff, acknowledged the invoices, and never objected to any of the invoices, or the amounts sought therein.

92.    On multiple occasions, Q5id's management promised that Plaintiff and its principal, Varma, that it would pay Plaintiff in full once the Q5id received funding from investors.

13

93.     Plaintiff and Q5id had a sufficiently close relationship or connection as to cause reliance or inducement by Plaintiff.  Plaintiff was retained by Q5id as an independent contractor, from April 2022 through December 2022.

94.     As a result of Q5id's accepting the Services without paying Plaintiff, Plaintiff has suffered actual and significant damages.  To date, Plaintiff is owed $556,070, plus interest for the Services rendered from June 1, 2022 through November 30, 2022.

95.     It is against equity and good conscience to permit Q5id to retain the amounts due to Plaintiff.

96.     Equity and good conscience require restitution to Plaintiff.

97.     As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but no less than $556,070, plus interest.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiff respectfully requests Judgment against Defendant:

(i)     in the amount of $556,070, plus pre- and post-judgment interest;

(ii)    attorney's fees and the costs of this action;

(iii)   and such other and further relief as the Court deems proper.

Dated: May 22, 2023
          New York, New York

LAZARE POTTER GIACOVAS
& MOYLE LLP

By:    <u>Robert A. Giacovas</u>
      Robert A. Giacovas
      Anna Pia D. Felix
      Jacob E. Englander
      747 Third Avenue, 16th Floor
      New York, NY 10017
      (212) 758-9300

14

FILED: NEW YORK COUNTY CLERK 05/22/2023 05:03 PM
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 05/22/2023

(212) 888-3295 (fax)
rgiacovas@lpgmlaw.com
afelix@lpgmlaw.com
jenglander@lpgmlaw.com

*Attorneys for Plaintiff Rearc, LLC*

# EXHIBIT F

FILED: NEW YORK COUNTY CLERK 09/08/2023 01:26 PM
NYSCEF DOC. NO. 10

INDEX NO. 651278/2023
RECEIVED NYSCEF: 09/08/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

REARC LLC,

       Plaintiff,      Index No. 651278/23

  -against-

Q5ID, INC.,

       Defendant.

         **DEFENDANT Q5ID, INC.'S**
         **ANSWER TO COMPLAINT**
         **AND COUNTERCLAIMS**

------------------------------------------------------------- x

Q5ID, INC.,

       Counterclaim-Plaintiff,

  -against-

REARC LLC,

       Counterclaim-
       Defendant.

------------------------------------------------------------- x

    Defendant Q5iD, Inc. ("Defendant" or "Q5iD"), by its attorneys Cowan, Liebowitz &

Latman, P.C., as and for its Answer to the Complaint (the "Complaint") filed by Plaintiff Rearc,

LLC ("Plaintiff" or "Rearc") responds to the allegations in the Complaint as follows:

<u>**NATURE OF THE ACTIONS**</u>

    1.   Defendant admits that it was founded in 2018 and that it has used the phrase

"THE premier enterprise cybersecurity software company delivering world-class identity

management solutions" in certain contexts but denies the remaining allegations contained in

Paragraph 1 of the Complaint.

    2.   Defendant admits that it entered into a contract with Plaintiff wherein Defendant

agreed to pay Plaintiff in exchange for certain software services to be rendered to Defendant but

states that Plaintiff failed to perform its obligations under the contract and that no further sums are

owed to Plaintiff, and, further, the Defendant is entitled to a return of money already paid due to



EXHIBIT
F

FILED: NEW YORK COUNTY CLERK 09/08/2023 01:26 PM
NYSCEF DOC. NO. 10

INDEX NO. 651278/2023
RECEIVED NYSCEF: 09/08/2023

the poor quality of Plaintiff's work and Plaintiff's failure to fulfill its obligations and denies the remaining allegations contained in Paragraph 2 of the Complaint.

3.     Defendant denies the allegations contained in Paragraph 3 of the Complaint.

4.     Defendant admits that it has received investor funding in connection with its business but denies the remaining allegations contained in Paragraph 4 of the Complaint.

5.     Defendants admits that Plaintiff purports to bring claims against Defendant for breach of contract, unjust enrichment and account stated but denies that Plaintiff has established such claims and denies liability therefor.

## THE PARTIES

6.     Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 6 of the Complaint.

7.     Defendant admits the allegations contained in Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 8 of the Complaint.

9.     Defendant denies the allegations contained in Paragraph 9 of the Complaint.

10.     Defendant admits that it is has engaged in business with Plaintiff, Rearc, LLC ("Rearc") and Goldstein Consulting Services, LLC ("GCS"), but is without knowledge or information sufficient to form a belief as to the offices or locations of Plaintiff, Rearc or GCS and denies the remaining allegations in Paragraph 10 of the Complaint.

11.     Defendants admits that it has had certain communications with Plaintiff and other independent contractors in New York and otherwise denies the allegations contained in Paragraph 11 of the Complaint.

00001/579/4363642.1

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:22 PM          INDEX NO. 651278/2023
NYSCEF DOC. NO. 10                                         RECEIVED NYSCEF: 09/08/2023

12.     Defendant admits that it entered into a written agreement with Plaintiff but is without knowledge or information sufficient to form as belief as to the remaining allegations contained in Paragraph 12 of the Complaint.

13.     Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 13 of the Complaint.

14.     Defendant admits that a member of Defendant's management travelled to New York on business but is without knowledge or information sufficient to form a belief as to the date of such travel and is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 14 of the Complaint.

15.     Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 15 of the Complaint.

16.     Defendant denies the allegations contained in Paragraph 16 of the Complaint.

17.     Defendant admits the allegations contained in Paragraph 17 of the Complaint but is without knowledge or information sufficient to form a belief as whether such county is an appropriate venue for trial.

18.     Defendants is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 18 of the Complaint.

## FACTUAL BACKGROUND

19.     Defendant admits that it was founded in 2018 and that it has used the phrase "THE premier enterprise cybersecurity software company delivering world-class identity management solutions" in certain contexts but denies the remaining allegations contained in Paragraph 19 of the Complaint.

20.     Defendant denies the allegations contained in Paragraph 20 of the Complaint.

21.     Defendant denies the allegations contained in Paragraph 21 of the Complaint.

FILED: NEW YORK COUNTY CLERK 09/08/2023 01:26 PM
INDEX NO. 651278/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 09/08/2023

22.     Defendant denies the allegations contained in Paragraph 22 of the Complaint.

23.     Defendant denies the allegations contained in Paragraph 23 of the Complaint and states that Defendant is a startup engaged in product building, marketing and growth.

24.     Defendant admits that it had engaged in business with Xmogrify, LLC ("Xmogrify") but denies the allegations contained in Paragraph 24 of the Complaint.

25.     Defendant admits it entered into a Statement of Work with Plaintiff (the "SOW") and refers to that agreement for its terms and otherwise denies the remaining allegations contained in Paragraph 25.

26.     Defendant refers to the SOW for its terms and otherwise denies the remaining allegations contained in Paragraph 26.

27.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 27 of the Complaint.

28.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 28 of the Complaint.

29.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 29 of the Complaint.

30.     Defendant admits that the SOW provided that Plaintiff would charge Defendant for services rendered at the hourly rates listed in Paragraph 30 of the Complaint, and otherwise refers to the SOW for its terms and denies the remaining allegations contained in Paragraph 30 of the Complaint.

31.     Defendant refers to the SOW for its terms and denies the remaining allegations contained in Paragraph 31 of the Complaint

32.     Defendant denies the allegations contained in Paragraph 32 of the Complaint and denies that Plaintiff performed the invoiced services.

-4-

FILED: NEW YORK COUNTY CLERK 09/08/2023 09:26 PM INDEX NO. 651278/2023

NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 09/08/2023

33.     Defendant denies the allegations contained in Paragraph 33 of the Complaint and

denies that Plaintiff performed the invoiced services or that the invoices contained sufficient

detail to adequately describe the services allegedly performed.

34.     Defendant admits that it did not pay the full amount invoiced by Plaintiff and

denies the remaining allegations contained in Paragraph 34 of the Complaint.

35.     Defendant is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 35 of the Complaint.

36.     Defendant is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 36 of the Complaint and denies that Plaintiff is due any

payment or that Plaintiff performed the invoiced services.

37.     Defendant is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 37 of the Complaint and denies that Plaintiff is due any

payment or that Plaintiff performed the invoiced services.

38.     Defendant is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 38 of the Complaint and denies that Plaintiff is due any

payment or that Plaintiff performed the invoiced services.

39.     Defendant denies the allegations contained in Paragraph 39 of the Complaint.

40.     Defendant denies the allegations contained in Paragraph 40 of the Complaint and

states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant,

which Plaintiff failed to do.

41.     Defendant is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 41 of the Complaint and denies that Plaintiff is due any

payment or that Plaintiff performed the invoiced services.

FILED: NEW YORK COUNTY CLERK 09/08/2023 01:02 PM    INDEX NO. 651278/2023
NYSCEF DOC. NO. 10    RECEIVED NYSCEF: 09/08/2023

42.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 42 of the Complaint but states that it did make some payments to Plaintiff and otherwise denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

43.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 43 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

44.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 44 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

45.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 45 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

46.    Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 46 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

47.    Defendant denies the allegations contained in Paragraph 47 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

48.    Defendant denies the allegations contained in Paragraph 48 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

49.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 49 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

50.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 50 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

51.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 51 of the Complaint and denies that Plaintiff is due any payment or that Plaintiff performed the invoiced services.

52.     Defendant denies the allegations contained in Paragraph 52 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

53.     Defendant denies the allegations contained in Paragraph 53 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

54.     Defendant admits that in or around January 2023 Brian Grant ("Grant") was appointed as CFO of the Company and denies the remaining allegations contained in Paragraph 54 of the Complaint.

55.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 55 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

56.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 56 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

-7-

FILED: NEW YORK COUNTY CLERK 09/08/2023 09:26 PM          INDEX NO. 651278/2023
NYSCEF DOC. NO. 10                                        RECEIVED NYSCEF: 09/08/2023

57.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 57 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

58.     Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 58 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

59.     Defendant admits that the company received certain funding in March 2023 and at other times but denies the remaining allegations contained in Paragraph 59 of the Complaint.

60.     Defendant is without knowledge or information sufficient to form a belief as to the allegations regarding the communications described in Paragraph 60 of the Complaint and denies that it owes any outstanding payments to Plaintiff.

61.     Defendant denies the allegations in Paragraph 61 of the Complaint.

62.     Defendant denies the allegations contained in Paragraph 62 of the Complaint. With respect to the accompanying footnote, Defendant admits that there are pending lawsuits involving Defendant and GCS and Xmogrify and that Defendant denies the allegations contained in those complaints and any liability therein.

63.     Defendant denies the allegations contained in Paragraph 63 of the Complaint.

64.     Defendant denies the allegations contained in Paragraph 64 of the Complaint.

65.     Defendant denies the allegations contained in Paragraph 65 of the Complaint.

## FIRST CAUSE OF ACTION
### ACCOUNT STATED

66.     Defendant repeats and realleges its responses to Paragraphs 1 - 65 as if fully set forth herein.

00001/579/4363642.1

FILED: NEW YORK COUNTY CLERK 09/08/2023 01:07 PM
NYSCEF DOC. NO. 10

INDEX NO. 651278/2023

RECEIVED NYSCEF: 09/08/2023

67.     Defendant denies the allegations contained in Paragraph 67 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

68.     Defendant denies the allegations contained in Paragraph 68 of the Complaint.

69.     Defendant denies the allegations contained in Paragraph 69 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

70.     Defendant denies the allegations contained in Paragraph 70 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

71.     Defendant denies the allegations contained in Paragraph 71 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

72.     Defendant denies the allegations contained in Paragraph 72 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

73.     Defendant denies the allegations contained in Paragraph 73 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

74.     Defendant denies the allegations contained in Paragraph 74 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

00001/579/4363642.1

FILED: NEW YORK COUNTY CLERK 09/08/2023 11:26 PM
INDEX NO. 651278/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 09/08/2023

75.     Defendant denies the allegations contained in Paragraph 75 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

76.     Defendant denies the allegations contained in Paragraph 76 of the Complaint.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**

77.     Defendant repeats and realleges its responses to Paragraphs 1 - 76 as if fully set forth herein.

78.     Defendant admits the allegations contained in Paragraph 78 of the Complaint.

79.     Defendant denies the allegations contained in Paragraph 79 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

80.     Defendant denies the allegations contained in Paragraph 80 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

81.     Defendant denies the allegations contained in Paragraph 81 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

82.     Defendant denies the allegations contained in Paragraph 82 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

83.     Defendant denies the allegations contained in Paragraph 83 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:26 PM
INDEX NO. 651278/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 09/08/2023

84. Defendant denies the allegations contained in Paragraph 84 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

85. Defendant denies the allegations contained in Paragraph 85 of the Complaint.

### THIRD CAUSE OF ACTION
### IN THE ALTERNATIVE, UNJUST ENRICHMENT

86. Defendant repeats and realleges its responses to Paragraphs 1 - 85 as if fully set forth herein.

87. Defendant denies the allegations contained in Paragraph 87 of the Complaint.

88. Defendant denies the allegations contained in Paragraph 88 of the Complaint.

89. Defendant denies the allegations contained in Paragraph 89 the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

90. Defendant denies the allegations contained in Paragraph 90 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

91. Defendant denies the allegations contained in Paragraph 91 the Complaint.

92. Defendant denies the allegations contained in Paragraph 92 of the Complaint and states that any payment to Plaintiff was conditioned on Plaintiff providing services to Defendant, which Plaintiff failed to do.

93. Defendant denies the allegations contained in Paragraph 93 of the Complaint.

94. Defendant denies the allegations contained in Paragraph 94 of the Complaint.

95. Defendant denies the allegations contained in Paragraph 95 of the Complaint

96. Defendant denies the allegations contained in Paragraph 96 of the Complaint.

97. Defendant denies the allegations contained in Paragraph 97 of the Complaint.

-11-

FILED: NEW YORK COUNTY CLERK 09/08/2023 03:26 PM        INDEX NO. 651278/2023

NYSCEF DOC. NO. 10                                      RECEIVED NYSCEF: 09/08/2023

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

Plaintiff failed to perform its obligations under the agreements between the parties and is therefore barred from any recovery.

### Second Defense

To the extent that Plaintiff's claims are based on any oral agreement or oral amendment to a written agreement, such claims are barred by the Statute of Frauds.

### Third Defense

To the extent Plaintiff has suffered any damages for which the law would provide a remedy, which Defendants deny, Plaintiff is not entitled to an award of attorneys' fees.

### Fourth Defense

Plaintiff's claims are barred by the principle of equitable estoppel.

### Fifth Defense

Plaintiff's claim for unjust enrichment is barred as duplicative of Plaintiff's contract claim.

\* \* \*

WHEREFORE, Defendant Q5iD respectfully requests judgment in its favor, that Plaintiff's claims be dismissed in their entirety, an award of attorneys' fees and costs, an award of prejudgment and post-judgment interest at the highest rate allowed by law, and such other further relief as the Court deems just and proper.

## COUNTERCLAIMS

Q5iD, Inc. ("Counterclaim Plaintiff" or "Q5iD"), by its attorneys Cowan, Liebowitz & Latman, P.C., brings these counterclaims against Goldstein Consulting Services, LLC ("Counterclaim Defendant" or "Rearc") for breach of the SOW, MNDA, and other agreements

-12-

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:26 PM          INDEX NO. 651278/2023
NYSCEF DOC. NO. 10                                        RECEIVED NYSCEF: 09/08/2023

between the parties due to Rearc's failure to perform the services required and for breach of the confidentiality provision therein. As a result of Rearc's breaches, Q5iD seeks a refund of the amounts paid by Q5iD to Rearc and damages due to breach of confidentiality.

## PARTIES

1.      Counterclaim-Plaintiff Q5id is a corporation organized under the laws of Oregon, with its headquarters at 801 Barton Springs, Austin, Texas and 800 Bellevue Way NE, Bellevue, Washington.

2.      Upon information and belief, Counterclaim-Defendant Rearc is a New York limited liability company with its principal place of business 1216 Broadway, Suite 218, New York, New York.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this counterclaim pursuant to CPLR § 3019.

4.      Venue is proper because Rearc is located in New York County, New York.

## FACTS

5.      Q5iD is an enterprise cybersecurity software identity management company providing enterprise technology products.

6.      Upon information and belief, Rearc is a consulting firm.

7.      On April 7, 2022, Q5id and Rearc entered into a Mutual Non-Disclosure Agreement (the "MNDA"), governing confidential information learned by either party in the course of the business transaction that they were at that time planning to enter into (the "Transaction").

8.      On April 25, 2022, Q5iD entered executed a Statement of Work (the "SOW") with Rearc.  The SOW established the terms of the Transaction that was governed by the MNDA.

9.      The MNDA included a confidentiality provision that provided that Rearc was not to disclose any data or information relating to the business of Q5iD that Q5iD would reasonably

be considered to be proprietary, including business plans related to any financial or strategic partnerships, investor information, client records, and information not generally known in the industry regarding Q5iD. Further, such information was deemed confidential regardless of whether it was provided before or after the date of the MSA or how it was provided to Rearc, and such obligations survived the termination of the MSA.

10.     During the course of the relationship between Q5iD and Rearc, Rearc submitted invoices to Q5iD notwithstanding that it did not perform the agreed upon services, or, alternatively, for services that were deficient, inadequate and not in accordance with standard protocols and procedures in the industry.

11.     In or around March 2023, Q5iD conducted an internal audit to review the services allegedly provided by Rearc and for which Rearc had been submitting invoices to Q5iD. The audit revealed that Rearc and its business associates GCS and Xmogrify had not been performing the services they had been engaged to perform, and, in the alternative, any services that were provided were deficient and substandard. In fact, no work product, artifacts or accompanying data, worksheets, manuals or other materials have been provided to Q5iD despite Plaintiff's demands for payment.

12.     Any payments due to Rearc were conditioned upon Rearc's performance of its obligations under the SOW or any other contracts upon which Rearc relies. Thus, Q5iD does not have any payment obligations to Rearc and is entitled to a return of sums already paid.

13.     On May 22, 2023, Rearc publicly filed the Complaint in this action against Q5iD for account stated, breach of contract, and unjust enrichment.

14.     In the Complaint, Rearc disclosed proprietary and confidential business information relating to Q5iD in violation of the confidentiality provision in the MNDA, including payment records, investor information and business processes and practices.

-14-

15.    Further, on or about May 26, 2023, Rearc sent an email to certain persons disclosing details regarding the parties' business relationship and the disputes between the parties, in breach of the confidentiality provision of the MNDA. Rearc has further threatened to reveal additional confidential information in an effort to obtain leverage in this dispute.

16.    Q5iD's investigation into Rearc's conduct is still ongoing and it is likely to find additional unauthorized disclosure of confidential and proprietary information in breach of the MNDA.

17.    As a result of Rearc's actions, Q5iD has been damaged and its reputation has been harmed, causing damage in an amount to be determined at trial.

18.    Rearc's unlawful activities have also resulted in irreparable harm and injury to Q5iD for which Q5iD has no adequate remedy at law, and Rearc must be further restrained to prevent further disclosure and harm to Q5iD.

19.    As a result of Rearc' breaches of the MNDA, Q5iD is entitled to an injunction prohibiting further disclosure of confidential information and to damages, in an amount to be determined at trial.

## COUNT I
### (Breach of Contract)

20.    Q5iD realleges paragraphs 1 through 19 above, as fully set forth herein.

21.    Q5iD and Rearc formed an agreement, the MNDA, through which Rearc would provide certain services to Q5iD.

22.    Rearc did not perform the consulting services it had contracted to perform under the MDNA.

23.    Q5iD performed by making some payments to Rearc under the MDNA but is relieved of further obligations under the MDNA due to Rearc's nonperformance and deficient performance.

-15-

FILED: NEW YORK COUNTY CLERK 09/08/2023 12:19 PM | INDEX NO. 651278/2023
NYSCEF DOC. NO. 10 | RECEIVED NYSCEF: 09/08/2023

24.     As a result of this breach, Q5iD has incurred losses by paying for services that were

not performed or were not performed satisfactorily.

25.     Accordingly, Q5iD is entitled to a return of the amounts paid by Q5iD to Rearc

under the MDNA.

**COUNT II**
**(Breach of Confidentiality)**

26.     Q5iD realleges paragraphs 1 through 25 above, as fully set forth herein.

27.     Q5iD and Rearc formed an agreement, the MNDA, which provided that Rearc

would maintain certain business and proprietary information of Q5iD in confidence and would not

disclose such information publicly.

28.     Rearc disclosed confidential information of Q5iD by publicly filing the Complaint

which contained proprietary and confidential business information relating to the business of

Q5iD, including payment records, investor information and business processes and practices.

29.     Further, on or about May 26, 2023, Rearc sent an email publicly disclosing

confidential information and has threatened to disclose additional information.

30.     Q5iD has been damaged by the public disclosure of its confidential information by

Rearc in an amount to be determined at trial.

31.     As a result of Rearc's wrongful conduct, Q5iD has sustained, and will continue to

sustain, immediate irreparable harm and incalculable monetary loss.

**PRAYER FOR RELIEF**

WHEREFORE, Q5iD respectfully demands judgment against Rearc and respectfully

requests that:

1.     The Court grant judgment in favor of Q5iD and against Rearc on all of Q5iD's

claims;

-16-

FILED: NEW YORK COUNTY CLERK 09/08/2023 01:06 PM
NYSCEF DOC. NO. 10

INDEX NO. 651278/2023

RECEIVED NYSCEF: 09/08/2023

2.  The Court issue a permanent injunction against Rearc and its officers, agents, subsidiaries, servants, partners, employees, attorneys, and all others in active concert or participation with it:

 a.  requiring Rearc to return or destroy all of Q5iD's Confidential Information;

 b.  enjoining Rearc from using or disclosing Q5iD's Confidential Information to any party, at any time, and for any reason;

 c.  requiring Rearc to provide an accounting of the whereabouts of, and the names of all persons given access to or who otherwise viewed, Q5iD's Confidential Information, including all files, data, information removed, downloaded, transferred or forwarded to any third-parties or unauthorized employees or contractors,

 d.  requiring Rearc to delete all content obtained from Q5iD anywhere it may reside, including the computer system and servers of Rearc or on any other computer, electronic device, or cloud accounts, hard copy documents, or any other materials in Rearc's possession, custody, or control; and

 e.  requiring Rearc to provide written certification to Q5iD's counsel of its compliance with paragraph (d) above;

3.  The Court award Q5iD a judgment against Rearc on the above claims in an amount of damages as may be proven at trial, including the disgorgement of any profits, benefits, or compensation received as a result of Rearc's misconduct;

4.  The Court award of attorneys' fees and costs, an award of prejudgment and post-judgment interest at the highest rate allowed by law, and such other further relief as the Court deems just and proper.

00001/579/4363642.1

NYSCEF DOC. NO. 10
INDEX NO. 651278/2023
RECEIVED NYSCEF: 09/08/2023

5.      The Court grant Q5iD such other and further relief as the Court deems just,

equitable, and proper.

Dated: New York, New York          COWAN LIEBOWITZ & LATMAN, P.C.
          September 8, 2023


                              By:_____/s/ Meichelle R. MacGregor___
                              Meichelle R. MacGregor
                              Jeremy A. Berman
                              Paige A. Geier
                              114 West 47th Street
                              New York, New York 10036-1525
                              (212) 790-9200

                              Attorneys for Q5id, Inc.

To:

Lazare Potter Giacovas & Moyle LLP
747 Third Avenue, 16th Floor
New York, NY 10017
Attorneys for Rearc, LLC

00001/579/4363642.1