IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 7 |
| | § | |
| ARTIUSID, INC., | § | CASE NO. 23-11007-cgb |
| | § | |
| Alleged Debtor. | § | |

**RESPONSIVE BRIEF OF PETITIONING CREDITORS RE: MOTION
TO DISMISS INVOLUNTARY CHAPTER 7 PETITION**

Xmogrify, LLC ("**Xmogrify**"), Goldstein Consulting Services, LLC ("**GCS**"), and Rearc LLC ("**Rearc**") (collectively, the "**Petitioning Creditors**," through the undersigned counsel, hereby submit their Responsive Brief as directed by the Court's May 9, 2024 *Order Authorizing the Petitioning Creditors to File a Response to the Alleged Debtor's Opening Brief* [Dkt. No. 56] (the "**Amended Scheduling Order**"), in further opposition to the Motion to Dismiss (the "**Motion**") [Dkt. No. 9] filed by Debtor artiusID, Inc. ("**ArtiusID**" or the "**Alleged Debtor**"). In further support of their opposition to the Motion, the Petitioning Creditors state as follows:[1]

**Response**

**A. The Alleged Debtor Has Provided No Evidence of a *Bona Fide* Dispute**

1.  In the Motion, the Alleged Debtor takes the position that the filing of Counterclaims in the three state court cases involving the Petitioning Creditors, in and of itself,

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Petitioning Creditors' Opening Brief [Dkt. No. 52].

1

creates a *bona fide* dispute sufficient to deprive the Petitioning Creditors of standing to bring the instant Bankruptcy Case.

2. In its Opening Brief [Dkt. No. 54], the Alleged Debtor fails to address, and otherwise ignores, the reems of evidence provided by Petitioning Creditors which establishes no such *bona fide* dispute exists. Instead, the Alleged Debtor relies on these same unverified Counterclaims without addition or explanation: "Debtor asserts the counterclaims and resulting offset, if successful, would effectively eliminate the claim amounts stipulated to by and between the parties." Alleged Debtor's Opening Brief, ¶ 4. This is it –the sum and substance of the Alleged Debtor's response. There is no effort to provide any explanation as to how the Counterclaims give rise to a *bona fide* dispute as to any particular Unpaid Invoice.

3. Specifically, the Alleged Debtor had the evidentiary burden of proof to counter, or at the very least, address the various Declarations filed by the Petitioning Creditors. These Declarations explain in detail how they performed exactly as requested and include a Declaration of the Director and COO of the Alleged Debtor, Rebecca Wanta.

4. Ms. Wanta unequivocally testified that:

- She was a member of the Alleged Debtor's Board of Directors, as well as Chief Operations Officer, Chief Technology Officer, and Chief Information Officer of the Alleged Debtor at various times from February 2022 to February 2023. Wanta Dec., ¶ 1.

- She was responsible for, among other things, overseeing the company's technology, operations and retaining outside, independent contractors, including the Petitioning Creditors, to assist in its software, product, business, and technology development. Wanta Dec., ¶ 2.

2

- She reviewed the April 8, 2024 Declaration of Mr. Marcotte and the attachments thereto and testified that Mr. Marcotte was not in a position to observe any of the work performed by the Petitioning Creditors; that she was unaware of any dispute as to the invoices in question; that she was responsible for approving invoices and the work product giving rise to such invoices; and she, in fact, approved these invoices for payment. Wanta Dec., ¶ 10.

- She assisted with onboarding each of the Petitioning Creditors. Wanta Dec., ¶ 3.

- The Petitioning Creditors "fully and satisfactorily performed" in accordance with their agreements with the Alleged Debtor. Wanta Dec., ¶ 5.

- At no point in time from their hiring in 2022, until her separation from the Alleged Debtor in February 2023, did she or anyone else at the company raise an objection to the services that each of the Petitioning Creditors provided. Wanta Dec., ¶ 5.

- To the contrary, Wanta testified that, from the time the Alleged Debtor began operations in 2018 until the time it hired the Petitioning Creditors, there was an inability to complete a commercial salable product by the Alleged Debtor, but within approximately 90 days of hiring the Petitioning Creditors, the Alleged Debtor finally brought a product to market which Wanta and her co-workers thought was an incredible accomplishment, and that it had additional salable products within months thereafter ("this is exactly why I hired the Petitioning Creditors"). Wanta Dec., ¶¶ 6, 10.

- She confirmed that the services for which the Alleged Debtor was billed by the Petitioning Creditors was performed satisfactorily and in accordance with the agreements. Wanta Dec., ¶ 7.

- She further testified that she reviewed the invoices annexed to the Second Goldstein Declaration and verified that each of these invoices were approved for payment by the Alleged Debtor. Wanta Dec., ¶ 8.

- She testified that an inability to pay the Alleged Debtor's creditors in the

    face of inadequate capitalization was the subject of repeated conversations, multiple times a day, with the Alleged Debtor's CEO, Steve Larson, where they discussed that these invoices were payable, but they needed to find the new investment to pay them; she further testified that she and Larson gave repeated assurances to the Petitioning Creditors that these invoices would be paid once the new investment funds came in, and ultimately convinced them to simply wait and continue to work without pay until this occurred. Wanta Dec., ¶ 9.

- She confirmed that the Alleged Debtor was not paying its debts as they came due ("This was true not just of the Petitioning Creditors, but for most of the Alleged Debtor's creditors because the company simply did not have the funds on hand to pay its obligations as they came due"). Wanta Dec., ¶ 12; *see also*, Second Goldstein Declaration, Exhibit 28.

- Finally, she testified that, by the end of January 2023, because the Alleged Debtor could not pay its outstanding debts, Mr. Larson, Mr. O'Dierno (a founding executive of the Alleged Debtor) and Wanta collaborated on a draft Payment and Standstill Agreement (attached to the Wanta as Exhibit A) and they tried to convince the Alleged Debtor's creditors to delay collection efforts and accept payment over time plus an option to convert some of their debt into equity; this payment plan was discussed with the Petitioning Creditors because their invoices were not in dispute, the Alleged Debtor just didn't have the funds to pay them. Wanta Dec., ¶ 13.

5.     In sum, the Petitioning Creditors provided overwhelming evidence supporting a *prima facie* case against the existence of a *bona fide* dispute; the Alleged Debtor simply ignored this evidence and submitted **nothing** in response to this *prima facie* case.

6.     Pursuant to clear Fifth Circuit authority, the burden of proof shifted to the Alleged Debtor to put in evidence that disputed the evidence offered by the Petitioning Creditors. Given the absence of such a showing, the Motion must be denied. *Subway Equipment Leasing Corp. v. Sims*, 994 F.2d 210, 221 (5th Cir. 1993) ("The petitioning creditor must establish a *prima facie*

4

case that no *bona fide* dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a *bona fide* dispute does exist. Because the standard is objective, neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden. … Because the debtors failed to meet their burden of presenting evidence demonstrating the existence of a bona fide dispute, the bankruptcy court did not clearly err in finding that the debts are not subject to such disputes.")

7. The Alleged Debtor cannot reasonably argue that the Petitioning Creditors failed to meet their burden of proof; it was incumbent on the Alleged Debtor to submit some evidence of specifically what the alleged *bona fide* dispute is based on and, indeed, why the Counterclaims were filed.[2]

8. Accordingly, the Motion should be denied for failure on the part of the Alleged Debtor to proffer any evidence of a *bona fide* dispute.

**B. The Invoices to Which the Alleged Debtor Stipulates There is no *Bona Fide* Dispute can be Bifurcated for the Purpose of a Standing Analysis**

9. The Alleged Debtor frames this issue as follows: "The Stipulated Claims cannot be separated from the whole of the claim asserted by each of the Petitioning Creditors even assuming the Stipulated Claims are deemed firm and resolute." Alleged Debtor Opening Brief, ¶ 5.

---

[2] Notably, the "cookie-cutter" counterclaims suggest that simply filing a complaint alleging non-payment of invoices is a breach of some alleged confidentiality agreement. Of course, this would never amount to a sustainable cause of action even if further explanation had been offered.

10. In essence, the Alleged Debtor argues that, even though the invoices to which it stipulates there is no *bona fide* dispute provide each Petitioning Creditor with a claim in excess of the statutory minimum required for standing, these invoices should be ignored because if a dispute exists as to other invoices issued in connection with the Petitioning Creditors' work for the Alleged Debtor, the dispute as to these other invoices makes the Undisputed Invoices irrelevant.

11. In support of this position, the Alleged Debtor relies on *Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co. (Green Hills Dev. Co.)*, 741 F.3d 651 (5th Cir. 2014). Alleged Debtor Opening Brief, ¶¶ 5-6.

12. *Green Hills Dev. Co.*, however, is easily distinguishable. *Green Hills Dev. Co.* involved an argument that the entire basis for the petitioning creditor's claim, an unpaid promissory note, was subject to *bona fide* dispute and was, among other things, induced by fraud:

> Green Hills filed suit against CULS in Texas state court (the Texas Litigation), seeking damages estimated to exceed $20 million, an injunction preventing CULS from collecting its debt under the Note, and other relief. Green Hills asserted a wide variety of claims and theories to invalidate the loan agreement and offset its debt, including fraud, promissory estoppel, breach of contract, breach of fiduciary duty, equitable estoppel, unconscionability, duress, reformation, equitable subordination, and various statutory claims. CULS answered and filed a counterclaim for $8,315,065.09, the amount it claimed was then owed under the loan agreement.

*Id.*, 741 F.3d at 653.

13. Critical with respect to the issue of a *bona fide* dispute was the fact that the Green Hills's petitioning creditor filed a motion for summary judgment as to all of the Green Hills's

6

alleged debtor's claims, as well as on its own counterclaims. *Id*. The court below, however, denied this motion confirming that the claim of *bona fide* dispute had at least sufficient merit to withstand summary judgment. *Id*.

14. Here, the Alleged Debtor seems to be arguing that the Undisputed Invoices would somehow be effected by a dispute as to the other Unpaid Invoices; however, unlike in *Green Hills Dev. Co.*, where there was **one** basis for the claim, an unpaid promissory note which was itself the subject of the alleged *bona fide* dispute (which *bona fide* dispute was confirmed by the lower court after briefing on summary judgment), there is **no** relationship between any of the charges in a particular Unpaid Invoice with any unpaid charges in another Unpaid Invoice other than they implicate the same creditor and the same debtor. The fact that the Undisputed Invoices are, as the name suggests, undisputed, distinguishes this case from *Green Hills Dev. Co.*, where the opposite was true.

15. This case is clearly factually identical to *In re Manolo Blahnik USA, Ltd.*, 619 B.R. 81 (Bankr. S.D.N.Y. 2020), which held that separate invoices amounted to separate "transactions" and that where there was no dispute argued with respect to the first unpaid invoice, but only as to a second unpaid invoice, the fact that the first invoice (which was in an amount sufficient to meet the statutory threshold) amounted to what could easily be "severed" from the second invoice. *Id*., at 98.[3]

---

[3] *See also*, *In re Miller*, 489 B.R. 74, 83 (Bankr. E.D. Tenn. 2013) ("Nevertheless, even applying

16. The Alleged Debtor seems to be suggesting that simply because each invoice was related to a common *relationship*, this requires the Court to find that the validity of all invoices (despite being for different time period and different work), rises and falls with the validity of any one invoice and, for example, if the time asserted in the last Unpaid Invoice is successfully attacked, then the Undisputed Invoices, which are admittedly not subject to a *bona fide* dispute, would somehow no longer due and payable. This is not the holding of *Green Hills Dev. Co.*

17. There is no difference between multiple invoices for distinct *services* (here), and for *goods* where there was a working relationship between supplier and buyer as in *In re Manolo Blahnik USA, Ltd.*, or between multiple invoices for distinct *services* (here), and for unpaid amounts to with respect to separate *loans* as in *In re Miller*, where the was a borrower lender relationship involving the same parties to multiple loans.

18. Accordingly, when determining whether the Undisputed Invoices are related to the "same transaction or occurrence," this Court should not focus on the "relationship" between the parties, but instead it should focus on the Undisputed Invoices themselves to determine whether the amounts claimed in the Undisputed Invoices relate to the "same transaction or occurrence" called into question with respect to one of the other Unpaid Invoices. Here, the work

---

the law as argued by the Debtor, in this case, Tennessee State Bank would still qualify as a petitioning creditor because the amount of its claim is not based upon one single transaction but rather, is the aggregate sum of thirteen separate loan transactions between the Debtor and Tennessee State Bank, and only loan no. xxx2406 dated November 10, 2010, in the principal amount of $2,880,000.00 would be considered in dispute.")

8

invoiced in the Undisputed Invoices is not from the "same transaction or occurrence" found in any of the other Unpaid Invoices – each unpaid invoice relates to a separate set of "transactions or occurrences."

19. This Court should adopt the reasoning of the *In re Manolo Blahnik USA, Ltd.* and *In re Miller*; the Undisputed Invoices are, pursuant to stipulation of the Parties, not subject to a bona fide dispute, nor do they include the same charges or otherwise relate to the same unpaid services detailed in the other Unpaid Invoices and, accordingly, these Undisputed Invoices are sufficient to convey standing on the Petitioning Creditors.

## **CONCLUSION**

20. Based on the foregoing, and on the prior submissions of the Parties, the Petitioning Creditors respectfully request entry of an order for relief against the Alleged Debtor under section 303(f) of the Bankruptcy Code.

Dated: May 17, 2024
Austin, Texas

Respectfully Submitted,

By:   /s/ *Jason Binford*
**ROSS, SMITH & BINFORD, PC**
Jason Binford, Esq.
2901 Via Fortuna
Bldg. 6, Suite 450
Austin, TX 78746
Telephone: (512) 351-4778
Facsimile: (214) 377-9409
jason.binford@rsbfirm.com

-and-

**LAZARE POTTER GIACOVAS
    & MOYLE LLP**
Robert A. Giacovas, Esq. (*Pro Hac Vice* to be filed)
Michael T. Conway, Esq. (*Pro Hac Vice* to be filed)
747 Third Avenue, 16th Floor
New York, NY 10017
Telephone: (212) 758-9300
Facsimile: (212) 888-0919
rgiacovas@lpgmlaw.com
mconway@lpgmlaw.com

*Counsel for the Petitioning Creditors*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 17, 2024, he caused a copy of the foregoing *RESPONSIVE BRIEF OF PETITIONING CREDITORS RE: MOTION TO DISMISS INVOLUNTARY CHAPTER 7 PETITION* to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Western District of Texas and on the parties listed below via First Class U.S. Mail.

      /s/ *Jason Binford*
      Jason Binford

ArtiusID, Inc.
Attn: Caleb Rawls
19600 Copperoaks Drive
Tyler, TX 75703

ArtiusID, Inc.
801 Barton Springs
Austin, TX 78704

Robert T. DeMarco, III
12770 Coit Road
Suite 850
Dallas, TX 75251

11