**The relief described hereinbelow is SO ORDERED.**

**Signed July 23, 2024.**

_Christopher G. Bradley_
_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-11007-cgb** |
| **ARTIUSID, INC.,** | § | |
| | § | **Chapter 7** |
| **Alleged Debtor.** | § | |

## OPINION ON MOTION TO DISMISS INVOLUNTARY CASE

### Introduction

Three creditors seek to force the alleged debtor into bankruptcy because it has not paid them for services provided. The alleged debtor seeks to dismiss the involuntary bankruptcy petition because the creditors' claims are subject to a bona fide dispute and therefore the creditors are not eligible to force it into bankruptcy. The creditors insist they are eligible because: (1) the alleged debtor concedes that several of their invoices are not contested, and these undisputed invoices represent separate "claims" that independently establish their eligibility; (2) even if their invoices are all deemed to constitute a single "claim," a significant portion—above the required statutory threshold—of each creditor's claim is uncontested, so they are eligible; and (3) in any case, no portion of each creditor's claim is actually subject to a bona fide dispute because the invoices were approved by the alleged debtor for payment well in advance of the bankruptcy filing and there is no objective basis to dispute them.

1

The Court disagrees with the petitioning creditors on the first two points but agrees with them on the third. First, while the petitioning creditors are correct that the analysis of eligibility to force an alleged debtor into bankruptcy should proceed on a claim-by-claim basis—the statutory text is clear that creditors who hold at least one *uncontested* "claim" can be eligible, even if a creditor holds other claims that *are* contested—they have failed to show that their various invoices amount to more than one "claim." To the contrary, based on the thin record that has been made by the parties, all of the invoices seem to relate to the same basic contractual relationship and set of services. Thus, the petitioning creditors each have only one claim related to their unpaid invoices.

Second, an uncontested *portion* of a claim is not enough to "save" eligibility if another portion of that same claim is contested. Some courts and commentators believe this result is incorrect or absurd and have read a "materiality" requirement into the Bankruptcy Code, but the Court respectfully disagrees with these authorities. The statute is unambiguous, and the result is not absurd. The weight of precedent favors this result as well, and the Court will follow it.

Third, however, the alleged debtor has failed to show that any portion of the creditors' claims is, in fact, subject to a bona fide dispute. While there is pending litigation concerning the creditors' claims, and even pending counterclaims against the creditors, the evidence for the alleged debtor's position is thin and insubstantial. Despite ample opportunity to demonstrate that there is an objective basis for a dispute, the alleged debtor has failed to do so. Because there is no bona fide dispute, the Court will deny the motion to dismiss.

### Factual and Procedural Background

ArtiusID, Inc. (the "Alleged Debtor") is a software company.[1] Goldstein Consulting Services, LLC ("GCS"), Xmogrify, LLC ("Xmogrify"), and Rearc LLC ("Rearc"; together with GCS and Xmogrify, the "Petitioning Creditors") did some work for the Alleged Debtor and were not paid.[2] They submitted invoices, at least some of which were approved for payment, and those invoices are the source of their claims against the Alleged Debtor.[3] They have pending lawsuits against the Alleged

---

[1]  V.S. in Supp. of Involuntary Chapter 7 Pet. 2, ECF No. 2.

[2]  *Id.* at 5–8, 8–11, 11–13.

[3]  *Id.*

Debtor in two New York state courts.[4] None of these suits appear to be far advanced. The Alleged Debtor has answered each complaint, denying liability and raising various affirmative defenses.[5] The Alleged Debtor has also brought counterclaims for breach of contract (citing poor performance) and breach of confidentiality provisions,[6] but, as described below, the Court has been provided with few details concerning these alleged breaches or the harms allegedly suffered by the Alleged Debtor.

The Petitioning Creditors assert that they brought this involuntary bankruptcy because the Alleged Debtor had changed its name to ArtiusID from Q5id, Inc.[7] and moved its location.[8] They were concerned that the Alleged Debtor was seeking to disappear to escape its debts.[9] In addition, the Alleged Debtor apparently provides identity theft-prevention services and holds significant personal information of its customers, and the Petitioning Creditors say that the Alleged Debtor has breached its obligations to customers and rendered their sensitive information unavailable to them.[10]

The Petitioning Creditors filed their involuntary chapter 7 bankruptcy petition against the Alleged Debtor on November 30, 2024.[11] The Alleged Debtor filed a Motion to Dismiss (the "Motion") on December 19, 2024.[12] It also moved for a bond under section 303(e), which the Court denied.[13]

The procedural history of the Motion is somewhat complicated. There was an initial status hearing on the Motion, and it was discussed again at the hearing on the

---

[4] Decl. of Michael Marcotte, Exs. A, C, E, ECF No. 48.

[5] *Id.,* Exs. B, D, F.

[6] *Id.*

[7] The Alleged Debtor does not deny that it is the same company as the one they originally contracted with, Q5id, Inc.

[8] V.S. in Supp. of Involuntary Chapter 7 Pet. 2, ECF No. 2.

[9] *Id.*

[10] *Id.* at 5.

[11] Involuntary Pet., ECF No. 1.

[12] Mot. to Dismiss, ECF No. 9.

[13] Mot. to Require Petitioning Creditors to Post a Bond, ECF No. 22; Order Den. Mot., ECF No. 31.

bond motion.[14] Among other things, at these hearings, the Court noted that it intended to follow the interpretation of section 303(b) reflected in the plain language of the statute—as well as the bulk of the case law (including cases in this district)—that if *any portion* of a claim is in bona fide dispute, then the claim cannot be used to establish the eligibility of a creditor to bring an involuntary petition. The Court acknowledged that there was contrary precedent. Because this issue might be dispositive, the Court stated that if the parties wished, and if they stipulated to sufficient facts, it could rule as a matter of law on the issue above, and if the Petitioning Creditors wished, they could take that ruling up on appeal. This alternative was offered as a potential cost-saving mechanism because, as the Court noted, the Petitioning Creditors might be forced to pay the Alleged Debtor's costs and attorney's fees if the Motion were granted.[15] The parties stated they would consider this possibility.

The parties filed a stipulation on February 23, 2024.[16] Among other things, it included some agreements on factual matters, an agreement from the Alleged Debtor not to seek reimbursement for its fees or costs as permitted under section 303(i), and a statement that, in light of "the relative costs associated with the prosecution and defense of the Motion to Dismiss," the parties "agreed to forgo an evidentiary hearing."[17] The Court did not believe this stipulation included enough facts for it to determine the Motion as a matter of law. At a status hearing a few days later,[18] it indicated certain factual matters left unsettled by the stipulation that would have to be resolved for it to issue the contemplated ruling. The parties then filed an amended stipulation, but this too did not settle those factual matters.[19] So the Court issued an

---

[14]  These hearings were on February 15 and 22, 2024.

[15]  11 U.S.C. § 303(i).

[16]  Joint Stipulation Among the Alleged Debtor and the Petitioning Creditors, ECF No. 32.

[17]  *Id.* at 2, 3.

[18]  February 29, 2024.

[19]  Am. Joint Stipulation Among the Alleged Debtor and the Petitioning Creditors (the "Amended Stipulation"), ECF No. 35. In specific, at the February 29 hearing, the Court had sought clarification on two matters. One of the remaining factual issues was whether the Petitioning Creditors each hold one claim or whether their invoices represent more than one claim. The Amended Stipulation simply states that each Petitioning Creditor "has one related set of claims." The second was whether the Petitioning Creditors conceded that the Alleged Debtor had a bona fide dispute as to a portion of their claims. The Amended Stipulation provides that "the Alleged Debtor agrees that there is no *bona fide* dispute as to the first two unpaid invoices

order that (1) laid out this procedural history and proposed a set of facts that would permit a determination as a matter of law, and (2) gave a deadline after which, in the absence of objection, it would take those facts as agreed and set to work on an opinion.[20] The Petitioning Creditors timely objected, stating that they disagreed with some of the proposed findings and wanted the Court simply to determine everything "on the papers" and without taking testimony, even if this required factual determinations as well as the legal holding that the Court had already indicated.[21] At yet another status hearing,[22] the Court expressed some hesitation about this proposal, but, in another order, it (1) laid out a schedule for further factual submissions and briefing; (2) made clear that if either party wished, it could request further hearings concerning this unusual proposed course of action; and (3) preserved its own discretion to decline to decide the matter "on the papers."[23] Although the Alleged Debtor missed one briefing deadline and, accordingly, the briefing schedule was somewhat adjusted,[24] both parties have generally continued to cooperate and, importantly, despite the Court's clear invitation to do so if necessary, neither party has alerted the Court to a change in preference or has requested a hearing.

In the end, the Court has determined to agree to the parties' request. Accordingly, *the Court will consider the evidentiary submissions—both the*

---

submitted by each of the Petitioning Creditors," but there is no reciprocal concession by the Petitioning Creditors. The Amended Stipulation simply states that "[t]he Alleged Debtor *contends* that the remaining invoices at issue . . . are subject to a *bona fide* dispute." ¶ 2 (emphasis added).

[20] Order Regarding Mot. to Dismiss, ECF No. 39.

[21] Limited Obj. of Petitioning Creditors to Order Regarding Mot. to Dismiss and Related Findings of Fact, ECF No. 41.

[22] March 26, 2024.

[23] Scheduling Order, ECF No. 45 ("[The Court] is willing to consider the pending Motion to Dismiss [ECF No. 9] without an evidentiary hearing—that is, 'on the papers'—if both parties continue to agree that is the most expeditious mode of proceeding, and if the Court is satisfied that the record is sufficiently clear for this Court to make a sufficient determination of the issues and for any appellate court to sufficiently resolve any appeal. . . . That said, the Court wishes to make clear that in light of the unusual course of events so far in this case, it reserves the right to alter how it intends to proceed, including by modifying this scheduling order, setting another status conference, requesting more evidence or evidence in different forms, etc. In addition, either party may request a further status conference if it so wishes, to raise any matter concerning the determination of the pending Motion.").

[24] *See* Petitioning Creditors' Letter Requesting Authorization to File Response, ECF No. 55; Order Authorizing Petitioning Creditors to File a Response, ECF No. 56.

*affidavits and the documents—as if they had been offered at an evidentiary hearing on this matter and as if they constitute the entire evidentiary record of that hearing.* The body of evidence submitted by the parties is that contemplated in the Amended Stipulation as well as the additional submissions of the parties.[25]

As discussed in detail below, the parties' decision to proceed in this way leaves a record that is less substantial than would have been likely in an actual, live evidentiary hearing, where not only could credibility have been tested, but follow-up questions, clarifying explanations, and so on, could have given the Court more evidence on which to base its decision. That said, both parties accepted this risk in favor of the cost savings of avoiding a full evidentiary hearing. The Court will not question their cost-benefit analysis. In considering the record that the parties have placed before it, the Court believes that it can satisfactorily resolve this dispute and that the record is sufficient for an appellate court to understand and review that decision in due course. For this reason, the Court has proceeded as the parties requested.

## Jurisdiction and Authority

The Court has jurisdiction pursuant to the order of reference in this district and 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). The Court has constitutional authority to determine this matter because it is purely a matter of bankruptcy law and does not require the resolution of any matter similar to "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789."[26]

## Analysis

"Recognizing that involuntary bankruptcy is a particularly severe remedy, Congress limited the circumstances in which creditors may force a debtor into such a proceeding."[27] These limitations are largely contained in section 303 of the

---

[25] *See* Am. Stipulation, ECF No. 35; Decl. of Kevin Goldstein, ECF No. 37; Decl. of Michael Marcotte, ECF No. 48; Decl. of Rebecca Wanta, ECF No. 49.

[26] *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)).

[27] *Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co. (In re Green Hills Dev. Co.)*, 741 F.3d 651, 655 (5th Cir. 2014).

Bankruptcy Code. This opinion focuses on section 303(b)(1), which provides in relevant part:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
>> (1) by three or more entities, each of which is . . . a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $18,600[28] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims . . . .

Two aspects of this provision are crucial in ruling on the Motion.

First, a petitioning creditor must be "a holder of *a claim*" that meets the statutory qualifications. Determination of eligibility relies on a claim-by-claim analysis. A creditor may hold more than one claim, and as long as it holds *one qualifying claim*, that claim sufficiently establishes the petitioning creditor's eligibility.[29] This principle seems to be generally accepted, but its importance, as well as its clear grounding in the statutory text, sometimes goes unrecognized, perhaps because distinguishing between one claim or multiple claims is not always easy and is not always necessary.

Second, a qualifying claim cannot be "the subject of a bona fide dispute as to liability or amount." Some courts and commentators have urged that this must not

---

[28] This amount is regularly adjusted for inflation. *See* 11 U.S.C. § 104.

[29] Of course, the statute also imposes a numerosity requirement for creditors when a debtor has more than twelve creditors. *See* 11 U.S.C. § 303(b). Thus, a creditor-by-creditor analysis may also sometimes be required. For instance, when creditors are in fact alter-egos of one another, they cannot separately serve as petitioning creditors. *See Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 217–18 (5th Cir. 1993) (explaining this legal principle and, on the facts, upholding the bankruptcy court's determination that despite "substantial interrelation," creditors had separate identities and could serve as petitioning creditors); *In re Gilbert*, 115 B.R. 458, 461–62 (Bankr. S.D.N.Y. 1990) (noting that "one creditor cannot create additional creditors by treating separate claims as separate creditors"). Here, the debtor has not challenged the Petitioning Creditors' ability to meet the creditor numerosity requirement.

mean what it says, and they have implied a requirement that a bona fide dispute disqualifies a claim only if it concerns enough of the claim that the aggregate petitioning creditors' claim amount falls below the $18,600 threshold. They sometimes call this a "materiality" proviso.

The Court analyzes each of these issues in turn. First, it explains the necessity of a claim-by-claim analysis and lays out the legal standards for distinguishing whether a creditor holds a single claim or multiple claims. It applies this framework and determines that the Petitioning Creditors have only one claim each, not multiple claims.

Second, the Court discusses why it believes adding a "materiality" proviso to the statutory text is unwarranted and concludes that the statute should be taken at its word: *any* bona fide dispute as to amount renders a claim ineligible to support a creditor's right to petition a debtor into bankruptcy. However, the Court finds that the Alleged Debtor has failed to demonstrate that there is an objective basis on which to dispute the amount of the Petitioning Creditors' claims, and thus, they are eligible to petition the Alleged Debtor into bankruptcy.

## A. The "Claim"/"Claims" of Each Petitioning Creditor

### 1. Establishing a petitioning creditor's eligibility requires a claim-by-claim analysis.

A petitioning creditor must be "a holder of a claim against [the debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount."[30] This statutory language is clear that holding any single claim that is undisputed as to liability and amount (and otherwise meets the statutory requirements) is sufficient to establish a petitioning creditor's eligibility. When creditors argue that they hold more than one claim—as with the Petitioning Creditors here—the Court must first distinguish the contours of each of their claims before determining if any one claim is a qualifying claim, that is, a claim that is not subject to bona fide dispute and meets the other statutory requirements. A petitioning

---

[30]   11 U.S.C. § 303(b)(1).

creditor need only hold one qualifying claim, and the fact that it may also hold other non-qualifying claims does not affect that creditor's eligibility.[31]

A "claim" is defined in the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment."[32] There is a substantial body of law interpreting this provision in the context of whether a creditor has a claim at all—for instance, whether a government regulator has a "claim" for environmental damage that at the time of the bankruptcy filing was still not fully realized.[33] The case law is more sparse on the issue that the Court must address here, which is where one claim ends and another begins.

There is no doubt that, on the one hand, a creditor may hold more than one claim: separate claims are not merged simply by virtue of being held by the same party. On the other hand, it is equally clear that a creditor cannot simply decide that it has a separate "claim" for each dollar that it is owed, regardless of the underlying source of each "right to payment."[34] This so-called *claim-splitting* is not permissible.

---

[31]  As Chief Judge Jernigan has explained:

> It is possible for a creditor . . . to actually have several claims against a debtor (for several separate shipments and invoices) and certain ones may be undisputed and certain ones may be disputed. A logical interpretation of Section 303(b)'s language "liability or amount" should mean that: (a) if there is a bona fide dispute about liability, then there is no standing; and (b) if there is no dispute about liability but a bona fide dispute about the amount that a debtor owes on a creditor's claim, then there is also no standing—but if there is **some claim** that is above the Section 303 threshold ($16,750) that a debtor does not dispute at all, that would be a claim not the subject of a bona fide dispute for purposes of Section 303.

E-mail from the Court to Counsel, *In re Intelligent Surveillance Corp.*, Case No. 21-31096 (Bankr. N.D. Tex. Sept. 21, 2021), ECF No. 49.

[32]  11 U.S.C. § 101(5).

[33]  *See, e.g.*, *In re Nat'l Gypsum Co.*, 139 B.R. 397 (N.D. Tex. 1992).

[34]  To allow such a thing would be absurd. Cases in the context of plan voting—where, as noted below, voting occurs on a claim-by-claim, not a creditor-by-creditor basis—confirm this. *See, e.g.*, *In re Meridian Sunrise Village, LLC*, No. 13-5503, 2014 WL 909219, at *5 (W.D. Wash. Mar. 7, 2014) ("A creditor does not have the right to split up a claim in such a way that artificially creates voting rights that the original assignor never had. . . . This arbitrary increase in voting power would prevent the remaining members of the class from accepting a plan without the [creditor/assignee's] support, which would nullify the Bankruptcy Code's voter majority requirement.").

Between these two extremes is the sometimes-difficult judgment call about when related debts are sufficiently independent as to constitute multiple claims rather than a singular claim.

As noted, in directing attention to whether a would-be petitioning creditor is "a holder of a claim" that meets the statutory qualifications, the text of section 303(b)(1) plainly requires a claim-by-claim analysis—an assessment of the precise number and scope of the claims held by each creditor. While not all courts explicitly tie their analytical process to this statutory text, their rulings generally implement it faithfully, in this Court's view. These opinions provide useful data points in how to separate one claim from another.

In substance, the issue turns on whether the court deems the underlying transaction(s) that generated each "right to payment" to be independent. For example, in *Fustolo*, the First Circuit faced the issue of a creditor whose claim(s), though subsumed in one state court judgment, had two distinct parts: one emerging from certain notes that the debtor had guaranteed and the other from notes that he had not.[35] In other words, the creditor held two "claims." The court held that there was no bona fide dispute as to liability or amount on the guaranteed notes but that there was a dispute about the second set of notes.[36] Because the claim on the guaranteed notes was "an independent claim capable of standing on its own merits," the court held that it established the creditor's eligibility to petition the debtor into bankruptcy.[37]

The Ninth Circuit has undertaken a similar analysis, although, under the facts before it, it reached a different result. In *Blixseth*, the court had to determine whether the Montana Department of Revenue ("MDOR") qualified as a petitioning creditor on the basis of a substantial tax deficiency claim for the alleged debtor's 2004 tax

---

[35] *Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1 (1st Cir. 2016). Usually a debt that has been reduced to judgment is not subject to bona fide dispute. *Id.* at 5–8. But as the court noted, this was a "rare circumstance" where that principle did not apply. *Id.* at 5. This aspect of *Fustolo* is not relevant here, where the Petitioning Creditors' state court lawsuits have not proceeded nearly as far.

[36] *Id.* at 3–4. Indeed, it appears that the creditor may have implicitly admitted that the judgment based on the non-guaranteed notes was in error. *Id.* at 4.

[37] *Id.* at 10–11.

year.[38] The alleged debtor conceded one *portion* of the 2004 tax year liability—relating to "Audit Issue 4"—but contested the rest. Both the lower court and the appellate court determined that MDOR was ineligible to serve as a petitioning creditor because it could not bifurcate the uncontested amount (relating to "Audit Issue 4") from the remainder of the 2004 tax bill.[39] The key principle in that case was that "a taxing entity generally has *but one claim for each calendar year* of a taxpayer's life," and MDOR had failed to give any evidence that Audit Issue 4 represented some sort of "separate liability."[40] Because the uncontested Audit Issue 4 could not be separated from MDOR's overall 2004 tax claim, it could not serve as a qualifying claim.

Judge Glenn of the Southern District of New York bankruptcy court grappled with this issue in the Manolo Blahnik USA, Ltd. bankruptcy in 2020.[41] In that case, the petitioning creditor asserted claims based on two separate purchase orders and two separate invoices for what the court held were two separate transactions—one in September and November of 2019 for €546,386, and the other in December 2019 for €403,181. The court found that because the debtor's liability to the petitioning creditor "arises from two separate transactions—one disputed and one not disputed,"[42] a dispute as to *only one* of those transactions meant that the other transaction could serve as a qualifying claim and support the petitioning creditor's status.[43]

Judge Brown of the Vermont bankruptcy court engaged in a similar analysis in the 2022 *Koffee Kup Bakery, Inc.* decision.[44] The court was faced with determining whether two creditors had qualifying claims. The first creditor, Lily Transportation Corp., held an apparently uncontested claim of $660,705.61 for unpaid invoices as well as a contested breach of contract claim for wrongful contract

---

[38]   *State Dep't of Revenue v. Blixseth*, 942 F.3d 1179 (9th Cir. 2019).

[39]   *Id.* at 1182–83, 1183 n.4.

[40]   *Id.* at 1182–83 (emphasis added).

[41]   *In re Manolo Blahnik USA, Ltd*., 619 B.R. 81 (Bankr. S.D.N.Y. 2020).

[42]   *Id.* at 92.

[43]   *Id.* at 97–98 ("The disputed portion of the Petitioning Creditor's claim in the amount of €403,181.00 does not strip the Petitioning Creditor of its standing to file the Involuntary Petition. This is because its claim in the amount of €546,386.00—arising from a separate transaction—is not in dispute.").

[44]   *In re Koffee Kup Bakery, Inc.*, No. 21-10168, 2022 WL 141516 (Bankr. D. Vt. Jan. 14, 2022).

termination in an amount "calculated . . . to be roughly around—or in excess of— $3 million."[45] The court held that Lily was ineligible to serve as petitioning creditor because both of these claims "stem[med] from a single transaction": a "Dedicated Contract Carriage Transportation Agreement" that "was the sole contract between those parties."[46] Another creditor, Ryder Truck Rental, suffered the same fate. "Ryder contended that it had two separate and distinct claim components: first, a claim for $477,429.04 for unpaid invoices for goods and services and, second, a claim for $1,759,499.23 arising from the Putative Debtor's Schedule A obligation to purchase vehicles upon contract termination."[47] Only this second amount was apparently contested. But the court held that both debts ultimately emerged from "a single transaction": the Truck Lease & Service Agreement ("TLSA") that the parties had entered into. Among other things, the court noted that the "Schedule A" transaction was expressly made subject to the TLSA and incorporated into that agreement. The creditor's own counsel had even sought payment of the "$477,429.04 on regular invoices under the attached [TLSA]."[48] Because, again, the contested and the uncontested portions of the creditor's claims were insufficiently distinct, the creditor had no qualifying claim and was ineligible to petition the debtor into bankruptcy.

A final case is the *Miller* case from Tennessee,[49] which most closely resembles *Fustolo*. In *Miller*, Tennessee State Bank asserted claims on notes related to "thirteen separate loan transactions," only one of which was in dispute.[50] The court explained its finding that the bank held multiple claims rather than a single claim with multiple parts:

> [E]ven though [an officer of the bank] testified that Tennessee State Bank considers all of the loans as part of the one relationship with the Debtor because the loans are cross-collateralized and cross-defaulted,

---

[45]  *Id.* at *7.

[46]  *Id.* at *7 (citations omitted).

[47]  *Id.* at *8.

[48]  *Id.*

[49]  *In re Miller*, 489 B.R. 74 (Bankr. E.D. Tenn. 2013). The holding discussed here is only an alternative, because the *Miller* court also held—contrary to what this Court holds below—that a bona fide dispute as to a portion of a claim is not enough to render a creditor ineligible to petition a debtor into bankruptcy.

[50]  *Id.* at 83.

it is immaterial because the loans are separate, made on different dates, for different amounts, and were made not only to the Debtor but to others as well, and Tennessee State Bank could, conceivably, forgive the Debtor of the amounts due under loan no. xxx2406 and rely only on the aggregate balance of the remaining loans—or any single loan—as the basis for filing the Involuntary Petition against the Debtor.[51]

The *Miller* court's reasoning seems consistent with the other cases discussed above.

As these cases demonstrate, this Court walks on well-trodden ground in holding that a petitioning creditor may be eligible so long as it holds one qualifying claim, even if it also holds non-qualifying claims. The cases above provide useful analyses and comport with this Court's claim-by-claim approach, although, the Court should note, not all of them use the exact same terminology. This Court's terminology is aimed at tying this well-used methodological approach more tightly to the specific text of the Bankruptcy Code. In this Court's view, the doctrine that courts have applied in this area aptly implements section 303(b)(1)'s requirement that each petitioning creditor be "a holder of a claim against [the debtor] . . . that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." In each instance, even if not using this precise vocabulary, the courts above have intelligently analyzed whether the creditor was the "holder of a claim" that qualified them as petitioning creditor, and they have done so by evaluating the relationship between the parties and the source of each claim, each "right to payment."[52]

---

[51]  *Id.* at 83–84.

[52]  Because it would be a distraction, this analysis leaves aside the substantial case law on the issue of whether an instrument or note or like document evidencing or constituting a right to payment on behalf of more than one beneficiary amounts to one singular "claim" that can only be brought jointly (or by a representative), or whether each beneficiary has a "claim." This case law accords with the general principles explored above, however. *See, e.g.*, *In re McMeekin*, 16 B.R. 805, 809 (Bankr. D. Mass. 1982) ("[T]he note here, which purports to be a promise to repay a fixed sum to two named payees, and which refers to the payees in the conjunctive, is nevertheless a single promise to pay. It creates a single right to payment, which may be shared jointly by the payees, and which may be enforced only by both payees."); *In re Richard A. Turner Co.*, 209 B.R. 177, 179 (Bankr. D. Mass. 1997) ("[A]lthough there is only one collective bargaining agreement, the agreement itself creates three distinct and independent obligations. Consequently, each Petitioning Creditor is a holder of a claim for the

The need to establish the boundaries between one claim and another is not unique to this context. It also arises in the context of voting on plans of reorganization. Section 1126 of the Bankruptcy Code, titled "Acceptance of plan," provides that "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold . . . more than one-half in number of the allowed claims of such class."[53] This provision requires a tally of the *claims*, not the creditors; a creditor can hold and vote more than one claim. Case law confirms this point,[54] and an excellent 2022 article, titled *Numerosity Unwound: Counting Votes on a Chapter 11 Plan*, explores and synthesizes this law as it currently stands.[55] Courts applying this law take a similar approach to the cases above in seeking to establish when one "right to payment" is sufficiently distinct to stand as a "claim" on its own rather than being merged into another. They look to the underlying transaction(s) out of which the allegedly separate claims emerged to establish whether there is sufficient independence.[56] The fact that a creditor has filed only one proof of claim—

---

amount it is owed under the collective bargaining agreement."); *In re Young Men's Christian Ass'n of Topeka*, No. 20-20786, 2020 WL 7483739, at *5 (Bankr. D. Kan. Dec. 14, 2020) (finding that bondholders and not indenture trustee hold the claims and thus have the right to vote on reorganization plan); *In re Edwards*, 501 B.R. 666, 679–80 (Bankr. N.D. Tex. 2013) (finding, based on record before it, that final judgment is "a single, indivisible judgment that represents a single claim jointly held by" two creditors).

[53]  11 U.S.C. § 1126(c).

[54]  *See, e.g.*, *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 641 (9th Cir. 1997) ("[The creditor] purchased a number of separately incurred and separately approved claims (each of which carried one vote) from different creditors. There simply is no reason to hold that those separate votes suddenly became one vote, a result which would be exactly the opposite of claim splitting."); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (citation omitted) ("The formula contained in Section 1126(c) speaks in terms of the *number of claims,* not the number of creditors, that actually vote for or against the plan."); *In re Concord Square Apartments of Wood Cnty., Ltd.*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) (citing and following *Gilbert*); *In re Kreider*, No. 05-15018, 2006 WL 3068834, at *3 (Bankr. E.D. Pa. Sept. 27, 2006) (same).

[55]  Stephen D. Zide, Joseph A. Shifer & Benjamin S. Sieck, *Numerosity Unwound: Counting Votes on a Chapter 11 Plan*, 31.1 Norton J. Bankr. L. & Practice (Feb. 2022).

[56]  For example, in the often-cited *Gilbert* case, a creditor purchased two claims from two creditors and sought to cast both in favor of the debtor's plan of reorganization. The court permitted it, stating that the creditor's "two claims and his entitlement to two votes is not the result of any legal fiction or product of some form of bifurcation." *Gilbert*, 104 B.R. at 211. "Each claim arose out of a separate transaction, evidencing separate obligations for which separate proofs of claim were filed. . . . [The creditor] acquired two distinct rights to payment

or for that matter, that it has filed many proofs of claim—is not determinative of the substantive matter of how many claims the creditor has, but it may be probative, and it may sometimes bind the creditor from taking subsequent inconsistent actions.[57]

Analogous inquiries into "claim-splitting" come from the realm of civil procedure, where courts must sometimes confront whether a later claim could or should have been brought along with an earlier one. If a party fails to bring all parts of a claim at the appropriate time and place, it may be precluded from bringing that claim later or in a different forum. "A plaintiff's obligation to bring all related claims together in the same action," for example, "arises under the common law rule of claim preclusion prohibiting the splitting of actions."[58] The Restatement (Second) of Judgments provides a general statement of the law in this area. It focuses on factual considerations similar to those considered by bankruptcy courts:

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2) What factual grouping constitutes a "transaction," and what groupings constitute a "series," are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial

---

through two separate and unrelated arms length transactions." *Id. See generally American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012–2014 Final Report and Recommendations*, 23 Am. Bankr. Inst. L. Rev. 1, 280–81 (2015) (citations omitted) ("[U]nder appropriate circumstances, a single creditor may exercise more than one vote so long as the court determines that the claims are sufficiently 'separate' to warrant more than one vote. The determination of sufficient separateness is based on whether the claims in question derive from independent underlying transactions with the debtor, and whether separate proofs of claim were, or will be, filed for the claims.").

57  Zide, Shifer & Sieck, *supra* note 55 (summarizing case law and noting that "some courts may focus on form over substance when deciding whether a creditor can vote more than one claim" and that "[i]t is therefore important for a creditor to decide whether to file a single proof of claim or multiple proofs of claim at the time proofs of claim are filed, much earlier in a chapter 11 case than plan solicitation").

58  *Stone v. Dep't of Aviation,* 453 F.3d 1271, 1278 (10th Cir. 2006).

unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.[59]

The Comments to this section of the Restatement cast some additional light on the question of when arguably distinct rights to payment are sufficiently related that they constitute one claim or, by contrast, are sufficiently independent as to constitute multiple claims. The Comments note that "[t]he transaction is the basis of the litigative unit or entity which may not be split," even if distinct "substantive theories, or variant forms of relief flowing from those theories," may be available.[60] They note that the meaning of "transaction" in this context "connotes a natural grouping or common nucleus of operative facts."[61] One of the Restatement's examples is particularly pertinent because it concerns financial obligations in various forms that commonly arise in bankruptcy:

> When a number of items are overdue on a running account between two persons, and the creditor, bringing an action on the account, fails to include one among several past due items, judgment for or against the creditor precludes a further action by him to recover the omitted item. This conforms to ordinary commercial understanding and convenience. On the other hand, when there is an undertaking, for which the whole consideration has been previously given, to make a series of payments of money—perhaps represented by a series of promissory notes, whether or not negotiable—the obligation to make each payment is considered separate from the others and judgment can be obtained on any one or a number of them without affecting the right to maintain an action on the others. The same applies to the obligations represented by coupons attached to bonds or other evidences of indebtedness which are similarly considered separate.[62]

Of course, between the two basic examples here, of a "running account" versus "a series of promissory notes," there is substantial gray area. But it is striking how these

---

[59]   Restatement (Second) of Judgments § 24 (Am. L. Inst. 1982).

[60]   *Id.* § 24, cmt. a. The Reporter's Note states that "[t]he Supreme Court has accepted the equation between claim and transaction in a variety of contexts in which the idea of claim is legally significant" and provides citations. *Id.*

[61]   Restatement (Second) of Judgments § 24, cmt. b.

[62]   Restatement (Second) of Judgments § 24, cmt. d.

hypotheticals concur with the examples from the bankruptcy case law surveyed above, for instance in *Fustolo* and *Miller*, where the court considered the claims on different notes to be distinct, versus *Koffee Kup*, where the court declined to find that claims from various invoices and purchase obligations were separate because they all "stemmed" from one governing contract. The more nuanced middle ground is represented by *Manolo Blahnik*, where the court found that there were two claims because there were two separate purchase orders and two separate invoices, even though the goods appear to have been ordered fairly close in time and to be of the general same type. The Restatement also offers the example of tax obligations, stating that they should be separated by tax year—an outcome that accords with the *Blixseth* holding.[63]

The Restatement's rules emphasize equitable and appropriate "units" for trial purposes, and these concerns have force in the bankruptcy claim context as well. Similar litigation-related problems could arise if a creditor were to try to bring a second claim within a bankruptcy after the first one had already been determined.

In addition, it does not seem equitable that a creditor in bankruptcy should be able to split a "claim" into multiple parts if it would not be able to sue separately on each such part outside of bankruptcy; a transactional unit for litigation purposes outside of bankruptcy should generally constitute a unit within it. Such splitting could allow the creditor—or the successor creditors to whom it could sell each resultant claim—to wield outsized power in the bankruptcy proceeding, whether in voting on a reorganization plan or in throwing a debtor into an involuntary bankruptcy. While the Restatement is certainly not binding authority, and the Court acknowledges that its discussion emerges from a civil procedure context with somewhat distinct concerns, it sheds some light onto the analytical basis of "claim" boundary-drawing, and it gives some comfort as to the soundness of the approach that courts have taken in this area.

In sum, the determination of when multiple allegedly distinct claims are sufficiently independent to be considered separate relies on the particular facts of each case, but courts' (and commentators') approaches have considerable common ground and the test can be stated at some level of generality. Courts look below the claims' surface to the underlying facts and relationship between the parties to

---

[63]  Restatement (Second) of Judgments § 24, illus. 9.

determine whether the claims emerge from independent transactions or share the same origin. Distinct promissory notes, tax years, or purchase orders can serve as the bases for distinct claims, but if multiple invoices or injuries or other alleged rights to payment emerge from the same contract or same tax year, they cannot be split.

## 2. The Petitioning Creditors have each asserted only one "claim."

Because the parties here have agreed that particular invoices are undisputed, a key question in this case is whether these invoices represent one or more separate, undisputed "claims," or whether they are part and parcel of the same "claim" together with the invoices that may be subject to dispute.

As noted, the parties submitted this matter to the Court's determination on a thin record. The primary evidence is the various invoices that were apparently submitted by the various Petitioning Creditors to the Alleged Debtor. These invoices contain little by way of explanation, and there has been little testimony to illuminate them further.

The Petitioning Creditors take the view that "each of the Unpaid Invoices is a separate 'transaction' for the purpose of determining whether the Petitioning Creditors each has undisputed claims."[64] Remarkably, they even argue that "there is *no* relationship between any of the charges in a particular Unpaid Invoice with any unpaid charges in another Unpaid Invoice other than that they implicate the same creditor and the same debtor."[65]

The evidence does not support this position. The Petitioning Creditors' own evidence strongly supports the notion that the invoices of each Petitioning Creditor relate to the same underlying agreement and cannot be asserted as separate claims. As to Xmogrify, the Petitioning Creditors cite to one Statement of Work and a Master Services Agreement entered into the next day.[66] They then state that Xmogrify provided services and submitted invoices[67]—all presumably under these same agreements. Indeed, the Court's review of the Xmogrify invoices shows that they all refer to "SOW 1," and provide names, dates, and amounts (together with

---

[64] Opening Br. of Petitioning Creditors ¶ 32, ECF No. 52.

[65] Responsive Br. of Petitioning Creditors ¶ 14, ECF No. 59 (emphasis in original).

[66] Opp'n to Mot. to Dismiss ¶ 7.a, ECF No. 16.

[67] *Id.* ¶ 7.c.

some expenses to be reimbursed, all of them identified as relating to "SOW 1"), with nothing else to distinguish them as unique or independent "transactions."[68]

As to GCS, the Petitioning Creditors again cite a Master Services Agreement[69] and then state that GCS provided services and submitted invoices[70]—all presumably under this same agreement. Indeed, the Court's review of the GCS invoices shows that they all merely reference "Development Management Services," and provide an amount billed (together with some expenses to be reimbursed), with nothing substantive to distinguish one project or transaction from another.[71]

As to Rearc, the Petitioning Creditors cite to one Statement of Work[72] and then state that Rearc provided services and submitted invoices,[73] presumably under this agreement. Indeed, the Court's review of the Rearc invoices shows that they all reference "Cloud Automation Services under SOW #1," and simply provide names, titles, dates, and amounts due, with nothing substantive to distinguish one project or transaction from another.[74]

While the Petitioning Creditors' briefs discuss several of the cases cited by the Court above, those cases do not in fact support the Petitioning Creditors. *Manolo Blahnik* involved not just separate invoices but separate purchase orders; *Miller* involved separate notes on separate loans. Both cases are distinguishable from this one (despite the Petitioning Creditors' assertion that their case is "clearly factually identical" to *Manolo Blahnik*), because such separateness is not in evidence here, where all of the nearly indistinguishable invoices relate to one underlying contract for each Petitioning Creditor. By contrast, *Blixseth* (which they cite) and *Koffee Kup* (which they do not) both involved creditors' unsuccessful efforts to separate out part of a liability that resulted from the same underlying obligation, with respect to one

---

[68]  Goldstein Decl. Exs. 14–27, ECF No. 37.

[69]  Opp'n to Mot. to Dismiss ¶ 8.a, ECF No. 16.

[70]  *Id.* ¶ 8.b.

[71]  Goldstein Decl. Exs. 1–7, ECF No. 37.

[72]  Opp'n to Mot. to Dismiss ¶ 9.a, ECF No. 16.

[73]  *Id.* ¶ 9.g.

[74]  Goldstein Decl. Exs. 8–13, ECF No. 37.

tax year (in *Blixseth*) or one contract (in *Koffee Kup*). This case is most analogous to those and especially to *Koffee Kup*.

The Court has scoured the record in search of other evidence on this issue, even though the Petitioning Creditors did not bring further evidence to the Court's attention in their briefing. The other evidence ultimately supports the Court's determination. For example, the affidavits submitted by the Petitioning Creditors discuss some broadening of the initial agreements. David Levy, who actually performed the work of Xmogrify for the Alleged Debtor, states that the initial agreement was broadened by oral agreement to include several other tasks relating to the Alleged Debtor's business.[75] But he also consistently characterizes the work performed as falling under the Master Services Agreement mentioned above (abbreviated by him as "Agreement"), which again underscores that the duties all arose under that same contract, as in *Koffee Kup*. Mahesh Varma, who is one of the principals of Rearc, also consistently references the Statement of Work ("SOW") as the governing agreement through Rearc's relationship with the Alleged Debtor until Rearc "terminated the SOW" in late 2022.[76] Similarly, Kevin Goldstein's declaration notes that the invoicing and payment was to be made "[p]ursuant to the MSA."[77] While that agreement was allegedly modified (including in terms of compensation) and the declaration even references the execution of a "change order" to the MSA that appears to have changed compensation again "to be aligned with compensation as an employee" (although that change order does not appear to have been placed in the record),[78] at no point does he suggest he was proceeding under any other agreement, and he repeatedly alludes to the MSA ("in accordance with the MSA," "to perform the obligations under the MSA," "could not keep providing services under the MSA," "did not terminate the MSA"). Based on the record of the invoices and agreements submitted by the Petitioning Creditors, there is not sufficient support for the Petitioning Creditors' stated position that each invoice is its own claim.[79]

---

[75]  Opp'n to Mot. to Dismiss Ex. A, at ¶¶ 8, 9, ECF No. 16.

[76]  *Id.*, Ex. C, at ¶ 17.

[77]  *Id.*, Ex. B, at ¶ 7.

[78]  *Id.*, Ex. B, at ¶ 15.

[79]  Opening Br. of Petitioning Creditors ¶ 32, ECF No. 52 ("[E]ach of the Unpaid Invoices is a separate 'transaction' for the purpose of determining whether the Petitioning Creditors each has undisputed claims."); Responsive Br. of Petitioning Creditors ¶ 14, ECF No. 59.("[T]here is *no* relationship between any of the charged in a particular Unpaid Invoice with any unpaid

Accordingly, the Court finds that they each have only one claim related to their unpaid invoices.

## B. Bona Fide Dispute

### 1. To establish a petitioning creditor's eligibility, a claim must be undisputed as to liability and amount; the statute includes no "materiality" requirement; and this rule is not absurd.

For a claim to qualify for establishing a petitioning creditor's eligibility, section 303(b)(1) states that it cannot be "the subject of a bona fide dispute as to liability or amount." This language dates from the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Before that, the statute required that it could not be "the subject of a bona fide dispute." Courts differed over the meaning of this phrase. As the Fifth Circuit explained in its 2014 *Green Hills* opinion: "some courts, including this one, interpreted the pre-BAPCPA § 303(b) to deny standing to a creditor only when there was a bona fide dispute as to liability. A dispute as to the amount of the claim, even if as to the total amount of the claim (for example, through an offsetting counterclaim), was not considered a basis to deny standing."[80]

But, as the *Green Hills* court went on to state, "[b]y adding the phrase 'as to liability or amount' to § 303(b), Congress changed its meaning. Post–BAPCPA cases have recognized that a bona fide dispute as to the amount of the debt is now sufficient to deny a creditor standing to bring an involuntary petition."[81] In light of the apparent clarity of the post-2005 text of section 303(b), many courts, including every circuit court to consider the issue,[82] have interpreted the text to mean what it says: that there must, in fact, be no—*no*—bona fide dispute as to liability or amount. The Court will refer to this as the "No Dispute Approach."

---

charges in another Unpaid Invoice other than that they implicate the same creditor and the same debtor.").

[80]  *Green Hills*, 741 F.3d at 656–57 (citations omitted).

[81]  *Id.* at 657.

[82]  This includes, at a minimum, the First and Ninth Circuits. Arguably, the Fifth Circuit has not issued a precedential *holding* on this issue, although in the view of this Court and others, including *Blixseth*, 942 F.3d at 1186, its statements in *Green Hills* seem to indicate support. See discussion below.

However, there is a competing interpretive approach that this Court will refer to as the "Material Dispute Approach." Under that approach, a bona fide dispute concerning a claim does not disqualify that claim from supporting a petitioning creditor so long as the the *undisputed* portions of all of the petitioning creditors' non-contingent claims still aggregates to above the statutory threshold, currently $18,600 (*i.e.*, the dispute is not in that sense "material").

The influential *Collier* treatise argues that the 2005 amendments did not, in fact, change the meaning of section 303(b) and thus the Material Dispute Approach is "the better view." It cites the *DemirCo Holdings Inc*. case as an illustration of why this view is better. In that case, the debtor conceded that the creditor was owed millions of dollars on its claim, but it argued that a portion of that claim was in bona fide dispute and therefore the claim could not establish the petitioning creditor's eligibility. The *DemirCo* court decided that it would follow its pre-2005 precedent and hold that a "non-material" dispute did not threaten the creditor's eligibility: "[w]ithout clear legislative intent, this Court cannot presume such a change in the law and declines to do so."[83] *Collier* argues for the wisdom of this approach with a series of rhetorical questions:

> Why would Congress want to disqualify a creditor whose claim is noncontingent and at least partially *un*disputed? Section 303's requirements regarding type and number of claims are an attempt to balance a debtor's interest in staying out of bankruptcy with the interest of creditors in putting a debtor into bankruptcy. Why shouldn't the undisputed, noncontingent portion of a petitioning creditor's claim count? Why disqualify the creditor in toto? Why effectively bar that creditor's access to the bankruptcy forum?[84]

But insofar as *DemirCo* serves as an illustration from one extreme, one could imagine hypotheticals from the other extreme, in which a creditor's massive claim is largely in dispute but for a tiny portion, enough to contribute to the relatively small amount required to petition the debtor into bankruptcy, currently $18,600. Recall that the threshold amount must be met only by the *aggregate* of the petitioning

---

[83]  *In re DemirCo Holdings Inc*., No. 06-70122, 2006 WL 1663237 (Bankr. C.D. Ill. June 9, 2006).

[84]  2 *Collier on Bankruptcy* ¶ 303.11[2] (Richard Levin & Henry J. Sommer eds.,16th ed. rev. 2024).

creditors' claims,[85] so under the Material Dispute Approach, could a debtor be successfully petitioned into bankruptcy by one creditor with an undisputed claim for $18,598 who is joined by two creditors with claims of $1 million each, only $1 of which is undisputed? And if so, is this clearly preferable to the No Dispute Approach?

This hypothetical provides at least a partial answer to *Collier*'s various rhetorical questions about the No Dispute Approach. The statute as written protects alleged debtors from having bankruptcy weaponized against them as a litigation tactic. The Material Dispute Approach provides much less protection.

The *Blixseth* decision provides a real-world example, in which a taxing authority sought to use a $200,000 concession as leverage to collect a total claim of well over $9 million. The Ninth Circuit made this point expressly:

> MDOR's own claim exemplifies why following the plain language is the logical interpretation that gives effect to the statute's basic policy. MDOR initiated an audit of Blixseth and several related entities for the 2002 through 2006 tax years. Blixseth conceded that the deduction challenged by Audit Issue 4 was improper, thus potentially altering his tax liability for the 2004 tax year. By MDOR's calculation, Audit Issue 4 gave rise to $219,258 in additional tax liability, penalties, and interest as of the petition date. In full, however, MDOR claimed more than $9 million in tax liability, penalties, and interest for the 2004 tax year stemming from multiple audit issues. And, as soon as Blixseth conceded the impropriety of the deduction challenged in Audit Issue 4, *MDOR sought to leverage an approximately $200,000 concession to collect on a disputed claim totaling more than $9 million along with tens of millions of dollars in additional disputed tax liability.* In doing so, MDOR engaged in the very type of conduct that § 303(b)(1)'s "bona fide dispute" limitation seeks to prohibit.[86]

In any case, whether the Material Dispute Approach or the No Dispute Approach is best as a matter of policy is not for this Court to decide. The discussion in the preceding few paragraphs is merely intended to answer the policy concerns articulated by *Collier* and others with respect to the No Dispute Approach and to

---

[85] *See* 11 U.S.C. § 303(b)(1) (requiring petitioning creditors to be "holders that hold in the aggregate at least $18,600 of such claims").

[86] *Blixseth*, 942 F.3d at 1186–87 (emphasis added).

suggest that the Material Dispute Approach yields difficulties of its own (as would any attempt to set up a general rule in this challenging context).

The purpose of this statute is to "address[] the risk of creditors using bankruptcy to force debtors into paying legitimately disputed debts as an alternative to resolving the disputed claims through other means."[87] Under the No Dispute Approach, section 303(b)(1) erects significant protection for debtors by requiring a petitioning creditor to hold at least one *entirely* undisputed claim (among the other requirements), and in doing so it is a perfectly reasonable implementation of a congressional priority.[88] "[I]nterpreting § 303(b)(1)'s inclusion of 'amount' to bar all claims disputed in amount, whether partially or fully disputed, does not lead to an absurd result."[89] The No Dispute Approach may occasionally yield results that appear inequitable to particular parties, but so too would the Material Dispute Approach.

To reiterate, because the results do not reach the high bar of absurdity, the Court has no alternative but to follow the text, which in the Court's view unambiguously supports the No Dispute Approach. It contains no materiality proviso and the Court has no basis for reading in such a proviso. As noted, no circuit court has followed the Material Dispute Approach, and the First and Ninth Circuits have squarely followed the No Dispute Approach.[90] And as quoted above, the Fifth Circuit, too, has stated, significantly: "[b]y adding the phrase 'as to liability or amount' to § 303(b), Congress changed its meaning. Post–BAPCPA cases have recognized that a bona fide dispute as to the amount of the debt is now sufficient to deny a creditor standing to bring an involuntary petition."[91] This seems like a square statement of the Fifth Circuit's position. It could, however, be considered dicta and

---

[87]  *Id.* at 1184 (describing purpose of original provision and its amendment).

[88]  *Fustolo*, 816 F.3d at 10 (internal citations omitted) ("[T]he bona fide dispute provision strikes a balance between the Bankruptcy Code's dual purposes of ensuring the orderly disposition of creditors' claims and protecting debtors from coercive tactics. Limiting petitioning creditors to only those claims that are of undisputed value is in line with those aims.").

[89]  *Blixseth*, 942 F.3d at 1186.

[90]  *Fustolo*, 816 F.3d at 10 ("We decline to read a materiality requirement into section 303."); *Blixseth*, 942 F.3d at 1186 ("We . . . hold that a creditor whose claim is the subject of a bona fide dispute as to amount lacks standing to serve as a petitioning creditor under § 303(b)(1) even if a portion of the claim amount is undisputed.").

[91]  *Green Hills*, 741 F.3d at 657.

not a precedential holding,[92] because in *Green Hills*, the bona fide dispute appears to have enveloped the entire claim—at issue was "the validity of the loan agreement and the amount due under that agreement."[93] Thus, the *Green Hills* holding does not appear to have *required* the court to address whether a "non-material" dispute would render a creditor ineligible to petition a debtor into bankruptcy. For this reason, Judge Hale in the 2020 *Williams* case suggested that it could still adopt the Material Dispute Approach: "The Court [in *Green Hills*] did not . . . specifically address the materiality of such amount (*i.e.*, whether or not a dispute as to the amount of a claim must fall under the statutory threshold of section 303(b) sufficient to make it a 'bona fide dispute.')."[94] Because he found the issue was still open in the Fifth Circuit, he therefore followed the Material Dispute Approach, holding that it "strikes the proper balance 'between the ability of petitioning creditors to have access to the bankruptcy courts and the interest of would-be debtors to remain free from involuntary petitions,' and is in line with the legislative history of section 303(b)(1)."[95]

*Williams* has been followed in at least one other case in this circuit, *Seven Three Distilling*.[96] It is not lost on the Court that *Williams* and *Seven Three Distilling* were issued by excellent bankruptcy judges, Judge Grabill and (now-retired) Judge Hale. Their agreement on this point is an indication of how compelling the position is. This Court disagrees with them reluctantly and with the greatest of respect. But, as noted, both circuits to squarely consider the issue, in addition to several other judges in the Fifth Circuit and numerous other judges elsewhere, have adopted the

---

[92] *See, e.g., Gochicoa v. Johnson*, 238 F.3d 278, 287 (5th Cir. 2000)("A statement should be considered *dictum* when it 'could have been deleted without seriously impairing the analytical foundations of the holding—[and], being peripheral, may not have received the full and careful consideration of the court that uttered it.'" (quoting *In re Cajun Elec. Power Coop., Inc.*, 109 F.3d 248, 256 (5th Cir. 1997))).

[93] *Green Hills*, 741 F.3d at 659. Elsewhere, the *Green Hills* opinion seems to add that the dispute concerning the claim was a counterclaim (or set of counterclaims) related to the underlying transaction. *Id*. at 657 (distinguishing the type of disputes in *Green Hills* from the "unrelated" counterclaims at issue in the Ninth Circuit's opinion in *In re Seko Inv., Inc.*, 156 F.3d 1005 (9th Cir. 1998)), 660 (disagreeing with pre-BAPCPA case law concerning effect of counterclaims on petitioning creditors' eligibility).

[94] *In re Williams*, 616 B.R. 690, 694 n.10 (Bankr. N.D. Tex. 2020).

[95] *Id*. at 694 (quoting *In re Gen. Aeronautics Corp.*, 594 B.R. 442, 465 (Bankr. D. Utah 2018)).

[96] *See In re Seven Three Distilling Co., L.L.C.*, No. 21-10219, 2021 WL 2843849 (Bankr. E.D. La. July 6, 2021).

No Dispute Approach.[97] And *Green Hills* itself—together with the Fifth Circuit's general commitment to the statutory text—leads this Court to the conviction that the Fifth Circuit would follow the No Dispute Approach, too. The *Green Hills* court expressly found that the 2005 amendment changed the meaning of section 303(b)(1) (which some advocates of the Material Dispute Approach have doubted), it made the statements above about the post-2005 meaning without any suggestion of a materiality proviso, and it cast doubt on several other precedents from other courts that were pre-2005, again underscoring its view that Congress wrought a change in meaning when it changed the statute's language.[98]

As an aside, *Collier* suggests, and cites courts suggesting, that a creditor whose claim is partially in dispute should "simply assert the *un*disputed, *non*-contingent portion of its claim."[99] Any concern over this potential work-around does not undermine the No Dispute Approach, and bad faith abuse of it might bring unfavorable consequences for parties or their counsel. For one thing, as *Collier* concedes, such a creditor risks seeing itself unable, later, to assert the remaining, disputed portion of its claim.[100]

Congress could have drawn the line somewhere else, or given courts the authority to draw the line, somewhere in between the various positions on how much disputedness should disqualify a creditor. And it could have imposed numerous other safeguards, qualifications, limitations, and so on. But it has not done so. This Court believes the statutory text clearly reflects that, in 2005, Congress chose the No Dispute Approach. Numerous other courts, including both circuit courts to have

---

[97] *See, e.g.*, *Blixseth*, 942 F.3d at 1185 (collecting cases). *See also* Transcript of Court's Ruling at 15–16, *In re Clean Fuel Techs., II, LLC*, No. 15-30827 (Bankr. W.D. Tex. July 20, 2015), ECF No. 54 (adopting No Dispute Approach); Transcript of Court's Ruling on Contested Involuntary Petition at 13–14, *In re CPME, L.L.C.*, No. 14-30393 (Bankr. W.D. Tex. Apr. 10, 2014), ECF No. 65 (same). Chief Judge Jernigan also appears aligned with the approach taken by this Court. *See* E-mail from the Court to Counsel, *In re Intelligent Surveillance Corp.*, Case No. 21-31096 (Bankr. N.D. Tex. Sept. 21, 2021), ECF No. 49.

[98] *See, e.g.*, *Green Hills*, 741 F.3d at 657 (noting that the amendment "eliminated the textual justification that existed prior to BAPCPA" concerning whether an unrelated counterclaim rendered a claim "disputed"), 660 (casting doubt on a case because "that case was decided under the pre-BAPCPA version of § 303(b), and, as discussed above, Congress has made clear that a claimholder does not have standing to file an involuntary petition if there is a 'bona fide dispute as to liability *or amount*' of the claim."). Notably, the italics in that last quotation were added by the *Green Hills* court!

[99] 2 Collier on Bankruptcy ¶ 303.11[2], n.37.

[100] *Id.* n.38 (noting that this risk "might constitute a restraining influence on this tactic").

clearly weighed in on this issue, agree. They also agree that this approach does not yield absurd results. This Court has no hesitation following it.

## 2. No bona fide dispute exists.

To decide whether any amount of a petitioning creditor's claim is subject to bona fide dispute as to liability or amount, "the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute."[101] In the *Green Hills* opinion, the Fifth Circuit explained that "[u]nder this objective standard, the petitioning creditor has the burden to establish a prima facie case that no bona fide dispute exists, after which the debtor must present evidence sufficient to rebut the prima facie case."[102]

Petitioning creditors can establish a prima facie case that there is no bona fide dispute through pleadings, accompanied by sufficient evidence.[103] The debtor must then "show through evidence that a bona fide dispute exists objectively."[104] A debtor's subjective belief regarding whether a bona fide dispute exists is not sufficient to rebut a petitioning creditor's prima facie case.[105]

Although courts can consider the existence of pending litigation as evidence of a bona fide dispute,[106] the fact that there is pending litigation between the parties is not dispositive[107] and courts must still determine whether there is an objective

---

[101] *Green Hills*, 741 F.3d at 658 (quoting *In re Sims*, 994 F.2d at 221).

[102] *Id.*

[103] *Id.* at 659; *In re eBackpack, LLC*, 605 B.R. 126, 134 (Bankr. N.D. Tex. 2019).

[104] *eBackpack*, 605 B.R. at 134.

[105] *Green Hills*, 741 F. 3d at 658; *eBackpack,* 605 B.R. at 133.

[106] *Green Hills*, 741 F. 3d at 658; *eBackpack,* 605 B.R. at 133.

[107] *In re Haymond*, 633 B.R. 520, 540 (Bankr. S.D. Tex. 2021) ("[W]ithout more, the existence of ongoing litigation on a claim is not dispositive."); *In re CorrLine Int'l, LLC*, 516 B.R. 106, 149 (Bankr. S.D. Tex. 2014) ("[P]ending litigation 'suggests, *but does not establish*, the existence of a bona fide dispute.'" (quoting *In re TPG Troy LLC*, 492 B.R. 150, 159 (Bankr. S.D.N.Y. 2013))). Collier on Bankruptcy § 303.11[1] (citing *IBM v. Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474 (W.D. Pa. 1995); *In re Hicks*, No. 11-32263, 2011 WL 6000861 (Bankr. E.D. Tenn. Nov. 30, 2011)) ("The existence of litigation before the filing of an involuntary case is also not dispositive of a bona fide dispute . . . ."). *See also Green Hills*, 741 F.3d at 659–60 (noting that the bankruptcy court "did not merely conclude that the existence of the Texas Litigation or the Texas court's apparent denial of summary judgment

basis for the dispute based on the evidence presented.[108] In *Green Hills*, for example, the Fifth Circuit found that the bankruptcy court had not held "that the existence of the Texas Litigation or the Texas' court's apparent denial of summary judgment were, by themselves, dispositive." Rather, the bankruptcy court had relied on documentary evidence of state court litigation—which had involved several motions for summary judgment and more than a dozen hearings—to conclude that a petitioning creditor's claim was subject to a bona fide dispute. The bankruptcy court had also found it significant that the state court had determined that there were facts that gave rise to a legitimate disagreement. It also "conducted a thorough, independent review of the evidence" from the state court litigation.[109] The Fifth Circuit approved of the bankruptcy court's analysis and affirmed the bankruptcy court's determination that a bona fide dispute existed in the case "[b]ased on the extensive record of parallel litigation."[110]

Similarly, the *In re eBackpack* bankruptcy court considered evidence of lengthy state court litigation—wherein the parties had conducted extensive discovery—when considering whether the petitioning creditors' claims were subject to a bona fide dispute.[111] In that case, the parties provided the bankruptcy court with "[e]xtensive pleadings, briefs, and other documents . . . which permitted limited legal analysis of the parties' disputes."[112] On the evidentiary record before it, the bankruptcy court concluded that the petitioning creditors' claims were subject to a bona fide dispute.[113]

Here, the Petitioning Creditors had to make a prima facie case that no bona fide dispute existed. The Alleged Debtor then had to present sufficient objective

---

were, by themselves, dispositive" and "also conducted a thorough, independent review of the evidence from the Texas Litigation."); *eBackpack*, 605 B.R. at 134–35 (finding that parties had presented the bankruptcy court with enough pleadings, briefs, and other documents to allow it to conduct a limited legal analysis of the parties' disputes).

[108] *Green Hills,* 741 F.3d at 658.

[109] *Id.* at 658–59.

[110] *Id.* at 660.

[111] *eBackpack*, 605 B.R. at 134–35.

[112] *Id.* at 135.

[113] *Id.*

evidence, beyond the mere existence of the state court litigation, to show that there is a bona fide dispute over the Petitioning Creditors' claims.

To support their contention that their claims are not subject to a bona fide dispute, the Petitioning Creditors first submitted verified statements in support of their claims.[114] In response to the Alleged Debtor's Motion to Dismiss, they also submitted declarations from David A. Levy (principal of Xmogrify), Kevin Goldstein (principal of GCS), and Mahesh Varma (principal of Rearc), which also outlined the facts supporting their claims.[115]

In accordance with the Court's Scheduling Order, Goldstein also submitted a second declaration that attached invoices sent by each of the Petitioning Creditors to the Alleged Debtor spanning from August 2022 through March 2023.[116] In addition, Goldstein included an e-mail dated January 13, 2023, from Elena Eastwood to Rebecca Wanta, who served on the Alleged Debtor's Board of Directors and as Chief Operations Officer, Chief Technology Officer, and Chief Information Officer from February 2022 to February 2023.[117] The e-mail included an attached report that listed unpaid invoices with GCS, Xmogrify, and Rearc, and suggested that the invoices were all approved for payment by the department managers.[118]

As further evidence that the invoices had been approved for payment by the Alleged Debtor, the Petitioning Creditors also submitted an affidavit from Rebecca Wanta.[119] She affirmed that the Alleged Debtor entered into contracts with each of the Petitioning Creditors, that each of the Petitioning Creditors had "satisfactorily performed the services in accordance with their written agreements," and that "at no point in time from their hiring in 2022 until my separation from the Alleged Debtor in February 2023, did I or anyone else at the company raise an objection to the services that each of them provided."[120] She stated "I am advised that the Alleged Debtor is now taking the position that the services provided by the Petitioning Creditors was somehow inadequate, but that is untrue. The services for which the Alleged Debtor was billed by the Petitioning Creditors was performed satisfactorily

---

[114] V.S. in Supp. of Involuntary Chapter 7 Pet., ECF No. 2.

[115] Opp'n to Mot. to Dismiss Exs. A–C, ECF No 16.

[116] Goldstein Decl., ECF No. 37.

[117] Goldstein Decl. Ex. 28, ECF No. 37.

[118] *Id.*

[119] Wanta Decl., ECF No. 49.

[120] Wanta Decl. 2, ECF No. 49

and in accordance with the agreements." She stated that she reviewed the invoices attached to the Goldstein declaration and verified that each of them "were approved for payment by the Alleged Debtor."

Together, the Petitioning Creditors' invoices and Wanta's declaration that the invoices were approved for payment are sufficient to establish a prima facie case that there is no bona fide dispute over the Petitioning Creditors' claims under the objective standard. Thus, the burden shifted to the Alleged Debtor to rebut the Petitioning Creditors' prima facie case.

In its Motion to Dismiss, the Alleged Debtor argues that there is a bona fide dispute over the Petitioning Creditors' claims because at the time the Involuntary Petition was filed it was "engaged in litigation over the validity and amount of any claims asserted by the Petitioning Creditors."[121] Based on offsets it believes it is entitled to by virtue of its counterclaims against the Petitioning Creditors, the Alleged Debtor contends that it owes the Petitioning Creditors nothing.[122] In support, the Alleged Debtor attached the state court complaints and its answers and counterclaims as exhibits to the Motion to Dismiss.[123]

In its answers and counterclaims, the Alleged Debtor primarily argues that the services provided by the Petitioning Creditors were inadequate, so it does not owe them anything. In support of its breach of contract counterclaims, the Alleged Debtor makes the following identical allegation against the Petitioning Creditors:

> In or around March 2023, Q5iD conducted an internal audit to review the services allegedly provided by [Petitioning Creditor] and for which [Petitioning Creditor] had been submitting invoices to Q5iD. The audit revealed that [Petitioning Creditor] and its business associates . . . had not been performing the services they had been engaged to perform, and, in the alternative, any services that were provided were deficient and substandard. In fact, no work product, artifacts or accompanying data, worksheets, manuals or other materials have been provided to Q5iD despite Plaintiff's demand for payment.[124]

---

[121]  Mot. to Dismiss 2–3, ECF No. 9.

[122]  Mot. to Dismiss 3, ECF No. 9.

[123]  Mot. to Dismiss, Exs. 1–6, ECF No. 9.

[124]  Marcotte Decl., Ex. B, at 38, Ex. D, at 76, Ex. F, at 112, ECF No. 48.

These vague and largely subjective allegations fail to rebut the Petitioning Creditors' showing. The Alleged Debtor could have submitted the contracts governing the relationships between the parties and an affidavit from the person who conducted the audit describing how the Petitioning Creditors breached those contracts, or the audit itself, which would have been some evidence to support its allegations. But it chose not to submit any documentation or detail other than the initial state court pleadings. Without any supporting evidence, the Court cannot make an objective analysis of the Alleged Debtor's contention that the services were insufficient, and so not compensable, or the breach of contract counterclaims.

The Alleged Debtor also asserts breach of confidentiality counterclaims, arguing that the Petitioning Creditors breached their confidentiality agreements with the Alleged Debtor by including "proprietary and confidential business information relating to the business of Q5id, including payment records, investor information, and business processes and practices" in the complaints and in an e-mail.[125] But again, the Alleged Debtor does not detail the alleged breaches or damages resulting from them, nor does it attach the confidentiality agreements or e-mails or any other documentation that would allow the Court to objectively evaluate these claims.

In response to the Court's Scheduling Order, the Alleged Debtor later submitted an affidavit from Michael Marcotte, President and Chief Executive Officer of the Alleged Debtor.[126] The declaration does not state when Marcotte began serving in this capacity. In his declaration, Marcotte asserted that the statements in his declaration are based on: "(a) information supplied to me by other shareholders or ArtiusID, its management or professionals; (b) my review of relevant documents; and (c) my opinion based upon my experience and knowledge of ArtiusID's operations and financial conditions."[127] He stated that he was "personally familiar with the content" of the Petitioning Creditors' complaints and the counterclaims against the Petitioning Creditors.[128] He then went on to list the allegations in each counterclaim and simply "adopted" them wholesale.[129] From

---

[125]  Marcotte Decl., Ex. B, at 40, Ex. D, at 79, Ex. F, at 114, ECF No. 48.

[126]  Marcotte Decl., ECF No. 48.

[127]  Marcotte Decl. 1, ECF No. 48.

[128]  Marcotte Decl. 2, 3, 5, ECF No. 48.

[129]  Marcotte Decl. 2–6, ECF No. 48. In his declaration, Marcotte used substantially the same language to adopt the Alleged Debtor's affirmative defenses and counterclaims against each of the Petitioning Creditors. For example, regarding the Xmogrify litigation, he stated "[t]he Xmogrify Counterclaim presents the following affirmative defenses, which affirmative

these statements, it is unclear whether Marcotte had personal knowledge of the facts underlying the answers and counterclaims or just personal knowledge of what those documents say because he read them.[130] The evidentiary value of an affidavit with such an inadequate foundation is minimal at best. Further, even if it were taken to be based on his personal knowledge, the lack of detail, not to mention supporting documentation, is damning, especially considering the wealth of detail supplied by the Petitioning Creditors at the time of Marcotte's submission. He had ample opportunity to consider and respond in full—and to carry the Alleged Debtor's burden, he needed to do so. This he failed to do.

The Marcotte declaration does not establish an objective basis for dispute. Aside from the state court pleadings, no other documentation was attached to the declaration. Nor does this witness provide anything approaching a sufficient evidentiary basis to rebut the prima facie case made by the Petitioning Creditors. Thus, the Marcotte declaration also does not provide the Court with an objective basis to hold that a bona fide dispute exists between the parties.

Aside from the Marcotte declaration and the state court pleadings, the Alleged Debtor provided no evidence to support its contentions that a bona fide dispute exists. The Court also has no rulings from the state court that would support the existence of a bona fide dispute because it appears that the litigation was in its initial stages at the time the involuntary petition was filed. As noted above, the mere existence of litigation is not enough to show a bona fide dispute.[131] This case is an excellent example of the wisdom of that rule. In light of the nascent state of the state court litigation, coupled with the Alleged Debtor's inability after ample opportunity to provide objective evidence of any actual dispute, the Petitioning Creditors should be able to proceed with this involuntary bankruptcy.

Due to the lack of objective evidence presented by the Alleged Debtor, the Court concludes that no bona fide dispute exists over the Petitioning Creditors'

---

defenses, I adopt and incorporate into this Declaration" and "[t]he Xmogrify Counterclaim asserts the following counterclaims against Xmogrify, which claims I adopt and incorporate into this Declaration."

[130] Notably, Rebecca Wanta stated in her declaration that Marcotte "was not in a position to observe any of the work performed by the Petitioning Creditors and I do not understand why he is suggesting that there is a dispute as to the invoices in question, other than to state this as a general conclusion or legal position . . . as I was responsible for approving invoices and the work product giving rise to such invoices and I, in fact, approved these invoices for payment." Wanta Decl. 3, ECF No. 49.

[131] *Haymond*, 633 B.R. at 540; *CorrLine Int'l, LLC*, 516 B.R. at 149.

claims and that the Petitioning Creditors thus have standing to file the involuntary petition.

## Conclusion

To be eligible to petition a debtor into bankruptcy involuntarily, a creditor must hold at least one claim not subject to a bona fide dispute as to liability or amount. This requires a claim-by-claim consideration of whether any portion of each claim is subject to a bona fide dispute, and if it is, that claim cannot serve as the basis for a petitioning creditor's eligibility.

Here, the Petitioning Creditors failed to demonstrate that they held more than one claim, but the Alleged Debtor failed to demonstrate that their claims were subject to a bona fide dispute. Therefore, the Petitioning Creditors prevail—they are eligible to force the Alleged Debtor into this bankruptcy proceeding.

The Court will issue an order denying the Motion to Dismiss and will enter the order for relief.

# # #