**The relief described hereinbelow is SO ORDERED.**

**Signed July 31, 2024.**

_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-11007-cgb |
| ARTIUSID, INC., | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |

### ORDER SETTING STATUS CONFERENCE ON
### MOTION FOR REHEARING OF THE ORDER FOR RELIEF

On July 29, 2024, the Debtor filed a Motion for Rehearing of the Order for Relief or in the Alternative for Stay Pending Appeal (the "Motion for Rehearing") in response to the Court's denial of the Debtor's Motion to Dismiss and subsequent entry of an Order for Relief.[1] The Debtor also requested an expedited hearing on its Motion for Rehearing.[2] For the reasons stated herein, the Court will hold a status conference on the Motion for Rehearing to consider whether a stay pending determination of the Motion for Rehearing is appropriate under the circumstances of this case.

---

[1] Mot. for Rehearing, ECF No. 70; Opinion on Mot. to Dismiss Involuntary Case, ECF No. 60; Order for Relief, ECF No. 62.
[2] Mot. to Expedite, ECF No. 72.

Out of respect for the urgency of the matter, the Court has worked very hard on a short timeframe to put together this order (and apologizes for any potential oversights due to this timetable). The Court provides the guidance below as background on this matter—not to suggest that it has already made up its mind (it has not), but to provide the parties with information, context, and tentative views that may help them as they make their decisions in this matter.

The upshot is, as the discussion below makes clear, the Court believes the Debtor's position is unlikely to prevail. Accordingly, *the Court urges the Debtor to consider other steps, such as converting this to a Chapter 11 case*—relief that the Court would be happy to consider on an expedited basis.

## Background and Analysis

In order to prevent the Court from simply entering an order for relief permitting an involuntary bankruptcy to continue, the statute requires an alleged debtor to "timely controvert" the petition that has been filed against it.[3] As the Debtor itself agrees,[4] the Debtor in this case "controverted" the involuntary Chapter 7 bankruptcy petition filed against it with a filing it made on December 19, 2023, in which it asked the Court "pursuant to 11 U.S.C. § 303 . . . to enter an Order dismissing the Involuntary Petition" because "all Petitioning Creditors [sic] claims are subject to a bone [sic] fide dispute as to both liability and amount."[5] The Debtor *did not mention* any other ground for dismissal of the petition—it did not "controvert" anything else. The Debtor *did not mention* Rule 12 of the Federal Rules of Civil Procedure or any of its sub-parts; it *did not mention* Rule 1011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[3] 11 U.S.C. § 303(h) (directing courts to enter an order for relief if an involuntary petition "is not timely controverted.").

[4] Mot. For Rehearing 4, n.2, ECF No. 70 ("Here, the Debtor 'timely controverted' the involuntary petition by filing the Motion to Dismiss.").

[5] Mot. to Dismiss, ECF No. 9.

2

In the involuntary petition,[6] the verified statement in support of the involuntary petition,[7] and the briefing in this matter,[8] the Petitioning Creditors straightforwardly alleged—*and the Debtor failed to challenge*—that the Debtor was not paying its debts as they came due, a required element under § 303(h). In their first response to the Debtor's Motion to Dismiss, for instance, the Petitioning Creditors spend no less than five substantive paragraphs over three pages presenting argument and authority to support the proposition that "**The Debtor Is Not Generally Paying Its Debts as They Come Due**."[9] Although this was plainly put at issue, the Debtor *made no attempt* to "controvert" this allegation either in any filing or at any hearing in this matter.

As to the single matter the Debtor did "controvert"—whether the Petitioning Creditors were holders of sufficient claims not subject to bona fide dispute as to liability or amount—the Court was prepared to promptly try the Debtor's position at that time as required by statute. But together with the Petitioning Creditors, the Debtor chose to stipulate to certain facts and conduct a trial on this matter "on the papers, as exhaustively discussed in numerous hearings,[10] documented in scheduling orders,"[11] and laid out at length in the Court's opinion.[12] In so doing, the parties chose not to avail themselves of all sorts of procedural rights that they would have been entitled to.[13]

After losing at this trial, the Debtor now—through no less than its *third* set of lawyers—insists that it should be able to evade bankruptcy on a new grounds, namely that it *is* in fact paying its debts as they come due. It demands another trial on this basis. Leaving aside whether this is procedurally appropriate (discussed below), the facts that are in evidence do not help the Debtor. The evidence plainly

---

[6] Involuntary Pet. 2, ECF No. 1 (checking box for "The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.").
[7] V. S. 1, ECF No. 2.
[8] Opp'n of Pet. Creditors to Mot. to Dismiss Involuntary Pet., ECF No. 16; Opening Br. of Pet. Creditors Re Mot. to Dismiss Involuntary Ch 7 Pet. ¶¶ 2, 21, 31, ECF No. 52.
[9] Opp'n of Pet. Creditors to Mot. to Dismiss Involuntary Pet. ¶¶ 23–27, ECF No. 16.
[10] *See* Hearings on Feb. 22, 2024; Feb. 29, 2024; Mar. 26, 2024.
[11] Order Regarding Mot. to Dismiss, ECF No. 39; Scheduling Order, ECF No. 45.
[12] Op. on Mot. to Dismiss Involuntary Case 2–6, ECF No. 60.
[13] *See, e.g.*, Bankruptcy Rule 1018. These are some of the rights the Debtor now, belatedly, insists that the Court must afford it to avoid a "manifest error of law." Mot for Rehearing 5, ECF No. 70

supports a finding that it was not paying its debts as they came due. While it now makes belated assertions regarding its excellent financial status and prospects, the documentary evidence demonstrates that for a considerable time period, and not very long before the petition was filed, the situation was dire. The Debtor's representatives were repeatedly promising payment of the Petitioning Creditors' large invoices but then not making the payments;[14] despite very ample opportunity to do so, the Debtor failed to show that there is any bona fide dispute as to any of the Petitioning Creditors' $975,272.89 in claims; the Debtor's supposed counterclaims against the Petitioning Creditors have (again despite ample opportunity for the Debtor to show otherwise) been shown to provide no objective basis to alter the finding that there is no bona fide dispute as to the Petitioning Creditors' claims;[15] and yet the Debtor has not paid these debts despite their being (over)due.

The actual e-mails from the Debtor's own staff, for instance, which are attached to the Petitioning Creditors' materials, are damning. They repeatedly state that the bills were "approved for processing and payment" (and similar language),[16] yet that never happened. Over time, ominous language was added to the approval: "Reviewed and approved for processing and payment *when we secure the funds*."[17] The Debtor's officer who reviewed and approved many of the invoices was Rebecca Wanta, who served with the Debtor at various times as member of its Board of Directors, Chief Operations Officer, Chief Technology Officer, and Chief

---

[14] Decl. of Rebecca Wanta ¶ 9, ECF No. 49; Opp'n of Pet. Creditors to Mot. to Dismiss Involuntary Pet. Ex. A (Decl. of David Levy. "From July 2022 through March 2023, I made numerous demands, both verbally and in writing, for Xmogrify to be paid. In response, both verbally and in writing, the Debtor expressly acknowledged that (i) the invoices and the amounts sought therein were correct, (ii) the Debtor was in breach of the Agreement, and (iii) Xmogrify was owed payment. However, in order to induce me to continue to provide Services, the Debtor made numerous promises that Xmogrify would be fully paid once it received more funding."), Ex. B (Decl. of Kevin Goldstein. "From January 2023 through March 2023, I continued to demand payments to GCS. Again, the Debtor admitted they owed the outstanding balance under the invoices and repeated their prior assurances that it would pay as soon as funding became available."), Ex. C (Decl. of Mahesh Varma. "From August 2022 through November 30, 2022, when Rearc terminated the SOW, I made numerous demands for payment, both verbally and in writing. Each time, the Debtor parroted the message it previously conveyed through Levy, i.e. that the amounts sought by Rearc in the invoices were correct, the Debtor owed those amounts, and it would pay in full once it received additional capital."), ECF No. 16.

[15] Op. on Mot. to Dismiss Involuntary Case 30–32, ECF No. 60.

[16] *See, e.g.*, Goldstein Decl. Exs. 2–5, 10, 18, 21, 22, ECF No. 37.

[17] Goldstein Decl. Ex. 23, ECF No. 37 (Jan. 18, 2023) (emphasis added).

4

Information Officer. The affidavit of this "C-suite" officer for the Debtor, filed in support of the Petitioning Creditors, presents further damaging evidence:

> 5. I can state unequivocally that GCS, Rearc, and Xmogrify fully and satisfactorily performed the services in accordance with their written agreements (and any agreed-upon oral modifications to such agreements regarding the scope of services) with the company. In fact, at no point in time from their hiring in 2022 until my separation from the Alleged Debtor in February 2023, did I or anyone else at the company raise an objection to the services that each of them provided. . . .
>
> 7. I am advised that the Alleged Debtor is now taking the position that the services provided by the Petitioning Creditors was somehow inadequate, but that is untrue. The services for which the Alleged Debtor was billed by the Petitioning Creditors was performed satisfactorily and in accordance with the agreements.
>
> 8. Specifically, I have reviewed the Exhibits annexed to the February 20, 2024 Declaration of Kevin Goldstein (the "Goldstein Declaration") and can verify that each of these invoices were approved for payment by the Alleged Debtor.
>
> 9. Prior to this time, I had several conversations with Steve Larson, the CEO through early 2023, and we repeatedly discussed how to get these invoices paid in the face of inadequate capitalization. Specifically, Mr. Larson was in my office daily and we discussed multiple times a day that these invoices were payable, but we needed to find the new investment to pay them. We gave repeated assurances to the Petitioning Creditors that these invoices would be paid once the new investment funds came in, and ultimately convinced them to simply wait and continue to work without pay until this occurred.
>
> 10. I have also reviewed the April 8, 2024 Declaration of Mr. Marcotte and the attachments thereto. My first comment is that Mr. Marcotte was not in a position to observe any of the work performed by the Petitioning Creditors and I do not understand why he is suggesting that there is a dispute as to the invoices in question, other

5

than to state this as a general conclusion or legal position; as suggested above, as I was responsible for approving invoices and the work product giving rise to such invoices and I, in fact, approved these invoices for payment. Indeed, as a result of the Petitioning Creditors' work, within approximately 90 days of hiring the Petitioning Creditors, in July 2022, the Alleged Debtor had its first salable product since it opened its doors in 2018 and had additional salable products within months thereafter – this is exactly why I hired the Petitioning Creditors.

11. At no time were any the Petitioning Creditors asked to perform services which they did not perform. The Petitioning Creditors even continued to perform without pay based on promises by Mr. Larson, CEO of the Alleged Debtor, that if they were patient, the invoices in question would all be paid.

12. This was true not just of the Petitioning Creditors, but for most of the Alleged Debtor's creditors because the company simply did not have the funds on hand to pay its obligations as they came due.[18]

One of the Petitioning Creditors' principals, David A. Levy, submitted an affidavit in which he stated:

[A]fter I demanded payment for the overdue invoices beginning in July 2022, the Debtor's then-Chief Executive Officer, Steve Larson ("Larson") apologized to me for the missed invoice payments. The only reason he and the Debtor's then-CIO, Wanta, gave me for the missed payments was that the *Debtor did not have sufficient capital to continue to pay for the Services and they simply "needed more time." They promised that if I "stuck it out," the Debtor would pay Xmogrify in full as soon as it received a capital infusion.* . . .

From July 2022 through March 2023, I made numerous demands, both verbally and in writing, for Xmogrify to be paid. In response, both verbally and in writing, the *Debtor expressly acknowledged that (i) the invoices and the amounts sought therein were correct, (ii) the Debtor was in breach of the Agreement, and (iii) Xmogrify was owed payment.*

---

[18] Wanta Decl. 2–3, ECF No. 49.

However, in order to induce me to continue to provide Services, the Debtor made *numerous promises that Xmogrify would be fully paid once it received more funding.*

(a) July 2022: Larson and Wanta acknowledged the invoices, amounts due, and *promised to pay Xmogrify in full once it received funding.*

(b) September 30, 2022: in a meeting with Larson, Wanta, and me, Larson again acknowledged on behalf of the Debtor that substantial payments were owed to Xmogrify for the Services, as invoiced, and *promised that payment would be made in full by the end of October 2022, once the Company received its expected infusion of needed capital.*

(c) Early November 2022: Larson made similar promises to me and *stated that payment in full would be made by the end of November.*

(d) November 14, 2022: the Debtor's then-Executive Vice President of Business Development and Co-Founder, Dominic O'Dierno traveled to New York to raise capital and solicit investments from investors. O'Dierno had dinner with me, during which he acknowledged the amounts owed to Xmogrify and *promised to pay it in full upon receiving additional funding.*

(e) December 2022: despite these promises, the Debtor did not pay Xmogrify. In December 2022, O'Dierno, Larson, and Wanta again *promised to pay Xmogrify as soon as funding came in.*

(f) January 4, 2023: around this time, I heard that a $6 million capital raise was "imminent," and so I inquired about payment. O'Dierno again *acknowledged that substantial amounts remain owing to Xmogrify*, and *promised that payment would be made in full.*

(g) <u>January 24, 2023</u>: following a capital raise, I again inquired with O'Dierno whether Xmogrify would be paid, and *O'Dierno promised to make payment*.

(h) <u>February 6, 2023</u>: in early 2023, the Debtor began overhauling its leadership. On January 23, 2023, it appointed Brian Grant ("Grant") as its Chief Financial Officer, who later reached out to me to discuss the balance owed to Xmogrify.

(i) <u>February 7, 2023</u>: Though he had only joined the Debtor two weeks prior, during the February 7th meeting, *Grant expressly acknowledged that the Company owed hundreds of thousands to Xmogrify. However, he reiterated that the Company needed additional capital and asked that I "work with" them by agreeing to a payment plan*.

(j) <u>February 8, 2023</u>: following our meeting, Grant again *acknowledged that the Debtor would pay Xmogrify in full*.

(k) <u>February 16, 2023</u>: the Debtor's then-Chief Information Security Officer, Tony Clem ("Clem") acknowledged in a phone call with me that substantial amounts were due to Xmogrify. *Clem told me that, "we've got to get you paid and everyone paid, and this isn't right,"* assured me that I was an "important part of the team," and Xmogrify would be paid as soon as the Company received more funding.

(l) <u>February 17, 2023</u>: in a phone call, Grant again made another promise that the Company would pay Xmogrify for all the outstanding amounts and that he would circulate a payment schedule. *Grant also promised that payment for Xmogrify's most recent invoice would be paid by wire "as soon" as the expected funding was "deposited" into the Company's accounts, i.e., "we get the money in, and you'll get paid the day after."*

8

> (m) <u>March 2, 2023</u>: all employees and contractors were invited to an "All Teams Meeting" during which Michael Marcotte ("Marcotte") announced that the Debtor had appointed him as the new Chief Executive Officer, replacing Larson. Marcotte and I had a call on that day, during which Marcotte acknowledged the past due balance owed to Xmogrify and *promised that the balance due would be paid*, but that they "need[ed] to figure out a plan" and "making the plan was the highest priority."[19]

Repeated assurances of payment, payment always just around the bend, stringing the creditor along—all of these are hallmarks of debtors who are not paying their debts as they come due.

    Not to belabor the point, but suffice it to say, very similar evidence was provided by the other Petitioning Creditors. In brief, Kevin Goldstein, principal of one of the Petitioning Creditors, provides a very similar account to Levy's. He states that the Debtor repeatedly "promised that 'payments would be coming' and [Goldstein's company] would be 'made whole.'"[20] In early 2023, the Debtor "failed to pay me (and other key employees) their salaries," and the Debtor's officer "told me that they would 'take care of it as soon as we can.'"[21] Mahesh Varma, principal of the third Petitioning Creditor, Rearc, gave similar credible, uncontroverted, and damning testimony in his Declaration. Among other things, he adds that he was told in September of 2022 by the Debtor's CEO that "the Debtor was 'so close' to having the funding to pay Rearc and promised that if Rearc continued to provide the Services, all outstanding amounts (which at that time was $476,000) would be paid in full by the end of October 2022. Following the meeting, I sent an email to Larson confirming the Debtor's promise to pay Rearc as discussed."[22]

    To emphasize, the Debtor chose to conduct what its own counsel described as a "trial" by means of these various affidavits, documents, and stipulations. They are the evidence that the parties agreed for the Court to use, and the Debtor never objected. Nor did it provide countervailing evidence of any substance. This is more

---

[19] Levy Decl., Opp'n Mot. To Dismiss Ex. A ¶¶ 14, 16, ECF No. 16 (all emphases added).
[20] Goldstein Decl. Ex. B ¶ 16, ECF No. 16.
[21] *Id.* ¶ 19.
[22] Varma Decl. Ex. C ¶ 17, ECF No. 16.

than enough evidence to support a finding that the Debtor was not paying its debts as they came due, particularly given the Debtor's lack of any countervailing evidence. The Debtor's after-the-fact, vaguely stated claims that, despite all of the above, the Petitioning Creditors actually do not deserve compensation was not sufficiently supported, nor was the equally vaguely stated counterclaim, as the Court has explained in its opinion on this matter.[23]

This is all already established in the record in this case. And in considering this mountain of evidence, the *procedural* problem with the Debtor's newly taken position becomes clear: contrary to the view the Debtor now takes, but as the Debtor's prior (two) counsel(s) were well aware, *the Motion to Dismiss was not a preliminary motion to dismiss based on Rule 12, but rather an evidentiary trial of the issue(s) the Debtor had chosen to "controvert" in this case—which do not include the issue the Debtor now seeks to controvert.*[24]

The Debtor's choice to title its response controverting the Petition a "Motion to Dismiss" is perhaps the source of the Debtor's current confusion, because that is often the title given to motions under Rule 12 of the Federal Rules of Civil Procedure. And it is true that Rule 12 motions (made applicable here by Bankruptcy Rule 1011) are often determined prior to the merits of a proceeding. But in the context of an involuntary petition, a Motion to Dismiss is not always a Rule 12 motion—it can instead be a substantive motion calling for an evidence-based trial of the merits of the petition as contemplated in § 303(h). And as *Collier* notes, the exact objection urged here (that the Petitioning Creditors' claims were subject to a bona fide dispute) is one of the "possible defenses" often urged in response to an involuntary petition.[25]

In other words, the Debtor initiated a merits determination by its Motion to Dismiss. This was obvious to all at the time. In fact, after receiving the Motion for Rehearing, the Court painstakingly reviewed the records of the four hearings held in this matter and found *no hint* that the Debtor disputed the Petitioning Creditors' assertion that it was not paying its debts as they came due or that it expected a separate, later trial on that matter. Indeed, the word "trial" *was* used by Debtor's

---

[23] Op. on Mot. to Dismiss Involuntary Case 27–32, ECF No. 60.
[24] *See In re AMC Invs., LLC*, 406 B.R. 478 (Bankr. D. Del. 2009) (entering an order for relief after determining that there was no bona fide dispute because the alleged debtors had not contested the involuntary petition based on insolvency).
[25] 2 Collier on Bankruptcy ¶ 303.20 (Richard Levin & Henry J. Sommer eds.,16th ed. rev. 2024).

counsel numerous times to refer to the dispute that was actually pending concerning what the Debtor had actually placed in dispute.[26] The whole purpose of the stipulations the parties entered into was to save what they anticipated to be the substantial expenses of what Debtor's counsel called the *trial*. This further confirms the Court's own strong impression from the time, which is that *this* was the *trial* that everyone expected and that the statute requires.

To elaborate further: as Bankruptcy Rule 1013 makes clear, the usual orders on an involuntary petition are either an "order for relief" (if the debtor loses) or an order "dismiss[ing] the petition" (if the debtor wins). If you want a dismissal (as the Debtor did here), then titling your motion as a "motion to dismiss" makes sense. But it does not necessarily mean that Rule 12 is implicated. Indeed, again, although Bankruptcy Rule 1011 permits Rule 12 objections to be raised in an involuntary bankruptcy, none were made here. After all, in a Rule 12 motion, "the petition is construed in the light most favorable to the party opposing the motion to dismiss, and all allegations of fact are taken as true."[27] No one asked for or expected such a presumption here—*because all knew that this was to be an evidentiary trial of the merits of the petition*. All of the lengthy back-and-forth about witnesses and documentary evidence and so on, which the Debtor engaged in together with the Court, would make no sense otherwise. Nor would the repeated mentions of "trial" in the hearings, as noted above. And nowhere was there any suggestion that this "trial" was to be later followed by yet another "trial," as the Debtor now suggests.

Rather than urge a Rule 12 basis for dismissal, the Debtor moved to dismiss via a direct challenge to the Petitioning Creditors' ability to meet the statutory

---

[26] For example, in the hearing on February 15, 2024, where Debtor's counsel stated, in support of the bond he was seeking, "if we *go to trial on this*, I've got to bring people in from out of state, I'll probably need to bring in my state court, New York lawyer here" (emphasis added) (Court's informal transcription from audio recording). In the hearing on February 22, 2024, he stated, "we want to have our day in court. That's perfectly fine. Well, we'll have a *trial* here on the 27th. But they're in New York. I've got clients in Washington State and Colorado, and San Antonio, that are all coming up here for this *trial*." (emphasis added) (Court's informal transcription from audio recording). He also stated, "it's going to be an awful lot of prep to get ready for this *trial*."

[27] *See, e.g.*, 9 Collier on Bankruptcy ¶ 1011.03 (discussing this principle in the context of an involuntary bankruptcy petition).

11

standard of § 303 (as indeed the Motion to Dismiss, quoted above, makes clear).[28] *This* was the Debtor's chance to present evidence and get the relief it wanted. In the Motion to Dismiss, the question to be *tried* was whether the Petitioning Creditors "had the goods," so to speak, as a factual and legal matter. The Debtor and the Petitioning Creditors put forth extensive arguments and evidence concerning this question. The Court found that they did indeed have the goods, and it issued the Order for Relief as a result.

The Debtor's complaints about due process do not, for these reasons, appear to have merit. The Debtor voluntarily chose to "try" the case "on the papers" based on stipulations, evidence, and briefing.[29] And it chose *not to controvert* the allegation—which was, as noted, repeatedly and clearly made,[30] and is supported by ample evidence—that it was not paying its debts as they came due. As with the other *uncontested* aspects of this petition, the Court did not "try" this issue because the Debtor chose to not seek such a trial by putting the matter at issue. There is no due process problem with that. Laying behind the log has consequences. An award of a second trial is not one of them.

The Fifth Circuit law cited by the Debtor certainly does not teach otherwise. In *Ferguson v. Baron (In re Baron)*,[31] the bankruptcy court was faced with challenges from the debtor both to whether the petitioning creditors' claims were subject to bona fide dispute (§ 303(b)(1)) *and* to whether the debtor was paying his debts as they came due (§ 303(h)). The bankruptcy court awarded partial summary judgment to the petitioning creditors on the "bona fide dispute" issue, and then after an evidentiary hearing, also found for them on the "paying debts" issue. The district court disagreed with the bankruptcy court on the "bona fide dispute" issue, and then, rather than remanding to the bankruptcy court to try that issue (as it had tried the

---

[28] As precedent makes clear, this is not a jurisdictional matter. 2 Collier on Bankruptcy ¶ 303.08 ("The circuits are in agreement that the requirements of section 303(b)—that is, the type of claims that petitioning creditors must have, and the proper number of petitioning creditors—are not jurisdictional and may be waived."); *see also In re Rambo Imaging, L.L.P.*, No. 07-11190FRM, 2007 WL 3376163, at *3 (Bankr. W.D. Tex. Nov. 8, 2007) ("Section 303(b) determines whether a creditor is 'eligible' to file the petition. . . . In the Fifth Circuit, however, it is clear that 'eligibility does not raise an issue of subject matter jurisdiction.'" (quoting *Matter of Phillips*, 844 F.2d 230, 236 n.2 (5th Cir. 1988))).

[29] Op. on Mot. to Dismiss Involuntary Case 3–6, ECF No. 60.

[30] *See supra* notes 6–8.

[31] 593 F. App'x 356 (5th Cir. 2014) (unpublished).

other one), the district court remanded with instructions to dismiss the case. The Fifth Circuit held this to be improper because, even if they were correctly denied summary judgment, the petitioning creditors had not yet received an evidentiary hearing on the bona fide dispute issue. *In this same ruling*, the Fifth Circuit also affirmed the bankruptcy court's ruling on § 303(h).

For our purposes, what is particularly revealing about *Ferguson* is that it actually supports the exact opposite position to that urged by the Debtor here. Both the "bona fide dispute" issue and the "paying debts" issue were "controverted" by the debtor in his response to the involuntary petition,[32] and both issues were the subjects of the *same appeal* at the Fifth Circuit. It is true that the bankruptcy court decided one issue by summary judgment well in advance of the other issue, on which it held an evidentiary ruling—but the bankruptcy court is at pains, in its opinion explaining its grant of the order for relief, to emphasize that this "bifurcation" was requested by the parties. The reason it ruled on the "bona fide dispute" issue at summary judgment is because—after the debtor "controverted" both issues in his response—the parties requested that the court first determine whether the petitioning creditors had standing under § 303(b) and, in fact, entered into stipulations in aid of such a determination.[33] There is no indication that the bankruptcy court would otherwise have bifurcated its consideration of these two issues. Indeed, its very (repeated) use of the term "bifurcation" shows that it considers these issues to have been linked *until* they were bifurcate; you do not bifurcate things that already are separate. Further, in its opinion supporting the order for relief, the bankruptcy court includes a full explanation of its partial summary judgment, which, as noted, was then appealed *together with* the § 303(h) determination. If the "bona fide dispute" issue had been a prior and separate contested matter, the time for appeal would have

---

[32] *See* Jeffrey Baron's 12(b) Motions & Provisional Answer, *In re Baron* (No. 12-37921), ECF No. 20. Notably, too, the debtor in that case did raise actual Rule 12 defenses, which highlights the distinction from the Debtor here.

[33] *In re Baron*, No. 12-37921, 2013 WL 3233518, at *5 (Bankr. N.D. Tex. June 26, 2013) ("[T]his bankruptcy court was asked to bifurcate the issues . . . ."), *rev'd sub nom. Baron v. Schurig*, No. 3:13-CV-3461-L, 2014 WL 25519 (N.D. Tex. Jan. 2, 2014), *aff'd in part, rev'd in part and remanded sub nom. In re Baron*, 593 Fed. App'x 356 (5th Cir. 2014); *id.* at *2 ("[T]he parties requested that the court first decide . . . whether the Petitioning Creditors had standing to file the involuntary petition under section 303(b)) . . . .").

13

long been past—but neither the district court nor the Fifth Circuit considered it to be so, as both appellate courts discussed both issues.[34]

The point is that in *Ferguson*, the debtor "controverted" both of the relevant issues, and the court set them up for determination at one time; our Debtor "controverted" only one issue, and now it has to live with the consequences. Nothing here is contrary to *Ferguson*. The Debtor was not entitled to multiple trials; it was entitled to one trial, and it received it, with a result that it does not like. The Court does not see the Debtor as having been ambushed; it sees the Debtor as trying to accomplish an ambush.

For the foregoing reasons, the Court is deeply skeptical that the Debtor has the right to another bite at the apple. The Court's view as of now is that the ship has sailed, the train has left the station, the Debtor was given *very* ample chances in this case and while it (or its new counsel) may now regret its (or its prior two counsels') strategic decisions, they cannot now be undone without inequity toward the Petitioning Creditors (and potentially other parties in interest). The Debtor could have changed courses at some point during the 5+ months that the parties were actively litigating this matter. The Debtor now contemplates a separate trial, dragging this matter out much further. This delay would be unwarranted and inequitable.

Nonetheless, the Court will hold a status conference in this matter on August 1, 2024, at 1:30 pm (Central Time), via Zoom, at https://www.zoomgov.com/my/bradley.txwb or Meeting ID: 160 1114 1085. At that status conference, among other things, it will consider staying the order for relief until the Debtor's Motion for Rehearing can be decided, although the Debtor is hereby put on notice that, at a minimum, in order even to consider such (temporary) relief, the Court will require the Debtor to either (a) accept supervision by an interim trustee pursuant to 11 U.S.C. § 303(g), while providing for sufficient retainer in order to guarantee payment of that trustee's fees; (b) stipulate that it will take no actions outside of the ordinary course of business without Court approval, while providing for sufficient monitoring for the Court to have confidence in its strict

---

[34] *Ferguson*, 593 F. App'x at 359–60 (noting that the district court "found it unnecessary to rule on [the debtor's] § 303(h) claim regarding whether he was insolvent" in light of its ruling on the bona fide dispute claim but providing no indication that the bona fide dispute claim was not still ripe for appeal).

compliance; or (c) take other, similar steps to ensure that its assets are protected on behalf of all creditors. A stay will be no picnic, in other words; and the Court will only grant it if it is convinced both that the requested relief is likely warranted *and* it has firm confidence that all parties in interest will be thoroughly protected.

## Conclusion

To be clear, the Court does not believe that Debtor's new counsel has behaved inappropriately in requesting this relief. Indeed, perhaps if that counsel had been retained earlier, the outcome for the Debtor would have been different. But before proceeding further down this road, counsel needs to be aware of the full history of the case, which does not seem, to the Court, to support the Debtor's current position. This order is intended to aid in that awareness.

Despite all of the foregoing—which is provided only in order to aid the parties as they consider next steps in this matter—the Court wishes to emphasize that it has not prejudged this matter, although undeniably, the Debtor has an uphill battle. Nevertheless, while emphasizing that the matter has not been decided, the Court urges the Debtor, and its new counsel, to consider whether the fight is worthwhile.

To be specific, the Court urges the Debtor to consider a different path. In light of the facts and law that are—as the Court currently sees the matter—unlikely to support the Debtor's position, and in light of the fact that the Debtor states that it fervently wants to avoid its business being liquidated, the Debtor should consider whether a better use of its time, energy, and money would be to consent to the order for relief and *seek expedited conversion of this case to Chapter 11*, so that the business could be more easily operated while it is reorganized.[35]

# # #

---

[35] *See* 11 U.S.C. § 706(a) ("The debtor may convert a case under this chapter to a case under chapter 11 . . . of this title at any time . . . ."). Of course, businesses can be operated for some time in Chapter 7 as well. *See* 11 U.S.C. § 721. But Chapter 11 might be a better fit if the Debtor does indeed have long-term operational value.

15