# EXHIBIT CV-4

Verified Correct Copy of Original 8/29/2023.



6799 NE Bennett Street
Hillsboro, Oregon 97124

## OFFERING SUMMARY

The following offering summary relates to a Short-Term Loan offering (the "**Convertible Loan Offering**") to be conducted by Q5ID, Inc., an Oregon corporation (the "**Company**"), and should be read in conjunction with, and is qualified in its entirety by, the more detailed information and financial statements set forth in the Company's Private Placement Memorandum, dated August 15, 2022, or as updated by the Company thereafter (the "**PPM**"), a copy of which has been delivered to prospective participants in the Bridge Loan Offering. This offering summary is a supplement to the PPM, and the PPM is incorporated herein by reference.

## THE BRIDGE LOAN OFFERING

**Offering**

The Company is offering for sale up to an aggregate of $7,500,000 (the "**Maximum Offering**") in promissory notes (individually, a "**Note**" and collectively, the "**Notes**") to accredited investors. The proceeds of the Convertible Loan Offering will be used by the Company for working capital purposes, to be repaid (if not converted to equity) from anticipated additional funding coming in prior to the maturity of the Notes. The Company will accept, as a minimum individual investment, purchases of Notes in the principal amount of $100,000, with larger principal amounts being offered in increments of $50,000. The Company may, at its sole discretion, accept purchases of Notes for a lower amount on a case-by-case basis. There can be no assurance that the Maximum Offering will be achieved, and no person is obligated to purchase any of the Notes. Purchasers of Notes in the Bridge Loan Offering are referred to herein as "**Investors**" or "**Noteholders**".

**Equity Issuance as Interest**

In connection with an investment in the Notes, the Company will issue to the Noteholders shares of the Company's common stock (a "**Stock Grant**"), equal to 25,000 shares per $100,000 invested. For example, a $200,000 investment would receive 50,000 shares of Common Stock, valued at $140,000 using the current offering price of $2.80 per share by the Company. The Stock Grant represents additional interest paid to the Noteholders for their investment in the Notes.

**Promissory Notes**

Upon execution of a Note Purchase Agreement, the Company will issue a Note in the principal amount of the Investor's investment as set forth in the applicable Note Purchase Agreement. The Note will have a maturity date of four (4) months following execution of the Promissory Note (the "**Maturity Date**").

Each Note issued as part of the Bridge Loan Offering will also entitle the Noteholder to convert all or any portion of their Note into shares of the Company at the current equity offering price at $2.80 per share, up to and until the Maturity Date of the Promissory Note.

The Notes will be unsecured.

_Verified Correct Copy of Original 8/29/2023._



6799 NE Bennett Street
Hillsboro, Oregon 97124

**Payments Under the Notes**
The payment obligations evidenced by the Notes will be junior to, and will be required to be subordinated to, any bank or financial institution offering debt financing to the Company.

On the Maturity Date, for any principal amount not already converted to other investments with the Company, the Company will pay to the Noteholder any remaining outstanding principal amount.

**Use of Proceeds**
The Company intends to use the proceeds of the Convertible Loan Offering primarily for the operating costs of the Company. The officers and directors of the Company will receive no commission or other remuneration in connection with the sale of the Notes.

**Investment Funds Subject to Immediate Use**
No minimum number of Notes must be sold to complete the Convertible Loan Offering. The Company intends to immediately use proceeds from the sale of Notes as proceeds are received as from Investors.

**Suitability Standards**
An investment in the Notes is suitable for you only if you are an "Accredited Investor" as defined in Rule 501 (a) of Regulation D.

**Closing of the Offering**
The Company completed an initial closing of the Bridge Loan Offering on July 25, 2022 (the "**Initial Closing**") and expects to keep the Bridge Loan Offering open for a period of up to sixty (60) days after the date of the Initial Closing, provided, however, that the aggregate principal amount of the Notes purchased as part of the Convertible Loan Offering shall not exceed $7,500,000.

**Additional Risk Factors**
An investment in the Notes involves a high degree of risk, including the risk of a loss of a Noteholder's entire investment because the Company may be unable to repay any amounts due on the Notes. Please carefully review the Risk Factors set forth in the Company's PPM, as well as the additional Risk Factors set forth below:

**We have a limited sales history.**
We are a relatively new company with a limited sales history in general. Our business model is subject to all business risks associated with new business enterprises, including the absence of a long operating history upon which to evaluate an investment. It is possible that we will incur a loss in the future. We cannot guarantee that we will be profitable or that we will generate sufficient revenue to pay any amounts due under the Notes.

**Our results of operations may be negatively impacted by the COVID-19 outbreak.**
In December 2019, the 2019 novel coronavirus, known as COVID-19, surfaced in Wuhan, China. The World Health Organization declared a global emergency on January 30, 2020, with respect to the outbreak. The full impacts of the outbreak are unknown and continue to rapidly evolve.

The spread of COVID-19 has caused us to modify our business practices, and we may take further actions as may be required by government authorities or that we determine are in the best interests of our employees, customers and business partners.

Hawkes Decl. Ex. 1
Page 7


You. Proven.

6799 NE Bennett Street
Hillsboro, Oregon 97124

The future impact of the outbreak is highly uncertain and cannot be predicted and there is no assurance that the outbreak will not have a material adverse impact on the future results of the Company. The extent of the impact, if any, will depend on future developments, including actions taken to contain COVID-19.

**Our success depends on cultivating new and maintaining established relationships with suppliers and partners.**

Our ability to grow or even to maintain our existing level of business depends significantly on our ability to establish and maintain close working relationships with suppliers and partners. The failure of these partnerships could have adverse effects on the success of the Company. Particularly during the ongoing coronavirus pandemic, and in general, we may not be able to maintain our existing relationships or develop and maintain new relationships in existing or new markets. If we lose existing relationships with our partners or suppliers, our revenue and profitability will be adversely affected. If we fail to develop new relationships or partnerships, our growth will be restrained.

If our business partners and third-party providers do not satisfactorily fulfill their responsibilities and commitments, it could damage our brand and our financial results could suffer.

Our business strategy relies significantly on our business partners and key personnel. If our partners fail to fulfill their responsibilities and commitments to the Company, our brand could be damaged, and our financial results could suffer.

**Our success is dependent on identifying, hiring, and retaining qualified sales representatives.**

Our success in part relies on the efforts and abilities of sales representatives. We compete with other companies in recruiting and retaining qualified sales representatives, and there is no assurance that we will be able to hire or retain such individuals.

**Our failure to grow our customer base or retain our existing customers could adversely impact our business, operating results and financial condition.**

The success of the Company relies on growing its customer base and expanding on its existing customer base, which is highly speculative in nature and may not occur.

An investment in the Notes involves a high degree of risk, including the risk of a loss of a Noteholder's entire investment because the Company may be unable to repay any amounts due on the Notes. Please carefully review the Risk Factors set forth in the Company's PPM, as well as the additional Risk Factors set forth below:

**We have a limited sales history.**

We are a relatively new company with a limited sales history in general. Our business model is subject to all business risks associated with new business enterprises, including the absence of a long operating history upon which to evaluate an investment. The likelihood of the success must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with young companies, and the competitive environment in which we will operate. It is possible that we will incur a loss in the future. We cannot guarantee that we will be profitable or that we will generate sufficient revenue to pay any amounts due under the Notes.

_Verified Correct Copy of Original 8/29/2023._

Hawkes Decl. Ex. 1
Page 8



_Verified Correct Copy of Original 8/29/2023._

6799 NE Bennett Street
Hillsboro, Oregon 97124

**We cannot assure you that the Company will generate sufficient cash flow to make payments under the Notes and the Notes are an unsecured debt of the Company.**
Our ability to make scheduled payments under the Notes depends on our ability to generate sufficient cash flow.  There is no assurance that the Company will be able to make any or all required payments under the Notes.  If we are unable to make payments under the Notes, you may not be able to recover the cost of your investment in the Company.  Additionally, the Notes are considered debt of the Company.

The Notes are not secured by any assets of the Company.  There is no collateral for the loans evidenced by the Notes.  This means that the Noteholders will be unsecured creditors of the Company, who would generally come behind any secured creditors of the Company in any payment waterfall (including in a bankruptcy scenario).  Further, Noteholders' remedies upon any event of default would be limited by the unsecured nature of the indebtedness.

The Notes may become subordinated to other indebtedness of the Company in the future. This means that a Senior Lender would have the right to restrict the payments to the Noteholders that are set forth in the Notes, including the quarterly interest payments, the annual payments of Additional Principal, and any payments of Principal Amount, including the payments due upon the Maturity Date.

**There is no market for the Notes.  The Notes are Nonnegotiable.**
There is no trading market for the Notes, and there will be no public market for the Notes as a result of this Bridge Loan Offering.  The sale of the Notes is not being registered under the Securities Act of 1933 or applicable state laws, and the Notes may not be sold or otherwise transferred.  Accordingly, Noteholders will be unable to liquidate their investment in the Company.


[the rest of this page intentionally blank]


You. Proven.

6799 NE Bennett Street
Hillsboro, Oregon 97124

This Nonnegotiable Promissory Note has not been registered under the Securities Act of 1933 or any state securities laws. This Nonnegotiable Promissory Note may not be sold, assigned, or otherwise negotiated to any person unless pursuant to an effective registration statement filed under the Securities Act of 1933 and applicable state securities laws, or unless Maker receives an opinion of counsel, in form and from counsel acceptable to Maker, that the sale, assignment, or other negotiation is exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws.

## NONNEGOTIABLE PROMISSORY NOTE

$200,000

**October 14, 2022**

This Nonnegotiable Promissory Note ("**Note**") is made by Q5ID, Inc. ("**Maker**" or the "**Company**") in favor of **Collaborative Vision LLC ("Holder")**.

1. **Definitions.** Capitalized terms used in this Note but not otherwise defined shall have the meanings ascribed to such terms in the Note Purchase Agreement. The following capitalized terms have the meanings below:

   "**Maturity Date**" means four (4) months following the date of this Note, or February 14, 2023.

   "**Principal Amount**" means Two Hundred Thousand Dollars ($200,000) which is equal to the face value of this Note and which has been paid by Maker to Holder as the Purchase Price pursuant to the Note Purchase Agreement.

2. **Payments.** Maker promises to pay only to Holder in immediately available funds, payments in respect of this Note as follows:

   (a)    Interest. In connection with an investment in the Notes, the Company will issue to Holder shares of the Company's common stock (a "Stock Grant"), equal to 50,000 shares. The Stock Grant represents interest paid to the Noteholders for their investment in the Notes.

   (b)    Convertibility. Prior to the Maturity Date, Holder may elect to convert all or any portion of their Note into shares of the Company at the lesser of i) the current equity offering price at $2.80 per share, or ii) any equity then available by the Company, up to and until the Maturity Date of the Promissory Note.

   (c)    Payment at Maturity Date. At the Maturity Date, Maker shall pay to Holder any remaining Principal Amount that has not been converted to equity.

3. **Application of Payments.** All payments under this Note will be applied first to any costs and expenses due to Holder, then to unpaid Principal Amount as set forth in this Note or as reduced by any conversion by Holder into other investment options with the Company.

4. **Place of Payments.** All payments under this Note will be made to Holder at the address on the signature page of this Note or any other address that Holder may designate by notice to Maker.

5. **Prepayments.** Maker may prepay a part or all of the unpaid Principal Amount at any time. Excess payments or prepayments will not be credited as future scheduled payments required by this Note.

Verified Correct Copy of Original 8/29/2023.



6799 NE Bennett Street
Hillsboro, Oregon 97124

6. **No Negotiation.** This Note is nonnegotiable and may not be sold, assigned, or otherwise negotiated to any person without the prior written consent of Maker, which Maker may withhold in Maker's sole discretion.

7. **Note Purchase Agreement.** The obligations of Maker under this Note are subject to the terms and conditions of the Note Purchase Agreement dated as of the date hereof between Maker and Holder (the "**Note Purchase Agreement**").

8. **Subordination.** Holder acknowledges and agrees: (a) the payment obligations set forth herein are junior to any payment obligations of the Company to any bank or financial institution (a "**Senior Lender**") offering debt financing to the Company; (b) Holder will subordinate the rights to payment evidenced by this Note to any Senior Lender; and (c) Holder will promptly execute any reasonable and customary subordination agreement upon the request of the Company and/or Senior Lender.

9. **Events of Default.** Each of the following is an event of default under this Note:

   (a)   Maker fails to make any payment required by this Note within ten (10) days after the payment is due;

   (b)   any representation or warranty made by Maker in the Note Purchase Agreement is found to have been untrue or misleading in any material respect as of the date of the Note Purchase Agreement;

   (c)   Maker materially breaches any covenant made by Maker in the Note Purchase Agreement, and fails to cure the breach within thirty (30) days after Holder notifies Maker of the breach;

   (d)   Maker voluntarily dissolves or ceases to exist, or any final and nonappealable order or judgment is entered against Maker ordering its dissolution;

   (e)   Maker:

      (1)   makes an assignment for the benefit of creditors;

      (2)   commences a voluntary bankruptcy case;

      (3)   files a petition or answer seeking for Maker any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or rule;

      (4)   files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against Maker in any proceeding of this nature; or

      (5)   seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of Maker or of all or any substantial part of Maker's properties;

   (f)   an involuntary bankruptcy case against Maker is commenced and is not dismissed on or before the 120th day after the commencement of the case; and

   (g)   a court:

      (1)   adjudicates Maker as bankrupt or insolvent; or

      (2)   appoints, without Maker's consent, a trustee, receiver, or liquidator either of Maker or of all or any substantial part of Maker's properties that is not:  (A) vacated or stayed on or before the 90th day after appointment; or (B) vacated on or before the 90th day after expiration of a stay.

_Verified Correct Copy of Original 8/29/2023._

Verified Correct Copy of Original 8/29/2023.



6799 NE Bennett Street
Hillsboro, Oregon 97124

10. **Remedies.** On and after an event of default under this Note, Holder may exercise the following remedies, which are cumulative and which may be exercised singularly or concurrently:

    (a) upon notice to Maker, the right to accelerate the due dates under this Note so that the unpaid Principal Amount and the Additional Principal, together with accrued interest on the Principal Amount, is immediately due in its entirety;

    (b) any remedy available to Holder under the Note Purchase Agreement; and

    (c) any other remedy available to Holder at law or in equity.

11. **Time of Essence.** Time is of the essence with respect to all dates and time periods in this Note.

12. **Binding Effect.** This Note will be binding on the parties and their respective heirs, personal representatives, successors, and permitted assigns, and will inure to their benefit.

13. **Amendment.** This Note may be amended only by a written document signed by the party against whom enforcement is sought.

14. **Waiver.**

    (a) Maker waives demand, presentment for payment, notice of dishonor or nonpayment, protest, notice of protest, and lack of diligence in collection, and agrees that Holder may extend or postpone the due date of any payment required by this Note without affecting Maker's liability.

    (b) No waiver will be binding on Holder unless it is in writing and signed by Holder. Holder's waiver of a breach of a provision of this Note will not be a waiver of any other provision or a waiver of a subsequent breach of the same provision.

15. **Severability.** If a provision of this Note is determined to be unenforceable in any respect, the enforceability of the provision in any other respect and of the remaining provisions of this Note will not be impaired.

16. **Governing Law.** This Note is governed by the laws of the State of Oregon, without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Note.

17. **Venue.** Any action, suit, or proceeding arising out of the subject matter of this Note will be litigated in courts located in Multnomah County, Oregon. Maker consents and submits to the jurisdiction of any local, state, or federal court located in Multnomah County, Oregon.

18. **Attorney's Fees.** If any arbitration, action, suit, or proceeding is instituted to interpret, enforce, or rescind this Note, or otherwise in connection with the subject matter of this Note, including but not limited to any proceeding brought under the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements specified in ORCP 68 A(2), incurred in connection with the arbitration, action, suit, or proceeding, any appeal or petition for review, the collection of any award, or the enforcement of any order, as determined by the arbitrator or court.

19. **Costs and Expenses.** If an event of default under this Note occurs and Holder does not institute any arbitration, action, suit, or proceeding, Maker will pay to Holder, upon Holder's demand, all reasonable



6799 NE Bennett Street
Hillsboro, Oregon 97124

_Verified Correct Copy of Original 8/29/2023._

costs and expenses, including but not limited to attorney's fees and collection fees, incurred by Holder in attempting to collect the indebtedness evidenced by this Note.

Maker:

**Q5ID, Inc.**

*Steve Larson*

**By:** Steve Larson (Oct 14, 2022 17:10 PDT)

**Steve Larson, CEO**

_Verified Correct Copy of Original 8/29/2023._

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement ("**Agreement**") is dated effective **October 14, 2022,** and is made by Collaborative Vision LLC ("**Holder**") to purchase a Promissory Note made by Q5ID, Inc., an Oregon corporation (the "**Company**") as set forth herein.

**NOTE PURCHASE**

Irrevocable Commitment to Purchase Promissory Note. **Subject to the conditions set forth herein,** Holder irrevocably commits to purchase a Promissory Note in the principal amount of Two Hundred Thousand Dollars ($200,000) (the "Note") from the Company.

Purchase Price. **The purchase price for the Note is Two Hundred Thousand Dollars ($200,000).**

**Issuance of Note.** Subject to the satisfaction of the conditions set forth in <u>Section 1.4</u> below, the Company will issue the Note to Holder.

**Conditions to Purchase.** The purchase of the Note by Holder and the issuance of the Note by the Company is conditioned on the following:
Holder has fully and accurately completed and signed the following documents (the "**Note Purchase Documents**") which are included in this Agreement:

    (1)    **U.S. Residents**: Accredited Investor Questionnaire for US Residents (<u>Schedule 2.5</u>);
    (2)    **Independent Third-Party Verification Letter**: Accredited Investor Representation and Verification Letter (Annex A to <u>Schedule 2.5 or 2.7 as appropriate</u>);
    (3)    **Canadian Residents**: Accredited Investor Questionnaire for Canadian Purchasers (<u>Schedule 2.7</u>);
    (4)    **Spousal Consent** (<u>Exhibit A</u>) (if Holder is an individual and is married or a member of a domestic partnership); and

The Company's acceptance, in its sole discretion, of this Agreement and the Note Purchase Documents by providing Holder with a countersigned copy of this Agreement.

**Equity as Interest.** In connection with an investment in the Notes, the Company will issue to Holder shares of the Company's common stock (a "Stock Grant"), equal to 50,000 shares. The Stock Grant represents interest paid to the Noteholders for their investment in the Notes. These Shares will be subject to the Shareholder's Agreement dated May 1, 2019, between the Company and the Company's shareholders (the "Shareholders' Agreement").

<u>**Convertibility.**</u> Prior to the Maturity Date, Holder may elect to convert all or any portion of their Note into shares of the Company at the lesser of i) the current equity offering price at $2.80 per share, or ii) **any equity then available by the Company,** up to and until the Maturity Date of the Promissory Note.

**Closing.** The Note is being offered as part of an offering that had an initial closing date of July 25, 2022 (the "**Initial Closing**"). Subsequent closings will occur as the Company

9 – NOTE PURCHASE AGREEMENT (Q5ID, INC)           **Page 9 of 19**

_Verified Correct Copy of Original 8/29/2023._

accepts signed Note Purchase Agreements by additional Holder(s).  Subject to the terms and conditions of this Agreement and other Note Purchase Agreements, the Company may at any time issue additional Notes; provided, however, that the aggregate principal amounts under the Note Purchase Agreements and Promissory Notes shall not exceed $7,500,000 unless authorized by the Company and its Board of Directors.  Any such subsequent issuance shall be on the same terms and conditions as those contained herein.

**Payment.**  Holder will pay the purchase price for the Note by delivering to the Company by certified check or wire transfer the Purchase Price at such time as requested by the Company.

## REPRESENTATIONS, WARRANTIES, AND COVENANTS OF HOLDER

Holder represents, warrants, and covenants to the Company as follows:

a. **Status.**

    i.    If Holder is an individual, Holder is at least 18 years of age.

    ii.    If Holder is an individual, Holder is a bona fide resident and domiciliary of the State specified on the signature page of this Agreement and has no present intention of becoming a resident of any other State or jurisdiction.

    iii.    If Holder is a business entity or trust, Holder is duly organized and validly existing under the laws of the State specified on the signature page of this Agreement.

b. **Authority.**  Holder has full power and authority to sign and deliver this Agreement and to perform all of Holder's obligations under this Agreement.

c. **Binding Obligation.**  This Agreement is the legal, valid, and binding obligation of Holder, enforceable against Holder in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

d. **No Conflicts.**  The signing and delivery of this Agreement by Holder and the performance by Holder of all of Holder's obligations under this Agreement will not:

    i.    if Holder is a business entity or trust, conflict with Holder's articles of incorporation, bylaws, articles of organization, operating agreement or trust documents (as applicable);

    ii.    breach any agreement to which Holder is a party, or give any person the right to accelerate any obligation of Holder;

    iii.    violate any law, judgment, or order to which Holder is subject; or

    iv.    require the consent, authorization, or approval of any person, including but not limited to any governmental body.

e. **Accredited Investor.**  Holder is an "accredited investor" as defined in Regulation D under the Securities Act of 1933.  Holder has indicated on Schedule e, which category of accredited investor that Holder comes within.  The indication on Schedule e is accurate in all material respects as of the date hereof.

_Verified Correct Copy of Original 8/29/2023._

f.  **Private Placement Memorandum; Offering Summary.**  Holder has received a copy of, has had a reasonable time to review, and has reviewed, the Confidential PPM, and the supplementary disclosure regarding the Notes as set forth in the Offering Summary dated August 15, 2022, or as subsequently updated by the Company (the **"Offering Summary"**). Holder has had an opportunity to consult with legal counsel regarding the PPM and the Offering Summary.

g.  **Speculative Investment.**  Holder understands that:

i.  The Note and the Shares are speculative investments and involve a high degree of risk of loss of Holder's investment; and

ii.  Holder will be unable to liquidate Holder's investment in the Note because the Note is non-negotiable;

iii.  Holder may be unable to liquidate Holder's investment in the Shares because the Shares are subject to substantial transfer restrictions and because no public market exists for the Company's shares.

h.  **Sophistication.**

i.  Holder has the knowledge and experience in financial and business matters necessary to make Holder capable of evaluating the merits and risks of an investment in the Notes and the Shares.

ii.  Holder has had the opportunity to ask questions and receive answers concerning the Company and the terms and conditions of the purchase of the Note and the Shares, and to obtain any additional information deemed necessary by Holder to evaluate the merits and risks of an investment in the Note and the Shares.  Holder has obtained all of the information desired in connection with the Shares.

i.  **Non-Reliance.**  In deciding whether to enter into this Agreement, Holder has relied solely on the information, statements, and representations contained in this Agreement and in the documents listed in Section f.  Holder has not relied on any information provided by, or on any statements or representations made by, the Company or any officer or authorized representative of the Company, other than the information, statements, and representations contained in this Agreement and in the PPM and the Offering Summary.

j.  **Investment Intent.**

i.  Holder is acquiring the Note and the Shares solely for Holder's own account, for investment, and not with a view to or for resale in connection with any distribution of the Note and the Shares.

ii.  Holder has no oral or written agreement or plan to sell, transfer, or pledge or otherwise dispose of the Note and the Shares to any person.

iii.  Holder understands that Holder must bear the economic risk of owning the Note and the Shares for an indefinite period of time.

k.  **Transfer Restrictions.**

_Verified Correct Copy of Original 8/29/2023._

    i.    Holder understands that the Note and the Shares have not been registered under the Securities Act of 1933 or any state securities laws and that the Company is not obligated to register the Note or the Shares.

    ii.   Holder understands that the Shares will be subject to certain transfer and other restrictions set forth in the Shareholders' Agreement.

**l.   No Assignment.**  Holder will not assign or delegate any of Holder's rights or obligations under this Agreement to any person.

**EFFECTIVENESS OF SHAREHOLDERS' AGREEMENT**

By executing this Agreement, Holder agrees to be bound by the terms of the Shareholders' Agreement, to which Holder is a party, with respect to the Shares Holder is acquiring by the execution of this Agreement. Holder further agrees that the Shares are subject to the Shareholder's Agreement, to which Holder is a party. If applicable, Holder's spouse has also executed the form of Spousal Consent that is attached as Exhibit A hereto. Holder acknowledges that once Holder and other purchasers of common stock in the Bridge Loan Offering complete their purchases of Shares, the Company may, in its discretion, have all shareholders sign an updated restatement of the Shareholders' Agreement which reflects all new shareholders on the schedule of shareholders and which appropriately references the common stock. Holder agrees to sign such restated Shareholders' Agreement presented by the Company provided that the provisions therein are substantially similar to those in the existing Shareholders' Agreement, to which Holder is a party.

**RELEASE AND INDEMNIFICATION**

Holder understands that the Company is relying on Holder's representations, warranties, and covenants in this Agreement to issue the Shares pursuant to one or more exemptions from the registration and qualification requirements of the Securities Act of 1933 and applicable state securities laws. Holder releases and will defend and indemnify the Company and each present and future shareholder, director, officer, employee, and representative of the Company for, from, and against any and all claims, actions, proceedings, damages, liabilities, and expenses of every kind, whether known or unknown, including but not limited to reasonable attorney's fees, resulting from or arising out of a breach by Holder of any representation, warranty, or covenant in this Agreement.

**OREGON SECURITIES LAW WAIVER**

To the fullest extent permitted by law, Holder irrevocably waives and releases all claims and rights of action (including, but not limited to, the right to seek rescission) that arise from or relate to the transactions contemplated by this Agreement (including, but not limited to, the issuance of the Shares and the issuance of any other securities), whether known or unknown, that Holder may have now or in the future under Oregon Revised Statutes ("ORS") 59.115, ORS 59.137 or any other provision of the Oregon Securities Law. Those persons identified in ORS 59.115(3) and ORS 59.137(2) are intended third-party beneficiaries of the waiver and release set forth in this Section 5. Nothing in this Section 5 limits or restricts Holder from asserting claims under the federal securities laws or for

breach of contract. Holder acknowledges and agrees that the protections afforded to Holder under the federal securities laws are adequate and appropriate given Holder's level of sophistication.

a) **GENERAL**

**Amendment.** This Agreement may be amended only by a written document signed by the party against whom enforcement is sought.

**Waiver.** No waiver will be binding on a party unless it is in writing and signed by the party making the waiver. A party's waiver of a breach of a provision of this Agreement will not be a waiver of any other provision or a waiver of a subsequent breach of the same provision.

**Severability.** If a provision of this Agreement is determined to be unenforceable in any respect, the enforceability of the provision in any other respect and of the remaining provisions of this Agreement will not be impaired.

**Further Assurances.** The parties will sign other documents and take other actions reasonably necessary to further effect and evidence this Agreement.

**Attachments.** Any exhibits, schedules, and other attachments referenced in this agreement are part of this Agreement.

**Governing Law.** This Agreement is governed by the laws of the State of Oregon, without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Agreement.

**Venue.** Any action, suit, or proceeding arising out of the subject matter of this Agreement will be litigated in courts located in Multnomah County, Oregon. Each party consents and submits to the jurisdiction of any local, state, or federal court located in Multnomah County, Oregon.

**Attorney's Fees.** If any arbitration, action, suit, or proceeding is instituted to interpret, enforce, or rescind this Agreement, or otherwise in connection with the subject matter of this Agreement, including but not limited to any proceeding brought under the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements specified in ORCP 68 A(2), incurred in connection with the arbitration, action, suit, or proceeding, any appeal or petition for review, the collection of any award, or the enforcement of any order, as determined by the arbitrator or court.

**Entire Agreement.** This Agreement contains the entire understanding of the parties regarding the subject matter of this Agreement and supersedes all prior and contemporaneous negotiations and agreements, whether written or oral, between the parties with respect to the subject matter of this Agreement.

**Signatures.** This Agreement may be signed in counterparts. An electronic transmission of a signature page will be considered an original signature page. At the request of a party, the other party will confirm an electronically-transmitted signature page by delivering an original signature page to the requesting party.

*[signature page to follow]*

_Verified Correct Copy of Original 8/29/2023._

This Agreement is dated effective as of the date first indicated above.

**Holder:**

**FOR INDIVIDUAL HOLDER:**

_____
(sign name)

_____
(print full legal name)

SSN: _____

Address, city, state, zip code:

_____

_____

State of residence:

_____


**FOR ENTITY/TRUST HOLDER:**

Full legal name of entity:

## Collaborative Vision LLC

By: _____
Lisa Matar (Oct 14, 2022 17:13 PDT)
(sign name)

Its: Lisa Matar, Manager Owner
(print name and title)

EIN: 51-0668456

Address, city, state, zip code:

7883 SW Barnard Drive

Beaverton, OR 97007

State of organization:

Oregon

NOTE PURCHASE AGREEMENT (Q5ID, INC) – SIGNATURE PAGE                    Page 14 of 19

_Verified Correct Copy of Original 8/29/2023._

### COMPANY NOTE PURCHASE ACCEPTANCE

Q5ID, Inc. hereby accepts the Note Purchase Agreement from the below Holder in the amount set forth below.

Holder: Collaborative Vision LLC

Amount of Note: $ 200,000

Number of Shares to be issued: 50,000

Dated: October 14, 2022

Company:

Q5ID, Inc.

*Steve Larson*

By: Steve Larson (Oct 14, 2022 17:10 PDT)

Steve Larson, CEO

_Verified Correct Copy of Original 8/29/2023._

## SCHEDULE 2.5

### Accredited Investor Representation and Verification Letter

### Accredited Investor Questionnaire for U.S. Purchasers

To determine whether you are eligible to purchase Notes in Q5ID, Inc. (the **"Company"**), please complete the following questionnaire. Please indicate each of the following categories that apply to the person or entity that is seeking to make the investment. (**please initial the appropriate line or lines**):

1. _____ A bank, as defined in Section 3(a)(2) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity; a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity; a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934; an investment adviser registered pursuant to section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; an investment adviser relying on the exemption from registering with the United States Securities and Exchange Commission (the **"Commission"**) under section 203(l) or (m) of the United States Investment Advisers Act of 1940; an insurance company as defined in Section 2(a)(13) of the U.S. Securities Act; an investment company registered under the United States Investment Company Act of 1940; a business development company as defined in Section 2(a)(48) of the United States Investment Company Act of 1940; a small business investment company licensed by the United States Small Business Administration under Section 301 (c) or (d) of the United States Small Business Investment Act of 1958; a rural business investment company as defined in section 384A of the United States Consolidated Farm and Rural Development Act; a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets in excess of US$5,000,000; or an employee benefit plan within the meaning of the United States Employee Retirement Income Security Act of 1974 in which the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan with total assets in excess of US$5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are U.S. Accredited Investors; or

2. _____ A private business development company as defined in Section 202(a)(22) of the United States Investment Advisers Act of 1940; or

3. _____ An organization described in Section 501(c)(3) of the United States Internal Revenue Code, a corporation, a Massachusetts or similar business trust, a partnership, or a limited liability company, not formed for the specific purpose of acquiring the Purchased Securities, with total assets in excess of US$5,000,000; or

4. _____ A director or executive officer of the Corporation; or

5. _____ A natural person whose individual net worth, or joint net worth, with that person's spouse or spousal equivalent (being a cohabitant occupying a

_Verified Correct Copy of Original 8/29/2023._

relationship generally equivalent to that of a spouse), exceeds US$1,000,000 as determined on the following basis:

(i) the person's primary residence shall not be included as an asset;

(ii) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale and purchase of securities contemplated by the accompanying Subscription Agreement, shall not be included as a liability (except that if the amount of such indebtedness outstanding at such time exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability);

(iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability;

(iv) for the purposes of calculating joint net worth of the person and that person's spouse or spousal equivalent, (A) joint net worth can be the aggregate net worth of the investor and spouse or spousal equivalent, and (B) assets need not be held jointly to be included in the calculation; and reliance by the person and that person's spouse or spousal equivalent on the joint net worth standard does not require that the securities be purchased jointly); or

6. _____ A natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

7. _____ A trust, with total assets in excess of US$5,000,000, not formed for the specific purpose of acquiring the securities offered under the accompanying Subscription Agreement, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D under the U.S. Securities Act; or

8. ☑ An entity in which all of the equity owners are U.S. Accredited Investors; or

*If you checked Category 8, please indicate the name and category of U.S. Accredited Investor (by reference to the applicable category number herein) of each Noteholder:*

| Name of Noteholder | Category of U.S. Accredited Investor |
|---|---|
| Lisa Matar | 5, 6 |
|  |  |
|  |  |
|  |  |
|  |  |

Verified Correct Copy of Original 8/29/2023.

It is permissible to look through various forms of debt or equity ownership to natural persons in determining the U.S. Accredited Investor status of entities under this category. If those natural persons are themselves U.S. Accredited Investors, and if all other debt or equity owners of the entity seeking U.S. Accredited Investor status are U.S. Accredited Investors, then this category will be available.

9. _____ An entity, of a type not listed in Categories 1, 2, 3, 7 or 8, not formed for the specific purpose of acquiring the Purchased Securities, owning investments in excess of US$5,000,000 (note: for the purposes of this Category 9, "investments is defined in Rule 2a51-1(b) under the United States Investment Company Act of 1940); or

10. _____ A natural person holding in good standing one or more of the following professional certifications or designations or credentials from an accredited educational institution that the Commission has designated as qualifying an individual for accredited investor status: The General Securities Representative license (Series 7), the Private Securities Offerings Representative license (Series 82), and the Licensed Investment Adviser Representative (Series 65); or

11. _____ Any "family office," as defined in rule 202(a)(11)(G)-1 under the United States Investment Advisers Act of 1940: (i) with assets under management in excess of US$5,000,000, (ii) that is not formed for the specific purpose of acquiring the Purchased Securities, and (iii) whose prospective investment is directed by a person (a **"Knowledgeable Family Office Administrator"**) who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; or

12. _____ A "family client," as defined in rule 202(a)(11)(G)-1 under the United States Investment Advisers Act of 1940, of a family office meeting the requirements set forth in Category 11 above and whose prospective investment in the Company is directed by such family office with the involvement of the Knowledgeable Family Office Administrator.

## SUPPORTING DOCUMENTATION

I understand that if I checked boxes 5 or 6 above, the Agent and/or its United States broker-dealer affiliate will be verifying my status as an accredited investor to the Company. In relation to assisting the Agent in the verification process, I will provide all supporting documentation as required by the Agent or deliver to the Agent a Verification Letter in substantially the form attached as Annex A hereto completed by either (a) a registered broker-dealer, (b) an SEC-registered investment advisor, (c) a licensed attorney who is in good standing under the laws of jurisdiction in which he or she is admitted to practice, or (d) a certified public accountant who is duly registered and in good standing under the laws of the pace of his or her residence or principal office. If I elect to deliver a Verification Letter, I hereby consent to the Agent contacting the person delivering the Verification Letter to answer any questions in relation thereto and to the delivery of the Verification Letter to the Company by the Agent at Closing.

I understand that the Company and the Agent may request additional supporting documentation from me in order to verify my status as an Accredited Investor and I hereby agree to promptly provide any such additional supporting documentation. In addition, the Company and the Agent reserve the right, in their sole discretion, to verify your status as an Accredited Investor using any other methods that they may deem acceptable from time to time.

**Verified Correct Copy of Original 8/29/2023.**

I further understand that, even if I complete and execute this Letter and provide all additional supporting documentation requested by the Company and the Agent, the Company may, in its sole discretion, refuse to accept my subscription for the Securities for any reason or for no reason.

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Representation and Verification Letter as of the __14th__ day of _October_____, 2022.

**FOR INDIVIDUAL SUBSCRIBER:**

_____
(sign name)

_____
(print name)

**FOR ENTITY/TRUST SUBSCRIBER:**

Entity/Trust: Collaborative Vision LLC
_____

By: _____
    lisa matar (Oct 14, 2022 17:13 PDT)
(sign name)
**Lisa Matar, Manager Owner**
_____
(print name, title)

_ Verified Correct Copy of Original 8/29/2023._

# Convertible Note - Collaborative Vision LLC (2022-10-14)

Final Audit Report                                                                 2022-10-15

| | |
|---|---|
| Created: | 2022-10-15 |
| By: | Dominic O'Dierno (dod@q5id.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-v0gnlvsXkXnkMsiQKoxrR0uwi153ChQf |

## "Convertible Note - Collaborative Vision LLC (2022-10-14)" History

- Document created by Dominic O'Dierno (dod@q5id.com)
  2022-10-15 - 0:00:43 AM GMT

- Document emailed to slarson@q5id.com for signature
  2022-10-15 - 0:06:21 AM GMT

- Document emailed to lisa matar (lisa@cvhires.com) for signature
  2022-10-15 - 0:06:22 AM GMT

- Email viewed by slarson@q5id.com
  2022-10-15 - 0:09:38 AM GMT

- Signer slarson@q5id.com entered name at signing as Steve Larson
  2022-10-15 - 0:10:03 AM GMT

- Document e-signed by Steve Larson (slarson@q5id.com)
  Signature Date: 2022-10-15 - 0:10:05 AM GMT - Time Source: server

- Email viewed by lisa matar (lisa@cvhires.com)
  2022-10-15 - 0:13:00 AM GMT

- Document e-signed by lisa matar (lisa@cvhires.com)
  Signature Date: 2022-10-15 - 0:13:25 AM GMT - Time Source: server

- Agreement completed.
  2022-10-15 - 0:13:25 AM GMT

 Adobe Acrobat Sign