# EXHIBIT CV-6

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| COLLABORATIVE VISION LLC, an Oregon limited liability company, | Case No. |
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT** |
| v. | Amount in controversy: $553,927.43 |
| Q5iD, Inc., an Oregon corporation, | Filing fee: $884 (ORS 21.160(1)(d)) |
| Defendant. | JURY TRIAL DEMANDED |

**INTRODUCTION**

1.

This is an action to recover substantial unpaid sums that Defendant Q5iD, Inc. ("Q5iD") owes Plaintiff Collaborative Vision, LLC ("Collaborative Vision") pursuant to three contracts. Pursuant to the parties' first contract, Collaborative Vision provided valuable consulting services—specifically, by recruiting and placing both employed and contingent workers with Q5iD, a startup company in the cybersecurity field. Pursuant to the parties' second contract, Collaborative Vision provided Q5iD with valuable consulting services by representing Q5iD at an industry conference. Pursuant to the parties' third contract, Collaborative Vision provided Q5iD a $200,000 bridge loan in order to help Q5iD weather cash-flow difficulties it was experiencing.

2.

Despite the extensive services and critical financing Collaborative Vision provided, Q5iD has repeatedly failed to pay Collaborative Vision the amounts it is due under all three

PAGE 1 –   COMPLAINT FOR BREACH OF CONTRACT

1   contracts—even though Q5iD has expressly acknowledged that it owes Collaborative Vision

2   those sums. As a result, Collaborative Vision is left with no choice but to bring this action to

3   recover damages for Q5iD's serial breaches of its contractual obligations.

4                                    **THE PARTIES**

5                                           3.

6          Collaborative Vision is an Oregon limited liability company that provides consulting

7   and staffing services to a wide range of Oregon businesses, including direct hire, contingent

8   employment and staff augmentation services. Lisa Matar is Collaborative Vision's founder

9   and sole member.

10                                          4.

11         Q5iD is an Oregon startup corporation developing cybersecurity and identity

12  verification products. Q5iD has its headquarters in Hillsboro, but its registered agent for

13  service of process is located in Portland.

14                          **THE CLIENT SERVICE AGREEMENT**

15                                          5.

16         On or about December 11, 2018, Q5iD entered into a Contingent and Direct Hire

17  Client Service Agreement (the "Client Service Agreement") with Collaborative Vision, a

18  copy of which is attached as **<u>Exhibit 1</u>**.

19                                          6.

20         Pursuant to the Client Service Agreement, Q5iD agreed to pay Collaborative Vision

21  18% of the annual base salary of any employment candidate identified through

22  Collaborative Vision's placement services whom Q5iD hired as a salaried worker.

23                                          7.

24         Q5iD further agreed to pay Collaborative Vision an hourly rate for any contingent

25  labor provided to Q5iD by Collaborative Vision's contractors.

26

       PAGE 2 –    COMPLAINT FOR BREACH OF CONTRACT

8.

Q5iD agreed that, if it converted any of those contingent laborers into salaried employees of Q5iD, it would pay Collaborative Vision a conversion fee of 15% of that person's annual base salary if the conversion occurred in the first three months after placement, or 10% of that person's annual base salary if the conversion occurred between three and six months after placement.

9.

The Client Service Agreement was terminable upon eight weeks' notice without cause, but immediately for cause, "including but not limited to a violation of one of the covenants of this Agreement."

10.

Payment of invoices under the agreement was due within thirty days, with interest at 1% per month for late payments made over 40 days after invoice.

11.

Section 23 of the Client Service Agreement provides that, in the event of litigation relating to its terms, conditions or subject matter, the prevailing party is entitled to recover its reasonable attorneys' fees and costs.

12.

On or about November 4, 2021, Q5iD entered into an Addendum to the Client Service Agreement with Collaborative Vision (the "Addendum"), a copy of which is attached as **Exhibit 2**.

13.

Pursuant to the Addendum, which Q5iD initiated and wrote, the parties agreed to modify and add certain terms to the Client Service Agreement. Specifically, Q5iD agreed that Collaborative Vision would be "the exclusive recruiter for Q5iD for the first forty-five (45) days of an initial open employment position." Q5iD was permitted to engage another

PAGE 3 –    COMPLAINT FOR BREACH OF CONTRACT

1   recruiting agency only if neither Q5iD nor Collaborative Vision located a suitable candidate

2   within that 45-day exclusivity period.

3                     14.

4        In addition, the Addendum increased the fee due to Collaborative Vision for the

5   hiring of salaried workers to 20% and set forth certain extended payment terms for the

6   benefit of Q5iD's cash flow management.

7                     15.

8        The Addendum provided that it would apply for a one-year term, and also provided

9   that it would renew automatically for another one-year term on November 4, 2022.

10                    16.

11        The Addendum was terminable by either party upon thirty days' notice. However,

12   Collaborative Vision had the right to terminate the agreement upon 24 hours' notice in

13   certain circumstances, including Q5iD's insolvency or "failure to make payments as

14   required by this Agreement," in which instance "all payments due and their respective due

15   dates to CV will accelerate, and payment in full will be due to CV immediately."

16                    17.

17        By its terms, the Addendum affected only those provisions of the Client Service

18   Agreement that it expressly modified, and left all remaining terms of the Client Service

19   Agreement "in full force and effect"—including the Client Service Agreement's provision

20   for an award of attorneys' fees and costs to the prevailing party in any litigation.

21   **Q5ID FAILS TO PAY COLLABORATIVE VISION'S INVOICES WHEN DUE**

22                    18.

23        Since entering into the Client Service Agreement in 2018, as modified by the

24   Addendum in 2021, Collaborative Vision has recruited dozens of employees and contingent

25   workers for Q5iD, delivering substantial value to Q5iD as it competes for skilled workers in

26   a challenging labor market. Collaborative Vision invoiced Q5iD regularly for the services it

PAGE 4 –    COMPLAINT FOR BREACH OF CONTRACT

1  provided under the Client Service Agreement, with each invoice corresponding to the

2  percentage of a particular employee's salary to which Collaborative Vision was entitled

3  under the agreement's payment formula.

4  19.

5  At all relevant times, Collaborative Vision was entitled to be paid for the services it

6  had provided in recruiting numerous employees to Q5iD on the terms set forth in the parties'

7  agreement. However, beginning approximately in May 2022, Q5iD largely stopped paying

8  Collaborative Vision's invoices, even as Q5iD continued to rely on the labor provided by

9  employees Collaborative Vision had recruited and for which Collaborative Vision was

10  entitled to receive compensation.

11  20.

12  On or about November 18, 2022, Q5iD's interim Chief Operating Officer, Becky

13  Wanta, purported to provide Collaborative Vision with 30 days' written notice of

14  termination of the Addendum. Upon information and belief, Wanta did so in retaliation

15  because she found an employment posting by Collaborative Vision for a Chief Operating

16  Officer position, which Wanta mistakenly believed was a posting for a permanent employee

17  to fill the interim position that she then held.

18  21.

19  On December 9, 2022, Collaborative Vision, in turn, provided Q5iD with 24 hours'

20  written notice of its termination of both the Addendum and the Client Service Agreement

21  due to Q5iD's then-likely insolvency, as well as its failure to make payments as required by

22  the parties' agreement.

23  22.

24  As explained in Collaborative Vision's termination notice, in addition to an

25  outstanding unpaid invoice, Q5iD owes Collaborative Vision substantial unpaid placement

26  fees for breach of the addendum's exclusivity provision due to Q5iD's use of competing

PAGE 5 –   COMPLAINT FOR BREACH OF CONTRACT

1  consulting firms to obtain approximately 22 contract workers during Collaborative Vision's

2  exclusivity period.

3                                    23.

4        As a result of Q5iD's breaches, Collaborative Vision exercised its right to accelerate

5  all outstanding balances for the placement services it had provided.

6                                    24.

7        As a result of Q5iD's pattern of non-payment of invoices when due and the

8  acceleration of the due dates on other invoices upon Collaborative Vision's termination of

9  the Client Services Agreement and Addendum, Q5iD currently owes Collaborative Vision

10  $344,260.18 in unpaid invoices for services rendered.

11                                    25.

12        In addition to invoices issued under the Client Service Agreement and Addendum,

13  Q5iD agreed to pay Collaborative Vision a consulting fee and reimburse travel expenses it

14  incurred in connection with Ms. Matar's and Q5iD's digital marketing manager's

15  representation of Q5iD at a National Minority Supplier Development Council ("MNSDC")

16  industry conference in New Orleans in fall 2022. Collaborative Vision invoiced Q5iD for

17  those fees and expenses, totaling $9,667.25, on or about November 12, 2022. That amount

18  was due on December 12, 2022. It has not been paid.

19                                    26.

20        A complete list of unpaid invoices, including the amounts due and dates on which

21  payment was due, is attached as **Exhibit 3**, which is incorporated by reference as if set forth

22  herein.

23                        **THE PROMISSORY NOTE**

24                                    27.

25        In October 2022, Q5iD's then-CEO, Steve Larson, made an urgent, personal appeal

26  to Collaborative Vision's founder and principal, Ms. Matar. Specifically, during a one-on-

PAGE 6 –    COMPLAINT FOR BREACH OF CONTRACT

1   one meeting with Ms. Matar at a restaurant, Mr. Larson represented that Q5iD was in danger

2   of failing to meet payroll and needed an immediate infusion of cash to avoid that scenario.

3   Mr. Larson asked if Ms. Matar would loan Q5iD the sum of $200,000.

4                                                  28.

5          Mr. Larson further represented that Q5iD expected to receive substantial investment

6   in the very short term such that Collaborative Vision would face little risk from loaning

7   funds to the company.

8                                                  29.

9          Having recruited a substantial percentage of Q5iD's staff herself, and trusting Mr.

10  Larson's representations, Ms. Matar agreed to loan Q5iD the $200,000. Ms. Matar was so

11  trusting of Mr. Larson's representations that she called her daughter, who brought a

12  checkbook to the restaurant, where Ms. Matar wrote a check to Q5iD for a $200,000 loan.

13                                                 30.

14         On or about October 14, 2022, Q5iD formalized that agreement in the form of a

15  Nonnegotiable Promissory Note in favor of Collaborative Vision in the amount of $200,000,

16  a copy of which is attached hereto as **Exhibit 4**.

17                                                 31.

18         Ms. Matar agreed to loan those funds due to her relationship of trust with Mr.

19  Larson, her hope that Q5iD would succeed financially, and her sense of loyalty to the many

20  Q5iD employees she had recruited whose livelihoods were at stake.

21                                                 32.

22         Collaborative Vision had the right to convert all or any portion of the note into shares

23  of Q5iD, but Collaborative Vision never exercised that right. By its terms, the note was due

24  and payable in full on February 14, 2023, and failure to pay within ten days of that date is an

25  express event of default on the note.

26

PAGE 7 –   COMPLAINT FOR BREACH OF CONTRACT

1      33.

2          Q5iD has made no payment whatsoever on the note, despite having immediately

3      available funds to repay the note and despite repeated inquiries from Collaborative Vision.

4      34.

5          On March 4, 2023, Q5iD's Chief Financial Officer, Brian Grant, expressly

6      acknowledged in an email to Ms. Matar that "we owe you a significant amount of money,

7      *including a bridge loan that is past due*."

8      35.

9          Despite Mr. Grant's acknowledgment of the past-due loan, and his suggestion that he

10     would be prepared to discuss repayment, neither Mr. Grant nor anyone else at Q5iD has ever

11     indicated when or whether Collaborative Vision can expect repayment of the amounts due

12     and owing on the Promissory Note.

13     36.

14         Section 17 of the Promissory Note requires that any dispute arising out of its subject

15     matter "will be litigated in courts located in Multnomah County, Oregon."

16     37.

17         Section 18 of the Promissory Note provides that the prevailing party in any dispute

18     relating to its subject matter is entitled to recover its reasonable attorneys' fees and "other

19     fees, costs, and expenses of every kind."

20     **Q5ID REPEATEDLY ACKNOWLEDGES ITS BREACHES**

21     38.

22         On January 9, 2023, Q5iD Executive Vice President Dominic O'Dierno sent an

23     email to Ms. Matar in which he acknowledged that Q5iD owed Collaborative Vision

24     "approximately $522,354 in total payables[.]" Mr. O'Dierno proposed a combination of a

25     payment plan and an equity exchange to satisfy those obligations, as well as "20,000 options

26     for your trouble."

PAGE 8 –   COMPLAINT FOR BREACH OF CONTRACT

39.

On February 10, 2023, Mr. O'Dierno sent another email to Ms. Matar acknowledging obligations to Collaborative Vision in the amount of $294,927.43 on unpaid invoices, as well as the $200,000 owed on the Promissory Note. Mr. O'Dierno proposed a payment plan and additional equity in Q5iD to satisfy those obligations.

40.

On February 26, 2023, Mr. O'Dierno sent yet another email to Ms. Matar proposing "to rectify the accidental termination of the addendum and all related breaches of the contract and delayed repayment of the loan[.]" Mr. O'Dierno acknowledged that, based on Q5iD's own accounting review, Q5iD owed Collaborative Vision $323,927.43 for unpaid invoices. Mr. O'Dierno proposed a payment plan for repayment of those amounts (as well as the amount due under the note), as well as the grant of additional shares of or warrants for Q5iD stock. However, Q5iD has not followed through on that proposal.

41.

On March 16, 2023, following a meeting between the parties the previous day, Mr. O'Dierno asked Ms. Matar to provide electronic payment instructions to Mr. Grant so he could process payment of amounts due under the Promissory Note, and further said that Mr. Grant would "let [her] know if he will do electronic or issue a check for [her] to pick up." (In fact, Q5iD already has that payment information, as Mr. O'Dierno and Mr. Grant know full well.)

42.

Despite Q5iD's repeated acknowledgment that it had breached its contractual obligations, and despite its pledges to pay the amounts owed, Q5iD has made no payments on the outstanding invoices detailed in **Exhibit 3** or on the Promissory Note.

PAGE 9 –   COMPLAINT FOR BREACH OF CONTRACT

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(CLIENT SERVICE AGREEMENT)**

43.

Collaborative Vision incorporates paragraphs 1 to 42 above by reference as if fully set forth herein.

44.

The Client Service Agreement, as amended by the Addendum, constitutes a valid, binding contract between Q5iD and Collaborative Vision.

45.

Collaborative Vision has fully performed its obligations under the Client Service Agreement and Addendum.

46.

Q5iD has breached its obligations under the Client Service Agreement and Addendum by failing to pay Collaborative Vision the $344,260.18 it is owed, exclusive of interest, and Collaborative Vision has suffered damages as a result of Q5iD's breaches in that same amount.

47.

The amounts Q5iD has failed to pay are readily ascertainable, and they have been due and outstanding since the dates reflected on **Exhibit 3**, which is incorporated by reference as if set forth herein. Collaborative Vision is entitled to an award of prejudgment interest at the contractual rate of 1 percent per month on that amount.

48.

In addition, Collaborative Vision is entitled to an award of its reasonable attorneys' fees and costs pursuant to Section 23 of the Client Service Agreement.

PAGE 10 – COMPLAINT FOR BREACH OF CONTRACT

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT
## (OTHER CONSULTING SERVICES)

49.

Collaborative Vision incorporates paragraphs 1 to 48 above by reference as if fully set forth herein.

50.

Collaborative Vision and Q5iD entered into a valid, binding contract whereby Collaborative Vision agreed to represent Q5iD at an NMSDC industry conference in New Orleans in fall 2022 in exchange for Q5iD's payment of a consulting fee and reimbursement of travel expenses (the "NMSDC Consulting Agreement").

51.

Collaborative Vision has fully performed its obligations under the NMSDC Consulting Agreement.

52.

Q5iD has breached its obligations under the NMSDC Consulting Agreement failing to pay Collaborative Vision the $9,667.25 it is owed, exclusive of interest, and Collaborative Vision has suffered damages as a result of Q5iD's breaches in that same amount.

53.

The amounts Q5iD has failed to pay are readily ascertainable, and they have been due and outstanding since December 12, 2022, as reflected on **Exhibit 3**, which is incorporated by reference as if set forth herein. Collaborative Vision is entitled to an award of prejudgment interest at the statutory rate of 9 percent per annum on that amount.

PAGE 11 –  COMPLAINT FOR BREACH OF CONTRACT

**THIRD CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(PROMISSORY NOTE)**

54.

Collaborative Vision incorporates paragraphs 1 to 53 above by reference as if fully set forth herein.

55.

The Promissory Note constitutes a valid, binding contract between Q5iD and Collaborative Vision.

56.

Collaborative Vision has fully performed its obligations under the Promissory Note.

57.

Q5iD has breached its obligations under the Promissory Note by failing to pay Collaborative Vision the $200,000.00 it is owed, exclusive of interest, and Collaborative Vision has suffered damages as a result of Q5iD's breaches in that same amount.

58.

The $200,000.00 Q5iD has failed to pay is readily ascertainable, and it has been due and outstanding since at least February 14, 2023. Collaborative Vision is entitled to an award of prejudgment interest at the statutory rate of 9 percent per annum on that amount.

59.

In addition, Collaborative Vision is entitled to an award of its reasonable attorneys' fees and costs pursuant to Section 18 of the Promissory Note.

WHEREFORE, Plaintiff prays for the following relief:

1.     On its First Claim for Relief, an award of damages in the amount of $344,260.18, or such amount as will be proved at trial, an award of its reasonable attorneys'

PAGE 12 –  COMPLAINT FOR BREACH OF CONTRACT

1    fees and costs pursuant to Section 23 of the Client Service Agreement, and prejudgment

2    interest at the contractual rate of 1 percent per month;

3        2.    On its Second Claim for Relief, an award of damages in the amount of

4    $9,667.25, or such amount as will be proved at trial, and prejudgment interest at the

5    statutory rate of 9 percent per annum;

6        3.    On its Third Claim for Relief, an award of damages in the amount of

7    $200,000.00, or such amount as will be proved at trial, an award of its reasonable attorneys'

8    fees, costs and expenses pursuant to Section 18 of the Promissory Note, and prejudgment

9    interest at the statutory rate of 9 percent per annum; and

10        4.    Such other relief as the Court deems just and equitable.

11

12    Date: April 13, 2023

13

14                    *s/ Peter D. Hawkes*
                   DAVID H. ANGELI, OSB No. 020244
15                   david@angelilaw.com
                   PETER HAWKES, OSB No. 071986
16                   peter@angelilaw.com
                   COLIN H. HUNTER, OSB No. 131161
17                   colin@angelilaw.com

18                   Attorneys for Plaintiff Collaborative Vision LLC

19

20

21

22

23

24

25

26

PAGE 13 –  COMPLAINT FOR BREACH OF CONTRACT



COLLABORATIVE VISION, LLC

# Contingent and Direct Hire Client Service Agreement

This Agreement is entered into by the Collaborative Vision LLC., (herein after called "CV") and Q5id (herein after referred to as "Client") agree to the terms and conditions set forth in this agreement dated on December 11, 2018.

In consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1. CV specializes in direct hire, contingent employment and staff augmentation services, and will identify and share suitable resources with the Client for consideration, and the terms of placement service will be met as set forth in the attachment hereto (Exhibit A). In support of Client staffing needs, CV agrees to provide Client with talent acquisition support services in alignment with the indicated qualifications needed by Client, for which CV shall invoice Client at the agreed rates. Exhibit A will take precedence, should there arrive any discrepancy between this Agreement and Exhibit A. In the event that additional resources and talent acquisition support are needed, additional talent acquisition services may be included under the Agreement through the execution of Exhibit A.

2. Direct Hire Services: CV shall be paid by Client in accordance with each Exhibit A, attachment hereto for each approved service. Client shall provide a full job description for each position to be recruited on, along with location, travel requirements and annual salary range budgeted. If the client chooses to hire a CV candidate as a salaried worker of Client, then a placement fee of 18% of the candidate's annual base salary will be charged to client due as follows: 12% will be due within 30 days of candidates first day of employment. The remaining 6% of annual base salary will be due within 90 days of candidate's first day of employment. If the candidate does not complete 30 days of employment for any reason, no fee is due. If the candidate does not complete 90 days of employment for any reason, the second payment of 6% is waived and will not be due. CV may provide services at rates lower or higher than 18% on a case by case basis, upon agreement with the Client, in alignment with discretion, depth, complexity, or other agreed variables that impact on the sourcing requirements and needs of the Client.

3. For the provision of contingent labor, CV shall be paid by Client in accordance with each Exhibit A, attachment hereto for each approved service. A set hourly rate to be paid by Client, shall be determined before the commencement of service, and full job description shall be provided. CV's Contractor(s) shall maintain a timecard on a weekly basis. At the end of each time period the assigned responsible party of Client will review the hours on the timecard and verify the hours to be accurate, and sign approval. A copy of the contingent worker's timecard shall be delivered to CV. CV will prepare an invoice for the Client in alignment with the approved timesheet data. The Client will ensure prompt payment of the amounts due within 30 days of receipt of the invoice. If it is found that CV's contingent worker has performed overtime that was not compensated for on the related invoice, the overtime shall be paid by the Client. Client understands that CV has relied on Client's representations of the nature and extent of the work so as to make a determination as to whether CV's contingent worker is exempt or non-exempt for overtime purposes. If Client provides such direction and control so that the contingent worker is determined to be non-exempt, Client will be responsible to pay CV such amounts to compensate CV's contingent worker for any overtime.

4. CV RESPONSIBILITIES:
   a) CV agrees to perform its services diligently and to use its best efforts to meet the needs and requirements of the Client and to promote the good reputation which Client enjoys.
   b) CV agrees that it will not cause or encourage its worker(s) to prematurely leave a project to which they are assigned.
   c) Should Client place a contingent worker at Company's client site, CV shall be responsible for all relocation cost. In event CV replaces a worker with another worker, all replacement & relocation costs shall be borne by CV.
   d) CV agrees to conduct a felony conviction background check of its worker(s) as well as any other background checks required by the Client prior to CV's worker starting on a project at a Client site. CV reserves the right not to place the contingent worker in the event that the CV, in its sole discretion, determines that based upon the background information the contingent worker is not suitable for the placement.

Exhibit 1



### COLLABORATIVE VISION, LLC

e) In the event that multiple submissions of the same candidate (CV's candidate) are made to the client by more than one agency, the candidate may be contacted to determine the agency they wish to work for. Likewise, if the submitted candidate is a resident in Client's database as an "active" candidate has been invited to apply to the direct hire position by CV, and has not received invitation to apply directly by the Client, the submittal will be accepted through CV and consideration will be paid to CV in the event of a placement.

f) CV shall pay their contingent workers on a regular pay schedule no less than once every month and said payment to the contingent worker shall not hinge on payment receipt for their services from Company.

8. NON SOLICITATION: Client and CV will not solicit each other's workers that are covered under this contract for full-time or contract positions for 12 month following the end of the contract.

9. CONFIDENTIALITY: CV realizes that the Client may disclose to CV's workers confidential information related to the business processes, apparatus, products, researches, research programs or any and all other information considered proprietary in nature. In consideration of the terms of this Agreement, CV agrees that any confidential information, including but not limited to, written embodiment thereof, is the property of Client and is to be held by CV workers in trust solely for Company or Company's client's benefit and shall not be used or disclosed to others at any time during or after termination of this Agreement. All original material including programs, disks, card decks, tapes, listings and other programming documentation originated and prepared for the Client and all materials deemed to contain confidential information that are in the possession of CV's workers including copies, note extracts, etc. of any kind are to be returned to the Client

10. TERMINATION: This Agreement / Assignment / Contract may be terminated by either party at any time upon eight (8) weeks written notice, or immediately for cause, including but not limited to a violation of one of the covenants of this Agreement.

11. INDEPENDENT CONTRACTOR: CV agrees that it is an independent contractor and neither CV nor CV's workers are serving as a worker of Client under this Agreement. Neither CV nor CV's workers shall be entitled to any benefits or facilities provided by Client to their respective workers. CV shall be solely responsible for all costs and expenses of CV's workers including but not limited to all applicable federal, state and local disability, worker's compensation, payroll taxes, self-employment insurance and all income and other taxes for CV's workers. CV represents and warrants that, except as otherwise specifically stated in writing, all of the persons CV assigns to work for Client under this Agreement shall be workers of CV unless they are submitted for direct hire to the Client. Notwithstanding the foregoing, all work performed by CV's workers assigned to Client here under shall work under the direction and management of the Client.

12. "RIGHT TO WORK" CV represents and warrants that their workers supplied to Client under this Agreement meet all United States federal and state regulations pertaining to their "right to work" in the United States (US citizen, valid H-1B visa, NAFTA certified, or green card has been issued by Immigration & Naturalization Service. H-1B or green card must be in good standing and will not expire during the term of their contract assignment).

13. Client will provide computer, material, work space and when needed and determined by the client, remote access to CV's contingent worker pursuant to all services performed for the Client.

14. It is expressly agreed between the Client and CV that neither party, during the term of this Agreement and for a period of 12 months from the termination of this Agreement, will solicit, employ nor contract with any associates or workers of the other party without the written consent of the other party, except that if the Client wishes to permanently hire or otherwise contract with CV 's Contractor, client may do so, if the Contractor agrees, by paying CV the normal hourly contracting or conversion placement fee (15% of annualized salary a described in point 15 below).

15. Client agrees to pay CV in accordance with the rates outlined in the rate schedule in Exhibit A. CV will invoice Client on a weekly basis for all services performed for contingent labor support during the period, and within 30 days of start date for direct hire, contract staffing and contract conversion to perm staffing support. Client agrees to remit payment to CV within thirty (30) days of date of invoice. Interest will be charged at a rate of 1% per month on late payments (over forty days) for CV's services.

16. Contingent labor travel to and from Client's address stated below is not billable to the Client; however, special travel to other locations required by the Client is billable at fifty-four (.54) cents per mile. Any preauthorized expenses are billable to the Client.

Exhibit 1



## COLLABORATIVE VISION, LLC

17. CV further agrees to maintain in confidence and not to disclose to any person, firm or corporation any data, information, technology or material developed or obtained by CV during the term of this Agreement. The covenants contained in this paragraph shall survive the termination of this Agreement for whatever cause. Client agrees that if this Agreement expires or is terminated in accordance with Article 3, the promises and covenants of Articles 6 and 7 shall out-live this Agreement and remain in effect in perpetuity.

18. Conversion Fee: If Client converts CV's employee the company will owe the contractor/agency a conversion fee as follows: If conversion occurs in months 1-3, then 15% of annual base salary is due, and if conversion happens between months 3-6, then 10% of annual salary will be due. After 6 months, there will be no conversion fee for the company to hire the contractor.

19. It is expressly understood that CV shall not be liable for: Failure to perform if due to causes or conditions beyond its control; Any special, consequential or exemplary damages; Any damages incurred directly or indirectly by any third persons as a result of errors and omissions of the Client or of CV

20. If any word, phrase, clause, sentence, provision or paragraph of this Agreement is or shall be held invalid or unlawful for any reason, the same shall be deemed severed from the remainder hereof, and stricken there from, and shall in no way affect or impair the validity of this Agreement or any other portion thereof, and this Agreement shall otherwise remain in full force and effect.

21. The failure of either party at any time to require performance by the other party of any provision hereof shall not be taken or held to be a waiver of the provision itself.

22. This State of Oregon shall be the presiding state overseeing this contract Agreement, and the obligations of the parties in this Agreement will be governed by and construed in accordance with the laws of Oregon.

23. In the event that there is commenced litigation relating to the terms and conditions of the Agreement of the subject matter hereof, the prevailing party in such litigation shall be awarded reasonable attorneys' fees and court costs in relation to such litigation.

24. Nothing herein shall be construed to create a relationship between the parties in the nature of a profit sharing, partnership, joint venture, principle/agent, employment, or any other relationship which might impose liability on any party hereto for it past, present, or future debts, liabilities, obligations, acts or omissions.

|  | QSid | Collaborative Vision LLC |
|---|---|---|
| Signature | *Dominic ODierno* | *Lisa Matar* (signature) |
| Name | Dominic ODierno | Lisa Matar |
| Title | Chief of Staff | Founder, Principal |
| Address | 3121 NE Cornell Rd | PO Box 481 |
|  | Hillsboro, OR 9714 | Beaverton, OR 97075 |

Exhibit 1



**COLLABORATIVE VISION, LLC**

## Talent Acquisition Support Invoice
## Appendix - A

Collaborative Vision LLC
PO Box 481 Beaverton, Oregon 97075
(503) 941-9444
Support@CVhires.com

TO: Q5id
Hillsboro, Oregon

| CANDIDATE NAME | JOB TITLE | SALARY REQUESTED | INVOICE NO. |
|---|---|---|---|
| | | | |

| SCOPE OF SERVICE | START DATE | INVOICE DUE DATE | PLACEMENT SERVICE FEE |
|---|---|---|---|
| | | | |
| | | | |
| | | TOTAL | |

Please make all checks payable to Collaborative Vision LLC due 30 days from candidate start date.
If you have any questions concerning this invoice, contact: Accounts Receivable at Support@CVhires.com

**Thank you for your Business!**

Exhibit 1

# Contingent and Direct Hire Client Service Agreement Addendum

This Addendum is made on this 4th day of November, 2021, to the Contingent and Direct Hire Client Service Agreement entered into by the Collaborative Vision LLC, (herein after, "CV") and Q5id, Inc. (herein after, "Q5id") on December 11, 2018, (herein after, the/this "Agreement") is incorporated into and made part of the Agreement. Any prior Addendum to this dated Addendum will be null and void in its entirety.

CV and Q5id agree that the Agreement is modified as follows:

Candidate Ownership:

a) As provisioned herein, Q5id and CV will have the right to simultaneously recruit candidates for open employment positions which will be determined solely by Q5id.
   i. When CV identifies and qualifies a potential candidate (herein after "PC") for an open employment position within Q5id, CV will provide the PC's resume to Q5id's Vice President of Operations and/or as directed by Q5id. If CV has provided all information required by Q5id with respect to a PC, and Q5id, in its sole discretion, agrees that the PC meets its requirements and criteria, and if the PC's resume and/or job application has/have been received from CV and qualified by Q5id prior to any applicant or PC already being reviewed and considered for the same position within Q5id by Q5id, the PC shall thereupon become a qualified candidate ("Qualified Candidate") of CV. Within five (5) business days of CV providing any PC to Q5id, Q5id will provide oral or written assessment to CV with respect to such PC and the status within Q5id's consideration process. Should CV present any PC to Q5id, and the candidate becomes a Qualified Candidate, CV shall benefit as referenced herein from any placement within Q5id.
b) Other than Q5id itself, CV will be the exclusive recruiter for Q5id for the first forty-five (45) days of an initial posted open employment position. If neither Q5id nor CV can locate a qualified and Q5id accepted candidate to hire, Q5id will have the right to engage any other recruiting agency of their choice to assist in the recruiting efforts.
   i. The forty-five (45) days from the initial posted open employment position does not reset after an initial or any candidate is rejected. The forty-five (45) days is the total time allotted to work each open employment position requisition.
   ii. Both Q5id and CV will immediately email a candidate's name to one another which will serve as the date stamp for ownership of a candidate.
   iii. If Q5id fills an open employment position within the forty-five (45) days before CV, Q5id will pay CV $1000 for that position in consideration of the time, effort and fees exhausted by CV.

Offer Letters:

a) Q5id and/or its assigns will draft, review and finalize any and all Offer Letters to be distributed to employment candidates;
b) Q5id and/or its assigns will make all necessary changes and/or approvals of all Offer Letters; and

c) All Offer Letters to be transmitted will be done so directly to the employment candidate only with a carbon copy to CV/employment agency. Offer Letters will not be submitted to CV/employment agency for distribution.

Salaried Employment Candidates:

Should Q5id elect to hire a salaried candidate referred by CV for permanent employment regarding any position other than positions qualified within the sales department, a placement fee of 20% of the candidate's annual base salary (base salary constitutes the annual salary assigned to the candidate as of date of hire, not including any bonus structured amount(s), commission(s) or the like) will be charged to Q5id and due as follows: 10% of the placement fee is due to CV after 30 days of the candidate's first day of employment (with the exception of a sales department candidate which will abide by the below referenced placement fee payment structure), with the remaining 10% of the placement fee due, amortized as equal payments and paid on a monthly basis over an 11-month period. The remaining payments shall begin on the 1st day of the third month of employment and continue each month thereafter for a total of eleven (11) payments equating to the total amount stated on the initial invoice for each Qualified Candidate provided by CV and hired by Q5id.

With respect to qualified sales department candidates, after ninety (90) days of employment, a placement fee of 20% of the candidate's annual base salary (base salary constitutes the annual salary assigned to the candidate as of date of hire, not including any bonus structured amount(s), commission(s) or the like) will be charged to Q5id and due as follows: 10% of the placement fee is due to CV *after* 90 days of the candidate's first day of employment, with the remaining 10% of the placement fee due, amortized as equal payments and paid monthly over an 8-month period. Should a sales department candidate be terminated or otherwise leave employment with Q5id on or *before* the 90th day of employment from the initial date of hire, a fee of $2,000 will be due to CV after 30 days from the candidate's/employee's employment end date (to cover CV's cost of recruiting and procuring). No fee shall be due by Q5id to CV should a candidate/employee elect to leave employment with Q5id for any reason within 30 days from candidate's/employee's start date. Sales department employees include but are not limited to, sales representatives, account managers, account executives, sales managers, business development managers, inside sales managers, outside sales managers, sales directors, etc.

Term of Agreement:

This Agreement will be for the term of one (1) year from the first date (November 4, 2021 – November 3, 2022) on which both Parties have executed the Agreement herein. On November 4, 2022, this Agreement will automatically renew annually, but this Agreement and any such renewals are subject to the termination clause referenced below.

The Agreement may be terminated by either party upon thirty (30) days written notice to the other Party, except that, if a Party becomes bankrupt or insolvent, discontinues operations, or fails to make any payments as required by the Agreement, either party may terminate the Agreement upon twenty-four (24) hours written notice. Should CV exercise the right to terminate due to Q5id's

bankruptcy, insolvency, discontinuation of operations for any reason, and/or failure to make payments as required by this Agreement, all payments due and their respective due dates to CV will accelerate, and payment in full will be due to CV immediately. Should CV exercise the right to terminate the Agreement for any reason other than Q5id filing bankruptcy, becoming insolvent, discontinuing operations for any reason, or failing to make payments, the schedule of payment benefit paid to CV shall remain as originally agreed upon, as referenced herein, and due dates for all payments will not accelerate for any reason other than expressly agreed upon by the Parties. Should Q5id exercise the right to terminate the Agreement for any reason, other than bankruptcy, insolvency, or failure to make payments as required, the schedule of payment benefit paid to CV shall revert to the terms of the original Contingent and Direct Hire Client Service Agreement signed by CV and Q5id on December 11, 2018.

**This Addendum shall not alter, modify, or change in any other respect the Agreement, and except as modified herein, all terms and provisions of the Agreement are expressly ratified and confirmed and shall remain in full force and effect.**

Q5id, Inc.
Signature _____
Name:       Steve Larson
Title:      Chief Executive Officer
Address:    6799 NE Bennett Street
            Hillsboro, Oregon 97124

Collaborative Vision LLC
Signature _____
Name:       Lisa Matar
Title:      Chief Executive Officer
Address:    P.O. Box 481
            Beaverton, Oregon 97075

| Invoice Date† | Invoice Number | Date due | Amount |
|---|---|---|---|
| 08/15/2023 | 061523BJ | 09/14/2023* | 1,363.60 |
| 08/01/2023 | 080124KK | 08/31/2023* | 909.10 |
| 07/29/2023 | 072923TB | 08/28/2023* | 1,181.82 |
| 07/15/2023 | 051523BJ | 08/14/2023* | 1,363.60 |
| 07/01/2023 | 070123KK | 07/31/2023* | 909.10 |
| 06/29/2023 | 062923TB | 07/29/2023* | 1,181.82 |
| 06/15/2023 | 041523BJ | 07/15/2023* | 1,363.60 |
| 06/01/2023 | 060123KK | 07/01/2023* | 909.10 |
| 06/01/2023 | 050123YS | 07/01/2023* | 545.50 |
| 05/29/2023 | 052923TB | 06/28/2023* | 1,181.82 |
| 05/15/2023 | 051523AC | 06/14/2023* | 772.70 |
| 05/02/2023 | 050223RJG | 06/01/2023* | 909.10 |
| 05/01/2023 | 050123KK | 05/31/2023* | 909.10 |
| 04/29/2023 | 042923TB | 05/29/2023* | 1,181.82 |
| 04/16/2023 | 041623RS | 05/16/2023* | 681.80 |
| 04/15/2023 | 041523AC | 05/15/2023* | 772.70 |
| 04/15/2023 | 041523GF | 05/15/2023* | 772.70 |
| 04/02/2023 | 040223RJG | 05/02/2023* | 909.10 |
| 04/01/2023 | 040123KK | 05/01/2023* | 909.10 |
| 04/01/2023 | 040123YS | 05/01/2023* | 545.50 |
| 03/29/2023 | 032923TB | 04/28/2023* | 1,181.82 |
| 03/20/2023 | 032023OS | 04/19/2023* | 1,136.40 |
| 03/19/2023 | 031923DM | 04/18/2023* | 1,363.60 |
| 03/16/2023 | 031623SL | 06/16/2023* | 3,409.20 |
| 03/16/2023 | 031622RS | 04/15/2023* | 681.80 |
| 03/15/2023 | 031523BJ | 06/15/2023* | 1,363.60 |
| 03/15/2023 | 031523AC | 04/14/2023* | 772.70 |
| 03/15/2023 | 031523GF | 04/14/2023* | 772.70 |
| 03/07/2023 | 030723JA | 04/06/2023* | 1,545.50 |
| 03/06/2023 | 030622MG | 04/05/2023* | 1,454.50 |
| 03/04/2023 | 030522KH | 04/03/2023* | 1,000.00 |
| 03/04/2023 | 030423TM | 04/03/2023* | 1,363.60 |
| 03/03/2023 | 030123YS | 04/02/2023* | 545.50 |
| 03/02/2023 | 030223RJG | 04/01/2023* | 909.10 |
| 03/01/2023 | 030123KK | 03/31/2023* | 909.10 |
| 02/28/2023 | 022923TB | 03/30/2023* | 1,181.82 |
| 02/21/2023 | 012123RC | 03/23/2023* | 590.90 |
| 02/20/2023 | 022023OS | 03/22/2023* | 1,136.40 |
| 02/19/2023 | 021923DM | 03/21/2023* | 1,363.60 |
| 02/16/2023 | 021623SL | 05/16/2023* | 1,363.60 |
| 02/16/2023 | 021623RS | 03/18/2023* | 681.80 |
| 02/15/2023 | 021523BJ | 05/15/2023* | 1,363.60 |

Exhibit 3

| 02/15/2023 | 021523AC | 03/17/2023* | 772.70 |
|---|---|---|---|
| 02/15/2023 | 021523GF | 03/17/2023* | 772.70 |
| 02/07/2023 | 020723JA | 03/09/2023* | 1,545.50 |
| 02/06/2023 | 020622MG | 03/08/2023* | 1,454.50 |
| 02/05/2023 | 020522KH | 03/07/2023* | 1,000.00 |
| 02/04/2023 | 020423TM | 03/06/2023* | 1,363.60 |
| 02/02/2023 | 020223RJG | 03/04/2023* | 10,000.00 |
| 02/01/2023 | 020323KK | 03/03/2023* | 909.10 |
| 02/01/2023 | 020123YS | 03/03/2023* | 6,000.00 |
| 01/29/2023 | 012923TB | 02/28/2023* | 1,181.82 |
| 01/21/2023 | 122122RC | 02/20/2023* | 590.90 |
| 01/20/2023 | 012023OS | 02/19/2023* | 1,136.40 |
| 01/19/2023 | 011923DM | 02/18/2023* | 1,363.60 |
| 01/16/2023 | 011623SL | 04/16/2023* | 1,363.60 |
| 01/16/2023 | 011623RS | 02/15/2023* | 7,500.00 |
| 01/15/2023 | 011523BJ | 04/15/2023* | 1,363.60 |
| 01/15/2023 | 011523AC | 02/14/2023* | 8,500.00 |
| 01/15/2023 | 011523GF | 02/14/2023* | 8,500.00 |
| 01/07/2023 | 010723JA | 02/06/2023* | 1,545.50 |
| 01/06/2023 | 010622MG | 02/05/2023* | 1,454.50 |
| 01/05/2023 | 010522KH | 02/04/2023* | 1,000.00 |
| 01/04/2023 | 010423TM | 02/03/2023* | 1,363.60 |
| 01/01/2023 | 010123KK | 01/31/2023* | 909.10 |
| 01/01/2023 | 010223RJG | 01/31/2023* | 909.10 |
| 01/01/2023 | 010123YS | 01/31/2023* | 545.50 |
| 12/29/2022 | 122922TB | 01/28/2023* | 1,181.82 |
| 12/21/2022 | 112122RC | 01/20/2023* | 590.90 |
| 12/20/2022 | 122022OS | 01/19/2023* | 1,136.40 |
| 12/19/2022 | 121922DM | 01/18/2023* | 1,363.60 |
| 12/16/2022 | 121622SL | 03/16/2023* | 15,000.00 |
| 12/16/2022 | 121622RS | 01/15/2023* | 681.80 |
| 12/15/2022 | 121522BJ | 03/15/2023* | 1,363.60 |
| 12/15/2022 | 121522AC | 01/14/2023* | 772.70 |
| 12/15/2022 | 121522GF | 01/14/2023* | 772.70 |
| 11/16/2022 | 111622SL | 02/16/2023* | 1,363.60 |
| 11/15/2022 | 111522BJ | 02/15/2023* | 15,000.00 |
| 10/16/2022 | 101622SL | 01/15/2023* | 1,363.60 |
| 10/15/2022 | 101522BJ | 01/15/2023* | 1,363.60 |
| 12/14/2022 | 121422YB | 12/16/2022* | 29,000.00 |
| 12/07/2022 | 120722JA | 01/06/2023* | 1,545.50 |
| 12/06/2022 | 120622MG | 01/05/2023* | 1,454.50 |
| 12/05/2022 | 120522KH | 01/04/2023* | 1,000.00 |
| 12/04/2022 | 120422TM | 01/03/2023* | 1,363.60 |

**Exhibit 3**

| 12/02/2022 | 120222RJG | 01/01/2023* | 909.10 |
| 12/01/2022 | 120122KK | 12/31/2022* | 909.10 |
| 12/01/2022 | 120122YS | 12/31/2022* | 545.50 |
| 11/29/2022 | 112922TB | 12/29/2022* | 1,181.82 |
| 11/21/2022 | 212122RC | 12/21/2022* | 590.90 |
| 11/20/2022 | 112022OS | 12/20/2022* | 1,136.40 |
| 11/19/2022 | 111922DM | 12/19/2022* | 1,363.60 |
| 11/16/2022 | 111622RS | 12/16/2022* | 681.80 |
| 11/15/2022 | 111522AC | 12/15/2022* | 772.70 |
| 11/15/2022 | 111522GF | 12/15/2022* | 772.70 |
| 11/12/2022 | 111322NMSDC | 12/12/2022 | 9,667.25 |
| 11/07/2022 | 110722JA | 12/07/2022 | 1,545.50 |
| 11/06/2022 | 110622MG | 12/06/2022 | 1,454.50 |
| 11/05/2022 | 110522KH | 12/05/2022 | 1,000.00 |
| 11/04/2022 | 110422TM | 12/04/2022 | 1,363.60 |
| 11/02/2022 | 110222RJG | 12/02/2022 | 909.10 |
| 11/01/2022 | 110122KK | 12/01/2022 | 909.10 |
| 11/01/2022 | 110122YS | 12/01/2022 | 545.50 |
| 10/29/2022 | 102922TB | 11/28/2022 | 1,181.82 |
| 10/29/2022 | 102922TC | 11/28/2022 | 1,818.18 |
| 10/21/2022 | 102122RC | 11/20/2022 | 590.90 |
| 10/19/2022 | 101922DM | 11/18/2022 | 1,363.60 |
| 10/16/2022 | 101622RS | 11/15/2022 | 681.80 |
| 10/15/2022 | 101522AC | 11/14/2022 | 772.70 |
| 10/15/2022 | 101522GF | 11/14/2022 | 772.70 |
| 10/15/2022 | 101522BS | 11/14/2022 | 1,318.18 |
| 10/10/2022 | 102022OS | 11/09/2022 | 1,136.40 |
| 10/08/2022 | 100822EE | 11/07/2022 | 1,045.46 |
| 10/08/2022 | 100822NS | 11/07/2022 | 1,181.82 |
| 10/07/2022 | 100722JA | 11/06/2022 | 1,545.50 |
| 10/06/2022 | 100622MG | 11/05/2022 | 1,454.50 |
| 10/04/2022 | 100522KH | 11/03/2022 | 1,000.00 |
| 10/04/2022 | 100422TM | 11/03/2022 | 1,363.60 |
| 10/02/2022 | 100222RJG | 11/01/2022 | 909.10 |
| 10/01/2022 | 100122KK | 10/31/2022 | 909.10 |
| 10/01/2022 | 100122YS | 10/31/2022 | 545.50 |
| 09/29/2022 | 092922TB | 10/29/2022 | 1,181.82 |
| 09/29/2022 | 092922TC | 10/29/2022 | 1,818.18 |
| 09/21/2022 | 092129RC | 10/21/2022 | 590.90 |
| 09/20/2022 | 092022OS | 10/20/2022 | 12,500.00 |
| 09/19/2022 | 091922DM | 10/19/2022 | 15,000.00 |
| 09/18/2022 | 091822AA | 10/18/2022 | 2,925.92 |
| 09/16/2022 | 091622SL | 12/15/2022 | 1,363.60 |

**Exhibit 3**

| | | | |
|---|---|---|---|
| 09/16/2022 | 091622RS | 10/16/2022 | 681.80 |
| 09/15/2022 | 091522BJ | 12/15/2022 | 1,363.60 |
| 09/15/2022 | 091522AC | 10/15/2022 | 772.70 |
| 09/15/2022 | 091522GF | 10/15/2022 | 772.70 |
| 09/15/2022 | 091522BS | 10/15/2022 | 1,318.18 |
| 09/09/2022 | 090822NS | 10/09/2022 | 1,181.82 |
| 09/08/2022 | 090822EE | 10/08/2022 | 1,045.46 |
| 09/07/2022 | 090722JA | 10/07/2022 | 1,545.50 |
| 09/06/2022 | 090622MG | 10/06/2022 | 1,454.50 |
| 09/05/2022 | 090522KH | 10/05/2022 | 1,000.00 |
| 09/04/2022 | 090422TM | 10/04/2022 | 1,363.60 |
| 09/02/2022 | 090222RJG | 10/02/2022 | 909.10 |
| 09/01/2022 | 090122KK | 10/01/2022 | 10,000.00 |
| 09/01/2022 | 090122YS | 10/01/2022 | 545.50 |
| 08/29/2022 | 082922TB | 09/28/2022 | 13,000.00 |
| 08/29/2022 | 082922TC | 09/28/2022 | 1,818.18 |
| 08/21/2022 | 082128RC | 09/20/2022 | 590.90 |
| 08/20/2022 | 081622RS | 09/19/2022 | 681.80 |
| 08/20/2022 | 082022OS | 09/19/2022 | 1,136.40 |
| 08/19/2022 | 081922DM | 09/18/2022 | 1,363.60 |
| 08/18/2022 | 081822AA | 09/17/2022 | 2,925.92 |
| 08/16/2022 | 081622SL | 11/16/2022 | 1,363.60 |
| 08/15/2022 | 081522BJ | 11/15/2022 | 1,363.60 |
| 08/15/2022 | 081522AC | 09/14/2022 | 772.70 |
| 08/15/2022 | 081522GF | 09/14/2022 | 772.70 |
| 08/15/2022 | 081522BS | 09/14/2022 | 1,318.18 |
| 08/08/2022 | 080822EE | 09/07/2022 | 1,045.46 |
| 08/08/2022 | 080822NS | 09/07/2022 | 1,181.82 |
| 08/07/2022 | 080722JA | 09/06/2022 | 1,545.50 |
| 08/06/2022 | 080622MG | 09/05/2022 | 1,454.50 |
| 08/05/2022 | 080522KH | 09/04/2022 | 11,000.00 |
| 08/04/2022 | 080422TM | 09/03/2022 | 15,000.00 |
| 08/02/2022 | 080222RJG | 09/01/2022 | 909.10 |
| 07/15/2022 | 071522BJ | 10/15/2022 | 1,363.60 |
| 7/15/2022 | 071622SL | 8/14/2022 | 3,409.20 |
| | | **TOTAL** | 353,927.43 |

†     Invoices were dated 30 days prior to original due date in absence of acceleration.

\*     Due date accelerated to 12/10/2023 upon Collaborative Vision's termination of Client Service Agreement and Addendum for cause.

**Exhibit 3**

**Q5id**
You. Proven.

6799 NE Bennett Street
Hillsboro, Oregon 97124

This Nonnegotiable Promissory Note has not been registered under the Securities Act of 1933 or any state securities laws.  This Nonnegotiable Promissory Note may not be sold, assigned, or otherwise negotiated to any person unless pursuant to an effective registration statement filed under the Securities Act of 1933 and applicable state securities laws, or unless Maker receives an opinion of counsel, in form and from counsel acceptable to Maker, that the sale, assignment, or other negotiation is exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws.

## NONNEGOTIABLE PROMISSORY NOTE

**$200,000**                                                                                                                   **October 14, 2022**

This Nonnegotiable Promissory Note ("**Note**") is made by Q5ID, Inc. ("**Maker**" or the "**Company**") in favor of **Collaborative Vision LLC** ("**Holder**").

1.  **Definitions**.  Capitalized terms used in this Note but not otherwise defined shall have the meanings ascribed to such terms in the Note Purchase Agreement.  The following capitalized terms have the meanings below:

    "**Maturity Date**" means four (4) months following the date of this Note, or **February 14, 2023**.

    "**Principal Amount**" means **Two Hundred Thousand Dollars ($200,000)** which is equal to the face value of this Note and which has been paid by Maker to Holder as the Purchase Price pursuant to the Note Purchase Agreement.

2.  **Payments**.  Maker promises to pay only to Holder in immediately available funds, payments in respect of this Note as follows:

    (a)      Interest.  In connection with an investment in the Notes, **the Company will issue to Holder shares of the Company's common stock (a "Stock Grant"), equal to 50,000 shares**.  The Stock Grant represents interest paid to the Noteholders for their investment in the Notes.

    (b)      Convertibility.  Prior to the Maturity Date, Holder may elect to convert all or any portion of their Note into shares of the Company at the lesser of i) the current equity offering price at $2.80 per share, or ii) any equity then available by the Company, up to and until the Maturity Date of the Promissory Note.

    (c)      Payment at Maturity Date.  At the Maturity Date, Maker shall pay to Holder any remaining Principal Amount that has not been converted to equity.

3.  **Application of Payments**.  All payments under this Note will be applied first to any costs and expenses due to Holder, then to unpaid Principal Amount as set forth in this Note or as reduced by any conversion by Holder into other investment options with the Company.

4.  **Place of Payments**.  All payments under this Note will be made to Holder at the address on the signature page of this Note or any other address that Holder may designate by notice to Maker.

5.  **Prepayments**.  Maker may prepay a part or all of the unpaid Principal Amount at any time.  Excess payments or prepayments will not be credited as future scheduled payments required by this Note.

**Q5id** You. Proven.

6.   **No Negotiation**.  This Note is nonnegotiable and may not be sold, assigned, or otherwise negotiated to any person without the prior written consent of Maker, which Maker may withhold in Maker's sole discretion.

7.   **Note Purchase Agreement**.  The obligations of Maker under this Note are subject to the terms and conditions of the Note Purchase Agreement dated as of the date hereof between Maker and Holder (the "**Note Purchase Agreement**").

8.   **Subordination**.  Holder acknowledges and agrees: (a) the payment obligations set forth herein are junior to any payment obligations of the Company to any bank or financial institution (a "**Senior Lender**") offering debt financing to the Company; (b) Holder will subordinate the rights to payment evidenced by this Note to any Senior Lender; and (c) Holder will promptly execute any reasonable and customary subordination agreement upon the request of the Company and/or Senior Lender.

9.   **Events of Default**.  Each of the following is an event of default under this Note:

(a)   Maker fails to make any payment required by this Note within ten (10) days after the payment is due;

(b)   any representation or warranty made by Maker in the Note Purchase Agreement is found to have been untrue or misleading in any material respect as of the date of the Note Purchase Agreement;

(c)   Maker materially breaches any covenant made by Maker in the Note Purchase Agreement, and fails to cure the breach within thirty (30) days after Holder notifies Maker of the breach;

(d)   Maker voluntarily dissolves or ceases to exist, or any final and nonappealable order or judgment is entered against Maker ordering its dissolution;

(e)   Maker:

(1)   makes an assignment for the benefit of creditors;

(2)   commences a voluntary bankruptcy case;

(3)   files a petition or answer seeking for Maker any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or rule;

(4)   files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against Maker in any proceeding of this nature; or

(5)   seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of Maker or of all or any substantial part of Maker's properties;

(f)   an involuntary bankruptcy case against Maker is commenced and is not dismissed on or before the 120th day after the commencement of the case; and

(g)   a court:

(1)   adjudicates Maker as bankrupt or insolvent; or

(2)   appoints, without Maker's consent, a trustee, receiver, or liquidator either of Maker or of all or any substantial part of Maker's properties that is not:  (A) vacated or stayed on or before the 90th day after appointment; or (B) vacated on or before the 90th day after expiration of a stay.

**Q5id**
You. Proven.

10. **Remedies**. On and after an event of default under this Note, Holder may exercise the following remedies, which are cumulative and which may be exercised singularly or concurrently:

    (a)    upon notice to Maker, the right to accelerate the due dates under this Note so that the unpaid Principal Amount and the Additional Principal, together with accrued interest on the Principal Amount, is immediately due in its entirety;

    (b)    any remedy available to Holder under the Note Purchase Agreement; and

    (c)    any other remedy available to Holder at law or in equity.

11. **Time of Essence**. Time is of the essence with respect to all dates and time periods in this Note.

12. **Binding Effect**. This Note will be binding on the parties and their respective heirs, personal representatives, successors, and permitted assigns, and will inure to their benefit.

13. **Amendment**. This Note may be amended only by a written document signed by the party against whom enforcement is sought.

14. **Waiver**.

    (a)    Maker waives demand, presentment for payment, notice of dishonor or nonpayment, protest, notice of protest, and lack of diligence in collection, and agrees that Holder may extend or postpone the due date of any payment required by this Note without affecting Maker's liability.

    (b)    No waiver will be binding on Holder unless it is in writing and signed by Holder. Holder's waiver of a breach of a provision of this Note will not be a waiver of any other provision or a waiver of a subsequent breach of the same provision.

15. **Severability**. If a provision of this Note is determined to be unenforceable in any respect, the enforceability of the provision in any other respect and of the remaining provisions of this Note will not be impaired.

16. **Governing Law**. This Note is governed by the laws of the State of Oregon, without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Note.

17. **Venue**. Any action, suit, or proceeding arising out of the subject matter of this Note will be litigated in courts located in Multnomah County, Oregon. Maker consents and submits to the jurisdiction of any local, state, or federal court located in Multnomah County, Oregon.

18. **Attorney's Fees**. If any arbitration, action, suit, or proceeding is instituted to interpret, enforce, or rescind this Note, or otherwise in connection with the subject matter of this Note, including but not limited to any proceeding brought under the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements specified in ORCP 68 A(2), incurred in connection with the arbitration, action, suit, or proceeding, any appeal or petition for review, the collection of any award, or the enforcement of any order, as determined by the arbitrator or court.

19. **Costs and Expenses**. If an event of default under this Note occurs and Holder does not institute any arbitration, action, suit, or proceeding, Maker will pay to Holder, upon Holder's demand, all reasonable

Exhibit 4

**Q5id**
You. Proven.

6799 NE Bennett Street
Hillsboro, Oregon 97124

costs and expenses, including but not limited to attorney's fees and collection fees, incurred by Holder in attempting to collect the indebtedness evidenced by this Note.

Maker:

**Q5ID, Inc.**

*Steve Larson*

**By:** Steve Larson (Oct 14, 2022 17:10 PDT)

**Steve Larson, CEO**