IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 23-11007-cgb |
| | § | |
| ARTIUSID, INC., | § | Chapter 7 |
| | § | |
| Debtor. | § | |

## DECLARATION OF STEVE LARSON

I, Steve Larson, pursuant to 28 U.S.C. § 1746, declare:

1.      My name is Steve Larson. I am over the age of 21 and in all respects competent to make this declaration (this "Declaration"). I am the former Chief Executive Officer of Q5iD, Inc., now known as ArtiusID, Inc. (the "Company"). I served in this capacity from the Company's inception in 2018 through the first quarter of 2023. During my tenure as CEO, I was responsible for overseeing the Company's operations, including overseeing the HR, Engineering, and Marketing Leadership who were responsible for implementing and adhering to its staffing and hiring practices.

2.      I make this Declaration in support of Collaborative Vision's position in the bankruptcy proceedings of ArtiusID, Inc. (formerly Q5iD, Inc.), Case No. 23-11007-cgb, in the United States Bankruptcy Court for the Western District of Texas, Austin Division. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information available to me in my capacity as CEO. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      I am familiar with the business relationship between the Company and Collaborative Vision LLC ("Collaborative Vision"), owned and operated by Lisa Matar.

1

4855-7845-3737.1

Collaborative Vision provided staffing and recruiting services to the Company pursuant to a Client Service Agreement dated December 11, 2018, and an Addendum dated November 4, 2021.

4.      During my time as Founder and CEO, Collaborative Vision successfully recruited and placed numerous employees for the Company. These placements were crucial to our operations and growth.

5.      The Company incurred financial obligations to Collaborative Vision for its services. These obligations were legitimate and based on services rendered.

6.      Under our agreement, payment was owed if an employee stayed for 30 days unless in a sales role, whereby a minimum of 90 days would trigger payment owed in full and paid over the terms of the contract. In some cases, a flat $2,000 was paid if we made an internal business decision after hiring that prevented a salesperson from completing their 90 days. To my knowledge, every person on Collaborative Vision's past due invoice list met these criteria.

7.      Q5iD leadership created job descriptions, reviewed resumes, shortlisted candidates, interviewed, assessed, and extended offer letters, onboarded employees, and oversaw and managed employee workload. Collaborative Vision created introductions aligned with our needs but was not in a decision-making position for hires, nor responsible for their performance thereafter.

8.      Collaborative Vision accepted an addendum to our agreement at Q5iD's request, offering 12-month payment terms to help manage our cash flow during a period of rapid staffing needs. This arrangement was solely for the benefit of Q5iD, allowing us to hire necessary talent while deferring payment.

2

4855-7845-3737.1

9.      Q5iD not only requested these extended payment terms but also drafted the addendum. In return for accepting these terms, Q5iD agreed to increase Collaborative Vision's fee from 18% to 20% of an employee's annual base salary and offered options as approved by the board, demonstrating our acknowledgment of the value of this arrangement and the additional risk Collaborative Vision was taking on.

10.     The 12-month payment terms agreed to by Collaborative Vision were better than any other vendor or service provider was willing to accept. To my knowledge, despite our HR manager asking, no other agency would accept 12-month terms.

11.     There was always an understanding and commitment from Q5iD to pay the past due invoices and loan as soon as additional funding was secured.

12.     The extended payment terms were incorporated into Q5iD's financial planning and projections, accounts payable record, and regular updates were sent to Collaborative Vision by the accounting team as part of their monthly invoice review process, indicating our intent and expectation to pay these amounts.

13.     The approval process for Collaborative Vision's invoices was rigorous. They were regularly reviewed and approved by Q5iD's accounting team, HR manager, and leadership, including myself. At no time did Collaborative Vision invoice us for candidates other than those directly recruited by its own staff.

14.     No financial audit was conducted on Collaborative Vision's invoices related to misconduct. Collaborative Vision invoices were regularly reviewed at least monthly and approved based on the contract terms.

15.     The performance of individual hires was not a condition of payment under our contract with Collaborative Vision. Q5iD bore the responsibility for resume review, interviewing

3

(which often included more than one conversation and panel interviews that included leadership and peers), onboarding, managing, training, directing and supporting these employees, with the first payment being owed only after 30 successful days of employment as specified in our agreement.

16. During my tenure, there were no significant disputes about the quality of Collaborative Vision's services, or the amounts invoiced. Any minor discrepancies were promptly addressed and resolved to the satisfaction of both parties. For example, I recall one instance where our bill pay was not working and so we had to issue a live check. There was confusion on our side as to whether both the direct deposit and check had been sent simultaneously. After review, our HR Manager Ms. Carnel informed me that she spoke to our accounting team and the error was on our side, and in fact Collaborative Vision only received one payment and not two despite Ms. Carnel's error in stating double payment before confirming facts.

17. On another occasion Ms. Carnel misread an invoice which denotes the first initial and last name initial, and she confused one temporary worker with another and told me that Collaborative Vision was over billing for one of those candidates. It was quickly discovered that Ms. Carnel had associated the rate of pay with the wrong candidate. Sometimes these instances could cause a little ruffling of feathers, but the fact is, our businesses always worked together in real time, and my team would work with Collaborative Vision to keep records aligned. Little errors can happen, but due to our monthly reviews, and the fact that we were months past due on payments, we had plenty of time to make sure our invoices and payments were accurate.

18. The value Collaborative Vision brought to Q5iD extended beyond staffing. Collaborative Vision introduced us to potential investors, including one that invested $250,000,

4

and to potential customers. Collaborative Vision attended a conference with our Digital Marketing Manager which resulted in several sales follow up meetings with our staff.

19.     Collaborative Vision, a shareholder, supplier, lender and consultant, was a strong advocate for the Company. I approved Collaborative Vision and our marketing manager to represent Q5iD at a conference in 2022 and for the cost to be covered up to $10,000.00, which Collaborative Vision paid for in advance and then reimbursed us.

20.     In October of 2022 I asked Collaborative Vision to provide a bridge loan to help us cover payroll. As a growing start-up, shareholders were our first line of support and as Collaborative Vision was a consultant, shareholder, supplier and lender and advocate for the Company. As a shareholder, Collaborative Vision and many other shareholders provided bridge loans in 2022 to cover payroll and operating expenses until the expected $6 million investment arrived, with an additional $4 million in the future. The investment was made in Q1 2023, and invoices and loans were expected to be paid.

21.     Collaborative Vision terminated the staffing relationship in December 2022 due to Q5iD's inability to pay balances when due. This termination accelerated all outstanding invoices, making them immediately due.

22.     Like many vendors owed money, we promised Collaborative Vision that amounts owed on the loan and all invoices would be paid once funding was secured, expected in early 2023.

23.     I left the Company shortly after it received this funding. To my knowledge, Collaborative Vision had not been paid prior to my departure, despite my instructions to do so.

24.     Michael Marcotte became a board member in December 2022 and CEO in March 2023. He was not involved when the hires for which Collaborative Vision is owed were made.

4855-7845-3737.1

25.     I am not aware of any legitimate basis for the Company to dispute the amounts owed to Collaborative Vision for its services and loan.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 24, 2024,
Hillsboro, Oregon

By: _____
Steve Larson
Former CEO of Q5iD, Inc.

6