UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


| | | |
|---|---|---|
| IN RE: | ) | CASE NO: 23-11007-cgb |
| | ) | CHAPTER  7 |
| | ) | |
| ARTIUSID, INC, | ) | Austin, Texas |
| | ) | |
| | ) | Wednesday, September 25, 2024 |
| Debtor. | ) | 1:35 p.m. to 2:22 p.m. |
| | ) | 3:01 p.m. to 5:55 p.m. |

HEARING RE:

1-1) CONSENT STIPULATION AND MOTION TO DISMISS CASE
[DKT.NO.88];

1-2) MOTION FOR RECONSIDERATION [DKT.NO.94];

1-3) APPLICATION TO EMPLOY HAYWARD, PLLC AS COUNSEL FOR THE
CHAPTER 7 TRUSTEE [DKT.NO.95]


BEFORE THE HONORABLE CHRISTOPHER G. BRADLEY,
UNITED STATES BANKRUPTCY JUDGE


<u>APPEARANCES</u>:          See page 2


Courtroom Deputy:      Ronda Farrar


Court Recorder [ECRO]:  Estella Benitez Jurado; Recorded


Transcribed by:        Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**


For Debtor:                    MARK D. BLOOM, ESQ.
Baker McKenzie
111 Brickell Ave., 10th Floor
Miami, FL 33131
305-789-8900

MARK D. TAYLOR, ESQ.
Baker & McKenzie
1900 N. Pearl Street, Suite 1500
Dallas, TX 75201
214-978-3089

For Collaborative      LYNN H. BUTLER, ESQ.
Vision:                THOMAS J. ZAVALA, ESQ.
Husch Blackwell
111 Congress Avenue, Suite 1400
Austin, TX 78701
512-479-9758

For Rearc, et al.:     JASON B. BINFORD, ESQ.
Ross Smith & Binford
2901 Via Fortuna
Building 6, Suite 450
Austin, TX 78746
512-351-4778

MICHAEL CONWAY, ESQ.
Lazare Potter Giacovas & Moyle
747 Third Ave., 16th Floor
New York, NY 10017
917-242-1597

For Chapter 7 Trustee:  TODD B. HEADDEN, ESQ.
Hayward
7600 Burnet Road
Suite 530
Austin, TX 78757
737-881-7102

Also present:           RON SATIJA, ESQ.

For U.S. Trustee:       GARY WRIGHT, ESQ.
Office of U.S. Trustee
903 San Jacinto Boulevard
Room 230
Austin, TX 78701

1                                    INDEX

2  DEBTOR'S WITNESSES          DIRECT     CROSS      REDIRECT    RECROSS

3  MICHAEL MARCOTTE

4    BY MR. TAYLOR            42                     109

5    BY MR. HEADDEN                      84

6    BY MR. BUTLER                      104

7    BY MR. WRIGHT                      106

8  DOMINIC O'DIERNO

9    BY MR. TAYLOR           111

10   BY MR. HEADDEN                     138

11   BY MR. BUTLER                      146

12

13 TRUSTEE'S EXHIBITS                                          RECEIVED

14 5                                                               97

15 6                                                               97

16 8                                                              100

17 10                                                             101

18 11                                                              96

19

20

21

22

23

24

25

4

1          **Austin, Texas; Wednesday, September 25, 2024; 1:35 p.m.**

2     **(Messrs. Conway and Zavala and Ms. Hayes Appeared via Zoom)**

3                       **(Call to Order)**

4          **THE CLERK:**  All rise.

5          **THE COURT:**  Please be seated.

6     **(Pause)**

7          All right, good afternoon, everyone.  This is

8  Judge Bradley.  I'm going to call Case Number 23-11007, *In re*

9  *ArtiusID, Inc.*  We're here I guess on the Consent Stipulation

10 at Docket Number 88, the Motion for Reconsideration at Docket

11 Number 94, and the Application to Employ at Docket Number 95.

12         So let's take appearances starting here in the

13 courtroom.

14         **MR. BLOOM:**  Good afternoon, Your Honor.  Mark Bloom,

15 B-l-o-o-m, and Mark Taylor, T-a-y-l-o-r, of Baker McKenzie on

16 behalf of ArtiusID.

17         **THE COURT:**  Thank you.  Good afternoon, you all.

18         **MR. TAYLOR:**  And I'm Mark Taylor.

19         **THE COURT:**  And happy birthday, Mr. Bloom.

20    **(Laughter)**

21         **MR. HEADDEN:**  Good afternoon, Your Honor.  Todd

22 Headden from Hayward PLLC on behalf of the Chapter 7 Trustee,

23 Ron Satija, who is also in the room today.

24         **THE COURT:**  Thank you.  Good afternoon, you all.

25         **MR. BUTLER:**  Good afternoon.  Lynn Butler, Husch

5

1    Blackwell, on behalf of Collaborative Vision.  And I believe my

2    associate, Tom Zavala, from Dallas is on the line somewhere.

3            **THE COURT:**  All right, thank you.  Good afternoon.

4            **MR. BINFORD:**  Good afternoon, Your Honor.  Jason

5    Binford with the law firm of Ross, Smith & Binford, PC on

6    behalf of the three petitioning creditors, Goldstein Consulting

7    Services, LLC, Rearc LLC, and Xmogrify, LLC.  Also joining us

8    this afternoon is lead counsel, Michael Conway, on Zoom.

9            **THE COURT:**  Hi, Mr. Conway.

10           **MR. CONWAY:**  Afternoon.

11           **THE COURT:**  Mr. Wright?

12           **MR. WRIGHT:**  Good afternoon, Your Honor.  Gary Wright

13    on behalf of the United States Trustee.

14           **THE COURT:**  Thank you for filling in for Mr. Tobin,

15    correct?

16           Okay, you know I was hoping that there was going to

17    be a settlement of some sort announced, but these look like war

18    faces, not settlement faces.

19       **(Laughter)**

20           Mr. Bloom, where do we stand on this?

21           I think you've got to come up to the podium.  It's --

22           **MR. BLOOM:**  Sure.

23           **THE COURT:**  We should have at least two podiums.

24    Actually that courtroom does have two podiums but we don't.  So

25    sorry about that.

6

1        **MR. BLOOM:**  I need the exercise, Your Honor.

2        **THE COURT:**  Okay, fair enough.

3        **MR. BLOOM:**  Okay.  There have been efforts but there

4    is nothing to report on that front in terms of a settlement

5    resolution.

6        **THE COURT:**  Okay.  Well then I'm going to pull these

7    notes up then.

8            Okay, so then I think we should start with some

9    housekeeping matters.  I would -- I'm just going to hold a

10   consolidated hearing on these three pending matters.  I mean

11   obviously I think the Consent Stipulation Motion to Dismiss is

12   the heart of what we're doing today.  I would like to know, you

13   know, what you all can stipulate to in terms of each other's

14   exhibits.  We had talked about presenting as much testimony as

15   possible by proffer.  And then the other stipulation we

16   commonly come to in this Court is to keep -- just so to keep

17   witnesses called only once, if possible, the cross would not be

18   limited to the scope of direct testimony.  Those would be our

19   usual -- that's what I'm asking in terms of housekeeping.

20           So where do you all stand on those matters?

21       **MR. HEADDEN:**  Thank you, Your Honor.

22           The parties did meet yesterday afternoon to go over

23   some of these housekeeping matters, did not address whether or

24   not a cross of parties should extend beyond the direct

25   testimony.  I believe the majority of the witnesses will be

7

1   coming from the Debtor so I'll allow Debtor's counsel to speak

2   to that.

3            With respect to exhibits, there were some exhibits

4   objections lodged.  I'll turn to Debtor's counsel because I

5   think you all were negotiating with Collaborative Vision on a

6   possible swap of objections.  Having said that, the Trustee

7   doesn't have any objections to any of the parties' exhibits.

8            **THE COURT:**  Okay, thank you.

9            **MR. TAYLOR:**  Your Honor, Mark Taylor for Artius.

10           And we did negotiate yesterday, I think it was, two

11  days ago, about the various exhibits and I think most at least

12  of our exhibits have not been objected to.  I think there was a

13  range of exhibits, 13 through 18 --

14           **MR. BUTLER:**  I believe that's right, that we would

15  have relevance objections to, Your Honor.

16           **MR. TAYLOR:**  Yeah.  And otherwise, on their exhibits

17  we had a few.  Most of them are in the nature of relevance

18  objections.  Because, as you know, we're not really here to try

19  whether this debt of Ms. Matar at Collaborative Vision is due.

20  In fact, I was not going to spend hours on end of your court

21  time to do that because it's more we're really focused on the

22  Motion to Dismiss.

23           **THE COURT:**  Great.  Okay, yeah, I was going to ask

24  you what your position -- like how to think about that claim.

25  So that's helpful, yeah.

8

1          **MR. TAYLOR:**  Actually it's a difficult question.  I

2     have to at least bring in some testimony to show that the debt

3     is disputed.  But do I want to try that case?  No.  Because

4     there is an Oregon proceeding that we can drop it off to.

5     That's our prayer.

6          **THE COURT:**  Right.

7          **MR. TAYLOR:**  Is that it go back to the court where it

8     is pending once this matter is done.  And so trying that case

9     this afternoon would take unbelievable amount of time and also

10    discovery that we have not done.

11         **THE COURT:**  Right.

12         **MR. TAYLOR:**  In fact, as you may recall, we tried to

13    depose Ms. Matar and that request was denied and I think under

14    the theory that Ms. Matar's deposition would relate mostly to

15    what her case is about in Oregon.  And so that, to me, is a

16    relevancy issue.

17         And then as to the scope of the testimony here today,

18    we do want to keep it pretty tight because of this relevancy

19    issue.  In other words, when I put up my witnesses, which I'll

20    have two, the scope of cross I think ought to be limited to

21    really what we are doing on direct.  Otherwise, we may start

22    wandering into this other lawsuit in Oregon and its -- and

23    witnesses that are relevant in Oregon.  In fact --

24         **THE COURT:**  Yeah, I would just do that as a relevance

25    objection and not an objection on the basis that the cross is

9

1    exceeding the scope of the direct.

2         **MR. TAYLOR:**  Okay.

3         **THE COURT:**  It's not really so much a problem for the

4    movant, it's usually I don't like the other side to sandbag the

5    movant and so that's the kind of reason I try to bring it up

6    right away, because it has happened where --

7         **MR. TAYLOR:**  Okay.

8         **THE COURT:**  -- I felt like that happened.

9         **MR. TAYLOR:**  Speaking of sandbagging, I have to bring

10   up Mr. Larsen I believe is -- was on the call or on the Zoom

11   and if he's expected to be called as a witness, then we're

12   going to invoke the Rule because we don't want him here

13   listening to everybody else's testimony informing his own.  So

14   that's number one.

15        And number two is that there was a filing

16   yesterday -- this morning, this morning at 10:40 a.m. and to be

17   honest I have not read it.

18        **THE COURT:**  I've heard tell of this filing, but I

19   haven't read it either.

20        **MR. TAYLOR:**  Yeah.  And so obviously, I think the

21   title of it is an affidavit of Mr. Larsen and if it's an

22   affidavit of Mr. Larsen it is one thousand percent hearsay.

23   He's not here to testify.  And it's also irrelevant because it

24   relates a hundred percent, at least what I understand, to the

25   debt owed and to the Oregon lawsuit that's already pending.

1    And so those factors, you know, whether Mr. Larsen thinks the

2    money is owed or not is not relevant to this proceeding today.

3          We're here to establish that this company is viable

4    and should be dismissed from bankruptcy.  Those are the two

5    issues and that's what I really wanted to limit our argument to

6    and our witnesses to.

7          **THE COURT:**  Right.  Okay, so, yeah, and I -- and

8    Mr. Butler can speak for himself, my understanding was they

9    concede that there is a bona fide dispute as to the claim and

10   so that to me, that's kind of where I was coming in too and

11   that to me does kind of -- I don't know what else we're getting

12   into in kind of dealing with this claim.

13         **MR. TAYLOR:**  I think you're absolutely correct that

14   there's a bona fide dispute on the invoices.  There is not a

15   bona fide dispute on the promissory note.  In fact, in

16   Oregon -- this will be admitted into evidence today -- there

17   was an offer of judgment--

18         **THE COURT:**  Right.

19         **MR. TAYLOR:**  -- made for the $200,000 promissory

20   note --

21         **THE COURT:**  Right.

22         **MR. TAYLOR:**  -- a long time ago.

23         **THE COURT:**  Right.

24         **MR. TAYLOR:**  And you can take judicial notice of it.

25         **THE COURT:**  Right.

1         **MR. TAYLOR:**  I mean it's -- so that piece of the

2  claim is out and conceded, but the invoices are not.  And

3  you'll hear testimony, some light testimony, if you want, to

4  hear that at least that is conceded.  Now -- excuse me,

5  contested.

6         Now, if they want to stipulate that it's contested,

7  that cuts down my outline.  It will be a lighter day.

8         **THE COURT:**  Got you.

9         **MR. TAYLOR:**  Okay?

10        **THE COURT:**  Okay.  Thank you.

11        Mr. Butler?

12        **MR. BUTLER:**  Yes, Your Honor.  Lynn Butler, Husch

13  Blackwell, on behalf of Collaborative Vision.

14        If you'll remember in the last hearing you and I

15  agreed it's a disputed claim.  It's ongoing litigation.

16  Whether we have the 200,000, it's undisputed.  I know your

17  position on partially undisputed claims in involuntaries, but

18  the existence of the litigation's there.  We didn't know where

19  this was going to go, so our exhibits are loaded up with -- if

20  they wanted to go there and you let them go there, I need to

21  adduce things.  Mr. Larsen is effectively a rebuttal witness.

22  Again, if they wanted to go there and you let them go there, he

23  was the CEO at the time that all those invoices were -- or the

24  work for the invoices was generated.

25        So really that's -- we're here on a Chapter 7

12

1  dismissal. That's the issue for today.

2          **THE COURT:** Right.

3          **MR. BUTLER:** I don't intend to litigate the substance

4  of the claim. It's not the time and place right now.

5          **THE COURT:** Right. Okay, so it sounds like there's

6  agreement that conceding that there is a bona fide dispute as

7  to, you know, at least most of this claim, whatever the total

8  claim amount is aside from the 200,000, both sides are ready to

9  say there is a bona fide dispute as to that, some significant

10 portion of it, and therefore anything further about that claim

11 doesn't seem to be relevant. And I tried to think of how it

12 could be relevant. I just -- I don't -- I mean I could see a

13 way it could be relevant but it sounds like it's not very close

14 to the heart of what needs to be decided.

15         **MR. BUTLER:** No, and that's why our objections to

16 their exhibits, Exhibit Number 2, which was their draft

17 admitted answer that has not been filed, and starting I believe

18 in -- you know, well, some of the stuff is on my exhibit list,

19 so it's kind of difficult to see, but it has to do with

20 substance of the claim.

21         **THE COURT:** Right.

22         **MR. BUTLER:** So the existence of the litigation is

23 not disputed. The fact that it did not result in a final

24 judgment prior to the bankruptcy being filed is not disputed.

25 The consent to judgment, not disputed. I think we're all on

13

1    the same page.

2           **THE COURT:**  Okay.  Okay, thank you.

3           Mr. Headden or Mr. Wright, do you all have anything

4    to add before I get the Debtor moving on its motion?

5           **MR. HEADDEN:**  No, Your Honor.  Todd Headden on behalf

6    of the Trustee.

7           The only bit that I would add, particularly I think

8    with respect to Collaborative, and I don't know that any of

9    this is within the dispute of the status of that claim, just

10   might be some of the color as to the timing of the claim,

11   because it seems to fit within the pattern, the larger pattern

12   that the Debtor operated, particularly with respect to the

13   Petitioning Creditors and some of the other creditors that we

14   know.  So to that end, that's just a little bit of color.

15          I don't know that any of that is really a disputable

16   fact.

17          **MR. WRIGHT:**  Gary Wright on behalf of the United

18   States Trustee.

19          Your Honor, we don't have anything to add on this

20   before the Court proceeds.

21          **THE COURT:**  Okay, and has the U.S. Trustee's position

22   changed at all?

23          **MR. WRIGHT:**  No, Your Honor.  We are resting on our

24   objection at this point.  The Debtor we don't believe has

25   satisfied the burden.  We'll see where it goes today.  Whether

14

1  it's under the 707 standard or 303, my understanding is it

2  would be 707, we don't believe that they've met either one.

3         **THE COURT:**  Okay, thank you.

4         Okay, I think I should have -- does anybody else

5  online need to make an appearance?

6      **(No audible response)**

7         I try to hold myself to doing this.  I think

8  everything's taken care of, but I wanted to make sure.

9         Okay, well thank you all.  That's very helpful.

10        **MS. HAYES:**  Sorry just to jump in.  I'm Rylie (audio

11  glitch) --

12        **THE COURT:**  Yes, please go ahead.

13        **MS. HAYES:**  -- with Baker McKenzie.  I'm Rylie Hayes

14  with Baker McKenzie, also for ArtiusID.  I'm here just to

15  observe.

16        **THE COURT:**  Great.  Okay, thank you.  You're welcome

17  to do that.

18        So I had a question about the Collaborative Vision

19  claim but I think that's kind of answered now.  The other

20  question I have is if on the merits, so leaving aside the Stay

21  Order is there any reason that Section 303 should apply instead

22  of Section 707?  Is there any merits reason?

23        So let's say an argument that could have been offered

24  back at the prior hearing, two hearings ago now, if you'd said

25  this is what we want, you know, we're asking for this relief,

15

1    what would the -- what are the grounds for the relief?

2           MR. BLOOM:  Well, there are two alternate grounds,

3    Your Honor, 303 and 707, as discussed.

4           THE COURT:  So why would 303 -- what's the argument

5    for 303 applying after an order for relief has been granted?

6           MR. BLOOM:  Okay.  Because again that gets to the

7    question that I would hope we might avoid, which is the legal

8    effect of the stay, and I think this goes --

9           THE COURT:  No, I'm asking you -- I'm going to talk

10   about that later.

11          MR. BLOOM:  Okay.

12          THE COURT:  There's no -- I have read the transcript

13   of that hearing very carefully.  I was also of course there.

14   There is no world in which that Stay Order determined the issue

15   of which standard applies.  And here's why.  Because I was very

16   clear that I didn't want to prejudice any party.  One.  Two,

17   substantively there was no notice to other parties.  The

18   U.S. Trustee wasn't even there.  You all came into a hearing

19   that was on a different matter, you asked for a completely

20   different kind of relief, that's what I granted.  I would never

21   have granted something that substantively changed the legal

22   standard that would apply later in a proceeding based on

23   absolutely no notice.

24          What I'm asking for now though is what is the merits

25   argument why 303 should have applied or should apply.  Is there

1    a merits argument?  After award for relief has duly been

2    granted why 303 should apply instead of 707.

3           **MR. BLOOM:**  Again, Your Honor, I don't know that I

4    can fully answer the question without going into the place that

5    you've asked me not to go, which is that the effect of the Stay

6    Order as it was submitted and entered -- I see that I'm

7    frustrating the Court, but let me ask you --

8           **THE COURT:**  It's not just you're frustrating the

9    Court.  You're not -- I don't think this is an ingenuous

10   argument, to be honest with you.

11          **MR. BLOOM:**  Okay.

12          **THE COURT:**  I don't.  I don't think you're in good

13   faith saying that in that hearing where you did not -- where I

14   explicit -- okay, so first of all the Stay Order explicitly

15   preserves 707.  I forced you to put 707 in there, which --

16          **MR. BLOOM:**  Right.

17          **THE COURT:**  -- clearly indicates that I did not think

18   the issue was determined.  One.

19          **MR. BLOOM:**  Right.

20          **THE COURT:**  So I don't know how you can possibly

21   argue it's already been determined.  Because it clearly wasn't

22   on the face of the Order.

23          Two, I clearly said that I didn't want to prejudice

24   anybody at that hearing, including Collaborative Vision.  Now,

25   if you want an easier standard to apply to you, that's clearly

1    prejudicial to other parties.  There's no way I would have

2    granted Debtor that relief.  You didn't ask for it and I

3    wouldn't have granted it.  And I didn't grant it.  That's two.

4            Three, in the actual -- I mean I was going to -- this

5    is all going to be part of a ruling, but I mean clearly to me

6    you don't have a merits argument for it.  So the other one is a

7    straightforward due process issue.  It is completely

8    outrageously unfair when the U.S. Trustee wasn't even at the

9    hearing, nobody had notice of what you were asking for in that

10   hearing.  When you walked into that hearing you had this big

11   due process, oh, my gosh, we're -- you know, you've got to

12   vacate the Order for Relief, there's all this -- you backed

13   away from all that.  You say, you explicitly say in the hearing

14   we're not -- this is not about a stay pending issue.  We're not

15   asking for the relief that was in the motion, we're asking for

16   this other thing because everybody's singing out of the same

17   hymnal or whatever.  That shift, which I was willing to

18   countenance only and only because I didn't think any party

19   would be prejudiced by it, and only insofar as no party was

20   prejudiced by it, and because I thought -- because I was

21   willing to consider other relief if it was done truly on a

22   consensual basis, which it's clearly not being anymore, right,

23   so when you had a settlement and when I thought you were going

24   to be able to get everybody onboard, there was a completely

25   different path we were all going to take.

1          And I'm happy with that path.  I'm pretty openminded

2    when it comes to that path.  That's why I was willing to

3    consider that path.  And I say in the transcript I'm willing to

4    consider vacating the Order, I'm willing to consider 303.  But

5    we're not on that path and there is -- it is, frankly,

6    outrageous to say that in that hearing, with no notice to

7    anybody, that this issue was decided of which standard would

8    apply.  Then everybody else would be prejudiced.  The Debtor

9    would get out of -- it would get this special treatment that it

10   did not argue for, that it has provided no arguments on the

11   merits for, and which today you can't provide any arguments on

12   the merits for.  I frankly think that position is outrageous.

13          **MR. BLOOM:**  I don't think we're going that far, Your

14   Honor.  First of all, as often happens in Bankruptcy Court, the

15   situation on I guess that was August 1st, it changed in real

16   time.  And Your Honor will recall indulging us with the benefit

17   of a 20-minute recess at the outset because we were that close

18   and ultimately got to an agreement with the Petitioning

19   Creditors.  But for that agreement, it would have been a much

20   different hearing.

21          Based upon that agreement we asked that the Court

22   stay the Order for Relief so that we could then seek relief

23   under Section 303(j) to dismiss the case and Your Honor pointed

24   out that we also ought to proceed under 707.  And the reason

25   why I would prefer that we not get hung up on that is because,

19

1  as I think is reflected in our omnibus reply, will be spent a

2  lot more time addressing 707 than we do 303.

3         We would like to proceed on both, to address both

4  standards.  Your Honor has made absolutely clear your view as

5  to which one applies.  I could take -- I could offer one more

6  analogy that will take me 15 seconds, if the Court would hear

7  it.  But may I, just --

8         **THE COURT:**  Yes, but what I would --

9         **MR. BLOOM:**  -- for the record, Your Honor?

10        **THE COURT:**  -- prefer is a merits reason.  Here's --

11        **MR. BLOOM:**  Okay.

12        **THE COURT:**  -- here's why I think it's outrageous, is

13 because you have never argued on the merits for why 303 would

14 apply.  You've said, oh, but Your Honor, we got you --

15        **MR. BLOOM:**  No.

16        **THE COURT:**  -- we got you.  That's what it feels

17 like.

18        **MR. BLOOM:**  Okay.

19        **THE COURT:**  And I don't appreciate being led down a

20 primrose path like that.  What I want to know and what I'm

21 asking you right here, is there any reason, a merits reason

22 that 303 instead of 707 would apply after an order for relief

23 is duly entered, as it was here?

24        **MR. BLOOM:**  Because the Order for Relief was stayed

25 and the cases that we've cited -- I see Your Honor is not

20

1    impressed with that point, but again --

2            **THE COURT:**  It's a bootstrap argument --

3            **MR. BLOOM:**  -- no one --

4            **THE COURT:**  It's a bootstraps argument.

5            **MR. BLOOM:**  It is not, Your Honor.  Respectfully,

6    Your Honor, it is not because not a single party has responded

7    as --

8            **THE COURT:**  Before, before the Order for Stay was

9    entered what would your argument have been that 303 instead of

10   707 applied?

11           **MR. BLOOM:**  None, because we didn't have the

12   settlement then.  303 only applies when you have a settlement

13   with the petitioning creditors who agree to dismiss their

14   petition.  And we didn't get that until 20 minutes after the

15   time the hearing was supposed to be convened.

16           **THE COURT:**  You had a settlement with the Petitioning

17   Creditors before the Order for Relief was granted.

18           **MR. BLOOM:**  Again, Your Honor, that was why we got

19   the stay.  And I just need to say this one time, we've already

20   offered the cases and no one has offered a distinction of those

21   cases as to why the legal effect of the stay was not to return

22   the parties to the status quo.

23           Let me offer this analogy and it will just take a

24   couple of seconds.  Suppose you have a prisoner on death row.

25   Suppose that prisoner is scheduled to be executed on Tuesday

21

1   evening and on Tuesday morning a court issues a stay of

2   execution.  On Wednesday morning is that prisoner dead or

3   alive?  The reason that that prisoner is alive is because the

4   stay, as the Supreme Court and the Fifth Circuit have made

5   clear, the stay returns the parties to the status quo as it

6   existed before the order that is subject of the stay was

7   entered.

8          And I fully understand that Your Honor is not

9   persuaded by this argument and so all I'm asking is that for

10  purposes of our record we will get, I promise the Court we will

11  get a detail for 707, we do have a bit that deals with 303, and

12  I would ask the Court to hear both.  I don't think I'm likely

13  to convince you, but I would ask the Court to let us make our

14  record as to both, please.

15          **THE COURT:**  That's fine.  I mean look --

16          **MR. BLOOM:**  Okay.

17          **THE COURT:**  -- so I'm glad you have clarified that

18  there is no merits reason that the stay should have been

19  entered aside from I was, you know, tricked into entering it or

20  something, but now that you've made that perfectly clear, the

21  Section 303 standard in your briefing I believe the only thing

22  you cited was the legislative history.  Is that correct?  Did

23  you cite any cases on 303 dismissals?

24          **MR. BLOOM:**  There are some cases that we cited in the

25  motion, but the legislative history sets out the standard, the

1   two-part standard that we'll be addressing I suspect briefly

2   with the Court, that the settlement that produces the motion is

3   not collusive and also that the interests of other creditors

4   are sufficiently protected in the event of dismissal.

5          That's what -- I mean that's the test that Congress

6   appeared to have in mind when it just adopted a statute that

7   says for cause, because, you know, cause can mean different

8   things in different contexts.

9          **THE COURT:**  Okay.

10         **MR. BLOOM:**  And 362, for example, which has nothing

11  to do with this case except that it talks about a relief from

12  the stay for cause, it says including lack of adequate

13  protection.  Well, there's no including guidance --

14         **THE COURT:**  Sure.

15         **MR. BLOOM:**  -- from Congress as to what --

16         **THE COURT:**  Sure.

17         **MR. BLOOM:**  -- cause is under 707(a).

18         **THE COURT:**  We may not -- as you've just stated the

19  standard I think we might not disagree as much as I thought

20  reading your brief.  So that's fine, we can --

21         **MR. BLOOM:**  Okay.

22         **THE COURT:**  -- talk about that when we get there.

23         **MR. BLOOM:**  And again, we fully understand where the

24  Court is coming from.  I hope the Court will understand that

25  there was no intent to mislead and that language stated in all

1  respects was in all --

2        **THE COURT:**  No, look I --

3        **MR. BLOOM:**  -- three, four, five versions --

4        **THE COURT:**  I don't disagree with you --

5        **MR. BLOOM:**  -- we circulated.

6        **THE COURT:**  -- I mean -- and I'm not accusing you of

7  bad faith.  But at the same time, like when I got Mr. Satija's

8  Motion to Reconsider I was like, oh, I clearly, you know, I

9  need to look back at this Order and I really -- I read the

10 Order before I entered it but, gosh, did I say something I

11 didn't mean to say.  And I looked back and I thought, no, this

12 preserves the issues.  And to then come back and say no, no,

13 no, you actually decided the issue and you decided

14 prejudicially to everybody else in the case, even when you say

15 you don't want to prejudice anybody and even though you left

16 that standard open, just it does smack of a very weak argument.

17 I mean that's what it smacks of to me.  And so -- but again, we

18 don't need to belabor that.

19        I do -- I mean it sounds like, you know, kind of when

20 you get to the substantive standard, that to me is the focus

21 here, is what can the Debtor -- the Debtor has failed to

22 satisfy the United States Trustee, the Debtor has failed to

23 satisfy Collaborative Vision on this point, but like can you

24 satisfy me that it's not prejudicial to everybody else to let

25 you dismiss the case.  And that to me does seem like an uphill

24

1 | battle, I have to say.

2 |       **MR. BLOOM:** Well, I think we can, Your Honor, and

3 | with that might I get into my opening statement?

4 |       **THE COURT:** Yes. I think that's great idea.

5 | Thank you.

6 |       **MR. BLOOM:** Okay, thank you. If I may just have one

7 | moment?

8 |       **THE COURT:** Yeah, please.

9 |       **MR. BLOOM:** Thank you.

10 |       **THE COURT:** And if you do, if you all do at some

11 | point want to admit exhibits en masse, I'm fine with that. So

12 | just figure it out. They get mad at me if we forget and then

13 | after the fact they're like, well, which ones were admitted

14 | and, you know, it becomes a nightmare. So, anyway, please

15 | proceed.

16 |       **MR. BLOOM:** Okay. So appreciating again the colloquy

17 | with the Court, again we don't think it's necessary at this

18 | stage for the Court to decide which standard applies because

19 | we're prepared to address both in great detail. We don't

20 | believe that there is much of a difference between the parties

21 | about the legal standard that would govern, assuming 303(j)

22 | applies and assuming 707 applies. I just articulated what the

23 | standard is under 303(j), settlement with petitioning creditors

24 | not collusive, sufficient protection to other creditors. For

25 | 707 I've already discussed with the Court, cause is in the best

25

1    interest of creditors, which cause is not defined in 707 or

2    elsewhere in the Code as applicable to 707, but the case law

3    that we cite in our reply I think provides a guide and that's

4    specifically that nine-point test that was articulated by the

5    Second Circuit in the *Murray* case.  And we ask the Court to

6    look to that standard, not because it's in any way controlling

7    in this Court but because its articulation of the nine-factor

8    test to apply in a case-by-case basis strikes us as thoughtful

9    and comprehensive and to a certain extent applicable here.

10         I should accept right up front, Your Honor, the fact

11   that we bear and accept the burden of proof on all of these

12   factors under either standard that the Court may apply.  Under

13   both standards if the Court wants to look at both.  And briefly

14   what I would like to do is take the Court through what we

15   believe the evidence will show as to the statutory grounds for

16   dismissal.

17         Treading lightly back on Section 303(j), we believe

18   the evidence will show that Artius has complied fully with the

19   terms of the State Order -- the Stay Order, rather, and made a

20   diligent effort to identify and provide notice of the Motion to

21   Dismiss to all of its known creditors on and since the

22   November 30, 2023, petition date.

23         Mr. Marcotte will be our first witness and he will

24   testify what effort was made to identify those creditors

25   undertaken at his direction, what that effort entailed, and

1   address concerns about slippage that are raised by the recent

2   filings with the Court.

3           In terms of the two-factor test, the two-factor test,

4   Mr. Marcotte will testify about the circumstances surrounding

5   the settlement, that it was not collusive, that the

6   negotiations were conducted at arm's length and began in

7   earnest after the Court entered its Order for Relief on

8   July 24th, that the funding for the settlement has been fully

9   funded and remains in the trust account of Mr. Conway's firm in

10  New York.  And on the second factor as to the sufficient

11  protection of creditors, other than disputed claims of

12  Collaborative Vision and then the alleged claims of these two

13  other parties that have been recently discovered and filed with

14  the Court, all other creditors have been paid in the ordinary

15  course since the petition date to the creditors on the list,

16  the matrix that were attached to the Declaration.

17          For those three disputed or omitted creditors we will

18  show through the evidence that the company has adequate

19  resources and is ready, willing, and able to provide sufficient

20  protection by the adoption and expansion of a rather elegant

21  solution that Your Honor first raised at the September 10th

22  status conference and that is to pay into escrow, and we would

23  propose a local bank here in Texas that is reasonably

24  acceptable to the affected parties and obviously to the Court,

25  to pay into escrow an amount sufficient to pay all of those

27

1    claims to the extent that they may be allowed by a court of

2    competent jurisdiction or subsequently resolved, just as we

3    resolved our differences with the Petitioning Creditors.  You

4    will hear testimony both from Mr. Marcotte and Mr. O'Dierno

5    regarding the company's intention and ability to do that from

6    existing resources and upon that funding to be able to continue

7    to pay its other ordinary course debts in the ordinary course.

8    You'll hear about a burn rate that's about $300,000 a month in

9    cash and about how Artius proposes to deal with that.

10           Turning to 707(a), which I think is really the focus

11   of the Court's concern, our evidence will address five of those

12   nine *Murray* factors that we believe to be applicable here, that

13   what we have is really a two-party dispute with Collaborative

14   Vision.  And again, as I think the parties have stipulated and

15   the Court accepts, we're not here to litigate that dispute but

16   it is a dispute that has apparently taken on somewhat of an

17   ugly form, even driving Collaborative Vision to dredge up

18   alleged claims by creditors that the company believes were

19   resolved a long time ago.  That's one of the factors.

20           With the full funding into the escrow as we've

21   proposed, there will be no competition among creditors for

22   payment.  No need for *pari passu* payment.  No need for the

23   Debtor, or Artius as the alleged Debtor in our view, no reason

24   for the company to seek a discharge of any claims in Chapter 11

25   and no basis to believe, based upon the history since

1  Mr. Marcotte came in in March of 2023, that any of the assets

2  of the company will be lost or dissipated.

3          So on the basis of this evidence that we would ask

4  the Court to hear, we'll present a closing argument as to why

5  it's in the best interests in our view of creditors to dismiss

6  the case conditioned upon the creation and full funding of this

7  escrow arrangement.

8          Oh, and by the way, I should have said we do not

9  intend to escrow the $200,000 that is owed to Collaborative

10  Vision on the promissory note.  We intend to pay it.  Pay it

11  outright.  In fact, that was the objective behind the offer of

12  judgment that was made in October or November of 2023.  And so

13  we stand behind that and are willing to pay that as part of

14  this escrow arrangement outside the escrow.

15          So with that, we're prepared to yield the floor, call

16  our first witness, or otherwise proceed as the Court may

17  direct.

18          **THE COURT:**  Okay.  Great.  Well, does anybody want to

19  address that?

20      **(Multiple speakers)**

21          **MR. BINFORD:**  Since I (indisc.) should I go next?

22          **THE COURT:**  You're certainly welcome to, Mr. Binford,

23  yes.

24          **MR. SPEAKER:**  Oh, sure.  Sorry.

25          **MR. BINFORD:**  Your Honor, again Jason Binford on

29

1    behalf of the Petitioning Creditors.  Just a short statement.

2         I do want to point out, I think I pointed out in a

3    previous hearing that I feel a little bit among the advocates

4    as the old man here with my colleague, Mr. Conway, as we're the

5    only ones who have been here since the beginning.  And I'm

6    going to draw on some of that capital, Your Honor, a little

7    bit.

8         **THE COURT:**  We need pins or something when this is

9    finally resolved.

10        **(Laughter)**

11        **MR. BINFORD:**  Queue up the creation.

12        And Your Honor, there's one attorney's signature on

13   the petition and that's the guy standing before you right now

14   and signing an involuntary petition is no nonsense.  It's a

15   scary thing that a bankruptcy lawyer can do because it has such

16   consequences.  So what I'd like to do is just talk for just a

17   minute as an advocate of the deal, because that's what I see

18   myself here as today.

19        Some of the history, again very briefly.  The

20   petition was accompanied, it's at Docket Number 2, by a

21   verified statement of the Petitioning Creditors.  And that was

22   important because, again, filing an involuntary and putting a

23   company into bankruptcy in Texas is a big deal.

24        And Your Honor, again, as you recall, there was quite

25   a bit of contentiousness and hard fought battling under what I

30

1   would characterize as a heading of no good deed goes

2   unpunished.  We tried to save some money.  A lot of these folks

3   are from out of town and so a lot of briefing, a lot of on the

4   papers, as opposed to having witnesses sit here and fly in and

5   testify and be under oath.  But again, that's how it proceeded.

6   And I don't think anything could be characterized as other than

7   a hard fought battle for those many months.

8           Your Honor, I've been doing this a while.  Bankruptcy

9   is an exercise of strange bedfellows and when a deal is

10  presented that is in the best interests of the client, then we

11  get onboard.  And that's where we are.  It came together

12  quickly.  I'll say, Your Honor, it came together in large part

13  because of the guidance provided by the Court, which we

14  appreciate.  Judges come in all shapes and sizes and some

15  judges play things quite close to the vest and we appreciate

16  the guidance because it changes course when the Court says the

17  direction you're going is probably not a good idea.  Well,

18  we're --

19          **THE COURT:**  Are you saying I would not be a good

20  poker player?  That's --

21          **MR. BINFORD:**  Your Honor --

22          **THE COURT:**  -- it's not -- you're not wrong.

23          **MR. BINFORD:**  I'm a big fan --

24          **THE COURT:**  I'm good at the math but nothing else.

25          **MR. BINFORD:**  I'm a big fan of it, Your Honor.  The

1 going in a direction and going down many steps of wasted time

2 is just a waste of money as well. And so we react and adjust.

3 And that's normal and to be expected. And that's what we did

4 and I think that's what the alleged Debtor did as well and now

5 we are an advocate of the deal.

6       Now collusion, I think it has a pejorative flavor to

7 it. I'm not going to put on any witnesses. I don't have any

8 exhibits. But I am here to point out and remind the Court and

9 have the Court take judicial notice of all the pleadings that

10 came before we became an advocate of the deal. And I think any

11 collusion has that whiff of under the table or in the shadows

12 and I think that couldn't be farther from the truth.

13       So Your Honor, again, we are supportive of this deal.

14 We think it meets the provisions of the law that it needs to

15 meet in order for this case to get dismissed and we think it's

16 not only a good deal for my clients, which is obviously

17 something I'm all about, but also otherwise lawful.

18       **THE COURT:** Thank you.

19       Yeah, I agree that the word collusion seems like --

20 I mean look at the case law, it seems like maybe not quite the

21 right word to what's really described. Preferential treatment

22 is what it kind of seems to me in the case law, where you're

23 looking for the good of the estate as a whole. Which I think

24 Mr. Bloom is also basically agreeing on. So thank you.

25       **MR. BINFORD:** Thank you, Your Honor.

1          **THE COURT:**  Mr. Butler?

2          **MR. BUTLER:**  Yes, Your Honor.  Lynn Butler on behalf

3   of Collaborative Vision.

4          To be fair to all the parties, what Mr. Bloom just

5   said is being translated to our client at this point.  But

6   let's assume that nothing happens.  So the Debtor has focused

7   on *Murray*, the factors in *Murray*, because the statute is

8   written in such a way to give you the discretion to really

9   figure out what needs to be done.  And the focus on *Murray*,

10  especially when they keep talking about a, just a two-party

11  dispute, is the wrong focus.  This is at least a seven-party

12  dispute.  You have the three Petitioning Creditors, you have my

13  client, and now we know you have two clients that have filed

14  proofs of claim.  That's what we know now.  And those two

15  clients weren't on the original list that was filed.  So that

16  factor goes out the window.

17         The next factor is that a creditor brought the case

18  solely to enforce a judgment.  No one has a judgment.  Even the

19  New York plaintiffs didn't have a judgment.

20         There are no competing creditors.  I've got two --

21  three creditors with a hundred percent escrowed and I've got

22  the rest of us.  We're all competing for the funds.  Now, if

23  there are sufficient funds to pay everybody, that's an

24  interesting concept.

25         **THE COURT:**  It's an interesting concept.  So you're

33

1    not against it in principle.

2            **MR. BUTLER:**  I almost called for a break, but I don't

3    know where we're going right now.  And I will credit Mr. Bloom,

4    we did have substantive discussions.

5            No need for *pari passu* distribution.  Quite the

6    opposite, all general unsecured claims are all based on

7    business debt, everybody gets paid.

8            Fraudulent transfers.  We have no idea.  We don't

9    know what has happened within the company.

10           Adequate remedies to enforce its judgment.  Don't

11   have a judgment.

12           Invoked the bankruptcy laws solely to secure a

13   benefit that you can't get in non-bankruptcy law.  Not really

14   applicable.  We don't have disclosures and schedules so we

15   really don't know what parts of the Code we would need.  But we

16   do absolutely know you have a creditor community that needs

17   protection and that's what Chapter 7 is for.

18           Only to the extent of distributable assets.  I agree

19   with that.  It may be that the money's not there and my client

20   gets a percentage less than what the client would like.  That's

21   the name of the game.  But you go through the process with the

22   Trustee.

23           The loss or dissipation of assets.  We already have a

24   Debtor that changed its name and moved across the country.  We

25   at least have an indicia that this is going to be a hunt to try

34

1   to find assets to collect on my judgment.

2          **THE COURT:**  Yeah, but if you had a nice, secured

3   claim and a pot of money escrowed somewhere conditional on

4   actually getting a judgment in State Court.

5          **MR. BUTLER:**  And I get my 200,000 and probably some

6   interest that accrued on the note, I may be happy.  Don't know

7   yet.

8          **THE COURT:**  You're channeling the United States

9   Trustee though.  Mr. Wright's about to get up and --

10         **MR. BUTLER:**  Yes.

11         **THE COURT:**  -- say this.  Okay.

12         **MR. BUTLER:**  I'm not the U.S. Trustee.

13         **THE COURT:**  All right, I appreciate it.

14         **MR. BUTLER:**  I'm not the --

15         **THE COURT:**  Okay.

16         **MR. BUTLER:**  -- U.S. Trustee.

17         **THE COURT:**  Okay.

18         **MR. BUTLER:**  What I'm saying, Your Honor, is that

19   case law doesn't support the dismissal, given the facts as they

20   are known as this hearing started.

21         **THE COURT:**  Yes, I hear you.

22         **MR. BUTLER:**  But I also reserve the right to change

23   my position.

24         **THE COURT:**  Okay.  Duly reserved.

25         **MR. HEADDEN:**  Good afternoon, Your Honor.

35

1          **THE COURT:**  Good afternoon.

2          **MR. HEADDEN:**  Before I begin I'd like to give a

3    little personal anecdote that occurred last night in my

4    kitchen.  I'd picked up my two daughters, brought them home

5    from swim practice, and it was after their usual bedtime.

6    Their brother was already in bed relaxing with Mom, they were

7    reading.  And my 11-year-old came up to me and asked if she

8    could have an ice cream bar.  Now, this is well past

9    dinnertime, well past treat time.  She should have known the

10   answer.  And I told her, I was like no.  So then she looks at

11   me and says well why not?  Because your brother's already in

12   bed.  You know that that's not fair to him if you have a treat

13   and he's not going to be able to have one.  Then she looks at

14   me, cute as a button, and says yeah, but he'll never know, Dad.

15   I mean, ah.

16          So now I'm not saying that they're my 11-year-old

17   daughter --

18          **THE COURT:**  Appreciate it.  I hear it.  And maybe

19   it's the legally right answer.  I don't know.  I mean I think,

20   you know, that it would become Mr. Bloom's turn to defend it on

21   appeal.  You know.

22          **MR. HEADDEN:**  Well, and where I was wanting to go

23   with that, Your Honor, is that from the Trustee's perspective

24   this is about the integrity of the system.  And I know that I

25   am echoing something that the U.S. Trustee will say and that

36

1    the Court is obviously expecting to come from at least this

2    party.

3            With respect to the offer that is being made now, I

4    think that is an offer that should be considered.  It is not an

5    offer that was conveyed yesterday.  We did have a meeting

6    amongst the parties.  And so this is something that again in

7    the moment is being offered up and it's something that is --

8    requires consideration, requires thought and attention, and

9    it's hard to do that on the fly.

10           And it seems that this is a recurring development,

11   that when this Debtor happens to be at the precipice of being

12   pushed, that's when there is a development.  And it's kind of

13   like Winston Churchill saying you can always count on the

14   United States to do the right thing once it's already exhausted

15   all other options.  Right?  And so --

16           **THE COURT:**  Okay.  That analogy, I like that analogy

17   more than the treat analogy.  But okay, yeah.

18           **MR. HEADDEN:**  And so --

19           **THE COURT:**  I agree.  It's not lost on me either.  I

20   just, I don't want to be led down another primrose path.  But

21   at the same time, you know, primroses smell nice and are

22   tempting, so, you know.  And throwing a debtor into or keeping

23   a debtor in Chapter 7 or even a converted 11 is a

24   consequential -- I mean I don't -- go ahead, I'm sorry.

25           **MR. HEADDEN:**  It's not a comfortable situation.  I

1   don't think that anybody would say that it is.

2          With respect to if this offer is something that is

3   agreed upon amongst the parties, Mr. Bloom is offering to have

4   the funds held in escrow in a Texas account, we do have a

5   Chapter 7 Trustee who is a fiduciary of the Court who has those

6   accounts, any of those funds being held in escrow, any of the

7   settlement proceeds or any of the settlement funds should be

8   held in escrow by the Chapter 7 Trustee.  I think that is a

9   pretty straightforward and clear answer.

10          And then with respect to the -- you know, there's a

11  question about the other claims, where did they come from?  And

12  that I think takes on a bigger question and going back to the

13  integrity of the system, it's hard to know, it's hard to have a

14  lot of faith here.  Not disparaging current counsel, this case

15  obviously has its history, has its legs, and so there is, I

16  think naturally, a suspicion here and we would want to make

17  sure that all creditors are actually noticed.  I don't know if

18  there's a way of having access to QuickBooks, which I believe

19  is what the Debtor uses, if there's an online system that can

20  be provided confidentially to review the books.  Because there

21  were creditors that should have been known to the Debtor that

22  were not disclosed in the Declaration at Docket Number 84.

23          **THE COURT:**  Okay, thank you.

24          Did the Trustee have some hand in unmasking those

25  creditors?

38

1          **MR. HEADDEN:**  The Chapter 7 Trustee was in

2  communication with both of the creditors.  Mr. Satija did file

3  the proof of claim, electronically filed it on behalf of

4  IOActive.  That's a creditor that's claimed to have about a

5  hundred thousand dollars.  There's a business affidavit along

6  with that.  And we were in communication with Skypoint and they

7  filed their own claim.

8          **THE COURT:**  Okay, thank you.

9          **MR. HEADDEN:**  But the information was provided by

10  Collaborative Vision.

11          **THE COURT:**  Thank you.

12          Mr. Wright?

13          **MR. WRIGHT:**  Thanks, Your Honor.  Gary Wright on

14  behalf of the United States Trustee.  I'm not going to waste

15  the Court's time and repeat what Mr. Butler and Mr. Headden

16  just said.  They've made a lot of the points that the

17  U.S. Trustee adheres to.

18          This is a case where we don't really know what the

19  universe is, unfortunately, and every time we seem to pull away

20  one particular piece, additional pieces fall out.  We don't

21  know that the universe of creditors is known.  We don't know

22  that everyone has been noticed.  We're not entirely sure what

23  the sources of funding are or where they're going or where

24  they're coming from, where the creditors sit.  Based on that,

25  Your Honor, we're not comfortable proceeding with the dismissal

39

1  because it may prejudice the creditors, it may prejudice the

2  estate.

3         That said, Your Honor, again the United States

4  Trustee hasn't changed his position from the objection and

5  plans to stand on it.  But I won't waste your time with further

6  comments that have already been made.  Thank you.

7         **THE COURT:**  Thank you.

8         **MR. BUTLER:**  Your Honor, can we have a 15-minute

9  recess?

10        **THE COURT:**  Sure.  Yeah.  Is that -- assuming that's

11 okay with you all.  Fifteen minutes?  Okay, so we'll be back

12 at 3 -- we'll go back on the record at 3 -- sorry, 2:36.

13 Thank you.

14        **THE CLERK:**  All rise.

15    **(A recess was taken from 2:22 p.m. to 3:01 p.m.; parties**

16 **present)**

17        **THE COURT:**  Mr. Bloom.

18        **MR. BLOOM:**  Good afternoon again, Your Honor.  So

19 with appreciation to the Court for the recess, we believe we

20 have an agreement with Collaborative Vision.  Personally, I

21 don't like it, I didn't like the agreement with the petitioning

22 creditors either, but that probably means it's a good

23 agreement.

24        Rather than tell the Court the terms of what that

25 agreement would entail, I should mention that notwithstanding

1   that agreement now with all of -- or that provides for all of

2   the unsecured creditors, prior to that entry of the now stayed

3   order for relief, the trustee tells us that he still objects.

4         And so I don't know that it's worth putting the

5   agreement on the record, perhaps the Court wants us to proceed

6   with our first witness, but the agreement is intended to

7   obviate, to get this case dismissed.  It is not intended to

8   empower a trustee who was discharged of his 704

9   responsibilities in that stay order, it's not intended to

10   empower him to conduct any kind of an investigation or to do

11   anything else.

12         I'm not going to argue about the agreement, I'm

13   simply going to say with the prepetition creditors that have

14   been identified, every one appears to be in agreement, but

15   there still appears to be an objection from the trustee and

16   from the U.S. Trustee and so I'm not sure we can go forward on

17   that agreement.

18         **THE COURT:**  Okay.  I understand.  So, I mean, you

19   know, it effectively looks like a structured dismissal is what

20   I kind of picture the proposal as being, based on my loose

21   understanding of it.  And, you know, Mr. Epstein who's the U.S.

22   Trustee has -- you know, does not like structured dismissals,

23   I'm aware of that.

24         Now, this is an unusual -- you know, even by the

25   standard structured dismissal, so I think, you know, frankly

41

1    I'll have concerns too.  I like structured dismissals in

2    general.  I understand the reasons to avoid bankruptcy here,

3    you know, obviously I've been very open to that in the past in

4    this case.

5            Do you propose -- how do you propose to deal with

6    these POCs that are out there?

7            **MR. BLOOM:**  I'm sorry?

8            **THE COURT:**  How to deal with the proof of claims, the

9    proofs of claim that have been filed, obviously concerning, you

10   know.

11           **MR. BLOOM:**  Escrow the full amount set forth in those

12   proof of claims.  If we go forward with our evidence today the

13   Court will hear about the efforts that were undertaken to

14   discover all creditors about how or why these may have come

15   through and about why we don't believe those claims are valid.

16           But as part of a resolution, we're prepared to escrow

17   them, escrow the funds and either settle them or litigate them

18   in a court of general jurisdiction.

19           **THE COURT:**  Okay.  Thank you.  I propose that you go

20   on and put on your case then.  I think that would be helpful.

21           **MR. BLOOM:**  Okay.

22           **THE COURT:**  Okay.

23           **MR. TAYLOR:**  Your Honor, Mark Taylor for ArtiusID and

24   we would call Michael Marcotte to the stand please.

25           **THE CLERK:**  Would you please come forward and raise

Marcotte - Direct / By Mr. Taylor                                    42

1    your right hand?

2              **MICHAEL MARCOTTE, DEBTOR'S WITNESS, SWORN**

3              **THE CLERK:**  Please have a seat.  And, sir, if you

4    would for the record, please, state your name and spell your

5    last name.

6              **THE WITNESS:**  Michael Frederick Marcotte.  Last name

7    is spelled M-A-R-C-O-T-T-E.

8              **THE CLERK:**  Thank you.

9                        **DIRECT EXAMINATION**

10   **BY MR. TAYLOR:**

11   Q    Mr. Marcotte, good afternoon.  Where are you presently

12   employed?

13   A    Q5I -- Freudian slip, ArtiusID, Inc.

14   Q    Okay.  And there's been a reference to ArtiusID, Inc. and

15   Q5ID, are they the same company?

16   A    Legally, yes.

17   Q    Okay.  Was that just a name change?

18   A    Correct.  Well publicized.

19   Q    Okay.  Did you propose that name change?

20   A    I did indeed.

21   Q    Why did you propose that name change?

22   A    The company had undergone significant restructural events

23   that occurred based on some sexual harassment claims that

24   occurred prior to my arrival.  It was time to turn over a new

25   leaf.

Marcotte - Direct / By Mr. Taylor                    43

1    Q    Okay.  When did you arrive at technically Q5ID?

2    A    So I joined Q5ID in approximately November of 2022 as a

3    board member.

4    Q    Okay.  Did you become an employee of Q5ID?

5    A    I did.  The board convened a meeting in late February

6    regards very serious allegation of sexual harassment in the

7    office and subsequently suspended its then CEO.  I was

8    approached by the board to take a position as the CEO of the

9    company and undertake its clean up effectively.

10   Q    Who was --

11   A    That was on or about March 1st of 2023, sir.

12   Q    Okay.  Who was its then CEO who you replaced?

13   A    Steve Larson.

14   Q    Okay.  And you replaced Mr. Larson on or about March 1st

15   of 2023; is that fair?

16   A    Correct.  Prior to my arrival, he was suspended at the

17   advice of outside counsel who was conducting the human

18   resources investigation at arm's length.  And it was at their

19   advice to the board that he be suspended indefinitely pending

20   the outcome of that investigation and so I stepped into the

21   role.

22   Q    And can you tell the Court how you came about becoming an

23   employee of Q5ID?

24   A    After the suspension of its then CEO, I was approached by

25   the board.  I recused myself, obviously, in my position as

Marcotte - Direct / By Mr. Taylor                            44

1    board member.  That conversation took place without me being

2    present and a key investor of the company and I was approached

3    on a Sunday, I believe it was a leap year, February 29th and

4    asked if I would consider taking on this --

5    Q    And you accepted that role.

6    A    I did, with a lot of consternation, yes.

7    Q    Okay.  When you accepted that role, what was the financial

8    condition of Q5ID at that time?

9    A    Q5ID at that time was out of money.

10   Q    Completely out of money?

11   A    Yes.

12   Q    Okay.  Had Q5ID before that time raised funds from

13   investors?

14   A    Yes.

15   Q    Approximately how much had Q5ID under Mr. Larson's

16   leadership raised in terms of funds?

17   A    In excess of $40 million.

18   Q    In excess of how much?

19   A    40 million.

20   Q    Okay.  When you got there, did you have any conditions to

21   you starting at Q5ID?

22   A    The condition upon additional funding was actually based

23   on me starting at Q5ID.  Had I not accepted, the offer to come

24   in and be its CEO on the company would cease to exist.

25   Q    And were you able to attract this additional funding by

Marcotte - Direct / By Mr. Taylor                45

1   becoming the CEO of Q5ID?

2   A    Yes.

3   Q    And just for the Court's edification and for us, how did

4   you attract $6 million into Q5ID?

5   A    The -- I'm not -- talking about myself, but the

6   credibility of the new team coming on board, you know, we've

7   done a lot of things.

8   Q    Well, tell us a little bit about your background so that

9   we have a flavor whether you've, you know, been a Walmart

10  greeter or somebody of a different --

11  A    Right about now I'm ready to be a Walmart greeter, sorry.

12  Q    Okay.

13  A    So I've been -- I tell nearly CXO level position within

14  the C Suite of major U.S. corporations, including Dish

15  Network's parent company, Echostar Corporation where I served

16  in various capacities from global chief information officer to

17  finance roles, to mergers and acquisition capacities, also to

18  the president of its Hughes HGS Division.

19           Additionally, I've been the CEO of several notable

20  and successful software companies, including but not limited to

21  Acumen Digital, the company that built Sling TV.  And then

22  finally I'm the co-founder of the United States National

23  Cybersecurity Center.

24  Q    So what attracted you to the opportunity to run Q5ID?

25  A    The short version is to solve a problem and to turn a

Marcotte - Direct / By Mr. Taylor                    46

1    company that had a lot of issues into something that could

2    serve the world in a very good way.

3    Q    Okay.  When you say serve the world in a very good way,

4    help us understand what in the world Q5ID and hence ArtiusID

5    has been doing?

6    A    Q5ID's products and I should also clarify, while I am the

7    chairman and chief executive officer I am also the company's

8    chief engineer, right.  And that's very germane in this matter

9    and the testimony that I'm giving.

10              Q5ID's product was fundamentally flawed.  And I'm

11   saying this as the company's chief engineer, potentially could

12   have impeded upon people's identity and the way it was

13   architected.  I'm not saying that anyone did this maliciously,

14   all right, but it was an opportunity to clean sheet all that

15   and do it correctly, so it actually didn't cause a problem.

16   Q    Okay.  Tell us about your experience and how you could

17   clean sheet all that, as you put it?

18   A    I've been letting a lot of software for a lot of years,

19   and obviously being the co-founder of the National

20   Cybersecurity Center I know how to do this stuff correctly and

21   ensure that, you know, it's a tag line, but it's actually

22   meaningful, the sovereignty of the individual.

23   Q    And the board of directors recognized that.

24   A    Yes, sir.

25   Q    And can you tell the Court a little bit about the

Marcotte - Direct / By Mr. Taylor                    47

1  composition of your board of directors, how many are there,

2  kind of general background as to who these people are?

3  A    Certainly.  The composition of the board has changed

4  subsequently, to the board that appointed me originally.  But

5  the board are notable individuals.  Currently seated some of

6  the most credible and notable individuals on -- there's no

7  hyperbole here.  Literally in the world.  I mean, just look at

8  the website, their backgrounds speak for themselves.  Of high

9  honor in dealing.

10 Q    I'm sorry, go ahead.  Yeah, when you joined Q5ID, what

11 were some of your initial duties?

12 A    Well, I mean, just very pragmatically, when you go into a

13 company that, you know, has just received new funding your

14 first responsibility to be that of a fiduciary to its

15 shareholders and in a responsible steward to its employees and

16 their families.

17        So when I walk into an enterprise and I see, and I

18 don't remember the exact number, so for -- I'm using this

19 number for brevity, when I see approximately 70 credit cards, I

20 immediately cancel all of them.

21        All right.  So we start spending money responsibly in

22 every way.  And, you know, it literally is a methodical process

23 to ensure that best practices are being following, whether it's

24 GAAP accounting or particularly in engineering that sovereign

25 development life cycles are followed, capabilities of maturity

Marcotte - Direct / By Mr. Taylor                    48

1  model are being followed.

2          If those best practices are not being followed, there

3  is negligence or incompetence in some area of the organization

4  and that's not mean to not feel good.  It just is.

5  Q    At the time that you joined, what was Q5ID's monthly burn

6  rate for cash?

7  A    It was several million dollars a month.

8  Q    Okay.  Did you do something about that?

9  A    Immediately.

10  Q    What did you do?

11  A    We took a very -- and I should clarify immediately.  There

12  was a careful look at the roles and responsibilities of people

13  within the organization to find out if they were actually doing

14  something or sitting idle.

15          Individuals who were sitting idle were laid off from

16  the company.  It's not fair to them to have them sitting there

17  idle anyway, paid or not.  Additionally, all outstanding

18  invoices from contractors to the company were methodically

19  reviewed, and I mean methodically.  We're talking mental

20  gymnastics here to make sure that the vendors who are in doing

21  things that should have been in-sourced to the company, not

22  out-sourced to the company -- out-sourced from the company were

23  actually -- their time and materials bids were actually

24  producing valid work and we're following basic best practices

25  that are industry prescribed with an engineering organization.

1  Q    As part of your changes to the employee base, what did you

2  do for the engineers?

3  A    We brought in an entirely new engineering team

4  particularly at the leadership level.

5  Q    So you stopped out-sourcing --

6  A    Immediately.

7  Q    Okay.  As part of your restructuring, did you also stop

8  the call center?

9  A    Yes.

10  Q    How many people were in the call center?

11  A    To the best of my recollection there was eight.

12  Q    And they're all gone?

13  A    Correct.

14  Q    Any other departments that you turned off?

15  A    Marketing, communications, sales, this is an engineering

16  company.

17  Q    Why did you turn -- why did you actually terminate

18  marketing, communication and sales at that time?

19  A    The product was not yet viable.  Engineering companies

20  need to build something.

21  Q    And the product at that time, when you say it was not that

22  viable, was it enterprise facing or was it consumer facing?

23  A    It was consumer facing.

24  Q    And what did this consumer facing product do?

25  A    The consumer facing product at the time was targeted

1   towards basically being an augment to the Amber alert system,

2   essentially, as I understand it, again I wasn't there for its

3   development.  But as I understand it, the marketing pitch on it

4   it was designed as an augmentation to the Amber alert system.

5   Q    Did you change the technology behind that consumer

6   oriented product to make it an enterprise or --

7   A    100 percent.

8   Q    Okay.  What did you do to change that product?

9   A    I had to clean sheet everything.  You know, we became an

10  enterprise software identity company that makes sure that

11  identities are held by the individual.

12  Q    Okay.  So you restructured the employees, you cut off all

13  the credit cards that were sitting around.

14  A    Correct.

15  Q    You brought discipline to vendors and investigated whether

16  vendors had, in fact, done their jobs --

17  A    Right.

18  Q    -- is that fair?

19  A    Part of my responsibility is a fiduciary to the

20  shareholders of the company.

21  Q    Removed employees who didn't appear to be contributing or

22  doing anything of value, fair?

23  A    Yes, sir.  Yes.  And a major sexual harassment case that

24  was investigated at arm's length.

25  Q    After you did all of that, what did you do in terms of

1    your burn rate there at Q5ID?

2    A    We reversed the burn rate from several million dollars a

3    month to $300,000 a month and change.

4    Q    Was the $300,000 a month and change burn rate sustainable

5    as a business?

6    A    Yes.

7    Q    Okay.  Was the company after you got there, especially

8    with the infusion of $6 million in cash able to pay its debts

9    when they became due?

10   A    Absolutely.

11   Q    Has that company been able to pay its debts as they became

12   due ever since you became an employee --

13   A    Yes.

14   Q    -- of Q5ID?

15   A    Yes.

16   Q    And when I say Q5ID, again you changed the name of that

17   company.

18   A    Correct.

19   Q    Why?

20   A    I changed the name of the company and I also should point

21   out that I also moved the location of the company in a very

22   public press release.  It was covered by Austin local news and

23   Bellevue local news.  And the move of the company was very

24   simple.  Again, it's an engineering company.  I had to move it

25   out of its present location to Bellevue, Washington which is

Marcotte - Direct / By Mr. Taylor                                    52

1    where AWS is, and Microsoft into Austin, Texas which is --

2    these are engineering rich environments where we can go hire

3    top talent to build something.  It's self-evident.

4    Q    So the employee base, the potential employees were driving

5    you --

6    A    Right.

7    Q    -- to actually move the company.

8    A    I also announced this at an annual meeting of shareholders

9    where there was over 120 people present.

10   Q    Was there anything secretive about your move to Texas?

11   A    No, quite the opposite.  We issued a global press release.

12   Q    Was that announcement also made at the shareholders

13   meetings of the annual shareholders?

14   A    Yes.

15   Q    And who were some of the participants, these shareholders

16   at the annual shareholders meeting?

17   A    So this was done on a Zoom call, not dissimilar to the way

18   this Court is handling it now, in a quasi-Sarbanes-Oxley

19   compliant manner.  And as far as attendees go, there was in

20   excess of 120 attendees on the call.

21   Q    When you say attendees, are you saying there were over 120

22   or approximately 120 investors who had an interest in the

23   company?

24   A    Yes, and possibly others too.

25   Q    Okay.  Today how many investors are in this company?

Marcotte - Direct / By Mr. Taylor                    53

1   A    125 approximately.

2   Q    Okay.  And do you still have interest from investors in

3   what is now ArtiusID?

4   A    Yes.

5   Q    Did you change the name from Q5ID to ArtiusID to escape

6   creditors?

7   A    Absolutely not.

8   Q    Did you move employees from Oregon to Bellevue, Washington

9   and Austin, Texas to escape creditors?

10  A    No.

11  Q    And those were all publicly announced?

12  A    Yes.

13  Q    You did that in Wall Street level publications --

14  A    Correct.

15  Q    -- is that fair?

16  A    Even an explanation of the name Artius, which we all know

17  in this courtroom Latin does not translate well to English.

18  Q    Well, does Artius mean?

19  A    Artius means of sound mind, body, and spirit.

20  Q    Okay.  And just tell us a little bit about the backing of

21  Q5ID as you approached becoming an employee there as CEO of

22  Q5ID?  I think you'd testified there'd been what, 36 million,

23  41 million of investor money already placed in the company?

24  A    I believe that is an accurate number, yes.

25  Q    And when you arrived, another 6 million came?

Marcotte - Direct / By Mr. Taylor                    54

1  A    Yes.

2  Q    And have there been other funds that have arrived since

3  that time?

4  A    Yes, approximately 2 million.

5  Q    And that 6 million and the 3 million has gone to what?

6  A    To pay employees and to build things.

7  Q    Okay.  Has there been anything nefarious that's occurred

8  with the money that you received from investors since receiving

9  it --

10  A    Not under this guy's --

11  Q    -- March 1?

12  A    -- watch.

13  Q    Okay.  And you watch that?

14  A    Oh, you better believe it.

15  Q    Yeah.  You're pretty tight on cash.

16  A    Uh-huh.

17  Q    Okay.  All right.  How many shareholders of Q5 or ArtiusID

18  are there today?

19  A    Somewhere in the neighborhood of 125.

20  Q    Okay.  So that base has stuck with you.

21  A    Yes, sir.

22  Q    And the base of investors, has it stuck with the company,

23  Q5 and Artius over time?

24  A    Yes.

25  Q    Okay.  That base of investors for Q5 and Artius, they've

1  been willing to fund as you request; is that fair?

2  A    That is correct.

3  Q    Okay.  Are they willing to fund if you're sitting in a

4  Chapter 7?

5  A    No.

6  Q    Have you even asked for funding while -- if you were to

7  sit in a Chapter 7 proceeding?

8  A    As a matter of integrity, no.

9  Q    Why wouldn't you ask for funding if it's sitting in a

10 Chapter 7?

11 A    Because it's not the right thing to do.

12 Q    Because they might be defrauded, so to speak?

13 A    Correct.

14 Q    And they might not get their return?

15 A    Right, yeah.

16 Q    Same thing for a Chapter 11, right?

17 A    Correct.

18 Q    Okay.  So get to further funds into your company, you

19 would need to actually be dismissed from this Chapter 7

20 proceeding; is that fair?

21 A    Yes.

22 Q    Okay.  If this company is not dismissed from this Chapter

23 7 proceeding, please explain to us what the impact would be on

24 Artius' technology and its people.

25 A    So first of all, as I pointed out, the company has 125

Marcotte - Direct / By Mr. Taylor                           56

1    shareholders.  All right.  With hard earned money that was

2    invested in this company.  Second of all, the company has 19

3    employees and families, all right, that has a ripple effect

4    throughout the economy.  These are people who are actually

5    building something.

6              Lastly, the company has a product that is approaching

7    viability that is ready to go live into an enterprise in fairly

8    short order.  The emphasis here though, is that without the

9    people there's no product.  These people are critical and they

10   speak for themselves, all right.

11       There's no enterprise customer who implements a product at

12   this level in this degree of sensitivity without the people who

13   built it behind them.

14   Q    All right.  This --

15   A    And I say that having been a former global chief

16   information officer of one of the largest corporations in the

17   world.

18   Q    Okay.  This product that you have now, can you describe to

19   the Court what it does?

20   A    Sure.  And I'd be happy to show it to.  Out of respect for

21   the Court I checked my iPhone in my bag, but I'd be happy to

22   show you.

23             So it uses sophisticated biometrics to identify that

24   you are actually who you are, Judge, and then it maps that

25   information against databases of record.  The key point here is

Marcotte - Direct / By Mr. Taylor                    57

1  that it's actually controlled on the user's device.

2         So if your device is appropriately locked down and

3  you lose it, nobody can either take your identity or replace

4  your identity.  If it were held on the Cloud or in some other

5  entity, that's a problem, and it doesn't work.  So it's

6  effectively decentralized.

7  Q    This app that's on your phone right now --

8  A    Yeah.

9  Q    -- is it pretty close to completely being --

10 A    Yeah.  It's software, I hesitate to use the term beta

11 because software's kind of always embedded, it can always be

12 improved.

13 Q    Sure.

14 A    But it's viable right now.  And it also cannot be deep

15 faked.

16 Q    Okay.  So this company has a product.

17 A    Yes.

18 Q    It doesn't just have dreams.

19 A    I'm going to say it again, it has a product, but the

20 product is dependent upon its people.

21 Q    Sure.

22 A    Then there is no product.

23 Q    And the product is dependent upon customers purchasing it

24 as well.

25 A    Customers purchasing and in the team that actually built

Marcotte - Direct / By Mr. Taylor                 58

1   it being able to implement it.

2   Q    The product as it exists now, is not consumer facing, but

3   instead is an enterprise facing; is that correct?

4   A    Yes, and that's not well understood by a large percentage

5   of the population what that means.

6   Q    So when I say enterprise facing, can you give us an

7   example of the types of customers who would buy ArtiusID's

8   product?

9   A    Certainly.  A larger software company, a large enterprise

10  resource software company would implement it as a component of

11  their system, or a major corporation would implement it as a

12  component of their system.

13       The branding of Artius wouldn't even be known

14  withinside that ecosystem, that enterprise architecture

15  ecosystem.  It's a --

16  Q    And for a small start-up company, help me get over the

17  hurdle of how Citibank, Wells Fargo or somebody like that would

18  come to you and say, sure, we're going to run your software

19  even though you're a start up?

20  A    At the risk of just smacking of hubris and it's not

21  intended to, there are people on the team, same as the board

22  for a second who's pedigrees, I mean, these people were brought

23  on subsequent what I will just metaphorically call the

24  restructure of the company who have serious credibility, like

25  and they're not sales people.

1        Like our -- one of our chief architects was an

2   important component of the rapid resource center, which is the

3   classified element behind the National Cybersecurity Center.

4   Curtis is also one of the nicest human beings you'll ever meet.

5   All right.

6        He's a brand name in cyber security.

7   Q    Who is Peter Stridh?

8   A    Dr. Peter Stridh is senior vice-president of corporate

9   development.  He's also the de facto CFO.  Peter and I say this

10  jokingly ran a little tiny company called Ingram Micro in

11  Irvine, California.  He also joined the team because of all of

12  us.  He has no history of the preceding company.

13  Q    And Dr. Peter Stridh currently works at ArtiusID?

14  A    He does.

15  Q    And did Dr. Peter Stridh is he part of the reasons the

16  company is able to attract continual funding?

17  A    Absolutely.

18  Q    Are you confident that if you were to get out of this

19  bankruptcy that you would be able to attract additional

20  funding?

21  A    You never say immediately because I try to be precise in

22  my language, but within hours or days.

23  Q    Okay.  These enterprise customers that you foresee going

24  to and actually selling your product, if you remain in

25  bankruptcy, would they be interested in your product?

Marcotte - Direct / By Mr. Taylor                                60

1    A    No.

2    Q    Why?

3    A    If the matter were to proceed in bankruptcy and the

4    company were to be dissolved, its employees would be dissolved.

5    Q    And why wouldn't some of the customers that you know that

6    are in enterprise, not want to purchase this product from a

7    startup that's in bankruptcy?

8         **MR. HEADDEN:**  Your Honor, objection.  I think we're

9    going pretty far down this path of -- I'm wondering about

10   relevance here as this pertains to whether or not dismissal

11   under 303 or 707 applies, but more importantly on that one,

12   we're now getting into speculation.  He's speculating as to

13   whether or not customers or the clients would be interested in

14   the product.

15        **THE COURT:**  I hear what you're saying.  I'll overrule

16   that.  I would be more interested -- I mean, to me, you know,

17   knowing you all I reckon there's a motion to convert that's

18   already been drafted that's ready to go if you were to lose

19   today, Chapter 11 seems like the possibility that's reasonable.

20   So I don't think you need to talk too much about staying in a

21   Chapter 7.  It doesn't seem like a likely course.

22        I'm -- I have heard a ton of business reasons why

23   Chapter 11 which as we know can be pretty flexible, can be

24   pretty fast, you know, I don't know if Belk, you know, a four

25   hour Chapter 11 is going to happen here, but you know, it could

Marcotte - Direct / By Mr. Taylor                    61

1   happen fairly efficiently.  That might be a better focus in

2   terms of this particular line of questioning.

3              **MR. TAYLOR:**  I appreciate that, Your Honor.

4   **BY MR. TAYLOR:**

5   Q    Are you familiar with some of the enterprise customers

6   that are potential customers for ArtiusID's current

7   applications?

8   A    Yes.

9   Q    Okay.  And based on your knowledge with them, would they

10  be willing to invest and to become customers of a company

11  that's operating under Chapter 11 bankruptcy?

12  A    No.

13  Q    Why not?

14  A    The viability of the company and its ability to retain its

15  employees and attract the best talent would be called into

16  question.  I say this having been a customer myself at the

17  highest levels.  I would sit the CEO down and say, hey, there's

18  nothing I can do with you right now because you might lose some

19  of your top people.  It's just pragmatic.

20  Q    Sure.  Let's go back for a moment when you said that you

21  investigated invoices when you first came to work at Artius --

22  Q5ID.

23  A    Yes.

24  Q    Okay.  What did you do to investigate invoices?

25  A    Well, colloquially I would call it mental gymnastics, but

Marcotte - Direct / By Mr. Taylor                    62

1    there is a process that is used.  So particularly within

2    engineering there are best practices that must be followed,

3    just in the same way there are in law and in medicine.

4           If those best practices are not followed, then the

5    invoices themselves can be called into question as to the

6    validity of the work.  I will give you an example of this.

7           There are industry accepted best practices such as

8    the software development life cycle and the capabilities and

9    maturity model.  If those things are not followed, the work

10   product by definition isn't valid and the people who are

11   putting it into place, whether it was the people approving it

12   or the people producing the work were effectively -- I hesitate

13   to use the word guilty because I don't want to cast dispersions

14   on anybody, but effectively they were either incompetent or

15   negligent in their duties.  It's malpractice.

16   Q    Okay.  So you looked at these invoices to determine

17   whether proper services --

18   A    Yes.

19   Q    -- that were called for had been provided.  And in some

20   instances, there weren't proper services called for.

21   A    Correct.

22   Q    And --

23   A    Things like documentation of code.

24   Q    Okay.  And that resulted in lawsuits.

25   A    And counterclaims.

Marcotte - Direct / By Mr. Taylor                    63

1   Q    And disputes for example, the New York claims.

2   A    Correct.

3   Q    And Ms. Matar's claim for Collaborative Vision?

4   A    Yes.

5   Q    Okay.  As CEO of the company are you familiar generally

6   with the outstanding creditors of the company?

7   A    Yes.

8   Q    Okay.  In the last year, year and a half since you've been

9   there, have you been the recipient of demand letters, dunning

10  notices, something of that ilk, other than demands by the

11  people who have already filed lawsuits against ArtiusID?

12  A    No.

13  Q    Are you aware of any claims that exist right now by people

14  who want to sue ArtiusID because they've not been paid?

15  A    Other than what has been introduced to this Court, no.

16  Q    Okay.  And you referenced a minute ago when you

17  investigated the invoices, you were looking at the QuickBooks

18  system.

19  A    Yes.

20  Q    You're familiar with QuickBooks?

21  A    I am.  QuickBooks, forgive the analogy, sounds a little

22  bit bush league (phonetic) but it's not.  QuickBooks enterprise

23  can be used to run a major corporation; however, you have to

24  know how to use the system.

25  Q    All right.  So that's where I was going to stop you.  I've

Marcotte - Direct / By Mr. Taylor                                                64

1    seen a lawn provider use QuickBooks.

2    A     Yeah.

3    Q     But that's probably not the same kind of QuickBooks that

4    you're utilizing.

5    A     They have an enterprise version of the software that is

6    quite sophisticated, it's Cloud based, and you could run a

7    billion dollar corporation on it.

8    Q     And Artius is using QuickBooks enterprise system to

9    maintain its record?

10   A     Correct, by people who actually know how to use the

11   system.

12   Q     Okay.  And the claims that have been made that you've

13   seen, have been claims that were made back in 2022 that are

14   being provided in the proofs of claim in this case, right?

15   A     Yes.

16   Q     Okay.  And those claims have been actually brought to the

17   attention of you through Collaborative Vision, right?

18   A     Yes.

19   Q     Okay.  Are there any other claims that you're aware of,

20   that are similar to the ones that have been listed by the

21   Chapter 7 Trustee that were not listed in your affidavit?

22   A     No.

23   Q     Okay.  And speaking of an affidavit, you actually signed a

24   document swearing to tell the truth that as of November 30th,

25   2023 the petition date, that these are all the creditors of

1    your company, ArtiusID; is that fair?

2    A    Yes.

3    Q    What did you do to investigate and to put together the

4    information to fill out that affidavit?

5    A    I relied on members of the team.

6    Q    Who?

7    A    Dominick O'Dierno.

8    Q    And he's in court here today.

9    A    Yes, sir.

10   Q    Okay.  And what did he do, do you know?

11   A    I do.  He examined systems of record per the order it came

12   in, to provide a list which I in turn reviewed based on our

13   current operational status and what we do on a day to day

14   basis, looked at it and said, yes, this is valid.

15   Q    So you read through this list?

16   A    Absolutely.

17   Q    You studied this list?

18   A    I did.

19   Q    Did you purposefully omit any creditor from this list?

20   A    No.

21   Q    Do you feel like you filed it in good faith?

22   A    Certainly.  We -- it was absolutely filed with the best of

23   intent and with all disclosure available.

24   Q    And you understood it was subject to penalties of perjury.

25   A    Yes.

Marcotte - Direct / By Mr. Taylor                                    66

1    Q    And you respect that.

2    A    Of course.

3    Q    Okay.  Are you also familiar with this Court's stay order?

4    A    I am.

5    Q    Okay.  Let me back up for a minute to the work that was

6    done to prepare the exhibit of all the creditors that you

7    attach to your affidavit, as of November 30th, 2023, okay?

8    A    Yes.

9    Q    How many hours, days were spent to look for information

10   about these creditors?

11   A    I'm reasonably precise on my math, so if we're just

12   talking about man hours, there was three of us, not including

13   outside counsel who reviewed it, somewhere in the neighborhood

14   of 200 hours of checks, counter checks, you name it, and even

15   operational details.

16        Like if I know that something didn't appear on the

17   list, but yet we're using Adobe or something, it's easy to omit

18   something like Adobe because (indisc.) on your website.  But I

19   know that we're using them for, you know, effectively Adobe's

20   version of DocuSign, that's the detail that was looked at to

21   this.

22   Q    And just looking at the array of creditors that you have,

23   are most of them kind of small providers, frankly?

24   A    With the exception of one, but yes, most of them are small

25   providers.  One is quite large.

Marcotte - Direct / By Mr. Taylor                    67

1   Q    When you say small providers, can you give the Court an

2   idea of the level of debt for each one of these creditors?

3   A    Yes.  One of them is significant because it's the PEO of

4   record.  It's critical to the --

5   Q    What's PEO?

6   A    PEO is a professional employment organization.

7   Q    What's PEO?

8   A    I brought the PEO in after the HR issues quickly --

9   Q    Yeah.

10  A    -- and to protect the company and its people.

11  Q    Who is the PEO?

12  A    TriNet.

13  Q    And is TriNet a large organization?

14  A    Extremely.

15  Q    Is it your largest creditor?

16  A    Yes.

17  Q    Has it always been your largest creditor?

18  A    Since my watch, yes.

19  Q    Are they current?

20  A    Always.

21  Q    Okay.  Any other creditors that are in the size of TriNet?

22  A    Not at the size of TriNet, but they're all important,

23  right.  I mean, it's hard to operate a business without Adobe.

24  It's hard to operate a business without making sure they're all

25  paid on time.

Marcotte - Direct / By Mr. Taylor                                68

1   Q    But to get from the top layer to the bottom layer, can you

2   kind of give us the difference as to what the level of various

3   bills would be on a monthly basis from that bottom layer and

4   the top layer?

5   A    Certainly.  I referenced Adobe then just that I call it to

6   mind regularly, I mean, you're talking about a couple of

7   hundred bucks of month there to TriNet, and you know, anything

8   that's employee related because we're an employee based

9   business.  Our people are our business.

10       So, you know, you've got hundreds of thousands of dollars

11  a month versus hundreds or thousands of dollars a month, so the

12  delta between them is obviously pretty significant.  And this

13  is all, you know, kind of common sense reasonable person

14  standard stuff.

15  Q    Those employees, have you met payroll since you've been

16  there?

17  A    Always.  That -- you know, after its shareholders which

18  legally I'm obligated to first, the employees are right on top

19  of my list period.

20  Q    Those employees when you arrived, did you notice that some

21  who were like cleaning staff had not been paid?

22  A    Yes, it was egregious.

23  Q    What did you do about it?

24  A    This is very personal to me, you know, if the utility

25  company is late on its bill because the company's out of mind

1   that's the way it goes, but when I personally observed a couple

2   in the office that were cleaning up other people's trash and

3   couldn't and hadn't been paid for months, you better believe I

4   was on my way to the ATM right away to make sure they got paid

5   in cash.

6   Q    You paid in --

7   A    Yes, and my language skills are fairly good in their

8   native language and in a sincere and heartfelt apology, and

9   then I told everybody in that office, thank them for their

10  service, and start picking up your own trash.

11  Q    Are you familiar with the Court stay order?

12  A    Yes, sir.

13  Q    And are you aware that paragraph 2 of the stay order

14  requires Artius to identify all known creditors, whether

15  claims, contingent, disputed or liquidated and file a creditor

16  matrix.

17  A    Yes.

18  Q    And you did that.

19  A    Yes.

20  Q    And you've described the efforts that you put together to

21  do that?

22  A    Yes.

23  Q    And you did that in good faith.

24  A    Yes.

25  Q    Okay.  Did you personally oversee that?

1   A    Yes.

2   Q    And what did you direct staff to do in order to find not

3   only through your systems, but all payables that you had to pay

4   that were unpaid?

5   A    To make every reasonable effort to comply with the Court's

6   order.

7   Q    What software systems besides QuickBooks enterprise did

8   you also look at if any?

9   A    QuickBooks enterprise would be the main source of record,

10  but we also took it a step further.  We said, okay, we know

11  that we're using this piece of software, whether it shows up in

12  QuickBooks or not, due to, you know, the staffing issues that

13  occurred originally at the company, we want to make sure that

14  those folks are getting paid.  But let me tell you, Adobe will

15  let you know pretty quick if the bill isn't paid, because it'll

16  stop working.

17  Q    Okay.  Now, are you aware that the Chapter 7 trustee in

18  this case has located a couple of maybe possibly three,

19  although we dispute that, of other claimants, creditors, who

20  claim they have not been paid?

21  A    Yes.

22  Q    Okay.  Let's walk through those for just a moment.  Okay.

23       First, IOActive, when's the first time you heard of any

24  entity called IOActive?

25  A    Approximately one year ago I received -- I remember where

Marcotte - Direct / By Mr. Taylor                    71

1    I was.  I was outside of Toronto at the time and I got a

2    telephone call and in my 40 plus career, there's no hyperbole

3    here, it was the most bizarre and unhinged one way call I've

4    ever heard.

5           It was a man purporting to be with some organization

6    called the Swisher Group.  My memory is pretty good.  He said,

7    I am Henry with the Swisher Group by and for the firm.  I don't

8    even know what that means.

9         So I let him carry on for a few minutes very aggressively.

10   I then asked him if he was a licensed attorney.  He said, no,

11   and then hung up the phone.

12          In the next hour, I received no less than 12 telephone

13   calls that were unhinged.  I turned him over, respectfully and

14   politely, to our Oregon counsel, Darius Hartwell at Schwabe,

15   that was the last I'd heard of him.  It was bizarre.

16   Q    And what is your understanding as to whether -- as to what

17   happened once you turned over this person who apparently is a

18   collection agent for IOActive.

19   A    That would be speculative and my nature is -- speculation,

20   but yeah, probably.

21   Q    Okay.  So what happened?

22   A    I don't know.

23   Q    Was the matter resolved?

24   A    I don't know.  I didn't hear from him again.

25   Q    Okay.

Marcotte - Direct / By Mr. Taylor                    72

1   A    There was no intent not to disclose them.  It didn't even

2   cross my mind.

3   Q    So it was a strange phone call, not from IOActive from

4   some credit collection agency --

5   A    Correct.

6   Q    -- who wouldn't identify who in the world who he was or

7   why he was authorized, right?

8   A    Yeah.  And just going back to the best practice piece, if

9   IOActive was legitimately owed money, I don't have any problem

10  having a conversation with their principal and saying, hey, did

11  you do the work, what's the work, you know, we'll pay you or

12  we'll negotiate something out.  It's just -- it's not that

13  hard.

14  Q    Okay.  Coming to that, are you willing to put aside the

15  $100,796 that IOActive claims it is due and put it into trust

16  and hold it there until you figure out whether this is a

17  legitimate claim?

18  A    Of course.  In determining if it's a legitimate claim or

19  not requires a conversation with actual IOActive to determine

20  whether or not it's valid.

21  Q    Right.  Likewise, the trustee listed a company called Sky

22  Point Cloud, Inc.  When did you first become familiar with Sky

23  Point Cloud, Inc.?

24  A    Thursdays, six days ago.

25  Q    Okay.  How did you learn about them?

Marcotte - Direct / By Mr. Taylor                                73

1   A    Paperwork that was filed by the trustee.

2   Q    Okay.  And have you investigated this Sky Point Cloud,

3   Inc. claim?

4   A    At a very cursory level.

5   Q    Okay.  Did you notice anything about the address of Sky

6   Point Cloud, Inc.?

7   A    Yes.  It's the same address as Collaborative Vision.

8   Q    Okay.

9        MR. HEADDEN:  Objection.  I'd like to get some

10  foundation on that if we could, sorry, so maybe a little out of

11  turn on that one, but I don't think that he's laid a foundation

12  here.

13       THE COURT:  Okay.  Fair enough.  How do you know this

14  is the same address?

15       THE WITNESS:  I just looked it up.

16       THE COURT:  So you looked at where?

17       THE WITNESS:  Google.

18       MR. TAYLOR:  We also have a witness, Your Honor, who

19  actually went to --

20       THE WITNESS:  And I'm not casting aspersions, I'm

21  just --

22       THE COURT:  No, no, it's fine.

23       MR. TAYLOR:  Mr. O'Dierno is going to testify about

24  actually going to Sky Point at the same address where Ms. Matar

25  and her company Collaborative Vision are located.

Marcotte - Direct / By Mr. Taylor                74

1          **THE COURT:**  All right.

2   **BY MR. TAYLOR:**

3   Q    Okay.  Are you also familiar with an entity called

4   Harvest?

5   A    Very much so.  They're on the matrix report.

6   Q    And Harvest, you're aware that the Chapter 7 trustee

7   asserts that Harvest has been unpaid.

8   A    With respect to the trustee, that is factually inaccurate.

9   Q    Are you current with Harvest?

10  A    Absolutely.

11  Q    And did you disclose Harvest in the list of creditors as

12  of November 30th, 2023, the petition date?

13  A    100 percent.

14  Q    Paragraph 3(a) of the stay order also requires Artius to

15  make no transfers or disposition of assets outside the ordinary

16  course.  My question for you as CEO of this company is are you

17  moving the shelves around, are you transferring assets, are you

18  doing anything outside the ordinary course of business?

19  A    Absolutely not.

20  Q    Okay.  Have you misrepresented the financial status of

21  Artius to anyone?

22  A    No.

23  Q    These companies that filed proofs of claim, Sky Point and

24  IOActive, are you willing to place in escrow the exact amounts

25  of their proofs of claim?

Marcotte - Direct / By Mr. Taylor                    75

1  A    Yes.

2  Q    Okay.  Likewise, are you willing to place in escrow the

3  exact amounts of the proof of claim of Collaborative Vision?

4  A    Yes.

5  Q    And then after that escrow is made, you can figure out

6  whether these accounts are due or not.

7  A    Correct.

8  Q    And if they're due, do you intend to pay them?

9  A    Yes.

10  Q    Do you have at Artius the money to escrow for all of these

11  accounts?

12  A    Yes.

13  Q    And do you intend to do so as soon as the Court allows us

14  to do so?

15  A    Yes.

16  Q    Has Artius made any dispositions outside of the ordinary

17  course, for example, transferring assets of any kind?

18  A    No.

19  Q    Okay.  And when Q5ID changed names to Artius, Inc. was

20  there any transfer of assets between Q5ID and Artius, Inc.?

21  A    No, the conversion was handled in the most professional

22  and public manner, no.

23  Q    It was a name change.

24  A    It was a name change and a domicile change.  It's on

25  public record.

Marcotte - Direct / By Mr. Taylor                          76

1   Q    The name change was filed in Oregon as a matter of record.

2   A    Yes, and then publicly announced.

3   Q    Paragraph 4 of the stay order requires submission of six

4   month and bi-weekly cash flow reports to the U.S. Trustee.  Do

5   you understand that?

6   A    I do.

7   Q    Okay.  Are you in compliance with the U.S. -- you being

8   Artius, in compliance with this U.S. Trustee requirement?

9   A    Yes.

10  Q    And would you be in compliance or would you intend to

11  comply with any orders from this Court or from any trustee?

12  A    Yes.

13  Q    Okay.  The petitioning creditors that are involved in this

14  case, do you recall that they are Xmogrify and Goldstein and

15  Rearc?

16  A    Yes.

17  Q    Okay.  These are the people that actually put you into

18  Chapter 7; is that fair?

19  A    That is correct.

20  Q    And these folks, these entities that placed this company

21  or at least filed a petition for relief, not a Chapter 7, but

22  these folks that filed this petition for relief, have you

23  voluntarily resolved the claims of each one of these entities?

24  A    Yes.

25  Q    Okay.  Was that a negotiated settlement?

1   A    The settlement was negotiated in an arm's length by

2   counsel.

3   Q    Without telling the Court, because I'm sure it's

4   confidential, did you pay the full price so to speak, or did

5   you negotiate?

6   A    We negotiated.

7   Q    And did the negotiation occur with New York counsel to

8   these three entities; is that correct?

9   A    Yes.

10  Q    And these three entities accepted that negotiation and

11  were willing to take the money if the Court is to dismiss this

12  Chapter 7 proceeding?

13  A    Yes.

14  Q    So those three petitioning creditors, the only ones that

15  filed a case that put you or attempted to put you in, have been

16  resolved?

17  A    Yes.

18  Q    Okay.  Are there any other creditors other than Xmogrify,

19  Goldstein, Rearc, well, let me back up, those are --

20  A    It's a legal matter through separate matters, as a

21  practical matter, one.

22  Q    Okay.  Which means what, they were related?

23  A    They were all working together on the same project.

24  Q    In fact, the complaints all say the same thing.

25  A    Correct.

Marcotte - Direct / By Mr. Taylor                    78

1    Q    And do you recall the last hearing with this bankruptcy

2    court, that the Court actually denied the motion to dismiss.

3    A    Yes.

4    Q    And within days of that denial, Artius undertook to settle

5    and to fund these three petitioning creditors; is that fair?

6    A    Yes.

7    Q    Was that done by your lawyers and the lawyers in New York?

8    A    Yes.

9    Q    At arm's length?

10   A    Yes.

11   Q    Okay.  Was anybody colluding or hiding that fact?

12   A    Absolutely not.

13   Q    Was that settlement announced on the record, not the

14   details, not the amount, but was the fact of settlement

15   announced on the record before this Court?

16   A    Yes.

17   Q    And the cash has been placed in a New York trust account

18   of your opposing counsel; is that right?

19   A    That is correct.

20   Q    Okay.  And that money would not be disbursed or released

21   until this case is dismissed from Chapter 7 proceedings.

22   A    Correct.

23   Q    Have you looked at Collaborative Vision's objections to

24   the dismissal?

25   A    Yes.

1   Q    Okay.  And are you aware that Collaborative Vision alleges

2   that names -- the name change from Q5ID was for the purpose of

3   avoiding creditors?

4   A    I'm aware that that's their claim.

5   Q    Okay.  And I think you've testified to this, but is that

6   accurate?

7   A    Any basic use of Google would identify that no one was

8   doing anything even remotely inappropriate.

9   Q    When that name change was announced to shareholders, was

10  Ms. Matar present?

11  A    She was.

12  Q    Do you know who she is?

13  A    I do.

14  Q    Okay.  Did you see her on the screen?

15  A    She was dialed in to the call and also present briefly

16  during video on the first call and then the second shareholders

17  meeting.

18  Q    So that name change was announced?

19  A    Yes, on the second call, we have a record of that.

20       Also, it's -- you know, it's just a Google search, I mean,

21  it fills up the first page of results, common stuff.

22  Q    Okay.  And are you aware of Collaborative Vision's lawsuit

23  in Oregon?

24  A    I am.

25  Q    Okay.  Is it still pending?

Marcotte - Direct / By Mr. Taylor 80

1 A    It is.

2 Q    Per this Court's orders, is it stayed?

3 A    Yes.

4 Q    Okay.  In other words, it can be pursued if the stay is

5 lifted and an agreement is not reached with Collaborative

6 Vision?

7 A    Yes.

8 Q    And today, are you prepared to place the entire amount of

9 the proof of claim, up to the entire amount into trust to

10 secure any claim or any successful claim that Collaborative

11 Vision may have through the Oregon court?

12 A    Yes.

13 Q    And, in fact, there was a promissory note involved in

14 Collaborative Vision's claim.  Do you remember that?

15 A    I do.

16 Q    Did you instruct your counsel to file an offer of judgment

17 in the amount of that particular promissory note claim?

18 A    Yes.

19 Q    What happened to that offer of judgment?

20 A    It was rejected.

21 Q    But it was offered.

22 A    Yes.

23 Q    And as part of your escrowing of monies for Collaborative

24 Vision's claims, are you also willing to escrow and include the

25 amount or pay immediately the amount of that claim if permitted

Marcotte - Direct / By Mr. Taylor                              81

1   to do so by the Court?

2   A    Have been and continue to be, yes.

3   Q    And I think we've already discussed that the invoices were

4   disputed and counsel has acknowledged that, but just for you to

5   acknowledge, are these Collaborative Vision's claims the

6   invoices portion disputed?

7   A    Yes.

8   Q    Okay.  And you intend if settlement did not work out or if

9   something wasn't accepted, to litigate those claims in Oregon.

10  A    Yes.

11  Q    Has Artius paid all known and undisputed claims of

12  creditors since the petition date?

13  A    Yes.

14  Q    That you're aware of.

15  A    Yes.

16  Q    If something else comes up, is Artius going to be able

17  outside of this bankruptcy to fund the money to pay additional

18  ordinary creditors?

19  A    Yes.

20  Q    Are there any creditors on the level of this largest

21  creditor, your PEO, that would be a large amount to cover that

22  you would worry about?

23  A    Not to my knowledge.

24  Q    All the rest are just quote, ordinary trade creditors.

25  A    Correct.

Marcotte - Direct / By Mr. Taylor                          82

1   Q    Can you give the Court some examples of these kind of

2   routine trade creditors?

3   A    Our co-working space, you know, we work here in Austin.

4   Amazon Web Services, Oracle, Adobe, we mentioned QuickBooks

5   repeatedly, I mean it's a Cloud provider now.

6   Q    And all of these are paid?

7   A    Yeah.

8   Q    They're all current?

9   A    It's really simple, it will stop working if it's not paid.

10  Q    Right.

11  A    That's why I canceled the credit cards.  As soon as you

12  cancel a credit card, you find out what you need really fast.

13  Q    And there's really not any communications, I think the

14  trustee asked for communications between these ordinary trade

15  creditors, would there be any?

16  A    No, of course not.

17  Q    These are like on auto pay?

18  A    It's just how it works.  Software company.

19  Q    If this case remains in Chapter 7 or 11, would you be able

20  to keep your employees?

21  A    No.

22  Q    Why not?

23  A    This group of employees works here because they want to,

24  not because they have to.

25  Q    How many are --

Marcotte - Direct / By Mr. Taylor                    83

1  A    They didn't sign up for any of this stuff.

2  Q    Okay.

3  A    Frankly neither did I.

4  Q    How many employees are there?

5  A    There's 19.

6  Q    If this case does not get dismissed, what happens to them?

7  A    They'll go back to something more productive than this.

8  Q    Okay.

9           **MR. TAYLOR:**  I'll pass the witness.

10          **THE WITNESS:**  But forgive me opining on that.

11          **MR. TAYLOR:**  Thank you.  I'll pass the witness.

12          **THE COURT:**  Mr. Binford, you didn't have anything?

13          **MR. HEADDEN:**  All right.  I am going to take a minute

14 to log my computer in.  So give me a second.

15          **THE COURT:**  Can I ask, so did you receive anything in

16 print from IOActive or from Swisher?

17          **THE WITNESS:**  They may have sent something over to

18 Darius Hartwell at Schwabe.

19          **THE COURT:**  I'm sorry?

20          **THE WITNESS:**  They may have sent something over to

21 Schwabe.  I honestly don't recall me personally receiving

22 anything from them.

23          **THE COURT:**  Okay.  But since, so have you checked

24 since the POC was filed a couple of days ago?

25 //

Marcotte - Cross / By Mr. Headden                                    84

1              THE WITNESS:  No, we've been heads down with all of

2     this stuff.

3              THE COURT:  Okay.  And what about Sky Point Cloud?

4              THE WITNESS:  So Sky Point Cloud, Dominick is going

5     to testify to.  I literally just heard about them on Thursday

6     and, you know, my understanding is that they had agreed to

7     settle the matter, that's why I never even saw the thing.  I

8     certainly would have disclosed it if I knew it was out there.

9     And it was before my time anyway, so I can't even give

10    testimony to it.  I wasn't there.

11             THE COURT:  Okay.  All right.

12             MR. HEADDEN:  I see, I'd just like to confirm that

13    I'm broadcasting.

14             THE WITNESS:  I see it.

15                        CROSS EXAMINATION

16    BY MR. HEADDEN:

17    Q    Thank you, Mr. Marcotte.  I have a couple of notes, a

18    couple of follow ups.

19         So just to clean up my understanding of some of the

20    numbers that you're talking about, looks like there's about 125

21    investors; is that correct?

22    A    Yes, sir, approximately.

23    Q    All right.  And then how much had been invested prior to

24    you coming on to Artius?

25    A    Somewhere in the neighborhood of $40 million.

Marcotte - Cross / By Mr. Headden                              85

1  Q    All right.  40 million and then subsequent to that I think

2  you said you raised 6 million and then 3 million.

3  A    And then 3 million.

4  Q    Okay.

5  A    Now, I do not have those exact numbers in front of me, so.

6  Q    No, no, understood.  I'm not trying to go there.

7         And in the question, what is your current salary for

8  Artius?

9  A    My current salary?  My current salary is $100,000 a month.

10 Q    $100,000 a month?

11 A    Correct.

12 Q    All right.  And how much is the TriNet expense every

13 month?

14 A    200 and -- I'd have to look at the exact number, but in

15 excess of $200,000 I believe.

16 Q    Okay.  And then so are you part of that TriNet

17 compensation, do you --

18 A    No.

19 Q    -- receive --

20 A    I get paid independently of that.

21 Q    Okay.  And are you also a shareholder of Artius?

22 A    Yes.

23 Q    And how much, what's your percentage of --

24 A    In equity?

25 Q    Yes.

Marcotte - Cross / By Mr. Headden                                    86

1   A    Approximately 11 percent of the company.

2   Q    Now, what did you say the burn rate was before you came on

3   board?

4   A    It was in excess a million dollars a month, potentially

5   within a couple of million dollars a month.

6   Q    Okay.  Because I didn't understand, I thought you had said

7   seven, and then you said after in subsequent questioning, that

8   sounded like maybe several million a month, but now you're

9   saying a million dollars a month?

10  A    I'm saying several million dollars a month.

11  Q    Several million dollars a month was the burn rate prior to

12  you coming on board.

13  A    Correct.

14  Q    Okay.  So not seven, but several?

15  A    Yes, sir.  Thanks for the clarification.

16  Q    I am told that I'm sometimes hard of hearing, so you know.

17       Let's see.  All right.  Listening to your testimony it

18  sounds like you came into a situation that needed a lot of

19  clean up; is that fair?

20  A    Yes.

21  Q    And then -- so you started implementing a lot of your best

22  practices cleaning up, engineering, cutting vendors.  Oh,

23  sorry, one other question.  You said you canceled 40 credit

24  cards?

25  A    There may be more than 40 credit cards.

Marcotte - Cross / By Mr. Headden                                87

1   Q    Okay.  And what was the outstanding balance on all of

2   those credit cards?

3   A    They were all paid, it didn't matter.

4   Q    All right.  So they were paid?

5   A    Yeah.

6   Q    All right.  Got it.

7   A    It's bad financial practice.

8   Q    Oh, yeah, that would be a nightmare --

9   A    Uh-huh.

10  Q    -- even with the enterprise version of QuickBooks.

11          So you came in, you started cleaning things up,

12  cutting vendors if they weren't value add, my words, not yours,

13  and just trying to implement a lot of best practices.

14  A    Yes, industry standard best practices.

15  Q    And then so Artius, I think you said is generally it's a

16  software company, I mean, that you started explaining

17  biometrics, but it's in the realm of IT --

18  A    It's --

19  Q    -- software company?

20  A    Yeah.  It's an enterprise class cyber security software

21  company, by definition.  My compensation by the way is measured

22  by the hours less than anybody in this room, trust me.

23  Q    All right.  Now, sounded like you heard about Sky Point

24  you said six days ago?

25  A    Yes, sir.

Marcotte - Cross / By Mr. Headden                                    88

1  Q    So I would like to -- and you know that the debtor did

2  provide documentation to the trustee through discovery,

3  correct?

4  A    That's my understanding.

5  Q    All right.  So within that, there were some documents that

6  y'all sent over, let me see if I can make this larger.  So can

7  you see the screen there, is that in front of you?

8  A    I do.

9  Q    Okay.  Do you recognize this?

10 A    No.

11 Q    Okay.  So I'd like to point -- draw your attention to --

12         **MR. TAYLOR:**  Objection, the document's hearsay, Your

13 Honor.  There's nobody from Sky Point to testify to it.

14         **THE COURT:**  Well, he was asking it if he saw it.

15         **THE WITNESS:**  The answer is no, I did not see it.

16 **BY MR. HEADDEN:**

17 Q    Okay.

18 A    There's also no header record on this, so I can't

19 determine its source even by looking at it.

20 Q    And so, sir, do you see my cursor down here on the bottom

21 right part of that screen?

22 A    Yes.

23 Q    Okay.  So what does that indicate, can you read that for

24 the --

25 A    Yeah, it said ArtiusID-001156.

Marcotte - Cross / By Mr. Headden                    89

1   Q    Okay.  So this was a document that was produced in

2   discovery by Artius to the trustee.  Do you understand that?

3   A    I understand that's what you're saying.

4   Q    Okay.  And so accepting my statement as fact that the

5   debtor produced this, how did the debtor produce this, where

6   did y'all find this?

7              MR. TAYLOR:  Calls for speculation from this witness.

8              THE COURT:  Well, you can ask him.  If he doesn't

9   know, he can --

10             THE WITNESS:  I don't know.

11  BY MR. HEADDEN:

12  Q    Okay.  So your team turned over documents to counsel who

13  produced this as a document and you don't -- you're not sure

14  how this discovery piece made its way to the trustee.

15  A    Correct.

16  Q    Because you relied upon other team members?

17  A    Correct.

18  Q    Could you just read us what the message says on the e-

19  mail?

20  A    Hi, Brian, when you have a moment, please let me know a

21  good time for you to have a teams meeting to discuss your

22  account balance and resolution.  Thank you, Tim.

23  Q    All right.  Sounds like Artius at least in 2023 was

24  reminding -- it sounds like Sky Point was reminding Artius that

25  they had an outstanding balance.

1          **MR. TAYLOR:**  Calls for speculation from this witness.

2          **THE WITNESS:**  I don't know.

3   **BY MR. HEADDEN:**

4   Q    What would you mean -- what would you understand, to

5   discuss your account balance and resolution to mean?

6   A    I don't know anything about this vendor, I don't know.

7   Q    No, I'm asking you the language, the plain language, what

8   would you understand your account balance and resolution to

9   mean?

10  A    I wasn't the recipient of this e-mail.

11         **MR. TAYLOR:**  Calls for speculation.

12         **THE WITNESS:**  I'm not trying to be elusive, I just --

13         **THE COURT:**  Yeah, I mean, you know, he said he

14  doesn't know anything about the e-mail --

15         **MR. HEADDEN:**  Okay.

16         **THE COURT:**  -- I mean, it's fair enough.  You can

17  argue.

18         **THE WITNESS:**  I would call the guy and say, what is

19  this.  I mean, I haven't seen the thing before.

20  **BY MR. HEADDEN:**

21  Q    All right.  And you indicated that approximately a year

22  ago, somebody called you up from the Swisher Group regarding

23  the IOActive or called you up from the Swisher Group, but you

24  weren't sure what he was talking about because he was unhinged.

25  A    The conversation was a one way conversation.  He asked --

Marcotte - Cross / By Mr. Headden                                    91

1   Q    They're annoying, aren't they?

2   A    Yeah, he asked --

3   Q    So he called you 12 times you said?

4   A    Approximately, a dozen times.

5   Q    And you turned him over to counsel.

6   A    Correct.

7   Q    So y'all have outside general counsel and you said, hey,

8   this guy is calling or you gave your general counsel's number

9   to the gentleman who was calling, which one was it?

10  A    I gave my general counsel, I should say outside counsel in

11  Portland, Oregon his name and on, you know, I'll call it the

12  tenth call approximately, I said no more of this, you can

13  contact our attorney.  This was after I again asked him if he

14  was a licensed attorney.

15  Q    Okay.  And did you follow up with your counsel as to what

16  this was about?

17          **MR. TAYLOR:**  Your Honor, I think we're treading into

18  attorney/client privileged information.  I mean, if he wants to

19  talk about high level, I guess that's fine, but not any advice.

20          **MR. HEADDEN:**  Your Honor, that's my last question on

21  this topic, did you follow up with your counsel, no privileged

22  communication being touched on there.

23          **THE WITNESS:**  Yes.

24          **THE COURT:**  Okay.

25  //

Marcotte - Cross / By Mr. Headden                                92

1    **BY MR. HEADDEN:**

2    Q    Now, in regards to the declaration that was filed on the

3    docket, it's Docket No. 84, I'm going to call that the Marcotte

4    declaration, how many hours did you say was put into that, that

5    declaration?

6    A    Well, if you take three people's time and multiply it by

7    the days that were worked, you're talking about easily a couple

8    of hundred man hours that went into that, not including outside

9    or including outside counsel.

10   Q    And so I don't think we got into the details of that, what

11   exactly went into 200 plus man hours to put together that

12   declaration?

13   A    Checking and cross-checking all available data in making

14   sure that it coincided with the operational wherewithal of the

15   business.  So there's tangible data and intangible data and I

16   will go back to the vignette of a small vendor being on there.

17   Hey, we use these guys all the time, are they in the system or

18   not.

19   Q    So I don't need the vignette.  You checked QuickBooks?

20   A    Yeah, we also looked at the operational wherewithal of the

21   business and compared that to not only systems of record, but

22   also how the business is operating.

23   Q    Okay.

24   A    It's what you do in an audit process.  I ran corporate

25   audit in one of the largest corporations in the world.

Marcotte - Cross / By Mr. Headden                               93

1   Q    There's not a question there, sir.

2          **THE COURT:**  Yeah, it's okay, you can say it's a

3   question.

4   Q    I won't go there.

5          You indicated that the employees would quit if this was

6   put into a -- if this was converted over to Chapter 11.  Have

7   you actually spoken with the employees about this, or is this

8   your speculation?

9   A    It is speculation.

10  Q    You also spoke as to the address of Collaborative Vision

11  and Sky Point, I believe it's Debtor's Exhibits -- what is it,

12  17, 18, 19 --

13         **MR. HEADDEN:**  Oh, now would be a good time for the

14  trustee to move to have its Exhibits 1 through 10 admitted.  I

15  don't believe there's any objections to the trustee's exhibits.

16         **THE COURT:**  What are 1 through 10?

17         **MR. HEADDEN:**  Essentially the documents of the proofs

18  of claims of IOActive and Sky Point.  And then also the bill

19  for Harvest.

20         **THE COURT:**  Well, it's also that e-mail.

21         **MR. HEADDEN:**  Yeah, I'll move to that e-mail as --

22         **THE COURT:**  So this looks like a different e-mail.

23  It's a different -- the Bates stamp on the exhibit list is 952

24  and -- or maybe it's all -- maybe it's -- you know, go ahead,

25  Mr. Bloom, do you have more to -- I haven't actually looked

Marcotte - Cross / By Mr. Headden                                94

1    at --

2            **MR. BLOOM:**  Only that the proofs of claim are

3    hearsay.  They were filed only recently and so the company has

4    had no opportunity to investigate them, determine whether to

5    object to them.  The Court will hear testimony from

6    Mr. O'Dierno about -- that casts, we believe, significant doubt

7    on the validity of those proofs of claim.

8            So we'd ask either they be excluded or hearsay, or to

9    the extent that they are admitted, they are not authenticated

10   evidence of the claim.

11           **THE COURT:**  Yeah, and I think I can take judicial

12   notice of the proof of claim insofar as their, you know, filed

13   documents.  But I agree that, you know, that they don't -- you

14   know, they're a weird form of evidence anyway and they are --

15   unless they're objected to, they become basically an allowed

16   claim, but I agree that they're on their face not substantively

17   evidence.

18           But anyway, okay, I think with those proviso, those

19   are fine.  Now, what about these other -- these documents from

20   production?

21           **MR. HEADDEN:**  The debtor -- the trustee would like to

22   move to admit this outstanding balance resolution that is

23   identified by discovery document 1156 as Trustee's Exhibit No.

24   11.

25           **MR. TAYLOR:**  Your Honor, we object on the grounds of

1  hearsay, because this is an out of court statement by Mr. Tim

2  Kalinzo (phonetic) of Sky Point.  Mr. Kalinzo is not being

3  called as a witness.  He cannot authenticate the document and

4  even if it's being produced by us, that's not authentication of

5  the document.  It's also being offered for the truth of the

6  matter asserted and all those -- for all of those reasons, it's

7  a hearsay document, chocked full of hearsay.  And the witness

8  didn't testify that he didn't know what it was.

9           **THE COURT:**  Yeah.  I mean, I think it depends on what

10  it's admitted for, because to me if it's admitted for the fact

11  that there was some knowledge somewhere within this

12  organization that there was some kind of claim it seems to be

13  pretty reliable for that purpose.  And without it being -- it's

14  commenting on the merits of the claim or even senior management

15  being provided notice or anything else, but I mean, your

16  production of it shows at least that much, right?

17           **MR. TAYLOR:**  Understood.

18           **MR. HEADDEN:**  And that's precisely what it's being

19  offered for, Your Honor, that there was notice provided by Sky

20  Point that it had asserted a claim.  This was produced in

21  discovery from the debtor to the trustee.

22           **THE COURT:**  Right, okay.  So is this part of T-6?

23  I'm just confused to where it is.

24           **MR. HEADDEN:**  No, this would be number -- this would

25  be a supplement.  This would be Trustee's Exhibit 11.

1          **THE COURT:**  Okay.  So this is like a rebuttal

2   exhibit?

3          **MR. HEADDEN:**  Yes, Your Honor.

4          **THE COURT:**  Fair enough.  Well, it's admitted for

5   that purpose then.

6          Now, what about the rest of these, though, the --

7   what was the --

8      **(Trustee's Exhibit Number 11 received in evidence)**

9          **MR. HEADDEN:**  I can't --

10         **THE COURT:**  1 through -- sorry, 1 through 4 are

11  attached to the proof of claim.  We've already dealt with

12  those.

13         **MR. HEADDEN:**  And --

14         **THE COURT:**  What is T-5 through 10?

15         **MR. HEADDEN:**  So let me go up here.  Sorry.

16         **THE COURT:**  Declaration.

17         **MR. HEADDEN:**  So T-5 is the business declaration that

18  is attached to the IOActive proof of claim.  That is also part

19  of the filed proof of claim.

20         **MR. TAYLOR:**  Yeah, it's likewise hearsay, because

21  it's an out of court statement and offered for the truth of the

22  matter asserted.

23  //

24  //

25  //

1       **THE COURT:** Right, I agree. So it's admitted for the

2  limited purpose of showing what the proof of claim, and again,

3  I can take judicial notice of it.

4       **(Trustee's Exhibit Number 5 received in evidence)**

5       **MR. HEADDEN:** Debtor or Trustee's Exhibit T-6, this

6  is a communication from -- so this is a Sky Point -- this is

7  not part of the Sky Point proof of claim, but this was a

8  document provided by the debtor to the trustee regarding

9  communications from Sky Point to the debtor about the

10 outstanding balance of the claim.

11      **MR. TAYLOR:** We don't have any objection to this

12 document because the -- Mr. O'Dierno is going to testify as to

13 its authenticity and business records exception to the hearsay

14 rule.

15      **THE COURT:** Okay. Great. That's fine, so I guess

16 that's admitted without objection although I don't really

17 understand anything in it, but for the most, okay, it's

18 admitted.

19      And so where does that bring us to?

20      **(Trustee's Exhibit Number 6 received in evidence)**

21      **MR. HEADDEN:** Trustee's Exhibit T-7 is also a

22 document that was produced in discovery in regards to Sky

23 Point's claim.

24      **THE COURT:** Okay. 2020, okay.

25      **MR. HEADDEN:** Trustee's Exhibit 8 --

1          **THE COURT:**  Just give Mr. Taylor just a second.

2          **MR. HEADDEN:**  I'm sorry.

3          **MR. TAYLOR:**  Yeah, that's hearsay as well because

4    it's from Harvest small business.

5          **MR. HEADDEN:**  Sorry, T-7 is what I was on.  I

6    scrolled down so I --

7          **THE COURT:**  It's the Sky Point invoice from 2020.  I

8    mean again, insofar as it's being admitted to show that they

9    had some notice somewhere within the debtor that there's -- I

10   mean, I think it's not admissible for, you know, actual amounts

11   being owing, but insofar as it's a submission --

12         **MR. TAYLOR:**  I would agree with that and a notice at

13   the top right-hand corner is it had the address of 14631

14   Southwest Milliken Way in Beaverton, which is the same address

15   as Matar's Collaborative Vision.

16         **THE COURT:**  Okay.

17         **MR. HEADDEN:**  Trustee's Exhibit T-8, this is a

18   monthly invoice that was provided also in discovery from

19   Harvest Small Business Finance.  Not being offered for the

20   truth of the matter asserted that the amount is owed, simply

21   well -- well, actually here it does show that there is money

22   owed, but --

23         **THE COURT:**  What's the purpose of this?  Sorry.

24   Well, just he'll -- what are you admitting it for?

25         **MR. HEADDEN:**  So we're submitting this because this

1   is showing here --

2           **THE COURT:**  A delinquent?

3           **MR. HEADDEN:**  -- a past due, a delinquent amount.

4           **THE COURT:**  Okay.  I mean --

5           **MR. TAYLOR:**  The same objection on hearsay, Your

6   Honor, and frankly Harvest is listed --

7           **MR. HEADDEN:**  Harvest is listed.

8           **MR. TAYLOR:**  -- as creditors.  So I don't understand

9   the purpose, the relevance of this document because it's

10  been --

11          **THE COURT:**  Well, this is just to show that they do

12  miss payments sometimes or something?

13          **MR. HEADDEN:**  Yes, Your Honor.

14          **THE COURT:**  Okay.

15          **MR. HEADDEN:**  And this is -- I'm sorry.

16          **MR. TAYLOR:**  We've had testimony from Mr. Marcotte

17  that they're fully paid, so you know, if you're late one month

18  but you pay the next, I don't see the relevance.

19          **THE COURT:**  You can make that argument.  I mean I

20  think it's -- I mean, do you see this exhibit, do you recognize

21  this?

22          **THE WITNESS:**  I don't recognize this exact bill, but

23  I can assure you that they're paid as soon as it comes into

24  queue.  I mean, I --

25          **THE COURT:**  It looks like maybe you missed this one.

Marcotte - Cross / By Mr. Headden                                    100

1      **THE WITNESS:**  Yeah, it would be -- it would simply be

2  human oversight would be the only reason that would happen but

3  they're paid regularly.  I mean we can even produce very

4  quickly upon the Court's request a current statement.

5      **THE COURT:**  Well, it looks you did produce one as of

6  August 9th.

7      **THE WITNESS:**  Yeah.  I mean, I could literally log

8  onto my iPhone.

9      **THE COURT:**  And this looks familiar to you from your

10  payment history?

11     **THE WITNESS:**  Yes, sir.

12     **THE COURT:**  Okay.  They're admissible, they're

13  admitted for that purpose.

14     **(Trustee's Exhibit Number 8 received in evidence)**

15     **MR. HEADDEN:**  And then I believe it's T-9 is the or

16  T-10 is actually the proof of claim filed by Sky Point.

17     **THE COURT:**  Okay.  And this attachment is also part

18  of that, this last page here, this Excel or whatever

19  spreadsheet?

20     **MR. HEADDEN:**  Yes, and that's part of the proof of

21  claim, Your Honor.

22     **THE COURT:**  That's part of the proof of claim.

23     **MR. TAYLOR:**  It's all hearsay.

24  //

25  //

1          **THE COURT:**  Okay.  Yeah, I think these -- yeah, the

2     POCs are what they are, okay.  So those are admitted with

3     those, you know, provisos.

4          **(Trustee's Exhibit Number 10 received in evidence)**

5     **BY MR. HEADDEN:**

6     Q    Some final questions.  So you were talking about a simple

7     Google search regarding this address that is shared between

8     Collaborative Vision and Sky Point?  So you said that you did a

9     Google search to find their addresses?

10    A    Yes.

11    Q    Okay.  And then so I think the implication is that there's

12    something nefarious between the two because they share an

13    address?

14    A    There was no implication, it's a statement of fact, based

15    on my observation.

16    Q    So did you follow up with a little bit more simple Google

17    searching as to that address and see what that location might

18    be?

19    A    No.

20    Q    Okay.  Would it surprise you that that address is a co-

21    working facility?

22    A    No.

23    Q    Okay.

24          **MR. HEADDEN:**  Let me double-check my notes, Your

25    Honor.  I don't think I have any other questions.

Marcotte - Cross / By Mr. Headden                    102

1          No further questions.

2          **THE COURT:**  Well, Mr. Satija was standing up and

3    walking toward you so.  One more bite at the apple.

4          **MR. HEADDEN:**  Okay.  And then one last question.

5    **BY MR. HEADDEN:**

6    Q    So you or Artius did not start negotiating with the

7    petitioning creditors until after the order for relief was

8    entered; is that correct?

9          **THE COURT:**  I'm sorry, can you repeat the question?

10   I didn't catch it.

11   Q    The negotiations with the petitioning creditors to settle

12   their claim, did that start before or after the order for

13   relief converting or approving the Chapter 7?  Was that before

14   or after the order for relief was stayed?

15         **THE COURT:**  Okay.  So wait just a second, Mr. -- I

16   think it's -- I mean, it's not admissible -- you know, it's not

17   admissible for liability purposes, for establishing liability

18   but I think it's admissible maybe for other purpose of that.

19         **MR. SATIJA:**  Well, Your Honor, I was going to raise a

20   different objection.

21         **THE COURT:**  Okay.  Please.

22         **MR. SATIJA:**  It's unclear what negotiations is.  We

23   clearly have spoke prior to that date, so I'm not sure what

24   negotiations.

25         **THE COURT:**  He's a good witness, he can answer his

103

```
 1   questions.  The question was, did you start negotiating with

 2   the petitioning creditors before --

 3           MR. HEADDEN:  Or after the order for --

 4           THE WITNESS:  We started negotiating with petitioning

 5   creditors before this matter was even brought to this court.

 6           MR. HEADDEN:  Thank you.

 7           UNIDENTIFIED:  Can we have a restroom break?

 8           THE COURT:  Yeah.  Fair point.  All right.  So we'll

 9   take a recess until 4:30.  Thank you.

10           THE CLERK:  All rise.

11       (Recess taken from 4:22 p.m. to 4:32 p.m.)

12           THE CLERK:  Mr. Butler.

13           MR. BUTLER:  I'm fine now.

14           THE COURT:  Well, I meant take your turn, please.

15   But, yes, I'm glad to hear that you're doing better.  We all

16   are I'm sure.

17           MR. BUTLER:  Thank you.  I have a short cross of

18   Mr. Marcotte, --

19           THE COURT:  Okay.

20           MR. BUTLER:  -- if you don't mind.

21           THE COURT:  Okay.  Great.  So you can come back on

22   up.

23       (Witness Marcotte retakes the stand.)

24           Mr. Headden, we need a copy of Exhibit 11.

25           MR. HEADDEN:  Yes.
```

1          **THE COURT:**  You can email it to the courtroom deputy.

2     Just copy -- you know, copy everyone, please.

3          **MR. BUTLER:**  Mr. Marcotte, Lynn Butler on behalf of

4     Collaborative Vision.

5                          **CROSS EXAMINATION**

6     **BY MR. BUTLER:**

7     Q    Couple -- if you'll reiterate what you said about what

8     you're willing to do on behalf of Collaborative Vision's claim

9     just so we get it on the record one more time.

10    A    I'm willing to escrow the amount into an account

11    forthwith.

12         **THE COURT:**  Well, and it's pay the $200,000, right?

13         **THE WITNESS:**  Yes.

14         **THE COURT:**  The note.

15         **THE WITNESS:**  Yeah.

16         **THE COURT:**  Okay.  And then whatever other amount.

17    Where does that amount come from, the additional amount?

18         **MR. BUTLER:**  The -- there are several components.

19    And they dispute some and -- that we all establish that.  You

20    have the 200 note which had some interest carry; don't know

21    exactly what it is but it is what it is.

22         We discussed they made an offer of judgment or a

23    consent to judgment.

24         **THE COURT:**  Right.

25         **MR. BUTLER:**  We would probably require or ask that

Marcotte - Cross / By Mr. Butler                    105

1   that portion of the fees up to that point get escrowed.  The

2   rest of it has to do with the invoices that they dispute.

3   We'll have the dispute.

4            And the attorney fee incrulled (sic) on that, which

5   is also a disputed legal issue under Oregon law, and we

6   understand that, we also discussed that it would be in a Texas

7   bank, make it easy for a Texas attorney to find if he had to.

8            Mr. Marcotte may not have been part of these

9   conversations but -- and this just -- they'll agree not to move

10  from Austin for a -- until we get it resolved.

11           **THE WITNESS:**  Of course.

12           **MR. BUTLER:**  Yeah.

13           **THE COURT:**  Okay.  That all sounds good to you?

14           **THE WITNESS:**  Yes, absolutely, --

15           **THE COURT:**  What you agreed --

16           **THE WITNESS:**  -- sir.

17           **MR. BUTLER:**  Yeah.

18           **THE COURT:**  Okay.

19           **MR. BUTLER:**  And that payment -- and these are all

20  potentially liquidated amounts on the note.  I just got to

21  refer back to the note and figure out what it was.  And I just

22  wanted him to reiterate it.  And that may be the end of my

23  cross.

24           **THE COURT:**  And -- okay.  I want to hear more about

25  that but I don't think he needs to be --

1          **MR. BUTLER:**  On the --

2          **THE COURT:**  -- on the stand for that so --

3          **MR. BUTLER:**  No.  As long as I got it right, I'm

4    good.

5          **THE WITNESS:**  Yes.

6          **MR. BUTLER:**  Okay.

7          **THE COURT:**  That's it?

8          **MR. BUTLER:**  Yeah.

9          **THE COURT:**  You have other questions?

10         **MR. SPEAKER:**  No.

11         **MR. BUTLER:**  I mean, we already established that

12   other creditors would go through that nine point on the test.

13   But I'm trying to drive somewhere else.

14         **THE COURT:**  Great.  Okay.  All right.  Mr. Wright.

15         **MR. WRIGHT:**  Thank you, Your Honor.  Gary Wright on

16   behalf of the United States Trustee.

17         Good afternoon, Mr. Marcotte.  I just --

18         **THE WITNESS:**  Good afternoon.

19         **MR. WRIGHT:**  -- have a few questions.

20                        **CROSS EXAMINATION**

21   **BY MR. WRIGHT:**

22   Q    I believe earlier you testified that you keep a pretty

23   close eye on cash.

24   A    I do.

25   Q    Can you tell me what the current cash on-hand is?

Marcotte - Cross / By Mr. Wright                      107

1   A    The current cash on-hand should be somewhere in the

2   neighborhood of 1.4 million.

3   Q    Okay.  Does that include amounts in -- held in trust with

4   respect to the petitioning creditors --

5   A    No, it does not.

6   Q    -- in the New York -- okay.

7   A    If you include --

8   Q    Go ahead.

9   A    There would be additional amounts.

10        **MR. WRIGHT:**  Okay.  Thank you.

11  Q    And it's my understanding that you said the company, the

12  Debtor, alleged Debtor has a product that is to be ready for

13  delivery in short order or to be ready for marketing in short

14  order; is that correct?

15  A    Yes, sir.

16  Q    All right.  And are you able to get that product ready and

17  out without additional investment?

18  A    Yes.

19  Q    Okay.  How long do you think that that would take?

20  A    Once the conclusion of this matter, couple of months.

21  That's an estimation on my part.

22        **MR. TAYLOR:**  This matter, just for clarity, being

23  this case?

24        **THE WITNESS:**  Yes, thank you.

25        **MR. WRIGHT:**  Thank you.

1   **BY MR. WRIGHT:**

2   Q    With respect to a Chapter 11 case, I believe you testified

3   that you would not seek additional investment if the case were

4   to be in a Chapter 11 posture; is that correct?

5   A    That's correct.

6   Q    Okay.  Is it your opinion that the company would not be

7   able to raise additional funds while it was in a Chapter 11?

8   A    Yes.

9   Q    Why?

10  A    It's a reasonable person standard.  It's challenging to

11  raise additional capital while in a bankruptcy matter when the

12  existing shareholders could be wiped.

13  Q    Have you been involved in a Chapter 11 proceeding before?

14  A    Not directly but indirectly I have.

15  Q    Are you familiar with financing arrangements that are --

16  that occur in Chapter 11 cases?

17  A    Colloquially.

18  Q    But you don't believe that this would be an option for

19  this Debtor.

20  A    Challenging would be an understatement.

21       **MR. WRIGHT:**  All right.  If the -- never mind, excuse

22  me.  I believe that's everything I have.  Pass the witness,

23  Your Honor.

24       **THE COURT:**  Okay.  Thank you.

25       **MR. TAYLOR:**  A quick redirect.

**REDIRECT EXAMINATION**

**BY MR. TAYLOR:**

Q    When you mentioned your salary, did you set your salary?

A    No.

Q    Who set it?

A    Board of directors.

Q    When you took this opportunity at this company, did you
take a haircut from what you normally charge?

A    Significantly.

Q    Okay.  How did you do so?

A    So in the unusual circumstances where I even agree to take
on this kind of work, I have a billable rate, an hourly
billable rate, and then a retainer that's associated with it;
not unlike any other professional services.

     So I calculated that hourly rate.  It's essentially --
well, even if measured at 40 hours a week, it's far less than
what I would have billed.

     Now, my current hourly rate, I work on average -- not that
it matters, I enjoy working but, you know -- somewhere in
excess of, you know, 60 to 80 hours a week.

     It was in lieu of an equity compensation in building this
company and taking care of its shareholders, delivering value.

Q    You were willing to take this --

A    That was the trade.

Q    Okay.  You were willing to take this haircut in order to

Marcotte - Redirect / By Mr. Taylor                    110

1   gain some equity in the company.

2   A    That is correct.

3   Q    And align yourself with the growth prospects of this

4   company.

5   A    That's correct.  My real incentive is to grow this

6   business, not my annual compensation.

7   Q    Would Chapter 11 or seven help grow this business?

8   A    No.

9         **MR. TAYLOR:**  Pass the witness.

10        **THE COURT:**  All right.  Thank you.  Anyone else?

11        (No audible response.)

12        No, okay, I think you're all done.  Thank you.

13        **THE WITNESS:**  Thank you.

14   **(Witness steps down.)**

15        **MR. TAYLOR:**  Your Honor, at this time Artius would

16   call Dominic O'Dierno.

17        **THE CLERK:**  (Inaudible)

18         **DOMINIC O'DIERNO, DEBTOR'S WITNESS, SWORN**

19        **THE CLERK:**  And, sir, if you would for the record,

20   please state your name and spell your last name.

21        **THE WITNESS:**  Dominic John O'Dierno, "O" apostrophe

22   D-I-E-R-N-O.

23        **THE CLERK:**  Thank you.

24        **MR. TAYLOR:**  Good afternoon, Mr. O'Dierno.

25        **THE WITNESS:**  Hello.

O'Dierno - Direct / By Mr. Taylor                              111

1          **MR. TAYLOR:**  Did I say that correctly?

2          **THE WITNESS:**  O'Dierno, yes.

3          **MR. TAYLOR:**  Okay.

4          **THE WITNESS:**  The opposite of oh, my, yes, O'Dierno.

5    It's a good way to remember it.

6          **MR. TAYLOR:**  Okay.

7                      **DIRECT EXAMINATION**

8    **BY MR. TAYLOR:**

9    Q    Where are you currently employed?

10   A    I am employed at ArtiusID.

11   Q    How long have you been at ArtiusID?

12   A    I'm one of the cofounders of the company back in 2018 of

13   the former company named Q5ID.

14   Q    So back when it was Q5ID you were one of the four original

15   founders of that company.

16   A    Correct.

17   Q    Okay.  So you've been there the entire time.

18   A    Yes.

19   Q    Okay.  What is your title then at Artius as we sit here

20   today?

21   A    It's evolved.  Startup companies go through evolutions.  I

22   was chief of staff, vice president of business development,

23   strategic development, and corporate development.  So right now

24   it's vice president of corporate development.

25   Q    Okay.  When you say vice president of corporate

O'Dierno - Direct / By Mr. Taylor                          112

1  development, tell us about what some of the duties are that are

2  involved in a vice president of corporate development.

3  A    I still wear many hats.  But one of the principal duties I

4  have is to secure capital for the company, to manage the

5  stakeholders of the company, and some business development.

6  Q    Can you describe for us how you go about securing capital

7  for the company?

8  A    Over time -- that changes over time.  When we were

9  starting the company it required lots of meetings with

10  potential investors and a business plan.  It was a concept at

11  the time.

12         And so we met with our network of angel investors, if

13  you know that term, and secured the initial funding to get the

14  company started.

15         Over time, as we made progress and met certain

16  milestones, we would go to new investors and existing investors

17  to continue to raise money.  So virtually every year we were

18  raising money.

19  Q    For how many years have you been raising money for

20  companies, startup companies?

21  A    For over 30 years.

22  Q    Okay.  Have you been successful in doing so at many

23  different places?

24  A    Yes.  I've raised over $200 million in my career.

25  Q    Okay.  And are you aware in this case that there was a

O'Dierno - Direct / By Mr. Taylor                    113

1    list of creditors that had been provided to the Court?

2    A    Yes.

3    Q    Okay.  And are you aware that paragraph two of the stay

4    order requires Artius to identify all known creditors, whether

5    claims, contingent, disputed, or liquidated, and file a

6    creditor matrix listing all claims?

7    A    Yes.

8    Q    Okay.  Were you tasked by anyone to actually go out and

9    find out who those creditors are?

10   A    Yes.

11   Q    Okay.  Who tasked you?

12   A    Mr. Marcotte.

13   Q    Okay.  What did you do as part of the process to learn

14   about the various creditors of ArtiusID as of November 30th,

15   2023?

16   A    I reached out and got some assistance from folks who

17   interact with our accounting processes.  I myself looked.  So

18   we did a teach approach, as Mr. Marcott described earlier.

19        We looked at all the available information, put our

20   list together, and then we said are we missing anything, what

21   else could there be, and thought about customers and vendors

22   that we dealt with on a daily basis that we should look for.

23   Q    How long would you estimate that you spent or your team

24   spent going through this process and finding out who was a

25   creditor that you should list as of November 30th, 2023?

O'Dierno - Direct / By Mr. Taylor                    114

1  A    It was a lot of work done by a lot of people.  It took

2  about a week I would say with a lot of us so, you know, over a

3  hundred hours collectively.

4  Q    Okay.

5  A    Yeah.

6  Q    And your outside counsel was also involved assisting you,

7  right?

8  A    Yes.

9  Q    And without describing any advice between legal counsel

10 and yourself, your outside counsel was looking at this

11 information as well.

12 A    Correct.

13 Q    Okay.  And what systems did you look into to make this

14 determination as to creditors as of November 30th, 2023?

15 A    QuickBooks.

16 Q    Is this QuickBooks Enterprise?

17 A    QuickBooks Enterprise, yeah.

18 Q    As opposed to the QuickBooks for lawnmowing guys.

19 A    Yes.

20 Q    Okay.  A sophisticated system.

21 A    Yes.

22 Q    Okay.  And after you looked at QuickBooks, did you look at

23 any other sources internally to try to find in good faith all

24 the creditors that are out there of ArtiusID?

25 A    We did our best efforts to look everywhere we could.

O'Dierno - Direct / By Mr. Taylor                                        115

1    Q    And did you review Mr. Marcotte's declaration?

2    A    Yes.

3    Q    And you understood it was a sworn statement.

4    A    Yes.

5    Q    Okay.  And did you look through that sworn statement and

6    determine that there were any missing creditors?

7    A    I did not see any missing creditors.

8    Q    So you reviewed it and you thought it was filed in good

9    faith.

10   A    Yes.

11   Q    Okay.  And you obviously didn't instruct anyone not to

12   include certain creditors.

13   A    No.

14   Q    But did anyone instruct you not to include any creditors?

15   A    No.

16   Q    Besides the QuickBooks systems were there any other

17   software systems that you looked at to determine who may be a

18   creditor?

19   A    I did refer to Carta.  It's where we track our

20   stakeholders, our investors.  We do have some convertible debt,

21   so Wood Capital is one example.

22   Q    Okay.

23   A    Yeah.

24   Q    And what is the name of that system you --

25   A    Carta.

O'Dierno - Direct / By Mr. Taylor                    116

1   Q    C-A-R-T-A?

2   A    C-A-R-T-A, yes.

3   Q    Okay.  So you looked through the Carta system.

4   A    Yes.

5   Q    And you ascertained from the Carta system some additional

6   creditors.

7   A    Yeah.  You could technically call convertible debentures a

8   form of equity.  But they're also potentially debt, so we

9   looked at that.

10  Q    Okay.  Are you familiar with who the largest creditors are

11  of ArtiusID?

12  A    Yes.

13  Q    Who are they?

14  A    It's TriNet.

15  Q    That's the people organization.

16  A    Yeah.

17  Q    The ones that supply your employees.

18  A    They are our co-employer.  They technically are our

19  employer, yeah.

20  Q    Okay.  And you started with TriNet right after

21  Mr. Marcotte joined the organization; is that fair?

22  A    I believe it was April 1st, so within 30 days of him being

23  on we set up TriNet, which is a very big deal.

24  Q    And is TriNet paid in full --

25  A    Yes.

O'Dierno - Direct / By Mr. Taylor                    117

1   Q    -- every month?

2   A    They're paid automatically every month.

3   Q    They're set up on autopay.

4   A    Autopay, they're on autopay, to my knowledge.

5   Q    Are many of the various accounts that the company has set

6   up on autopay?

7   A    Yes.  In fact, when we went to try to identify

8   communications, there really are almost none.  Everything is on

9   autopay or automatic payment, or you log in to a website.

10        Harvest, for example, you have to log in to their

11  website.  They don't send you invoices.  And so if someone's on

12  vacation or is gone, that could happen.  So that did happen one

13  time.  But it's paid on -- in full and current.

14  Q    Before Mr. Marcotte joined, and since you started at Q5ID

15  back in 2018, how much money were you able to bring in from

16  various investors into Q5ID?

17  A    Yes.  So before Mr. Marcotte got to the company we had

18  raised about $42 million approximately.  When he came, the

19  day -- maybe it was two days after -- we secured the $6

20  million.

21        Since that time we've raised about $1.4 million.

22  Q    Okay.  So up to the time Mr. Marcotte's arrival, you've

23  received from various investors about $42 million.

24  A    Correct.

25  Q    And how large is this investor group?

O'Dierno - Direct / By Mr. Taylor                    118

1   A    It's over 120 people.  Principally 80 of them are the real

2   investors.  There's other family members that get distributed

3   shares.  So if you look at the cap table, it'll list 125.  But

4   there's really about 80, 85 investors.

5   Q    Has this investor group changed over time?

6   A    Very, very little.

7   Q    They've stuck with the company.

8   A    Yes.

9   Q    Have you gone to them and asked them whether they're going

10  to be willing to fund you if this matter is out of bankruptcy?

11  A    I've talked to a few people.  I'm not clearly talking to a

12  lot of people right now.  It would be disingenuous.

13         But, yes, there's two shareholders I've talked to

14  that are very significant investors that are standing by to

15  support the company once we're through this process.

16  Q    And when you say you've talked to them but you can't talk

17  to them right now because it would be disingenuous, what do you

18  mean?

19  A    No investor -- and this is going back to my 30, almost 35

20  years of raising money for early stage companies, no investor's

21  going to put money into a company when they don't know if it's

22  going to be around next week.  So that's not fair to them.  I

23  would never do that.

24         You can let them know where you're at and they can be

25  ready to support you if you're through that phase.  But no

O'Dierno - Direct / By Mr. Taylor                    119

1   one's going to, that I know, would do -- would invest in that.

2   Q    Okay.  Does Artius now have enough cash reserves to pay

3   its creditors?

4   A    Yes.

5   Q    Okay.  Is Artius current on its creditors, except for the

6   ones that are disputed claims?

7   A    Yes.

8   Q    Okay.  Are they paying its -- their debts as they become

9   due?

10  A    Yes.

11  Q    Would you know if there are debts that are out there,

12  creditors out there who have communicated, screamed, sent

13  dunning letters, anything like that to the company, would you

14  know about those?

15  A    We're a small company.  We would all know.

16  Q    Okay.  When you say small company, how many employees are

17  there now?

18  A    We have less than 20 employees.

19  Q    Okay.  When you -- when Mr. Marcotte arrived, how many

20  employees were there?

21  A    Depends on if you count contractors.  If you just count

22  employees in the company, we were over 60.  We were pushing

23  maybe 65 or 70 at the peak.

24  Q    And what happened to many of those employees when

25  Mr. Marcotte arrived?

1  A    As he described, a lot of them were let go fairly quickly

2  because there was no need for them.

3        An assessment, a very detailed assessment, I was one

4  that was -- that went through this process with him to

5  understand what am I doing for the company, what's my role, how

6  can I contribute with the new vision of enterprise.

7        And so over time several other folks were let go for a

8  variety of -- and including I have to say some were potentially

9  not even qualified for the roles they brought in for.

10  Q    Okay.  And so for those people who were qualified -- not

11  qualified for the roles that they were brought in for, they

12  were dismissed.

13  A    Yes.

14  Q    Okay.  Was the marketing department dismissed?

15  A    Yes.

16  Q    The call center dismissed?

17  A    Yes.

18  Q    All of those efforts, what impact did it have on your

19  monthly burn rate?

20  A    Significantly reduced it.

21  Q    Are you aware as to what that reduction was?

22  A    We're around -- before Michael got there it varied month

23  to month because you have peaks and valleys, between a million

24  three and a million six.  So the average was close to a million

25  and a half dollars.

O'Dierno - Direct / By Mr. Taylor                     121

1           And it had skyrocketed in that year immediately

2    preceding Michael joining the company.  And now it's just north

3    of 300,000 a month.

4    Q    At $300,000 a month, with the investors that you have

5    available to you, is that burn rate sustainable?

6    A    Yes.  As example, we have one investor with $10 million in

7    the company.  He's got warrants for another $4 million he's

8    standing by to exercise once we're through this.  And that's

9    one example.

10   Q    Okay.  So if this matter comes out of Chapter 7, you can

11   go back to that investor, you'll have another load of cash.

12   A    And we call it runway.  We'll build out two or three years

13   of runway, meaning we have enough cash to survive as a company

14   for two to three years.

15   Q    Okay.  So we're not looking at a situation where the

16   company, if it comes out of Chapter 7, is going to flop the

17   next day, the next month, the next six months; is that correct?

18   A    Coming out of Chapter 7 or 11, any of those enables us to

19   go back to our friends and investors and have them recontribute

20   to the company and add to their investment.

21   Q    Okay.  Are you aware that the Chapter 7 Trustee has

22   located some creditors, a couple of them, who are not on the

23   sworn list that Mr. Marcotte signed and that you helped him

24   prepare?

25   A    Yes.

1    Q    Okay.  And are you familiar with IOActive, Inc.?

2    A    I've become familiar with them.

3    Q    And when did you become familiar with IOActive, Inc.?

4    A    Recently with these filings.  But I also recall hearing --

5    you got to recall, we had engagements or conversations with

6    hundreds of vendor companies trying to provide us services.

7    So I might have heard about them a couple years ago.  But once

8    I heard about them recently, that's for sure when I heard about

9    them.

10   Q    Okay.  And a couple years ago did you -- do you recall

11   what you heard about them?

12   A    Just that they might be bidding on some work for us.  I

13   never heard if they performed any work.

14   Q    Okay.

15   A    I didn't know.

16   Q    But nothing like, for example, demands for payment out of

17   IOActive, Inc.?

18   A    No.

19   Q    Okay.  If this IOActive, Inc. is truly owed a hundred

20   thousand dollars, are you willing to put that aside in a trust

21   to pay those people?

22   A    I'm not authorized.  Our CEO would be.  But I would

23   certainly support it.

24   Q    Okay.

25   A    So yes.

O'Dierno - Direct / By Mr. Taylor                    123

1  Q    All right.  And would you have the funds at Artius to do

2  that?

3  A    Yes, we do.

4  Q    All right.  Let's look at Skypoint Cloud, Inc. for a

5  moment; you remember them?

6  A    Yes, very much so.

7  Q    Okay.  Tell me a little bit about what you know about the

8  Skypoint Cloud, Inc. account.

9  A    This requires little context.  So in late 2020, early

10 2021, Ms. Matar introduced the company to a Tisson Mathew,

11 Mr. Tisson Mathew.  He's the CEO at Skypoint.

12        Conversations were had.  He was -- he has a

13 development -- software development company.  And he actually

14 was placed by Collaborative Vision for a few weeks as an

15 interim chief technology officer at the company.  So they had

16 an existing relationship.  By May of 2021 --

17 Q    Let me stop you there.

18 A    Yes.

19 Q    So the CEO is Mister --

20 A    Tisson Mathew.

21 Q    Spell that for us, please.

22 A    T-I-S-S-O-N M-A-T-T-H-E-W (sic).

23 Q    And he was placed by Collaborative Vision into Artius as

24 an employee?

25 A    Yes, temporarily.

O'Dierno - Direct / By Mr. Taylor                                    124

1   Q     For what period of time?

2   A     I think a few weeks.

3   Q     Okay.  Keep going, please.

4   A     Okay.  During this time our then-CEO Mr. Larson was

5   interested in building out a product that we ultimately called

6   Guardian to -- it was designed to protect families.

7         Mr. Mathews at Skypoint Cloud proposed to build that app

8   for us, initially quoting 299,000 and change.

9   Q     So he made a bid.

10  A     Yes.

11  Q     And the bis was for $299,000.

12  A     Yes.

13  Q     Was the bid exceeded by Mr. Mathew?

14  A     By the time we took over the project from Skypoint, they

15  had billed us nearly $1.1 million, of which we had paid

16  $800,000, almost three times -- we paid them almost three times

17  what they bid for the project.

18  Q     Okay.  And so out of that 1.1 million or so that's out

19  there, 800,000 has already been paid to Skypoint.

20  A     Correct.

21  Q     Okay.  Did you meet with or investigate the Skypoint

22  account to determine whether any further monies were owed to

23  Skypoint?

24  A     Around May of 2022, in that timeframe, May to June, early

25  June, the company took control of the development, got all the

O'Dierno - Direct / By Mr. Taylor                          125

1    software from Skypoint and took it over.

2           It was supposed to have been delivered with certain

3    features.  There were many, many missing features.  They were

4    supposed to build an OIDC interconnect, which is a specific

5    type of connection required for our software to work on certain

6    devices and for certain systems securely.

7       They never developed it.  They billed us 120,000 for that

8    and it was never developed successfully.

9           They had an invoice for a hundred some thousand

10   dollars for their data vault which, when we got control and did

11   an assessment internally, our technical team did an assessment,

12   realized that had we actually used the data vault, which we

13   never did, there was security vulnerabilities that could have

14   resulted in all of our customers' PII, personally identifiable

15   information, be exposed by a novice hacker.

16          It was extremely urgently discussed at the company.

17   Thank God we never turned that on.

18          And then a list was prepared by the then-chief

19   technology officer, Ms. Becky Wanta, about all the defects of

20   the product that was supposed to be delivered.  And she

21   prepared a spreadsheet summarizing these issues.

22          In one category were all the claw-back items.  These

23   are items that were so egregious, $255,000 of value, which

24   essentially was just about the amount that Skypoint was looking

25   for, that was one bucket.

1          Then the other bucket was what did it cost us to fix

2    the software that was supposed to be developed for 300,000, we

3    paid 800,000, now he's asking for another two seventy-two.

4    And that was a long, long list on the lefthand column of the

5    spreadsheet listing out all the costs, all the features, and

6    all the associated costs that we took about $600,000.

7          Ms. Wanta was so upset about that that she was

8    pursuing a demand letter for claw-back of the two fifty-five

9    and reimbursement of the $600,000.

10         **MR. TAYLOR:**  Okay.  Let me stop you there for just a

11   second.  I'm going to hand to opposing counsel -- I've got

12   three or four of these, I think, (inaudible) --

13         **THE COURT:**  Yeah.

14         **MR. TAYLOR:**  -- what's been previously admitted as

15   Trustee's Exhibit Number 6.  And may I approach the witness,

16   Your Honor?

17         **THE COURT:**  Sure, please.

18      **(The Clerk/Mr. Taylor confer.)**

19         **THE WITNESS:**  Thank you.

20         **THE COURT:**  Thank you, sure.  Okay, thank you.

21   **BY MR. TAYLOR:**

22   Q    Looking at what's been previously marked as Trustee's

23   Exhibit Number 6, can you identify that for us, please?

24   A    Yes.  This is the spreadsheet that Ms. Wanta provided to

25   our team and myself.

O'Dierno - Direct / By Mr. Taylor                127

1  Q    Okay.  And can you walk us through what this spreadsheet

2  means?  It's got a lot of data on it.

3  A    Absolutely.  So if you look at the --

4          **MR. HEADDEN:**  Your Honor, if I can, I -- within the

5  scope of relevance there's some aspect of that that is about,

6  you know, speeding things along.

7          I don't know that there's really any dispute that

8  Skypoint and their claim can be disputed by the Debtor, right?

9          And so I just -- I want to make sure that we're using

10  the time -- the Court's time and everybody else's time

11  efficiently.  If the witness wants to say we dispute Skypoint's

12  claim, noted.

13          **THE COURT:**  Yeah, I hear you.  I do think I would

14  like to focus on the issue of -- I mean, I get that it's more

15  than just that.

16          Maybe it's like a question of why didn't you list

17  them as an active creditor, for instance.  I mean, that's the

18  key question.  So insofar as you can get to that, that would be

19  helpful.

20          **MR. TAYLOR:**  That's where we're headed.

21          **THE COURT:**  Okay.  I figured, thank you.

22          **MR. TAYLOR:**  Okay.  No, thank you, Your Honor.

23  **BY MR. TAYLOR:**

24  Q    So looking at T-6, without going into excruciating detail,

25  what was the purpose of developing T-6?

O'Dierno - Direct / By Mr. Taylor                    128

1  A    It was developed as part of the assessment of the

2  transition from Skypoint's work to ours, and identifying areas

3  where we would have counterclaims against their invoices

4  because they were -- it was defective, didn't work as promised,

5  it was missing a bunch of features, and there was these very

6  serious issues, security issues that we were addressing.

7          So it was essentially built to say, here is the

8  demand we're going to send back to Skypoint to not only wipe

9  out the two seventy-two, but there's $855,000 of essentially

10  damage here that we were going to pursue.

11  Q    So this Exhibit T-6 --

12  A    Yes.

13  Q    -- was actually presented by Ms. Becky Wanta of Q5ID to

14  Skypoint.

15  A    Yes.

16  Q    As in the form of a demand letter.

17  A    She never got to the demand letter.  They had

18  conversations.

19          And what happened was they got together -- you can

20  work with someone for a year, you kind of become friendly.  So

21  we like Tisson.  This is nothing against him as an individual.

22  It was about what's fair.

23          So they got together to discuss this.  And just as

24  preparatory, I think this is very important, their system would

25  send invoice reminders, you have this invoice due, you have

O'Dierno - Direct / By Mr. Taylor                          129

1   this invoice due, literally daily.  Our accounting team was

2   like, stop, this is too much.

3          After the conversation in and around July of 2022,

4   those invoices stopped coming.

5          The conversation, as was conveyed to me, directly

6   after they discussed, they talked to the whole executive team,

7   was that we had such significant counterclaims that could be

8   devastating to Skypoint should this become made public that we

9   all agreed it was in the best interest to walk away and just

10  say, you know what, you made 800,000 on this, you bid 300,000,

11  there's these costs that we've incurred to fix your problems,

12  and potentially would create a demand letter to go after you if

13  we wanted to.

14         Mr. Larson said, let's just walk away.  Wanta wanted

15  to pursue it but Mr. Larson as CEO convinced her to let it go.

16  And they walked away and there was no further invoicing from

17  Skypoint from that point.

18  Q   Your understanding at the time that the list of creditors

19  was built, and at the time that it was attached to

20  Mr. Marcotte's declaration, --

21  A   Yes.

22  Q   -- that this Skypoint account had been resolved.

23  A   Yes.  And even -- if I could, even the subsequent thing

24  that was shown later, after Mr. Larson was excised from the

25  company and Ms. Wanta was no longer at the company,

O'Dierno - Direct / By Mr. Taylor                    130

1   mysteriously in 2023 there's an inquiry by either Ms. Matar or

2   Mr. Tisson about the Skypoint, old Skypoint invoices that were

3   agreed to be left, let go, or dismissed.  And --

4   Q    Who brought to the attention of you or the company the

5   Skypoint invoices?

6   A    Somebody from Skypoint or Ms. Matar.  Somebody -- I --

7   this is my best -- based on what I've seen, there was a meeting

8   set up including Mr. Tisson Mathew and one of his employees and

9   two of our employees that had no prior knowledge or history of

10  this.

11        They had a meeting in April of 2023, days after the

12  CFO asked me to provide him this very document.  Because I

13  heard about the meeting, I said, wait a minute, this was

14  already dealt with.  They don't want to open this can of worms.

15  Q    Okay.  So --

16  A    Yeah.

17  Q    -- Skypoint came to you before the changeover in officers

18  at Artius; is that fair?

19  A    Yes.

20  Q    And Skypoint came to you after the changeover at Artius of

21  management, --

22  A    Right.

23  Q    -- hoping to find a new soul who might pay them; is that

24  fair?

25  A    Yes.

O'Dierno - Direct / By Mr. Taylor                    131

1   Q    Was the matter fully and finally resolved to your

2   understanding after Skypoint came to Artius the second round?

3   A    So after the meeting, I provided this to our then-CFO,

4   Brian Grant, --

5   Q    You provided Debtor's --

6   A    Yes.

7   Q    -- T-6?

8   A    Yes.  So he was made aware and brought up to speed on the

9   issues.

10          And then there was that email that was shown earlier

11  on May 10th just asking what's the status.  There was nothing

12  sent after that.  And there was no invoice submitted to say,

13  please pay, nothing.  So it was a fishing expedition.

14  Q    Okay.  And a spart of that fishing expedition, when it

15  came down to actually writing out who are the creditors, you

16  knew --

17  A    Yes.

18  Q    -- that this particular Skypoint account had been at --

19  A    Yes.

20  Q    -- one point in time a creditor; is that fair?

21  A    Yes.  And I knew that they had agreed to walk away.  And

22  it was very frustrating to me to see this come back.

23  Q    Okay.  Have you ever been to Skypoint's offices?

24  A    Yes.

25  Q    Where are they?

O'Dierno - Direct / By Mr. Taylor                               132

1   A    They're on Millikan Way in Beaverton.

2   Q    Is that the same address as Ms. Matar's business,

3   Collaborative Vision?

4   A    I believe so.

5   Q    Okay.  And the address there in Millikan Way, you don't

6   recall that?

7   A    I don't recall the numbers.  But it's Millikan Way.  And

8   we met Mr. Tisson in a conference room there.

9   Q    Okay.  When is the normal payroll for Artius, Inc.?

10  A    On the 5th and the 20th of every month.

11  Q    So the 20th, which is five days ago.

12  A    Correct.

13  Q    Did you make payroll?

14  A    Yes.

15  Q    Did you make payroll the 5th?

16  A    Yes.

17  Q    Have you made payroll every month that this matter has

18  been pending in this court?

19  A    Yes.

20  Q    Have you been paying all other creditors as they become

21  due, as those debts become due, in a timely basis?

22  A    To my knowledge, yes.  That's not my job function but to

23  my knowledge, yes.

24  Q    But you would be aware -- as you said, it's a small --

25  A    Yeah.

O'Dierno - Direct / By Mr. Taylor                    133

1  Q    -- company -- if somebody was coming in and screaming like

2  Skypoint did in the very beginning.

3  A    Yes, I would.

4  Q    Okay.  And this trustee, Chapter 7 Trustee has also listed

5  one other creditor as being missing from the list attached to

6  Mr. Marcotte's deposition; do you remember that one?

7  A    Can you refresh my --

8         **(Mr. Taylor/Mr. Speaker confer.)**

9              **MR. SPEAKER:**  Harvest.

10 **BY MR. TAYLOR:**

11 Q    Harvest.

12 A    Oh, Harvest, yes.

13 Q    Okay.  Are you familiar with Harvest?

14 A    Very much so.

15 Q    Okay.  Who are they?

16 A    They're PPP-related finance.

17        So when the paycheck protection program came out,

18 we -- I was involved in the actual securing of those funds.

19 And the calculation was done slightly improperly, so when it

20 went to get forgiven, there was a net still due.  So that's a

21 monthly payment that's due to Harvest.

22        It's a challenge because their system requires you to

23 log in to a secure site and pay.  It's not like something you

24 can set up autopay.  So -- but, yes, I'm very familiar with

25 them.

O'Dierno - Direct / By Mr. Taylor                    134

1  Q    To your knowledge are they fully paid?

2  A    They're paid up and they're on a monthly installment until

3  they're due.  That's why they were on the list.

4  Q    The document indicates that one payment was missed; do you

5  know whether that payment has been paid?

6  A    That happens.  Yes.  Was it late?  Yes.  Was it not paid?

7  No.  It was paid.

8  Q    Okay.  If Artius is dismissed from this bankruptcy, will

9  Artius be able to obtain additional funding?

10  A    Yes.

11  Q    Why do you say that with confidence?

12  A    I've had direct conversations with investors that have a

13  very strong, vested interest in this company.  Two represent

14  nearly $20 million of invested capital in this company.  They

15  want it to succeed.

16        We have conversations with new investors all the

17  time.  They're very excited about what Mr. Marcotte has

18  delivered to this company.

19        And if I could speak just a minute on that, not only

20  does he have the background to help us succeed with his

21  cybersecurity background, cofounding that with his technology

22  background, but he is very connected with many of the CEOs and

23  CIOs of companies we would want to do business with on a very

24  personal level.

25        And when I vetted him personally, it took couple

O'Dierno - Direct / By Mr. Taylor                           135

1   months.  Unbeknownst to him I did a deep dive on Mr. Marcotte.

2   And I was so excited that he was a part of this company because

3   he represented somebody that could actually help us execute.

4            And that's what investors are looking for; the team

5   is important as anything else.  Who am I investing in?  The

6   team and what they can execute on.

7   Q    Besides Mr. Marcotte, are there other members of the team

8   who you've observed are able to attract major investments --

9   A    Yes.

10  Q    -- in the startup company?

11  A    Yes.  If I could elaborate, Mr. Curtis Elswick has got a

12  worldwide reputation for architecture of engineering products

13  that are designed for enterprise.

14           Our head of software development has got multiple

15  patents and is very, very well-recognized.

16           We have the board members, which weren't discussed in

17  detail, are world-known.

18  Q    These are not people who have invested in small companies

19  that won't succeed.

20  A    No.  For example, the former chief technology officer of

21  the United States Central Intelligence Agency is on the board

22  of directors.

23  Q    And he attends board meetings.

24  A    Yes.

25  Q    Are there people who are similarly situated to this chief

O'Dierno - Direct / By Mr. Taylor                    136

1   technology over --

2   A    Yes.

3   Q    -- who are on the board?

4   A    Yes.

5   Q    Have you attended board meetings?

6   A    Yes.

7   Q    Okay.  Have you met these people?

8   A    Virtually I have, yes.

9   Q    How many people are on the board of directors of Artius,

10  Inc.?

11  A    Four.

12  Q    Four?

13  A    Four.

14  Q    Okay.  Are there more who are also -- are there different

15  levels of board members?  In other words, some who are kind of

16  volunteers and some who are --

17  A    There's the official board of directors and then there's -

18  - we have a board of advisors, an advisory board.

19          **THE COURT:**  I think Mr. Headden rose to say you're

20  gilding the lily.  And I think I agree with him at this point.

21          **MR. TAYLOR:**  Okay.

22          **THE WITNESS:**  Okay.

23          **MR. TAYLOR:**  We will move on.

24  //

25  //

O'Dierno - Direct / By Mr. Taylor                    137

1   **BY MR. TAYLOR:**

2   Q    Last topic on this, have you been in charge of document

3   production in this particular case?

4   A    For some of it, correct.

5   Q    Okay.  And what have you done to provide documents to the

6   Trustee?

7   A    What haven't I done?  It's been a very, very time-

8   consuming effort; again, tap folks who could help me get access

9   to documents.

10          We've done a deep dive on specially looking for --

11  the most challenging part to be honest was looking for

12  communications.  Most of our vendors we just pay so there's not

13  communications.

14          But, yeah, very intense --

15  Q    Would it be --

16  A    -- review of every available --

17  Q    Would it be fair to say that you --

18  A    -- source of information.

19  Q    -- crawled through the systems to look for responsive

20  documents to the Trustee?

21  A    Yes.

22  Q    And would it be necessary for a trustee or anyone else to

23  come look through those systems to find the same things than

24  you've already produced?

25  A    No.

1          **MR. TAYLOR:**  Okay.  I'll pass the witness.

2          **THE COURT:**  Thank you.

3          **MR. HEADDEN:**  Good afternoon.  Todd Headden from

4     Hayword on behalf of the Trustee.  And I'll try and keep this

5     close or quick.

6                         **CROSS EXAMINATION**

7     **BY MR. HEADDEN:**

8     Q    But when you say that you crawled through the system, I

9     have no idea what that means.  Tell me what that means that you

10    crawled through the system.

11    A    So QuickBooks has attachments, can print reports on

12    payments.  So that's the single source of truth on payments, so

13    we went through that.

14         We looked at recent emails for correspondence.

15    There's not much there because we don't correspond with vendors

16    hardly at all.

17    Q    Okay.  So when you go through emails, what's that look

18    like; what are you doing?

19    A    Well, all bills are supposed to send through a bill dot

20    com email address, so it's pretty easy to find.

21         We also looked at individual emails who might have

22    received, for example, one of the vendors comes through our PR

23    marketing person.  So we reached out to her, as an example.

24         So we did everything we could to find everything

25    responsive.

O'Dierno – Cross / By Mr. Headden                    139

1  Q    So you -- okay.  SO you reached out to a PR person.  But,

2  I mean, can you be more specific?  Can you give us the details?

3  Like, I mean, you -- so you reach out to a person.  What else

4  did you do?

5  A    Everything to my knowledge where we would find information

6  responsive to the request, we searched and provided it.  So

7  that involves checking emails, checking QuickBooks, checking

8  any other source that we could think of.

9  Q    So you're just -- you're checking what is in somebody's

10  inbox or what are you doing?

11  A    Yes, in some cases.

12  Q    Okay.  What email searches, what search terms did you use?

13  Do you all use Outlook, to you all use another interface?

14  A    We use Proton.

15  Q    Okay.  So you use Proton.  Does it have a search function

16  in there?

17  A    Yes.

18  Q    What email or what search terms did you use in Proton to

19  identify these documents?

20       **MR. TAYLOR:**  Your Honor, I think we're getting into

21  proprietary information on the Proton interface.  And I

22  really -- I'm not sure that any of this is going to be

23  completely relevant.  But even if it is, we'd ask it be placed

24  under a protective order because this company is a tech

25  company.

O'Dierno - Cross / By Mr. Headden                    140

1          And I did -- I am concerned that if we get -- we

2    wander into details of that system or any other system like it,

3    that we're going to end up with disclosures that are

4    unwarranted.  And so --

5               THE COURT:  So --

6               MR. HEADDEN:  You --

7               THE COURT:  -- but I think he's just asking the

8    search terms that were used, right?  That's okay, right?

9               MR. HEADDEN:  That's --

10              THE COURT:  Usual discovery --

11              MR. HEADDEN:  -- the relevant --

12              THE COURT:  -- kind of --

13              MR. TAYLOR:  You can describe your search terms.

14   BY MR. HEADDEN:

15   A    Every company name.  So you search by the company name to

16   find is there relevant, you know, communication to that

17   company.

18        So the 40 some companies, every single one we searched.

19   And that's the effort that we undertook.

20   Q    Okay.  So you had -- you identified the company and you

21   did a search term for that company.

22   A    Uh-huh.

23   Q    You identified that company from QuickBooks.

24   A    Correct.

25   Q    What searches did you do in QuickBooks?

O'Dierno - Cross / By Mr. Headden                    141

1   A    Well, QuickBooks is simple.  You look for -- you put in

2   the time, November 30, what's in the system as of November 30.

3   And that tells you all you need to know from the universe.  And

4   then you go from there.

5   Q    So November 30, you're looking at payments that were made.

6   A    Payments that were made, yes, outstanding obligations,

7   etcetera.

8   Q    So outstanding obligations.  So is there an accounts

9   payable report?

10  A    We didn't look at accounts payable.  We looked at

11  balances, vendors, so we went by vendor in the system as of

12  that date.

13  Q    Okay.  So you didn't look at accounts payable.  Is there

14  an accounts payable?  I mean, I know there's a function in

15  QuickBooks --

16  A    There's a function in there, yeah.

17  Q    Is there --

18  A    There's a function --

19  Q    -- an accounts payable for Artius' --

20  A    No.  We don't -- we pay everything current so we don't

21  rely on accounts payable.  You look at that if you're behind.

22  You know, we were paying currently so there was no reason to

23  look at that.

24  Q    Who's the CFO of Artius?

25  A    I guess Peter Stridh would be our CFO.  He's -- we don't

O'Dierno - Cross / By Mr. Headden                    142

1   really have a CFO.  He's a senior vice president of finance and

2   corporate development.

3   Q    So who's in charge of the books and records at Artius?

4   A    Ultimately the CEO.  But who manages that, Peter Stridh.

5   Q    But you headed up this search.

6   A    Among others, yes.

7   Q    Who's KBF?

8   A    They're an accounting firm.

9   Q    Did KBF assist with the search for creditors for the

10  Marquette (sic) declaration?

11  A    They're our auditing firm.

12          **THE COURT:**  Just answer -- you can just --

13          **THE WITNESS:**  I'm sorry, no.

14          **THE COURT:**  -- answer the question.  Okay.

15          **THE WITNESS:**  No.

16      **(Pause)**

17  **BY MR. HEADDEN:**

18  Q    Okay.  Going back to I think it was -- or May 22, there

19  was conversation about the Skypoint billing or the claim that

20  Skypoint.  And you said that the company took over the work

21  from Skypoint.

22  A    Correct.

23  Q    So had Skypoint done their work and turned it over?

24  A    They had done work and turned it over.  But they didn't

25  deliver what was promised.

O'Dierno - Cross / By Mr. Headden                 143

1  Q    Was the contract completed?  Let me ask that.  By

2  Skypoint, did they say we have completed our contract, here's

3  the product?

4          **MR. TAYLOR:**  Objection, calls for a legal conclusion

5  out of this witness.

6          **THE COURT:**  Okay.  Well, how do you want to ask the

7  question?

8  **BY MR. HEADDEN:**

9  Q    Did Skypoint deliver the product or did Artius take the

10  product?  I'm trying to understand what the back and forth was

11  there.  Meaning did Skypoint think that they had completed the

12  terms of their contract and turned it over?

13          **MR. TAYLOR:**  Calls for speculation if it's asking for

14  what Skypoint thought.

15          **THE COURT:**  Okay.  Yeah, just answer your

16  understanding of the question.  You can explain --

17          **THE WITNESS:**  Yes, I could.

18          **THE COURT:**  -- your understanding, yeah.

19          **THE WITNESS:**  It's fairly nuanced because they were

20  so far delayed.  They were supposed to have completed the

21  product in six months.  We're now a year out.  It's vastly

22  overbudget, vastly behind schedule.

23          So the company and -- made a decision.  They had to

24  take control.  So they took control of the product.

25          It should have been finished many, many months ago

1   but was not, and had all those deficiencies listed in the

2   spreadsheet and had all those charges for things that weren't

3   done or that could have exposed the company.

4           So it was a very hotly contested issue in the company

5   in terms of should we go after these guys for 855,000 or should

6   we just walk -- mutually walk away.

7   **BT NR, HEADDEN:**

8   Q     Okay.  And then so that was in May of '22.

9   A     Probably -- well, the transition was around May of 2022,

10  yes, about a year after they started.

11  Q     And so that lasted a while, though, it sounds like, the

12  back and forth.

13  A     The back and forth of what?

14  Q     With Artius and Skypoint.  And I'm saying Artius

15  recognizing it was Q5 at that time.

16  A     The back and forth about the product was an ongoing issue

17  because they had to fix so much.

18          The back and forth on once this was prepared, this

19  document was prepared about the cost overruns essentially and

20  claw-backs that we were owed, the --

21  Q     So let me ask this way.  Was the back and forth between

22  the two days, weeks, or months?

23  A     Probably just weeks.

24  Q     And then there was a subsequent meeting with Tisson and

25  somebody from Artius or Q5 at that time; and when was that

O'Dierno - Cross / By Mr. Headden                    145

1   meeting?

2   A    If you're talking about the meeting in 2023 --

3   Q    Okay.  So it was '23.

4   A    Yeah.  So but it's important to know before that there was

5   a matter of July, 2022 through April of 2023 with not a single

6   email from them asking for payment.  So --

7   Q    Okay.  So --

8   A    But, yes, so and then our CEO, former CEO, and the person

9   that wrote this document was gone.  Then all of a sudden, yes,

10  in March or April they out -- they reach out to try to meet

11  with some of the new team that's there.

12  Q    Okay.  So --

13  A    Yes.

14  Q    -- March or April.  And then were you in that meeting?

15  A    No.  But I was asked to provide this document to the

16  person in the meeting, --

17          **MR. HEADDEN:**  No, --

18  A    -- Mr. Grant, yes, --

19          **MR. HEADDEN:**  -- that's fine.  All right.  No further

20  questions.

21  A    -- as follow-up.  Thank you.

22          **THE COURT:**  Thank you.

23          **MR. BUTLER:**  Real quick.  Yes, sir, Lynn Butler on

24  behalf of Collaborative Vision.

25  //

O'Dierno - Cross / By Mr. Butler                    146

1                         **CROSS EXAMINATION**

2    **BY MR. BUTLER:**

3    Q    Did you hear Mr. Marcotte talk about the proposed

4    treatment to the Collaborative Vision claim?

5    A    Yes, I did.

6    Q    Do you have enough resources to make that happen --

7    A    Yes, we do.

8    Q    -- money wise?  Okay.  And now just so we're clear, the

9    claim was filed, and I know you dispute a large portion of it,

10   $857,737.08.  So we're still on board.

11   A    Yeah.

12   Q    Okay.  And that would be escrowing, allow you to fight it,

13   it'll stay there until resolved.

14   A    But pay -- immediately pay the 200,000 for the loan

15   portion.

16   Q    With whatever interest component, we'll figure that out.

17   A    Okay.

18        **MR. BUTLER:**  Thank you.  That's all, Your Honor.  Oh,

19   one last thing.

20   Q    Now, in the cross examination, that address of Ms. Matar's

21   offices is a coworking space; that make sense?

22   A    Yes.

23   Q    Okay.  That -- and so there was nothing nefarious that you

24   were trying to indicate by saying they were at the same

25   address, right?

O'Dierno - Cross / By Mr. Butler                    147

1  A     Just that they knew each other clearly --

2  Q     Okay.

3  A     -- and worked together.  She introduced us to each other

4  so --

5  Q     Oh, that makes sense.  Okay.

6  A     Yeah.

7          **MR. BUTLER:**  Thank you.  Appreciate it.

8          **THE WITNESS:**  Thank you.

9          **THE COURT:**  All right.

10          **MR. SPEAKER:**  (Inaudible) questions, Your Honor.

11          **THE COURT:**  All right, thank you.

12          Anything further, Mr. Taylor?

13          **MR. TAYLOR:**  I don't think I have any redirect.

14          **THE COURT:**  Okay.

15      **(Laughter)**

16          **MR. TAYLOR:**  Thank you.

17          **THE COURT:**  All right.  I think you're done then,

18  thank you.

19          **THE WITNESS:**  Thank you very -- nice to meet you,

20  Judge.

21      **(Witness steps down.)**

22          **MR. TAYLOR:**  Your Honor, this might be a good time

23  for an odd request I just thought about.

24          And if I could approach, we might want to have a two-

25  minute discussion in chambers about this topic because it

148

 1   relates to the next witness.  And I'm not sure that what I

 2   would do with that witness would be productive for today.

 3            **THE COURT:**  So mysterious.  Okay.

 4            **MR. TAYLOR:**  It's mysterious.

 5            **THE COURT:**  So who would come in for this chambers

 6   conference?

 7            **MR. TAYLOR:**  Certainly counsel.  I mean, everybody

 8   that's a lawyer --

 9            **THE COURT:**  Okay.

10            **MR. TAYLOR:**  -- in here.

11            **THE COURT:**  Okay.  How --

12            **MR. TAYLOR:**  It's an odd request.

13            **THE COURT:**  -- clean are things back there?

14       **(Laughter)**

15            **MR. SPEAKER:**  Is it pretty tight?

16            **THE COURT:**  I think we're -- might be some dirty --

17   there's some crickets.  We have a cricket infestation going on.

18   But --

19            **MR. SPEAKER:**  (Inaudible).

20            **THE COURT:**  Yeah.  You could also see if they've

21   finished cleaning out that room next door to the jury room.

22            **MR. BUTLER:**  They were pulling stuff -- oh, I'm

23   sorry.

24            **THE COURT:**  Okay.  That's fine.

25            **MR. BUTLER:**  They were pulling out stuff earlier

1    today.

2        **THE COURT:**  All right.  We'll be right back.  And

3    that's fine, thank you.

4        **THE CLERK:**  All rise.

5        **(Recess taken from 5:24 p.m. to 5:32 p.m.)**

6        **THE COURT:**  So the discussion in chambers was just

7    that the Debtor's counsel was confirming that there was no need

8    to elicit further testimony about the Collaborative Vision

9    claim.

10       And I certainly -- I said from my perspective that was not

11   necessary.  None of the parties had any problem with that.

12       So I think with that, Mr. Taylor, do you --

13       **MR. TAYLOR:**  I think as far as our case is concerned,

14   we would rest.  And I think Mr. Bloom has some argument for

15   closing.

16       **THE COURT:**  Okay.  Great, thank you.  Okay.

17       So, yes, Mr. Headden, any evidence that you want to

18   put on?

19       **MR. HEADDEN:**  No, Your Honor.  For the Chapter 7

20   Trustee, Todd Headden.  And there's no witnesses for the

21   Trustee to call.

22       **THE COURT:**  Okay.  Thank you.

23       Mr. Wright.

24       **MR. WRIGHT:**  Same for the United States Trustee, Your

25   Honor.

150

1          **THE COURT:**  Okay.  Thank you.

2          Mr. Butler?

3          **MR. BUTLER:**  No, sir, Your Honor, nothing further.

4          **THE COURT:**  Okay.  So we're closed in evidence.

5          So it's 5:33.  I'm cognizant that I'm keeping Court

6    staff -- I'm tempted to say in addition to the birthday boy,

7    but I'm not going to say that -- here.

8      **(Laughter)**

9          So do -- I mean, how long are you thinking for

10   closing?  We can also reset.

11         I mean, if it's going to -- if we're going to -- if

12   this discussion which I suspect is maybe what it turns into to

13   some degree is going to stretch, we could set an -- you know,

14   an online hearing, whatever, for tomorrow afternoon really

15   easily, conceivably tomorrow morning or whatever works.

16         Mr. Bloom, what are your thoughts?

17         **MR. BLOOM:**  My closing, if I have to make it, would

18   probably be no more than ten or 15 minutes.  And of course the

19   Court wouldn't hear one closing, it would hear all of them.

20         Recognizing the Court's availability, depending upon

21   the hurricane named Helene, I'm flying at some unknown point in

22   time tomorrow and Friday on kind of a --

23         **THE COURT:**  I see.

24         **MR. BLOOM:**  -- ridiculous itinerary.

25         **THE COURT:**  I see.  Okay.

1          **MR. BLOOM:**  And obviously if it were a command from

2     the Court, I would have to rearrange those things.  But --

3          **THE COURT:**  You'd rather give them now.

4          **MR. BLOOM:**  If it's not too taxing on the Court and

5     the personnel.

6          **THE COURT:**  Okay.  So I don't think I need much

7     closing.  I mean, so, okay.  Let me make sure.  Let me talk to

8     you.  So I -- you know, I appreciate this evidence, and it's

9     very helpful.

10         You know, I don't necessarily agree with the

11    assessment that Chapter 11 would be such a death knell.  I

12    think I have some questions about the credibility.

13         But I'm largely convinced by your case.  And I want

14    to make sure so what I'm understanding in terms of what the

15    kind of Debtor's proposal is, structure dismissal if you will,

16    is -- and this is a lot of money to escrow, first of all.  I

17    mean -- okay.  That's just a comment on the record.

18         I mean, so but you all are prepared to do that.  And

19    it's -- and I think -- I assume that the way you would

20    structure it, you may or may not have talked kind of drafting

21    with Mr. Butler.

22         But I assume you're thinking -- I mean, it would be -

23    - how would the escrow be administered?  I mean, I don't --

24    obviously I don't need exact language.  But talk me through

25    what you're imagining on that.

1          **MR. BLOOM:**  It would -- there'd be an escrow

2    agreement with a third party acceptable to the affected parties

3    and of course to the Court.  I had --

4          **THE COURT:**  Security interest in favor of them up to

5    the amount of their future --

6          **MR. BLOOM:**  Just really would be just an escrow

7    arrangement like is commonly placed with an escrow agent.

8          **THE COURT:**  Yeah.

9          **MR. BLOOM:**  And we would use a professional escrow

10   agent.

11         **THE COURT:**  I guess I'm just wondering -- and this is

12   just my ignorance.

13         So does title -- I mean, so I just want to make sure

14   that if the Debtor were to file a subsequent case that it

15   would -- that this money would be segregated in favor of the

16   creditors; does that make sense?  In favor of these particular

17   creditors, that make --

18         **MR. BLOOM:**  I mean, haven't thought that through.

19         **THE COURT:**  Okay.  That's fine.

20         **MR. BLOOM:**  If we did wind up in a case, it would

21   seem to me that all these payments would be recoverable as

22   preferences.

23         **THE COURT:**  I mean, --

24         **MR. BLOOM:**  So --

25         **THE COURT:**  -- yeah, but at least we would get the

153

1    timer moving on -- if you grant them the security interest,

2    then the transfer would be effective, you know, today or

3    whatever.  I'm not -- and that's just --

4            **MR. BLOOM:**  Right.  It --

5            **THE COURT:**  -- that's a relatively minor detail.

6    But--

7            **MR. BLOOM:**  It'll be an escrow that the escrow agent

8    would be -- and I'm thinking as I'm speaking so --

9            **THE COURT:**  Yeah.

10           **MR. BLOOM:**  -- forgive me if it's inartful, Judge.

11   But it would be an arrangement where the escrow agent would pay

12   such amounts as are agreed by the parties in writing or as may

13   be set forth in a final judgment of a court or competent

14   jurisdiction.

15           And so, for example, suppose that we finalize the

16   walkaway with Skypoint and some other arrangement with

17   IVActive/Swisher (phonetic) and then went back to litigation in

18   Oregon State Court.

19           The resolutions with those first two that I mentioned

20   would lead to the immediate release.  And then the Oregon

21   litigation would determine the rest of it.

22           But in the meantime, I mean, everyone would be

23   protected.  And, again, it would be with an independent third

24   party escrow agent.

25           Corporate trust divisions of banks typically take on

1    escrows for many different purposes.  And I suspect that they

2    might have some type of a form escrow agreement that we could

3    modify.

4              I have what may be a crazy thought that addresses

5    both of these topics.  Your Honor asked how would this work,

6    and before that what about closing.

7              Suppose that we were to try to just put some meat on

8    these boys, flesh out with Mr. Butler what this would look

9    like, and submit it to the Court in advance of a hearing to be

10   set at the Court's convenience next week, and at that point in

11   time the Court either approves it and dismisses it or we

12   proceed with those closing arguments.

13             Is that -- we've done a lot here by the seat of our

14   pants, including producing 1100 documents for the Trustee, not

15   all of which we frankly had a chance to review before we

16   produced them.

17             And we're prepared to work with the rapidity and

18   diligence that the Court has required.  But I'm just wondering

19   if maybe we take a deep breath, work this out, and then we come

20   back and either present it or do the final argument.

21             **THE COURT:**  Okay.  Thank you.  Yeah.  I think that

22   basically is right.  I just wanted to kind of get the general

23   terms.

24             So what about adding ten percent to the totals just

25   for potential interest or attorneys' fees, that kind of

 1    additional award?

 2            **MR. BLOOM:**  I --

 3            **THE COURT:**  Are we getting up to the cap of what

 4    you --

 5            **MR. BLOOM:**  Mr. Marcotte is smiling.  I don't think

 6    the record reflects that.

 7            I certainly will talk to the client about that.

 8            I will say, and I don't mean to set anything off --

 9            **THE COURT:**  I understand.

10            **MR. BLOOM:**  -- with Collaborative Vision.

11            **THE COURT:**  But let me --

12            **MR. BLOOM:**  There's already a bunch of --

13            **THE COURT:**  I understand that.

14            **MR. BLOOM:**  -- that in the Collaborative --

15            **THE COURT:**  I understand --

16            **MR. BLOOM:**  -- Vision plan, yeah.

17            **THE COURT:**  -- that you don't file a proof of claim

18    for the lowest amount you think you're owed.

19        **(Laughter)**

20            I understand that.  I mean, you know, if you're smart

21    you don't.  I've filed proofs of claim so I understand.

22            Just some -- that's just something to think about

23    that would -- you know, again we're just talking comfort points

24    for me.

25            So I'm going to push on another sore spot, which is

156

1   the Trustee's fees.  Now, I recognize that the Trustee has been

2   a gadfly for the Debtor in this case.

3           I will say the Trustee's -- and I think it's -- I

4   think that I'm -- or we are responsible in significant part

5   anyway for the fact that he's in this -- been in this awkward

6   position.  I realize the stay order lifted some of those

7   responsibilities.

8           You know, it has given me -- it gives me comfort in -

9   - let me put it this way.  I'm getting -- I'm obviously getting

10  my way to ruling for you, and it's helped me.  His presence and

11  activity has helped me get there; does that make sense?  So

12  that's where I stand on this issue.

13          I would like a Trustee's reasonable and necessary

14  fees, you know, hourly, not talking percentage of distribution

15  or whatever.  That would be my proposal as part of an agreement

16  on that.  So I would like you to think about that, too.

17          **MR. BLOOM:**  Indeed we have thought about it.  In

18  fact, the proposed form of order that we submitted with this

19  motion of dismissal contained an express reservation of

20  jurisdiction for the Court upon application, notice, and

21  hearing --

22          **THE COURT:**  Okay.

23          **MR. BLOOM:**  -- to award fees.

24          Frankly, if the Court were to accept the process that

25  I suggested, we take a few days to work this out, come back and

1    either present it or argue it, maybe we can come to a number

2    that would obviate the need --

3            **THE COURT:**  Right.

4            **MR. BLOOM:**  -- for that notice, application, and

5    hearing.  And that just goes in the order along with the escrow

6    terms.

7            **THE COURT:**  Okay.  Great.  Just in terms of dates, by

8    the way, it will not be next week because I am out of town next

9    week so -- my kids have a fall break in the middle of nowhere

10   so we're taking advantage of it.

11           But the week after that should be -- there should be

12   plenty of times that we could find for somebody, you know,

13   based on what you all need.  Okay.  Thank you.

14           Is there anything else that you wanted to talk about

15   right now?

16           **MR. BLOOM:**  I mean, not at present.

17           We appreciate the Court's time and the Court's

18   indications about what might be acceptable, and we'll continue

19   to work toward it.

20           **THE COURT:**  Okay.  Thank you.

21           Mr. Headden, Mr. Wright, Mr. Butler.  I think

22   Mr. Butler's content to hang out, yeah, okay.

23       **(Laughter)**

24           Mr. Butler knows when to hold -- or hold them, I

25   guess.

1          **MR. HEADDEN:**  I suffer like you, Your Honor, on not

2    having a good poker face.  I have a feeling that our colleague

3    Mr. Butler might have gone a couple of rounds around a poker

4    table so he might be pretty good on that one.

5          In regards to timing, if we are to reset this, I

6    myself will be out the week that Your Honor is back.  But I

7    don't know that in the interim that Mr. Satija wouldn't be able

8    to represent on behalf of Hayward the Trustee.

9          **THE COURT:**  Okay.  Thank you.

10         **MR. HEADDEN:**  I'm looking for -- okay, I'm done.

11         **THE COURT:**  So in -- okay.  And so let me -- and so

12   nonetheless, despite what -- I mean, basically the Trustee's --

13   the Trustee still opposes what we're doing or what this -- the

14   Debtor's proposal, even in its current form which, again, I'm

15   not condemning.  I do understand it actually.

16         I mean, I think it's a -- it's obviously -- it's a

17   close -- it's a difficult call.  I think it's a -- I think I'm

18   within the bounds of the statute.

19         I mean, I don't like really -- I personally don't

20   like super broad kind of statutory language because I do think

21   it -- you know, it can be difficult to apply.

22         And I -- but I think that if I conclude that this is

23   in the estate's best interest, Debtor -- it's creditors' best

24   interest, then I think this can be done in basically the form

25   proposed.  That's my view.

159

1          Now, so but I don't -- but I have doubts about --

2    what's giving me consternation is some of the facts and some of

3    the details.  And that's why I have appreciated your work

4    trying to help flesh those out, pushing on the Debtor's case,

5    like really investigating.  And I have appreciated that.

6          I'm currently leaning toward thinking, well, it was

7    sufficiently credible, they're putting a lot of money on the

8    table, they are -- they've given credible testimony, they've

9    produced documents, you know.  On the balance, I'm kind of

10   coming out in that -- on -- in favor of that right now.

11          But I want to understand your perspective.

12          **MR. HEADDEN:**  Well, your -- I think Your Honor is

13   dialed in very well on the Trustee's perspective.  And to harp

14   on it again, it's about the integrity of the system and making

15   sure that there's not creditors being prejudiced.

16          To the Debtor's point, they have, you know, indicated

17   in my words, not theirs, look, there's not a lawsuit out there

18   aside from Collaborative Vision that, you know, is not coming

19   to the table, right?

20          So Skypoint and IOActive, Debtor indicates has warts

21   on their claims.  I don't know.  It's a proof of claim that's

22   filed, and so we take that at face value.

23          We're not asserting on behalf of IOActive or Skypoint

24   that they are actually owed that money.  It's just a matter of

25   making that the system is vetted.

1          **THE COURT:**  Right.

2          **MR. HEADDEN:**  One thing that I did think about as all

3   of this is going along -- and this case is truly an odd one --

4   my dad has a long history of medical procedures and whatnot,

5   and he has grown to hate the phrase from his doctor, well

6   that's odd.

7          And I think that's kind of appropriate for this case.

8   It's an odd case so I understand that doesn't fit neatly into

9   our system.

10         But if the Court feels like the -- you know, that it

11  is satisfied as to the due diligence that the Debtor has done,

12  I don't think that myself or the Trustee would lose sleep

13  tonight.

14         **THE COURT:**  Okay.  Thank you.

15         Mr. Wright, would you lose sleep tonight?  Would

16  Mr. Epstein lose sleep tonight?

17         **MR. WRIGHT:**  Gary Wright on behalf of the United

18  States Trustee, Your Honor.

19         With respect to the dismissal or not of the case, I

20  don't think that the issue would give the Trustee any sort of

21  pause.  If the Court feels that the burden has been met, then

22  that's sufficient.

23         That said, of course with the order and the

24  statements that the Court made earlier about the structured

25  dismissal, I think the idea of a structured dismissal in a

1    Chapter 7 would definitely give the U.S. Truste heartburn.  And

2    I think there will probably be pushback regarding the order.

3            But having not seen that, I can't say what it would

4    be.  But that said, I will happily send Mr. Tobin to state the

5    U.S. Trustee's position at that time.

6            **THE COURT:**  Yeah.  I appreciate that.  I think -- I

7    mean, and I respect the Trustee's right to appeal.  And, again,

8    that becomes Mr. Bloom's problem to, you know, handle that

9    appeal.

10           One thing I really don't have to do in this job is

11   worry about appeals really.  I mean, it's kind of like the

12   doctrine of equitable mootness, for instance, is really I just

13   try to just block it all out now because I'm like, well, it's

14   just never something I'm going to have to care about because

15   that's -- let them decide.

16           But, you know, so, you know, but I appreciate that.

17   And I appreciate the -- I -- and so structured dismissal is the

18   closest analogy I can think of to what we're doing.

19           What I don't like here is that we're tailoring all

20   these processes and that we've kind of -- and, you know, and I

21   don't like the fact that the trustee was not in the hearing,

22   the prior hearing.

23           **MR. WRIGHT:**  Yes.

24           **THE COURT:**  And I'm not blaming the Trustee for that.

25   All I'm saying, we -- there was a pivot, things evolved.  And I

1    think again what's great about this practice is things can

2    evolve.

3          But I also think I certainly don't want to -- I

4    didn't want to come in here -- I did not come in here today I

5    have draft ruling denying the motion to dismiss.

6          So, you know, I had a feeling when I was writing, I

7    was like there's going to be some kind of twist and this is

8    going to be -- you know, but I still did it.

9          But it -- you know, it was not a fait accompli anyway

10   coming in here for sure, --

11          **MR. WRIGHT:**  Understood.

12          **THE COURT:**  -- in my view.  And so I don't know

13   exactly -- it's not exactly going to -- it doesn't have to say

14   the word structured dismissal.  I think --

15          **MR. WRIGHT:**  No, Your Honor.  It just --

16          **THE COURT:**  It's a similar concept in the fact that

17   you're --

18          **MR. WRIGHT:**  Right.  The --

19          **THE COURT:**  -- kind of saying we're paying everybody

20   off.

21          **MR. WRIGHT:**  Yes.  The idea that the order is going

22   to provide for anything other than just the dismissal --

23          **THE COURT:**  Yeah.

24          **MR. WRIGHT:**  -- is possibly problematic.

25          **THE COURT:**  Yeah.  Well, you're -- he's -- Mr. Tobin

163

1   is welcome to bring in the objection.  We can deal with that.

2   Okay.  Thank you.

3          Okay.  Anybody else have anything further to add?

4      (No audible response.)

5          Okay.  Well, I do want to thank everyone for their

6   hard work today and every day on behalf of your clients.  It's

7   really an honor truly to be with so many excellent lawyers.

8          I appreciate Mr. Bloom and his colleague's

9   representation of the Debtor; Mr. Butler's able representation

10  of his client; Mr. Wright's representation on behalf of the

11  U.S. Trustee; and Mr. Satija and Mr. Headden's work on behalf

12  of all interest holders in the estate.

13         Despite what I recognize were very abnormal and

14  difficult circumstances, not at all really of their making --

15  and, again, I think I'm not -- the situation has been difficult

16  for everybody who's been involved in this from the start

17  including, you know, Mr. Conway who's sitting there on Zoom,

18  and Mr. Binford in here, and all of us.

19         So, you know, I think that assuming there's a

20  proposed settlement that looks along the contours of what we

21  described, I think I'm becoming comfortable with it.

22         I don't -- you know, I think the Debtor

23  understandably overstated a little bit maybe what the

24  catastrophe of Chapter 11.  I don't think this Debtor would

25  stay in Chapter 7 but I think Chapter 11 might be able to work.

1          But I -- ultimately on balance I'm -- I can see again

2    based on these -- with these conditions that the Debtor's

3    proposing that the Debtor's might -- best interest might be

4    served by not being in bankruptcy.

5          I do think the Debtor was properly put into

6    bankruptcy.  I think the Debtor failed to sufficiently contest

7    involuntary petition.

8          And, again, whether because it couldn't or perhaps

9    out of misguided strategy, I realize there's a third set of

10   lawyers here who came in, you know, after the, you know, train

11   left the station.  And not an enviable position to be in.

12         And involuntaries are tricky.  And the way this one

13   kind of developed and the way the issues were tried was tricky

14   as well.

15         That said, again like I said just a second ago, I

16   think it's very significant that the Debtor has put down a

17   considerable amount of money here to get out of the case, or is

18   offering to; that they worked on discovery; that there's

19   credible testimony.

20         The Debtor has money to pay its, you know, debts that

21   they come due, and it has been doing so.  But -- and but it's

22   willing to protect the creditors who have come forward.

23         You know, we've been in bankruptcy for quite a while

24   now.  And the -- largely in the, you know, netherworld of

25   preorder for relief.

165

1          But still these are the creditors that have come

2   forward, and I am -- and I just -- and I don't think the

3   Debtor -- it doesn't seem to me that the Debtor's likely to,

4   you know, be stiffing a bunch of other creditors at this point.

5          If nothing else, that seems like it would be bad for

6   it as a going concern.  So -- anyway.  So that's kind of where

7   I stand at this point.

8          Let's set a hearing date to reset his for -- we

9   propose the 7th of October.  I need to -- I don't know if I

10  have all my calendars.  But we're looking at the 7th in the

11  afternoon.  Does that -- is that an irreconcilable conflict for

12  anybody?  Two o'clock central.

13          **MR. SPEAKER:**  Your Honor, I assume just the lawyers

14  would be present for that.

15          **THE COURT:**  Yeah.  And, yeah, and we will do it by

16  Zoom --

17          **MR. SPEAKER:**  Okay.

18          **THE COURT:**  -- so yeah, yes.

19          **MR. SPEAKER:**  That's terrific.

20          **MR. CONWAY:**  And, Your Honor, Michael Conway.

21          If for some reason we could do it at 3:00 o'clock,

22  I've got two 341s now scheduled for 2:00 o'clock eastern, so I

23  will likely be done.

24          But just to be safe, if there's any way we could

25  schedule it for 3:00 o'clock or for -- I guess you're saying

1   2:00 o'clock your time, which is 3:00 o'clock my time.

2          So, yeah, if you could do it 3:00 o'clock your time,

3   4:00 o'clock my time, I -- if not, I'm sure that Mr. Binford

4   could adequately represent our clients.

5          **THE COURT:**  Okay.  No, I think that's okay for us.

6   So 3:00 o'clock Central, okay.

7          So and good, okay.  And, yeah, the degree to which --

8   you know, obviously (inaudible) agreed by various parties would

9   be helpful.  And, yeah, if you can get to a number with the

10  Trustee, even better.

11         I mean, I'm willing to decide what's reasonable and

12  necessary, but you all probably do a better job.

13         So any other questions in advance of that?

14     **(No audible response.)**

15         Okay.  So I think in terms of a filing, I mean,

16  whatever you want to propose I think or wherever things stand,

17  it -- you know, obviously as far in advance if you can.  But

18  we'll review it, you know, that day.

19         **MR. BLOOM:**  Just to be clear, what I would propose to

20  do is to settle with Mr. Butler the terms of the escrow and

21  then settle with everyone the order.

22         The last time I circulated an order it became a point

23  of some contention.  But I promise I'll circulate it again just

24  as widely.  And --

25         **THE COURT:**  Okay.

1          **MR. BLOOM:**  -- it would be an order of dismissal or

2   granting the motion, but it would set forth all of the terms --

3          **THE COURT:**  Right.

4          **MR. BLOOM:**  -- that we discussed today.

5          **THE COURT:**  So in the terms of the escrow, I mean,

6   with respect to the other creditors, I think if you could -- if

7   you -- if they -- if the terms resemble the ones that

8   Collaborative Vision is getting, I think that'll be some

9   comfort.

10         And then certainly the Trustee and U.S. Trustee may

11   have feedback on that as well.

12         **THE COURT:**  Actually, Your Honor, I had the same

13   thought, that given the fact that the proof of claim amount for

14   Collaborative Vision already has interest and fees built in,

15   that Your Honor's ten percent suggestion might be applied only

16   to the other claims.

17         **THE COURT:**  Okay.

18         **MR. BLOOM:**  I mean, that --

19         **THE COURT:**  Yeah.

20         **MR. BLOOM:**  -- may be a way to do it.

21         **THE COURT:**  Yeah.  Okay.  Well, again, I realize that

22   that, you know, that buffer may not be necessary.  But it seems

23   like, you know, putting in a little extra, okay.

24         Anything else?

25         **MR. BLOOM:**  Not from us, Your Honor.  Thank you.

1          **THE COURT:**  Okay.

2          **MR. SPEAKER:**  Thank you, Your Honor, for hanging out

3    there and for your staff to stay late.  I really --

4          **THE COURT:**  Absolutely.  Well, no, it's the, you

5    know, courtroom security officer and the courtroom deputy and

6    the recording officer.  So, you know, yes, they're the heroes

7    here.

8          So, all right, thank you all very much.  I really

9    appreciate it.  It's great to meet you.

10          **THE CLERK:**  All rise.

11          **THE COURT:**  Great, so we're adjourned.

12      **(This proceeding was adjourned at 5:55 p.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **September 29, 2024**

        **Signed**                                                      **Dated**

*TONI HUDSON, TRANSCRIBER*